## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FRIENDS OF THE CAPITAL CRESCENT :
 TRAIL, :
 P.O. Box 5803 :
 Bethesda, MD 20824, :
  :
JOHN MACKNIGHT FITZGERALD, : Civil Case No  _____
 4502 Elm Street :
 Chevy Chase, MD 20815, :
  :
CHRISTINE REAL de AZUA, :
 4502 Elm Street :
 Chevy Chase, MD 20815, : **COMPLAINT FOR**
  : **INJUNCTIVE AND**
  Plaintiffs, : **DECLARATORY RELIEF**
  :
  v. :
  :
FEDERAL TRANSIT ADMINISTRATION :
 c/o Therese W. McMillian :
 Acting Administrator :
 1200 New Jersey Ave., S.E. :
 Washington, D.C.  20590, :
  :
DEPARTMENT OF TRANSPORTATION :
 c/o Anthony Foxx. Secretary :
 1200 New Jersey Ave., S.E. :
 Washington, D.C.  20590, :
  :
U.S. FISH AND WILDLIFE SERVICE, :
 c/o Daniel M. Ashe, Director :
 1849 C Street, N.W. :
 Washington, D.C.  20240, :
  :
DEPARTMENT OF THE INTERIOR, :
 c/o Sally Jewell, Secretary :
 1849 C Street, N.W. :
 Washington, D.C.  20240 :
  :
  Defendants. :

## COMPLAINT FOR
## INJUNCTIVE AND DECLARATORY RELIEF

Plaintiffs, Friends of the Capital Crescent Trail, John MacKnight Fitgerald and Christine Real de Azua, by and through their undersigned counsel, sue defendants and state as follows:

## NATURE OF THE ACTION

1.      Plaintiffs seek relief from violations of federal law in connection with Defendants' decision to approve federal assistance, which will facilitate and make possible the construction of a light rail transit system in an area of Montgomery County, just over the border of the District of Columbia known as "the Purple Line Project" or "Project".   The Project's construction and operation will have severe adverse direct and cumulative impacts on wildlife, biodiversity, the environment, and the aesthetic enjoyment of both Rock Creek Park – a national park in the heart of our nation's capital – and the Capital Crescent Trail – a popular hiking-biking trail that begins in Georgetown in Washington, D.C., includes the Georgetown Branch Trail between Bethesda and Silver Spring, and ends in Montgomery County, Maryland.   As alleged more fully below, in making the decision to go forward with this Project, the federal agencies ignored or failed to take a hard look at myriad adverse environmental impacts of the Project in violation of the National Environmental Policy Act ("NEPA") and in violation of the Endangered Species Act ("ESA"). Defendants failed to seriously scrutinize adverse impacts on two critically imperiled shrimp-like species called "amphipods" – one of which (Hay's spring amphipod) is already listed as endangered under the ESA and the other of which -- the Kenk's amphipod -- the Fish and Wildlife Service ("FWS") has determined also warrants listing as endangered. Defendants also failed to establish for the candidate Kenk's amphipod an effective monitoring system so as to list it promptly to prevent a significant risk to its well-being. Defendants also failed to prepare a Supplemental

Environmental Impact Statement ("EIS") as required by both NEPA and the Federal Aid Highway Act ("FHA") after being advised by the leading amphipod expert of the potential presence of the amphipod species in the area affected by the Project.  Defendants also failed to require and obtain a permit under the Migratory Bird Treaty Act ("MBTA") to protect migratory birds from the "taking," that is killing or injuring, of such birds by destroying nests that contain their eggs, and removing their opportunity for migration and reproduction in the area affected by the Project.  For example, the Project will be constructed extremely close to a colony of herons, which should have been protected under such permit through the MBTA. Defendants also failed to adequately consider alternatives that would avoid these grave impacts as required by both NEPA and the FHA. For all of these reasons, Defendants' actions are arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, within the meaning of § 706(2) of the Administrative Procedure Act ("APA"). Defendants also unlawfully withheld and delayed actions required by law within the meaning of § 706(1) of the APA.  Accordingly, Plaintiffs seek to have the Purple Line Project's federal approvals set aside, as well as to gain an order compelling Defendants to require appropriate corrective actions for the species and to the Project before any future federal approvals.

## JURISDICTION

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 16 U.S.C. § 1540.

## PARTIES

3.      Plaintiff Friends of the Capital Crescent Trail ("FCCT"), is a 501(c)(3) non-profit organization dedicated to preserving parkland, open space, and quality of life in Montgomery County, Maryland.  FCCT is an environmentally conscious group that advocates for transportation solutions that do not sacrifice invaluable regional resources such as the Capital Crescent Trail.  It

brings this case on its own behalf and on behalf of its Board members and supporters. FCCT's board members use the Capital Crescent Trail on a regular basis. They enjoy walking, running, biking, and observing wildlife in this unique setting – a serene, natural refuge just twenty minutes outside Washington, D.C. For example, Ajay Bhatt, FCCT's president, lives directly adjacent to the section of the Capital Crescent Trail (popularly known as the "Georgetown Branch Trail") that will be most affected by the Purple Line Project and uses the trail daily, taking walks with his dog and one-year-old son, and observing wildlife, such as woodpeckers and owls. FCCT has participated extensively in the public process of federal agency decisions concerning the Purple Line Project, submitting comments on the Draft EIS (under the organization's former names the "Greater Bethesda-Chevy Chase Coalition" and "Save the Trail") and Final EIS, along with a petition with over 5,000 signatures of the organization's supporters who oppose the current configuration of the Purple Line Project.

4.      As proposed, the Project will harm the interests of FTTC and its Board members and supporters in preserving the ecological integrity and tranquil, natural character of the Capital Crescent Trail. As proposed the Purple Line Project will entirely change the nature of the Capital Crescent Trail, adversely impacting the FCCT board members' experience on this trail and causing them aesthetic injury. The Purple Line Project's proximity to the trail, in conjunction with the commercial development projected to occur as a result of the Purple Line Project's construction, will completely alter the scenery surrounding the trail, stripping it of its current natural beauty. The clamor of the Project's construction and the resulting frequently running trains will shatter the tranquility FCCT board members enjoy in this natural haven. In addition, the destruction of the tree canopy along this trail will harm FCCT board members' interest in observing diverse wildlife, including woodpeckers and owls. Furthermore, Defendants' failure to comply with NEPA by

4

supplementing its environmental analysis of the Project in light of significant new information relevant to its environmental impacts and ensuring that this new analysis is made publicly available prior final to federal action concerning the Project, harms FTTC and its board members by depriving them of this evaluation, as well as the opportunity to submit comments that could influence federal agency decisions about Project.

5.    A Court Order vacating the Defendants' Project approvals will protect FTTC's interests and the interests of its Board members in the conservation and continued use and enjoyment of the Capital Crescent Trail in its current state. Requiring Defendants to prepare and make public a supplemental EIS would also provide FTTC and its board members with crucial information concerning the potential environmental ramifications of the Purple Line Project as currently planned and would afford FTTC and its board members the opportunity to participate in Defendants' decision-making process by submitting comments on important environmental and other issues that have been ignored or inadequately addressed in the Final EIS.

6.    Plaintiff Real de Azua is a self-employed energy and environment consultant. Her clients include the American Wind Wildlife Institute, which focuses on reducing and controlling the impact of wind energy generation on wildlife. Her work focuses on sustainability, biodiversity, and the accurate valuation of the natural environment and its ecosystem services. Ms. Real de Azua has also directed the Urban Forest Project, a project of the Society for Conservation Biology. The Urban Forest Project aims to find better ways to value and protect urban and suburban forests – like those surrounding the Capital Crescent and Georgetown Branch Trails – with an emphasis on how the loss of mature tree canopy and other productive natural green space in urban areas undermines the sustainability of the environment.

7.      Plaintiff Real de Azua has lived in Chevy Chase, Maryland since 1991, during which time she has been a regular user of the Capital Crescent and Georgetown Branch Trails. She uses these trails several times a week, and has a recreational, aesthetic, and professional interest in the trails as a whole.  In particular, she spends a lot of time in and around the Coquelin Run area of the trails, which starts at the foot of Elm Street Park and runs east-northeast until the trail intersects Rock Creek Park.  In tandem with her professional focus, she enjoys knowing that this trail supports the Kenk's amphipod and the Hay's spring amphipod so close to her home.  She has visited Rock Creek Park and the Coquelin Run to observe the areas hosting the seeps that these extremely rare creatures inhabit, including a visit with Dr. David Culver – the leading expert on these species.  Given the focus of Plaintiff Real de Azua's professional work, she greatly values the presence of two critically endangered species in an urban forest within walking distance to her home, and she intends to continue to visit their habitat on a regular basis in the future if it is not destroyed or degraded by the Project.  The knowledge that these rare and unique species may be in the immediate vicinity of her home has created a special and unique bond between Ms. Real de Azua and this particular geographic area, a bond that she feels most strongly when she is hiking in and around the species' known habitats.  This bond will be irreparably harmed if the Project proceeds in its present configuration.

8.      Plaintiff Real de Azua also enjoys walking and biking under the mature tree canopy along the Capital Crescent and Georgetown Branch Trails.  This tree canopy provides habitat for many bird species that she enjoys viewing, including Red-Tailed Hawks, Herons, Doves, Tufted Titmouse, and Towhees.

9.      As proposed, the Project will seriously impair Plaintiff Real de Azua's aesthetic, recreational, and occupational interests in the urban and suburban forests along the Capital

Crescent Trail, including her interests in the Kenk's spring amphipod, the Hay's amphipod, countless bird species, biodiversity, and maintaining a healthy mature tree canopy and restoring a healthy Coquelin Run and watershed.  As a result, she has participated in the NEPA process associated with the Project, including by coauthoring and submitting detailed comments on the "Final EIS" regarding its environmental impacts.  If the Purple Line Project is constructed as planned, Ms. Real de Azua will not be likely to continue to use the Capital Crescent Trail because of the drastic and environmentally adverse ways in which these areas will be forever changed.

10.    A Court Order vacating the Defendants' decision to approve the Purple Line Project will protect Plaintiff Real de Azua's environmental, aesthetic, recreational, and professional interests in the Capital Crescent and Georgetown Branch Trails.

11.    Plaintiff John Fitzgerald is a semi-retired public interest attorney and consultant. Mr. Fitzgerald's recent clients have included the Endangered Species Coalition and the Society for Conservation Biology.  His current work focuses on environmental conservation.  Prior to becoming a sole practitioner and consultant, Plaintiff Fitzgerald was a Legislative Aide for a Member of the Merchant Marine Committee of the U.S. House of Representatives -- when that Committee approved the 1982 amendments to the ESA.  After that Plaintiff Fitzgerald worked for Defenders of Wildlife for ten years in various positions including Director of Wildlife Law, where his work focused on biodiversity, endangered species, and wildlife in general. Mr. Fitzgerald helped to convene for several years the meetings in Washington of the Endangered Species Coalition, a national consortium of hundreds of organizations dedicated to the conservation of endangered species and strengthening enforcement of the ESA.  In the late fall of 1986 in a meeting with Bob Davison of the staff of the Senate Committee on Environment and Public Works he proposed and helped draft what became the 1988 amendment to Section 4(f) of the ESA requiring

site specific management actions, objective measureable criteria for delisting and estimates of the time and cost required to carry out those measures in order to eliminate excessive requests and provide practical guidance for the implementation of other sections of the ESA and other agencies' actions.   From early 2000 to September 2002 at the US Agency for International Development ("USAID").  Plaintiff Fitzgerald was the primary author of reviews by USAID of Environmental Impact Assessments of projects proposed by the World Bank and other multilateral development banks and represented USAID in the interagency review process that helped to determine whether the US could vote for such projects and which projects would be included in reports to Congress and the public concerning proposals likely to have significant effects upon the environment and indigenous peoples under the Pelosi Amendment, which Plaintiff Fitzgerald had helped to draft in 1987. In 2012, based on his accomplishments over many years of service to endangered species and biodiversity, Mr. Fitzgerald was awarded the Brock Evans Award for Endangered Species Protection.

**12.**    Plaintiff Fitzgerald has lived in Chevy Chase, Maryland since 1999, during which time he has been a regular user of the Capital Crescent and Georgetown Branch Trails.  When working in downtown Washington D.C., he used the trail from time to time for commuting and currently uses these trails once or twice a week and has a recreational and aesthetic interest in both. Plaintiff Fitzgerald uses the trails as a healthy way to run errands and as an escape from the urban noise and hassle of the city.  In particular, he spends considerable time in and around the Coquelin Run area of the trails.  Plaintiff Fitzgerald is particularly fond of this trail area because it is a corridor for biological diversity and is home to many nesting bird species.  He has seen in this area numerous species of birds, including owls, hawks and woodpeckers, as well as mammals such as chipmunks, rabbits and an occasional fox.  Plaintiff Fitzgerald enjoys biking and strolling on these

two peaceful and quiet trails under the relatively mature canopy while looking for and viewing these and other wildlife species.

13.     While working as an attorney at Defenders for Wildlife on endangered species issues, Plaintiff Fitzgerald inquired as to whether there were any endangered species in the greater Washington D.C. area.  He learned that the critically endangered Hay's spring amphipod lived in certain parts of Rock Creek Park, and  subsequently that the equally rare Kenk's amphipod also lives in seeps in ponds in Rock Creek Park and along  Coquelin Run.  As a result of his interest in these particular species, Plaintiff Fitzgerald has visited areas in Rock Creek Park and Coquelin Run to observe the seeps that these extremely rare creatures inhabit.  He has visited this area with Dr. David Culver searching for amphipod habitat.  He derives personal enjoyment from and very much values the presence of these two rare amphipod species and their habitats along the Capital Crescent and Georgetown Branch trails because they represent – within walking distance of his home – a tangible effect of his passionate and dedicated work on endangered species.  This has resulted in a very special and unique bond between Plaintiff Fitzgerald and this particular geographic area, which would be destroyed if the Purple Line Project is constructed in its present configuration.

14.     The proposed Purple Line Project will seriously and irreversibly impair Mr. Fitzgerald's aesthetic and recreational interests in the forests along the Capital Crescent and Georgetown Branch Trails, including his recreational and professional interests in the Kenk's spring amphipod, the Hay's amphipod, myriad bird species, biodiversity, the peaceful and quiet nature of the trails, maintaining a healthy mature tree canopy and restoring the quality of Coquelin Run and its watershed.  As a result, Plaintiff Fitzgerald participated in the NEPA process associated with the Project, including by coauthoring and submitting detailed comments on the Final EIS

regarding the Project's environmental impacts.  If the Purple Line Project is constructed as planned, Mr. Fitzgerald's use the Georgetown Branch Trail will be adversely impacted by degradation of the environment in a variety of ways.

15.     A court order vacating the Defendants' decision to approve the Project will protect Plaintiff Fitzgerald's environmental, aesthetic, and recreational interests in the Capital Crescent and Georgetown Branch Trails.

16.     Defendant McMillian is the Acting Administrator of the Federal Transit Administration ("FTA"), an agency within the Department of Transportation, and as such is responsible for issuing the federal approvals at issue here.

17.     Defendant Foxx is the Secretary of the Department of Transportation and therefore ultimately responsible for the decision at issue here.

18.     Defendant Ashe is the Director of the Fish and Wildlife Service ("FWS"), an agency within the Department of the Interior, and hence is responsible for the challenged violations of the ESA and for preventing or correcting violations of the MBTA detailed below.

19.     Defendant Jewell is the Secretary of the Department of the Interior and therefore ultimately responsible for the acts and omissions of the FWS detailed below.


## STATUTORY AND REGULATORY FRAMEWORK

### A.     The National Environmental Policy Act

20.     NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1. Section 101 (42 U.S.C. §4331) states that "it is the continuing responsibility of the Federal Government to use all practicable means... to the end that the Nation may ... (2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings..."

It was enacted to "help public officials make decisions that are based on understanding of environmental consequences, and to take actions that protect, restore, and enhance the environment," and to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." *Id.* § 1500.1(b)-(c).

21.     To accomplish these objectives, NEPA requires all agencies of the federal government to prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). This statement – known as an Environmental Impact Statement ("EIS") - must describe (1) the "environmental impact of the proposed action," (2) any "adverse environmental effects which cannot be avoided should the proposal be implemented," (3) "alternatives to the proposed action," and (4) "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332.  Subsection (c) also requires the action agency to consult with and obtain the comments of any Federal agency which as jurisdiction by law or special expertise with respect to any environmental impact involved, such as the Corps of Engineers regarding any dredge and fill permit.  NEPA's implementing regulations define "environmental effects" to include the "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health" aspects of a decision, "whether direct, indirect or cumulative." 40 C.F.R. § 1508.8. While "direct" effects are those "caused by the action and occur at the same time and place," "indirect effects" may include "growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." *Id.*

22.     NEPA's implementing regulations define "environmental effects" to include the "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health" aspects of a decision, "whether direct, indirect or cumulative." 40 C.F.R. § 1508.8. While "direct" effects are those "caused by the action and occur at the same time and place," "indirect effects" may include "growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." *Id.*

23.     In the EIS, the agency taking the proposed action must "rigorously explore and objectively evaluate" the effect of each alternative on the "human environment," which is defined as "the natural and physical environment and the relationship of people with that environment." *Id.* § 1508.14.

24.     Agencies must also make "diligent efforts to involve the public in preparing and implementing their NEPA procedures," including providing public notice and soliciting public comment. *Id.* § 1506.6.  Further, agencies "must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken," because "[a]ccurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." 40 C.F.R. § 1500.1(b).

25.     At the time of its decision to take a proposed action, the agency must prepare a concise public record of decision ("ROD") that identifies all reasonable alternatives and states "whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not." *Id.* § 1505.2.

26.     NEPA's implementing regulations further provide that if "[t]here are significant

new circumstances or information relevant to environmental concerns and bearing on the proposed

action or its impacts," the agency "[s]hall prepare" a supplement to its draft or final EIS. 40 C.F.R.

§ 1502.9(c)(1)(ii).

### B.    The Endangered Species Act

27.    Prompted by the "esthetic, ecological, educational, historical, recreational, and

scientific value" of the nation's species of wildlife and plants, Congress enacted the ESA to

"provide a means whereby the ecosystems upon which endangered species and threatened species

depend may be conserved." 16 U.S.C. §§ 1531(a)(3), 1531(b) (hereinafter cited also as Sections

of the Act, in which Section 1536, for example, is referred to as Section 7 of the Act). The ESA

defines "conservation" as the use of "all methods and procedures which are necessary to bring any

endangered species . . . to the point at which the measures provided [by the Act] are no longer

necessary" – that is, to recover species so that they no longer need ESA protection. *Id.* § 1532(3).

The ESA imposes obligations on the Secretary of the Interior that have been delegated to the

Director of the FWS. 50 C.F.R. § 402.01(b).

28.    An "endangered species" means "any species which is in danger or extinction

throughout all or a significant portion of its range," 16 U.S.C. § 1532(6) – i.e., the species is already

on the brink of extinction. Section 4(a)(1) directs the Secretary of Interior to determine whether

to list a species after considering four specific factors, the first of which is --

> "(A) the present of threatened destruction, modification, or
> curtailment of its habitat or range"

29.    As explained by the Supreme Court in the seminal ESA case, *Tennessee Valley*

*Authority v. Hill*, 437 U.S. 153, 177-78 (1978), which halted construction of a major public works

project to avoid jeopardizing a three-inch fish species called the snail darter, the statute was enacted

to guard against "the risk that might lie in the loss of *any* endangered species," because "[t]hey are

keys to puzzles which we cannot solve, and may provide answers to questions which we have not yet learned to ask." (Emphasis in original).  As the Court further explained, because such species may for example be "potential cures or cancer or other scourges, present or future," "[s]heer self-interest impels us to be cautious," and "[t]he "institutionalization of that caution lies at the heart" of the ESA. *Id.*

    **30.**    Once listed as "endangered," a species is entitled to a number of important protections.  For example, pursuant to Section 9 of the Act, it is illegal for anyone to "take" an endangered species, 16 U.S.C. § 1538(a)(1) – a term that is broadly defined to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." *Id.* § 1532(19).  In listing a species, the FWS and Secretary are generally required to designate habitat that is critical to the survival and recovery of the species in the wild. Critical habitat may include unoccupied habitat that is suitable for future recovery through natural re-colonization or agency-assisted translocation.  Not only may critical habitat not be destroyed, but it may not be *degraded* by any federally funded or permitted action.  Section 4(b)(1)(A) of the ESA provides that the Secretary shall make determinations in listing species (and designating critical habitat and providing recovery plans as generally required in the ESA) based "solely on the best available scientific and commercial data."  Section 4(b)(1(B) provides further that in fulfilling the listing and concomitant duties, "The Secretary shall give consideration to species which have been ... identified as in danger of extinction, or likely to become so within the foreseeable future, by any State agency... that is responsible for the conservation of fish or wildlife or plants." Sections 4(f) and (h)(4) require the Secretary to develop and implement recovery plans unless he finds that such a plan will not promote the conservation of the species. Section 4(f)(1) requires that the Secretary give priority in developing and implementing recovery plans

particularly to "those species that are, or may be, in conflict with construction of other development projects...."

31.     Pursuant to Section 7 of the ESA, each federal agency must "utilize [its] authorities in furtherance of the purposes" of the ESA, 16 U.S.C. § 1536(a)(1), and "shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency…is not likely to jeopardize the continued existence of any endangered species." *Id.* § 1536(a)(2).   In fulfilling these requirements, "each agency shall use the best scientific and commercial data available." *Id.*

32.     To ensure the fulfillment of the Section 7 mandate, Congress, along with the federal officials charged with implementing the ESA, have established a detailed "consultation process" that must be followed by federal agencies whose actions "may affect" an endangered species. 502 C.F.R. Part 402.   Pursuant to this process, "[e]ach Federal agency shall review its actions at the earliest possible time to determine whether any action *may affect* listed species." 50 C.F.R. § 402.14(a).   If such a determination is made, the agency must, prior to making any final decision, enter into "formal consultation" with the FWS, by requesting that the FWS issue a "biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species." *Id.* § 402.14(g)(4).

33.     The FWS's own Handbook defines the "may affect" determination that triggers the formal consultation requirement under Section 7 as "the appropriate conclusion when a proposed action may pose *any* effect on listed species," and further stated that a "may affect" determination is required when any "*possible effect*, whether beneficial, benign, adverse, or of an undetermined character" occurs.   U.S. Fish and Wildlife Service and National Marine Fisheries Service 1998 Endangered Species Consultation Handbook: Procedures for Conducting Consultation and

Conference Activities Under Section 7 of the Endangered Species Act.   Further, in determining whether any such effects may occur, the FWS and action agency must consider not only "direct" effects of the action, but also the "indirect effects," which are defined as those that are "caused by the proposed action later in time, but still are reasonably certain to occur."  50 C.F.R. § 402.02. With regard to accessing the best available scientific data that may not have been considered initially, the Consultation Handbook states in part 1- (page) 6 as follows (emphasis added):

> The Act requires the action agency to provide the best scientific and commercial data available concerning the impact of the proposed project on listed species or designated critical habitat. **If relevant data are known to be available to the agency or will be available as the result of ongoing or imminent studies, the Services should request those data and any other analyses required by the regulations at 50 CFR §402.14(c), or suggest that consultation be postponed until those data or analyses are available as outlined in section 4.4(A) of this handbook.**

34.    When the FWS concludes that agency action will result in incidental "taking" of a listed species that does not rise to the level of jeopardy to the entire species, the FWS must issue a statement as part of a biological opinion that specifies the impact of the incidental take and sets forth the terms and conditions with which the agency must comply to avoid further damage to the species.  Section 7(b)(4) of the ESA.  As part of that "incidental take statement" the FWS "shall provide the Federal agency . . . with a written statement that . . . specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize [the] impact" on the species. *Id.*

35.    Section 7(d) of the ESA prohibits "any irreversible or irretrievable commitment of resources" to a project before it has completed the Section 7 consultation process and the FWS has had an opportunity to determine whether, and the conditions under which, a project impacting a listed species should be permitted to proceed, because the commitment of resources would have

"the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures" the agency should consider.  16 U.S.C. § 1536(d).

36.     Section 7 of the ESA also provides that "[e]ach Federal agency shall *confer* with the Secretary on any agency action which is likely to jeopardize the continued existence of any species *proposed* to be listed" under the Act.  As part of this conference, the FWS may assist the agency action in determining effects and advise the action agency on ways to avoid or minimize adverse effects to proposed species (or candidate species if present).  *See* FWS Handbook, *supra*, at 6-1.  A "candidate species" is one for which the FWS has "sufficient information of biological vulnerability and threat(s) to support issuance of a proposal to list, but issuance of a proposed rule is currently precluded by higher priority listing actions."  *Id.* at xi.  Following the conference with the action agency, the FWS issues a conference report containing recommendations for reducing adverse effects.  *Id.* at 6-1.

37.     In addition, Section 4 of the ESA provides that the FWS "shall implement a system to monitor effectively the status of all species" that have been determined to "warrant" listing under the statute, but for which immediate listing is "precluded" by other pending listing proposals under the Act to "prevent a significant risk to the well being of any such species," while it awaits a final listing decision.  16 U.S.C. § 1533(b)(3)(C)(iii).  In addition, the Service must "make prompt use of its [emergency listing authority] to prevent a significant risk to the well being of any such species."  *Id.*

### C.     The Federal-Aid Highway Act

38.     The Federal-Aid Highway Act ("FHA"), 23 U.S.C. §§ 101 *et seq*., was enacted to fulfill the national interest in the construction of federal-aid highway systems.  Under the statute, "the National Highway System" consists of the highway routes and connections to transportation

facilities that "serve national population centers...public transportation facilities and other intermodal transportation facilities," etc. *Id.* § 103(b). It provides for federal assistance to states in constructing components of the national system. *Id.* §§ 104, 106(b). The statute is administered with respect to transit programs by the Administrator of the FTA.

39.     Pursuant to the statute, "each State transportation department shall submit to the Secretary for approval such plans, specifications, and estimates for each proposed project as the Secretary may require." *Id.* § 106(a)(1).

40.     The statute further provides that it is declared national policy "that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites." 23 U.S.C. § 138(a). This Section, in subparagraph (b) and (c) further directs the Secretary of Transportation to take strong measures to avoid harming parks or areas that function like parks, such as refuges.

41.     The duty of FTA to complete an EIS and to review and respond to comments on it arises under NEPA Section 102 and also under FHA Section 4(f) as set forth above and must be completed before the FTA decides to offer matching funds for any transit project.

42.     The FHA further provides that "[t]he Secretary shall consider new information received after the close of a comment period if the information satisfies the requirements for a supplemental environmental impact statement" pursuant to FTA regulations. *Id.* § 139(l)(2). Those regulations provide that "[a]n EIS shall be supplemented whenever the Administration determines that . . . new information or circumstances relevant to environmental concerns and bearing on the proposed action or its impacts would result in significant environmental impacts not evaluated in the EIS." 23 C.F.R. § 770.130.

### D.    The Migratory Bird Treaty Act

43.    The United States has entered into several Conventions to protect migratory birds. In particular, Congress enacted the Migratory Bird Treaty Act ("MBTA") in 1918 for the purpose of "execut[ing] the [Conventions] to make [them] effective and enforceable by the courts." H.R. Rep. No. 243, 65th Cong., 2d Sess. At 1(1918).   Congress intended the MBTA to provide a comprehensive, uniform system for the protection of both game birds and other bird species from all forms of unauthorized destruction.

44.    The MBTA provides that, except as permitted by regulations issued by the Secretary of the Interior, "it shall be unlawful at any time, by any means or in any manner, to…take, capture, [or] kill…any migratory bird…included in the terms of the conventions." 16 U.S.C. § 703.

45.    The Secretary of the Interior has promulgated regulations that require all persons, including federal agencies, to "obtain a valid permit before commencing an activity" that will take, capture or kill any birds protected by the MBTA.  50 C.F.R. §§ 13.1; 21.11.

46.    The FWS has issued clarifying guidance that "while destruction of a nest by itself is not prohibited under the MBTA, nest destruction that results in unpermitted take of migratory birds or their eggs, is illegal and fully prosecutable under the MBTA."   According to this FWS guidance, destruction of certain species nests "entails an elevated degree of risk of violating the MBTA.  For example, colonial nesting birds are highly vulnerable to disturbance; the destruction of unoccupied nests during or near the nesting season could result in a significant level of take. (April 15, 2003 Migratory Bird Permit Memorandum.)

## FACTS GIVING RISE TO PLAINTIFFS' CLAIMS FOR RELIEF

### A.    Endangered Amphipods of Rock Creek Park and Vicinity

**47.**    The Hay's Spring amphipod (*Stygobromus hayi*) is a small (5-10 millimeters in length), shrimp-like crustacean that lives in shallow interstitial habitats primarily near groundwater seeps and springs.  The amphipod spends most of its life in voids among rock, gravel and the leaf-litter near these springs and seeps – places where water oozes from the ground to form a pool – feeding off biological detritus-dead leaves and insects.  Since 1982, this amphipod has been federally listed as an endangered species.

**48.**    Like many underground species, the Hay's amphipod is blind and colorless, and is extremely vulnerable to human activities.  When it was first listed as an endangered species, the entire world population was thought to have been reduced to a single, one-meter-wide spring inside the Smithsonian National Zoological Park.  Since then, four additional springs and seeps inside Rock Creek Park in Washington D.C. have been confirmed to be occupied by the amphipod, and three additional locations in the Park are probable sites for the species.

**49.**    The amphipod is a food source for other species that inhabit Rock Creek Park, including dragonflies, salamanders, and fish.

**50.**    According to the FWS when it listed the amphipod over 30 years ago, "[t]he extremely small size of [the] habitat makes the species *exceptionally vulnerable to construction activities*," which, "if not carefully carried out, *could adversely affect or eliminate the spring habitat*" of the species."  47 Fed. Reg. at 5425-26 (Feb. 15, 1982) (emphasis added).  Further, the habitat is so small "that careless movement of equipment slightly onto the hillside from which the spring flows *could have a catastrophic effect on the habitat*." *Id.* (emphasis added). Despite recommendations in the Service's two most recent five-year status assessments for the Hay's that

the Service develop and implement recovery plans, the FWS has failed to do so.  The Center for Biological Diversity recently filed an APA petition challenging that failure.

51.     Similar to Hay's spring amphipod, the Kenk's amphipod (*Stygobromus kenki*) is slightly smaller (up to 6 millimeters in length).  It also inhabits groundwater, seeps, and springs in and around Rock Creek Park and connected areas in Maryland, and its life history is very similar to the Hay's spring amphipod in that it spends most of its life in underground/interstitial habitats close to springs and seeps, feeding on biological detritus.

52.     The Kenk's amphipod is currently known to occur in five locations – four in Rock Creek Park and one along Coquelin Run, a tributary to Rock Creek within Montgomery County.

53.     Like the Hay's spring amphipod, the Kenk's amphipod is also a food source for species such as dragonflies, salamanders, and fish.

54.     While the Hay's spring amphipod may be slightly more common than it was thought to be when first protected under the ESA, it now appears that the Kenk's amphipod is actually the rarer and more endangered of the two species.

55.     The Kenk's amphipod was first petitioned for listing and protection under the ESA in 2007, and became a formal candidate species in 2010.  Pursuant to a court-ordered settlement, the FWS is committed to reviewing the Kenk's amphipod in fiscal year 2016 for potential listing under the ESA and making a final determination by the end of fiscal year 2017.

56.     Many types of human activities have already degraded and continue to degrade amphipod habitat, including, as found by the FWS, "intensive recreational use adjacent to the springs in Rock Creek Park" and adjacent areas in Maryland, which "increases the potential for pollution of the springs, and intensive development and associated increases in impermeable

surfaces, which may decrease water quality and quantity in the springs." FWS 2013 Hay's Spring amphipod 5-year Review: Summary and Evaluation.

57.     Loss of forest cover and intact forest canopy alters and reduces forest leaf-litter, which in turn reduces food availability for the amphipods and increases surface temperatures. Increasing impervious paved areas due to additional development alters the hydrology of the shallow-water seeps and springs, potentially putting the entire spring ecosystem in which the amphipods dwell at risk due to increased flooding and runoff.

58.     Amphipod species are very difficult to study and monitor because of their small size and because they live most of their lives underground in interstitial groundwater. As a result, little is known about the natural history of these species, and they are difficult to find even when they are present in a particular habitat.

59.     In general, amphipods in the genus Stygobromus tend to occur in caves or areas where there are permanent groundwater habitats that contain low levels of organic matter such as decomposing leaf litter and dead insects, on which they feed.   More recent amphipod research suggests that the amphipod may also be able to live in a few other valley floor habitats within Rock Creek Park that have shallow subsurface groundwater, and are high in organic matter, to the point of even being seasonally dry. These "hypotelminorheic" habitats occur when groundwater seeps to the surface from underlying bedrock to flow up through sediments and vegetative litter.

60.     The Hay's Spring amphipod can be found in both the hyporheic (water that leaks below streams) and hypotelminorheic (shallow soil layer within superficial rock layers) zones. Both of these habitats exist in and adjacent to Rock Creek, but the hypotelminorheic zone periodically dries out near the surface, particularly in the spring and summer months, making sampling difficult during those periods.

61.     The most successful sampling technique for amphipods cannot be used in areas with high amounts of fine sediment, making detection more difficult. A 2004 study on amphipods in Rock Creek Park demonstrated the relative success rate in detecting amphipods by seasons, showing that amphipods could be found in springs at some months of the year even when none were detected just a few months prior.

62.     Given the inherent difficulties in locating the amphipods, the inability to actually find Hay's or Kenk's amphipods in the vicinity of Rock Creek on any given day does not indicate that they are not there, particularly when this area is known to include their extremely limited and specialized habitat.

## B.     Adverse Environmental Impacts of the Purple Line Project

63.     The proposed Purple Line Project is a major transportation infrastructure project that will consist of a 16.2-mile east-west, above-ground double track rail system traversing parks, streams, forested areas and other open spaces between the Bethesda Metrorail station in Montgomery County and the New Carrollton Metrorail/MARC/Amtrak station in Prince George's County. The Purple Line "Preferred Alternative," as adopted in the ROD for the project, includes two sets of train tracks, their overhead power lines and adjacent power stations and almost a mile of new culverts. The project would divert water from the area, and traverse parks, streams, forested areas and other open spaces, and in particular, would impact Rock Creek National and regional Parks where it would cross Rock Creek in Montgomery County. Along the Capital Crescent Trail, which it would replace, the Project includes a new, moved, deforested and paved and walled Trail.

64.     According to the FTA, the purpose of the Purple Line Project is to "[p]rovide faster, more direct and more reliable east-west transit service connecting the major activities in the Purple Line corridor at Bethesda, Silver Spring, Takoma/Langley Park, College Park, and New

Carrollton; [p]rovide better connections to Metrorail services located in the corridor; and "[i]mprove connectivity to the communities in the corridor located between the Metrorail lines." ROD (March 2014) at 3.

65.     On October 17, 2008, the FTA and the Maryland Transit Administration ("MTA") made available for public comment the Project's Draft EIS.

66.     Four years later, the FTA had not issued a final EIS. In August 2012, MTA prepared a purported reevaluation of the Project, but both the MTA and FTA determined at that time that a supplemental Draft EIS was not required.

67.     On August 28, 2013, FTA and MTA made available to the public a Final EIS and provided the public with a sixty-day comment period.

68.     Plaintiffs FCCT, Mr. Fitzgerald and Ms. Real de Azua, among many others, submitted extensive comments on the Project. FCCT asserted that the selection of the Preferred Alternative was outcome-driven and failed to "rigorously explore" alternatives as required by NEPA's implementing regulations, including (a) employing a bus rapid transit system ("BRT") and (b) an alternate route to avoid the most sensitive ecologically sensitive areas, such as those adjacent to Coquelin Run, where amphipods are known to exist and where they are believed likely to exist, or which they might inhabit in the future as the result of a recovery program. FCCT commented, for example, that an alternative route further north that would have terminated at the NIH facility in Bethesda was not considered. FCCT also commented that the Final EIS had failed to adequately consider the adverse impacts of the Preferred Alternative with respect to the Project's impacts on increased noise in the neighborhoods affected by the Project, on enjoyment of the Capital Crescent Trail, on impairment of visual resources, on adverse impacts on public health, and on parks, recreational land and open spaces in the areas affected by the Project. FCCT also

specifically commented on the dearth of information in the Final EIS regarding impacts of the Project on wildlife and wetlands.

69.    Mr. Fitzgerald and Ms. Real de Azua commented that the Final EIS was seriously flawed because it failed to disclose the presence of "highly endangered" amphipods, including those "downstream in Rock Creek Park." They further commented that the Final EIS understates and fails to adequately address the extent and cost of the loss of tree canopy and natural green space that will result from the Project, which now serve to reduce stormwater runoff, reduce air and water pollution, provide shade, reduce noise, provide wind buffering, and provide wildlife habitat, among other environmental services. They further asserted that the above-ground option for the Purple Line would result in degradation of public parks, in violation of the FHA, and specifically questioned the assertions of the FTA that all of the impacts on and harmful "uses of " Parks and park-like areas, which the FHA seeks to avoid, along and beyond the Purple Line right of way were adequately assessed, compared with alternatives, and whether as asserted they were indeed in actual compliance with Section 4(f) of the FHA.

70.    These impacts, inadequately assessed and inadequately considered for purposes of NEPA, the ESA and FHA include but are not limited to storm water run off and sewerage overflows into a system that no longer complies with the Clean Water Act, 33 U.S.C. §1251 et seq. (1972), or the existing Montgomery County standards thereunder (found to be inadequate by a Maryland Court in late 2013 in Anacostia Riverkeeper v. Md. Dept. of Environment, et. al.). Montgomery County officials are now informing concerned citizens that the Purple Line Project leaders are refusing to comply with Montgomery County storm-water regulations and that it is too early to tell what the effective increase in stormwater will be as it is too early in the design stage to tell --

From Robert Hoyt Montgomery County Director of Environmental Protection, July 30, 2014 to Mr. Rolf Sinclair of Chevy Chase by email --

Dear Mr. Sinclair:

Thank you for your June 9, 2014, email regarding the Purple Line. The Department of Environmental Protection (DEP) has been working closely with the Maryland Transit Administration (MTA) to assure that the MTA is providing adequate stormwater treatment to prevent any increase in stormwater flow in areas of the County where potential flooding is a problem. We have made the MTA aware of your (and other citizens) concerns and have been assured that the Purple Line will not increase stormwater flows. **At this point in the design, it is too early to evaluate what potential impacts to stormwater flows will be.** (emphasis added)

**I would encourage you to voice your concerns directly to the MTA, letting them know that you think the Purple Line in Montgomery County should comply with Montgomery County stormwater requirements regardless of whether or not it is a state project, and that 100 percent of the stormwater treatment should be in the Purple Line right-of-way, where impervious area is being added rather than off-site. Since the Purple Line is a state project, the MTA is required to follow state standards, which are less restrictive than the County stormwater requirements. The MTA is also proposing to treat over half the stormwater volume off-site because they say they cannot locate the treatment facilities within the right-of-way due to physical and other constraints. Both of these situations could increase the risk of future problems.** (emphasis added).

If you have any further questions or concerns, please contact me or Steven Shofar at
steven.shofar@montgomerycountymd.gov.

Sincerely,

Robert G. Hoyt, Director
Department of Environmental Protection

cc: Steven Shofar

71.     In light of the foregoing, the overall impact has not been and could not have been properly assessed.   These impacts include hazardous substances about to be unearthed by construction and washed downstream into Park areas and potentially lifted by high waters to contaminate amphipod seeps. The FEIS attempted in a few cases, but failed in most, to accurately describe these limits, or how the Project would conform to them. For example, a local physicist noted that the FTA altered the distance at which it took sound readings from the track in park areas, moving well beyond areas most highly used by visitors, in order to reduce the decibel levels recorded.  The Project promoters also persuaded the County to alter the zoning designation of Elm Street Park, and rename it the "South Bethesda Purple Line Station" in a special amendment to the County zoning ordinance.   The FTA simply disregarded the massive effects on Rock Creek Regional Park both within and beyond the right of way, and dismissed the effects on fish and wildlife, and aquatic invertebrates in particular, in Rock Creek.

72.     Mr. Fitzgerald and Ms. Real de Azua also included in their comments on that the FTA's Final EIS inadequately addressed adverse impacts on migratory birds, including, but not limited to prohibited "takes" that can occur as a result of birds alighting on the un-insulated live wires used to supply electricity to the rail trains used in the Project.

73.     Thus the EIS inadequately and potentially misleadingly assessed the cumulative effect of the Project upon the water and groundwater quality and quantity.  This results in citizens, Towns, the County and other Federal and State agencies being unable to comment and rely upon the EIS in doing their jobs as required under Section 102(C) of NEPA.  For example, the Army Corps of Engineers will need to assess again the new information provided by the plaintiffs in order to fulfill its duties under NEPA, ESA, the Fish and Wildlife Coordination Act (16 U.S.C. 661-667e), and the Clean Water Act, 33 U.S.C. §1251 *et seq.*, including but not limited to the

Clean Water Act Section 404, when the Project leaders request a permit from the Corps, as the EIS noted that they would need to do, for the construction of two new bridges over Rock Creek. The dredge and fill permit is also likely to include the footings at Rock Creek for both the Purple Line and Trail bridges as well as bike ramps down the very embankments that host what may be the highest quality seeps mapped in April by Dr. Culver.

74.     On January 7, 2014, a FWS official sent FTA an "updated endangered species review" for the Project.  That letter stated that "no federally proposed or listed endangered or threatened species are known to exist within the impact area of the propose Purple Line Project, and that it remains our conclusion that the Project will have no effect on Hay's Spring Amphipod." Acknowledging that "[a] second rare amphipod species, Kenk's amphipod . . . does occur within a quarter mile of the Purple Line project," the FWS further stated that the "ground and surface water draining from the area where the Purple line is to be constructed is expected to have no effect on this spring site or Kenk's amphipod."

75.     Because the FWS provided FTA with a letter stating that the Project would have "no effect" on either the Hay's Spring or Kenk's amphipod, FTA did not engage in formal consultation with the FWS, nor comply with its conference obligations for candidate species pursuant to Section 7 of the ESA.


76.     On March 19, 2014, FTA issued its Record of Decision ("ROD") regarding its decision to go forward with the Purple Line Project.  The ROD states that "FTA and MTA have consulted with the US Fish and Wildlife Service and Maryland Department of Natural Resources under Section 7 of the Endangered Species Act to determine the presence of state or federally protected species within the project corridor," and particularly had inquired about potential impacts

on the Hay's Spring and Kenk's Amphipod, and that "the US Fish and Wildlife Service...has determined that the Project will have no impact on protected species."

77. FTA's Final EIS and ROD ignored or only cursorily considered the following environmental impacts that may occur as a result of the Project:

- impacts on the critically imperiled Hay's Spring and Kenk's Amphipods;

- adverse impacts on forest interior dwelling species as a result of the break in the forest canopy that will be caused by the Project;

- adverse impacts on the heron colony near Coquelin Run, and possible "take" of other migratory birds as a result of nest destruction and the exposure to live wires used in the light rail system;

- adverse impacts to wetlands, the flowing waters of Rock Creek and Coquelin Run and the wildlife, including another amphipod, stygobromus sextarius, near Rock Creek between the trestle and the District line listed by Maryland as endangered, the water quantity and quality and the implications of that for the Army Corps of Engineers and Montgomery County *vis a vis* the Clean Water Act, and Fish and Wildlife Coordination Act with regard to the Corps;

- noise impacts on users of the Capital Crescent Trail, parks and the neighborhoods adjacent to the Project;.

- overall adverse impacts to the ecology and visitor use and enjoyment of Rock Creek, the Capital Crescent Trail, and surrounding areas;

- adverse impacts on public health; and

- indirect adverse environmental impacts generated by the Project, including those from the foreseeable development triggered by the Project.

78. FTA also failed to adequately assess and describe the needs or objectives to be met by the Preferred Alternative and its associated parts, including critical elements such as ridership, traffic displacement, and fare collection estimates that are at the heart of both the NEPA process and the process by which the FTA evaluates applications for matching federal funds. The ridership

estimates and the overall benefit - cost ratio of the Purple Line have recently come under closer scrutiny. The Wall Street Journal reported on questionably large changes in those numbers. The validity of those estimates is crucial to the reliability of the NEPA assessment of the Preferred Alternative and other alternatives within a similar or lesser price range. The FTA also failed to properly evaluate high-risk junctions in the to-be-rerouted Capital Crescent Trail.

79.    In contrast to the finality of the Final EIS, the Project is still being re-designed, with material changes from mid-2013 into August of 2014, obviating such claimed finality. These changes include –

   a.  re-routing the Trail out of the safe tunnel under Wisconsin Avenue to a ramp down into the area of Elm Street Park now used daily by toddlers from day care centers;

   b.  re-routing the Trail through the Park and over Wisconsin Avenue, and down some of the narrowest streets in downtown Bethesda;

   c.  foregoing a trestle that was to be built over another major intersection at Jones Bridge Road and then "reconsidering that change" without a decision; and

   d.  portraying and promising but failing to secure rights to property sufficient to ensure as safe, and direct path as described, for example, into Silver Spring, as negotiations on acquiring that route and other properties continue to this day as far as the plaintiffs know.

80.    But for the Project, the Trail could be completed by the County without these risks and with negligible environmental impact at a very small percentage of the cost of construction and maintenance of the Purple Line. These practical but changing differences are among the most direct effects on the human environment that will be experienced and understood by people in and

around and using the rerouted Trail.  They will alter human behavior and should have been fully
and fairly assessed in a Final EIS revision and made available for public comment.

81.     The FTA also failed to adequately consider alternatives, including, but not limited
to employing a bus rapid transit system using existing roads or such a "BRT" in conjunction with
other improvements in local transit and movement options.  These were the most cost-effective
options according to Samuel Schwartz, the transportation analyst who assisted the Town of Chevy
Chase with its comments during the EIS process.  Such comparative assessments are at the heart
of the EIS and Biological Opinion processes, and the data for them should have been assembled
and properly evaluated.

82.     A comparative assessment was especially needed in this case because assessment
of alternatives was sorely lacking in detail in the draft EIS and on account of the many changes in
the design and context of the Project between 2008 and 2012.  Some of the more recent changes
are material to compliance with the legal requirements enumerated above, due to increased
construction in at least one Park and across at least two major thoroughfares at grade level, leading
to a much more dangerous combination.  Recent articles in the Washington Post and recent
conversations between Members of the Board of the FCCT and project bidders indicate that many
more design changes, as many as 70% of the total design, are yet to come, based on interviews
with officials.

83.     These omissions and deficiencies in turn cast increased doubt on the estimated costs
and benefits -- from ridership on the Project to the effects on existing commuting methods from
bikes and buses to Metro and cars. The Defendants' estimates were brought under serious scrutiny
in a June 27, 2014 article in the Wall Street Journal. The article reported that the firm Parsons
Brinkerhoff was retained by the new O'Malley Administration and revised the 2007 estimates that

did not qualify for FTA funding using a proprietary formula that resulted in much higher ridership numbers in 2008 that would qualify. The article went on to note that the official in charge of that process is now working for Parsons Brinkerhoff, which only recently released its data, but not the program to interpret it, to the Town of Chevy Chase. The reliability of all of these elements and the EIS as a whole is further strained in light of the increasing degree to which control of the design, construction and operation of the Project is being delegated to an as yet un-chosen private firm or consortium.

84.     Despite the fact that (a) there is a significant heron colony near Coquelin Run – an area that will be severely impacted by the Project, (b) the Project will invariably involve the destruction of nests of various bird species that use the trees that will be cut down as a result of the Project, and (c) that migratory birds will likely be electrocuted when they alight on the live electric wires that will be used for the light rail system – the FTA has not applied for, nor has the FWS required it to obtain, a permit to "take" migratory birds, as required by the MBTA.

### C.     Plaintiffs Formal ESA Notice Letter and Dr. Culver's Expert Report

85.     By letter dated June 25, 2014 to Defendants Jewell, Ashe, FTA officials, and the Secretary of Transportation, Plaintiffs FCCT, John Fitzgerald, Christine Real de Azua and others provided notice to FTA of its violations of the ESA in connection with the Purple Line Project ("Notice Letter").  In particular, the Notice Letter called into question the FWS's "no effect" determination with respect to both the Hay's Spring and Kenk's amphipods –a determination upon which FTA apparently relied in failing to conduct any consultation or conference normally required by Section 7 of the ESA with respect to listed and candidate species by virtue of the duty to monitor and then to emergency-list candidates at risk. The Notice Letter asserts that the "no effect" determination failed to take into consideration any but the most immediate and direct

impacts of Purple Line construction on the existing populations of Hay's or Kenk's amphipods. The Notice Letter asserts that Defendants (a) failed entirely to consider cumulative and indirect impacts of the Purple line and development linked to and indeed intended to be precipitated by it, and (b) also failed to consider the impact upon the recovery of those species, which will require additional seeps beyond those already known to be inhabited, such as those discovered more recently by Dr. Culver. The Notice Letter asserts that had Defendants included those additional impacts, defendants could not have properly reached a no-effect conclusion. The proper result would have been the halting of further commitment of resources to the Project and completion of a biological assessment of the direct, indirect and cumulative impacts of the proposal and reasonable and prudent alternatives to it. In particular, "new research conducted by Dr. Culver, detailed in the Notice Letter, calls into serious question the FWS's "no effect" conclusion, and, at the very least, warrants further scrutiny by the Service before irreversible damage is done to the habitat of these two highly imperiled species. That scrutiny properly and lawfully comes in the form of a Biological Assessment and Opinion by the FTA and FWS, respectively, typically done in conjunction with a Supplemental EIS in a situation such as this.

86.    The FWS has also failed to comply with its mandatory duty in Section 4(b)(3)(C)(iii) of the ESA to effectively monitor the federal candidate species, Kenk's amphipod (Stygobromus kenki), in order to "prevent a significant risk to the well being" by failing to consider the potential impacts of the Project on this critically endangered candidate species.

87.    The Notice letter also noted Defendants' failure to comply with Section 4(b)(3)(C)(iii) of the ESA, requiring the Secretary and FWS to effectively monitor, and as necessary, list the Kenk's. Such listing, as noted above, with very limited exceptions then provides the benefits of listing, including a recovery plan, critical habitat designation and consultation.

33

88.     The Notice Letter attached and incorporated Dr. Culver's expert report on the endangered amphipods.  Dr. Culver explained that he is an expert in the study of the biology of subterranean animals and their habitats, including "seepage springs where Hay's and Kenk's spring amphipods are found."  He further explained that both species "are rare, being limited to the Rock Creek basin," and that "[w]hile these species have no direct economic value, their habitat . . . makes them indicators of the overall health of the ecosystem, especially the forest riparian community."   Thus, Dr. Culver warned that "*[s]uccessful management of these species,* precariously positioned to suffer the impacts of many environmental insults to the Rock Creek basin, is *paramount to the health of the ecosystem, including water quality.*"  (emphasis added).

89.     Dr. Culver further explained that in April 2014, he and his associate looked for the seepage habitats that would indicate the presence of the Hay's Spring and Kenk's amphipods in the "area directly adjoining the proposed purple line," and "riparian downstream sections of Coquelin Run and Rock Creek that potentially could be impacted by contamination of the waterways as a result of activities associated with purple line construction and associated development."   He reported locating a total of nine seepage springs that provide likely habitat for rare amphipods, including a cluster of seepage sites that "[d]ue to its location, [] is at *high risk from activities that will accompany construction of the purple line.*"  (emphasis added). Acknowledging that, due to the time of year the survey was done, "[a]t present it is unknown whether there are any [amphipod] populations in these seeps," Dr. Culver advised that because the habitat used by the species is certainly present, "all of the sites should be checked again" for such populations during the winter, when the amphipods tend to emerge from underground "into twilight habitats to obtain food."

90.     Relying on Dr. Culver's new information about the amphipods' habitat, its close

proximity to the Purple Line Project, the "high risk" of adverse impacts on the species' habitat from the Project, and the importance of surveying the relevant seepage sites during the winter months when the amphipods would likely emerge from underground, Plaintiffs advised FTA in their comments on the EIS and in the Notice Letter that the FTA would be in violation of 7 of the ESA and NEPA if FTA were to move forward with the Project without conducting formal consultation and without preparing a supplemental EIS.  Plaintiffs also put the FWS on notice that, in light of the new information from Dr. Culver, that agency would also be in violation of its duty under section 4 of the ESA "to effectively monitor" and take emergency action to list the Kenk's amphipod "in order to 'prevent a significant risk to the well being'" of the species "by failing to consider the potential impacts of the Project on this critically endangered candidate species." *Id.* (quoting 16 U.S.C. § 1533(b)(3)(C)(iii)).  On August 25th, plaintiffs obtained a copy of a memorandum of August 19th from Daniel Feller, Western Regional Ecologist to Gregory Benz, Project Manager for the Maryland Department of Natural Resources assessing Dr. Culver's Preliminary Reports.  The memo notes that Feller is planning to survey this area and others again in early 2015 in preparation for the expected proposal by the FWS to list the Kenk's as endangered and that Feller had not been aware of at least four of the seeps found by Dr. Culver close to the Purple Line's pathway.  Feller also confirmed that "washout has been determined to be a high cause of mortality for Stygobromus in caves streams and is likely to cause mortality during washout in spring seeps."

91.     Under Section 4 of the ESA, inherent in the duty to list, for the Hay's, and to monitor and to use the emergency listing process for the candidate Kenk's, is the general duty of the FWS under subparagraph (b)(2) to designate and protect habitat that is critical to the survival and recovery of the species and under subparagraph (f) to develop and implement recovery plans to

guide the actions of all agencies that may affect the species. For these amphipods, newly discovered, forested seeps and the areas necessary to provide for groundwater recharging and to act as buffer zones are, in essence, the only way to recovery-- the mandate for all listed species if biologically possible.  Thus, emergency listing facilitates prompt designation of critical habitat that then cannot be degraded by federal action, permits or funds. This protection has thus far been withheld from both of these highly endangered species now facing specific and acute risks from which they should be protected through the proper operation of law.  The Hay's has, since its listing in 1982, been denied this protection of critical habitat designations.  The new discovery of potential habitat by Dr. Culver provides a tailor-made opportunity for a review of the evidence and possible emergency designation, if necessary, of some or all of such seeps as critical habitat for the Hay's and for possible expedited listing and critical habitat designations for the Kenk's amphipod and any other species further imperiled by the Project, such as the second Maryland-endangered amphipod, the Stygobromus sextarius, as that species is known to occur between the nearby Kenk's and Hay's, and sometimes in the same seeps. Completing the listing and designating habitat for the Hays, Kenk's and Sextarius is particularly appropriate now in light of the FWS' policy of listing groups of similar species or species depending on the same habitats in the same listing process whenever practicable.

92.     The Notice Letter explained that, based on Dr. Culver's conclusions, "[t]he Project and/or development resulting from it will likely destroy or degrade seeps and springs that are likely to be occupied by Hay's spring amphipod, Kenk's amphipod, or both species," and that "[t]he Project will likely degrade forest habitat conditions in and around these creeks and may cause additional damage in the Rock Creek drainage, potentially degrading additional amphipod habitat along Rock Creek itself and along the Coquelin Run tributary."  The Notice Letter further

explained that "[b]ecause further loss of spring/seep habitat along Rock Creek would likely preclude the recovery of these species" – i.e. these species could *never* be brought back to the point where they would no longer need the protections of the ESA – "the FTA's and Service's determination that the Project would have 'no effect' on these species is patently unlawful as well as arbitrary and capricious."

93.     The Notice Letter further explained that, based on Dr. Culver's report, "[t]he best available science" – the mandatory standard that applies to the agency decisions under Section 7 of the ESA – "makes clear that the Project is likely to have serious and long-term impacts on the hydrology of the spring-seep ecosystems that the Hay's spring amphipod requires and will degrade suitable habitat of the species by degrading the forest ecosystems around Rock Creek Park." The Notice Letter further pointed out that, despite the legal obligation to base decisions on "the best available science," the FWS and FTA had conspicuously failed to contact any of the world's leading experts on these species, including Dr. Culver – the expert that the FWS itself relied upon in its 2013 review of the status of the Kenk's amphipod.

94.     The Notice Letter satisfied any and all legal obligations Plaintiffs had to put Defendants on notice of their violations of Sections 4 and 7 of the ESA regarding the Hay's spring and Kenk's amphipods. The elements of Sections 4 and 7 reinforce each other such that Defendants should have reviewed all of their respective duties to each species potentially affected by the Project, which would have enabled adherence to Section 7(a)(1) of the ESA, requiring creation of a conservation program for these species, and the listing and protection of other species now at risk,  and the development of proactive programs to conserve other, less imperiled but still declining species in the ecosystem.

95.     Although not legally required, the Notice Letter also explained that for similar reasons the FTA was required to prepare a supplemental EIS under NEPA so that the agency can take the requisite "hard look" at the potential impacts of the Project on these two rare amphipod species.  The Notice Letter explained that Dr. Culver's report certainly qualifies as "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" within the meaning of the relevant NEPA regulations, 40 C.F.R. § 1502.9(c)(1)(ii), and they stressed that such significant new scientific information must also be made "available to public officials and citizens before decisions are made and before actions are taken," as also required by the NEPA regulations, *id.* § 1500.1(b), because "public scrutiny [is] essential to implementing NEPA."  *Id.*

96.     On August 9, 2014, Plaintiff Fitzgerald sent a representative of the FTA additional materials about this matter for distribution at a meeting that took place on August 11, 2014, with agency representatives about the concerns identified in the Notice Letter.  These materials included, among other things, the Chevy Chase Lake Sector Plan's Environmental Appendix which described in detail how increased development expected to flow from construction of the Purple Line poses threats to the Kenk's amphipod from deforestation, increases in storm water runoff and pollution.  Also included was an expert declaration of Dr. David Berg, a zoologist at Miami University in Ohio who has helped the FWS to add other amphipods to its endangered species list. The declaration states that "[a]fter review of pertinent documents and relying on my experience and expertise, I conclude that construction of the Purple Line preferred alternative has the potential to cause harm to the Hay's spring amphipod and Kenk's amphipod," and that the Final EIS statement that no endangered species are affected by the Preferred Alternative "is not supported by available information."  Like Dr. Culver, Dr. Berg also recommended that additional research

be conducted in the Project area, including "[e]xtensive surveys of Rock Creek, Coquelin Run, their tributaries, and floodplains…in order to determine whether these species of amphipods are found at additional sites," before allowing the Project to go forward and risk catastrophic results to these already imperiled species.

97.     To date, the FTA and FWS have failed to engage in any formal consultation (that is, consultation supported by a properly detailed and comprehensive biological assessment) regarding the impacts of the Project on the endangered Hay's Spring amphipod, or to engage in a conference with respect to the candidate Kenk's amphipod.  Nor, on information and belief, has the FWS initiated proceedings to emergency list the Kenk's, although the Purple Line poses an imminent threat to the survival and recovery of that species.

98.     To the contrary, on August 22, 2014, the FWS sent the FTA a letter, with a copy to the Plaintiffs, once again declining to initiate formal consultation and using the wrong legal standard to make that decision. The FWS wrote that the "information submitted doesn't demonstrate a *reasonable certainty* that the species is present and could potentially be affected" and therefore the Service is declining to reinitiate consultation. (Emphasis added).  The legal standard, as plaintiffs pointed out in the Notice Letter, is not "reasonable certainty" but the very low threshold of "may affect". To conclude that there cannot be any effect, is, in the face of heavy expert opinion from several sources to the contrary, arbitrary and capricious, especially given the risk of extirpating large fractions of some of the most highly endangered species in the country. That contrary evidence had previously been provided to Defendants, as detailed above.  The FWS neglected to consider the severity and variety of threats to the Hays and Kenk's posed by the Project in deciding that the two agencies should not initiate formal consultation, or conduct a biological assessment.

**99.** Under the current schedule set forth in the ROD, construction of the Purple Line Project is expected to begin in 2015, although it may begin earlier than that. In spite of this, the FWS and Secretary of the Interior have, as far as Plaintiffs are aware, still failed to establish a system to effectively monitor the candidate Kenk's other than five-year assessments that do not take into account actual, readily available current land use plans or zoning changes. They have also failed to list the Kenk's even though its situation as assessed in the summer of 2013 by the FWS is that it warrants not only listing but emergency listing should it face an acute rather than chronic threat to its conservation and recovery. That acute threat has arrived.

## PLAINTIFFS' CLAIMS FOR RELIEF

### COUNT I
### VIOLATIONS OF NEPA AND THE FHA

**100.** Plaintiffs incorporate in this Count, as if stated herein in full, the allegations set forth in paragraphs 1 - 99 of this complaint.

**101.** In light of the unfinished and steadily changing material elements in the design and costs of the Preferred Alternative into July of 2014, as further described in paragraphs 74, 75 and elsewhere above, the FTA could not, by definition, accurately describe, assess and receive meaningful comments from other agencies on the preferred alternative in mid-2013. By the fundamentally premature nature of this assessment and by otherwise failing to adequately accurately assess and describe the project and even the need or objective that it and the alternatives are intended to meet, and by failing to adequately portray and assess the preferred alternative and to assess the various direct, indirect, and cumulative environmental impacts of the Project (the "preferred alternative") and reasonable alternatives thereto as part of the NEPA process, by specifically choosing not to assess alternatives other than no action alternative, after an inadequate and outdated draft assessment in 2008, the FTA and Defendants McMillian and Foxx have violated

NEPA, including but not limited to Sections 101 and 102 of NEPA and its implementing regulations and Guidance, 40 C.F.R. 1500 et seq., and the Guidance issued by the Council on Environmental Quality, e.g., on the Duty to Monitor and Mitigate the effects of agency actions, as set forth above in paragraphs 20-25 describing the requirements of NEPA, and abused their discretion, and acted arbitrarily, capriciously, and not in accordance with law within the meaning of the APA, 5 U.S.C. § 706(2).

**102.** Even if the FTA's EIS were adequate, given the fundamental changes, shifting designs, the decision to allow a yet to be chosen private firm to build and operate the Project and the lack of a binding contract with such firm specifying the environmental compliance elements, other inadequacies raised by the plaintiffs, the FTA now must complete a supplemental EIS at the least, to correct these deficiencies and other inadequacies discussed above, to take the requisite "hard look" at the potential impacts of the Project on these two rare amphipod species. Dr. Culver's report qualifies as "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" within the meaning of the relevant NEPA regulations, 40 C.F.R. § 1502.9(c)(1)(ii).  Thus by failing to prepare a Supplemental EIS after receiving Dr. Culver's expert report as well as the report from Dr. Berg and the Environmental Appendix to the Chevy Chase Lake Sector Plan, and failing to make that information in a Supplemental EIS available for public scrutiny, FTA and Defendants McMillian and Foxx have violated NEPA and its implementing regulations, as well as the FHA, 23 U.S.C. § 138(a), and have violated Section 4(f) of the FHA to the extent that impacts upon, or "uses", of parks or park-like areas and abused their discretion, and acted arbitrarily, capriciously, and not in accordance with law, and also abused their discretion within the meaning of the APA, 5 U.S.C. § 706(2).  They have also withheld agency action required by law and unreasonably delayed such

action, within the meaning of the APA, 5 U.S.C. § 706(1).

**103.** Defendants' violations of NEPA and the FHA injure Plaintiffs in the manner described in Paragraphs 3-15 above.

## COUNT II
## VIOLATIONS OF THE ESA

**104.** Plaintiffs incorporate in this Count, as if stated herein in full, the allegations set forth in paragraphs 1 - 99 of this complaint.

**105.** By issuing a "no effect" determination with respect to the endangered Hay's Spring and Kenk's Amphipods and thus failing to engage in formal consultation regarding the endangered Hay's Spring Amphipod, and failing to undertake a conference with the FWS with respect to the candidate Kenk's Amphipod, in light of the best available scientific and commercial data from biologists' reports provided prior to this filing, with scientists' plans to obtain further information at the earliest possible survey opportunity within a very few months, the FTA and FWS violated Section 7(a)(1) and (2) of the ESA, including their duties under 7(a)(1) to identify means of assisting in the recovery of, and under 7(a)(2) identify the means of avoiding jeopardy to, the amphipods, and abused their discretion, and acted arbitrarily, capriciously, and not in accordance with law, and also abused their discretion within the meaning of the APA, 5 U.S.C. § 706(2).

**106.** By refusing a second time in its August 22d letter to FTA to initiate consultation concerning the Hay's spring and Kenk's amphipods, and by erecting an arbitrarily and illegally high and incorrect standard for that determination, the FWS again violated Section 7(a)(1) and (2) of the ESA and acted arbitrarily, capriciously and not in accordance with the law, and abused their discretion within the meaning of the APA, 5 U.S.C. § 706(2). This second failure to initiate consultation also constitutes agency action that has been unlawfully withheld and unreasonably

delayed within the meaning of the APA, 5 U.S.C. § 706(1).

107.   By failing to designate critical habitat for the Hay's to provide for inhabitable recovery habitat, as required and described in paragraph 30, the FWS and Defendants Jewell and Ashe violated their duty to designate critical habitat for the Hay's under § 4(b)(2).

108.   By failing to develop and implement a recovery plan for the Hay's despite the recommendations in its own status reviews for the past several years and despite the mandate of the Act granting priority to those species that may be in conflict with construction or development projects, the FWS and Defendants Jewell and Ashe have violated § 4(f)(1) of the ESA.

109.   By failing to regularly review relevant information from expert local authorities and by otherwise failing to establish and implement an effective monitoring system for the candidate Kenk's amphipod and properly to apply listing criteria in the ESA the FWS and Secretary of Interior also violated their monitoring and emergency listing duties under Section 4(b)(3)(C)(iii) and 4(a)(1)(A) and 4(b)(1)(A) and (B)(ii) of the ESA with respect to the Kenk's Amphipod, and abused their discretion, and acted arbitrarily, capriciously, and not in accordance with law, and also abused their discretion within the meaning of the APA, 5 U.S.C. § 706(2).  Their failure to monitor and emergency list the Kenk's, also constitutes agency action that has been unlawfully withheld and unreasonably delayed within the meaning of the APA, 5 U.S.C. § 706(1).

110.   Defendants' violations of the ESA injure Plaintiffs in the manner described in Paragraphs 3-15 above.

## COUNT III
## VIOLATIONS OF THE MBTA

111.   Plaintiffs incorporate in this Count, as if stated herein in full, the allegations set forth in paragraphs 1 - 99 of this complaint.

112.   As described in plaintiffs' comments on the EIS, and summarized above, FTA's

authorization for and funding of the Project without obtaining, or ensuring that the project proponent obtains, a permit to "take" migratory birds, when the Project will likely lead to many deaths and other forms of take of migratory birds protected by the MBTA, which taking could have been avoided, minimized and mitigated through proper planning and assessment, is likely to lead to takings of migratory birds in violation of 16 U.S.C. § 703 and the implementing regulations that require all persons, including federal agencies, to "obtain a valid permit before commencing an activity" that will take, capture or kill any birds protected by the MBTA, 50 C.F.R. §§ 13.1; 21.11.   The failure to ensure compliance with the MBTA is also arbitrary, capricious, and otherwise not in accordance with law within the meaning of the APA, 5 U.S.C. § 706(2).

**113.**   Defendants' violations of the MBTA injure Plaintiffs in the manner described in Paragraphs 3-15 above.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiffs respectfully request that this Court:

1.   Declare that Defendants have violated Sections 101 and 102 of NEPA, Section 4(f) the FHA, Sections 4 and 7(a)(1) and (2) of the ESA, the MBTA (16 U.S.C. 703), and the Sections 706(1) and (2) of the APA;

2.   Declare that the Purple Line Project may not go forward unless and until Defendants comply with all of the relevant provisions of NEPA, the FHA, the ESA, the MBTA, and the APA as cited in paragraph (1);

3.   Set aside the FTA's final Record of Decision as invalid and contrary to law, as required by the judicial review provisions of the APA;

4.   Enjoin Defendants from spending any federal funding on, approving in any way, or otherwise proceeding with, the Purple Line Project unless and until they have fully complied

with all of the requirements of NEPA, the FHA, the ESA, and the MBTA;

     5.     Award Plaintiffs their reasonable attorneys' and expert witness fees and other litigation costs in this action pursuant to Section 11(g)(4) of the Endangered Species Act, and upon application for them, under the Equal Access to Justice Act (28 U.S.C. §2412(d) with regard to the APA, NEPA and MBTA claims; and

     6.     Grant Plaintiffs such other and further relief that the Court may deem is just and proper.

Respectfully submitted,

**KNOPF & BROWN**

David W. Brown, Bar No. 415426
401 E. Jefferson Street, Ste. 206
Rockville, MD 20850
brown@knopf-brown.com
(301) 545-6100

August 26, 2014

**Attorney for Plaintiffs**