# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

FRIENDS OF THE CAPITAL CRESCENT  :
 TRAIL, *et al.*         :
             : **Case No. 1:14-cv-01471-RJL**
      Plaintiffs,    :
             :
  v.           :
             :
FEDERAL TRANSIT ADMINISTRATION, *et al.* :
             :
    Federal Defendants,  :
             :
MARYLAND TRANSIT ADMINISTRATION :
             :
    Defendant/Intervenor  :

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**PAGE**

TABLE OF CONTENTS ............................................... i-iv

CASE NAME AND TITLE PAGE.................................... -

INTRODUCTION................................................. 1

BACKGROUND.................................................... 3

    I.       RELEVANT STATUTES AND REGULATIONS............................ 3

          A.      NEPA Requires A Rigorous, Objective Evaluation Of
Reasonable Alternatives And  Environmental Impacts ............ 3

          B.      The Federal Highway Act Imposes Additional Obligations
on Defendants.................................................. 6

          C.      The Endangered Species Act And Migratory Bird Treaty Act
Impose Additional Duties On Defendants............................ 7

    II.      RELEVANT FACTS.......................................... 8

          A.      The Affected Environment Includes Irreplaceable Natural
Resources.................................................... 8

          B.      Expert Testimony Detailed the Lack of Rigor, Objectivity
and Accuracy in the Analysis of Alternatives........................ 9

          C.      The FEIS Of 2013 and ROD Did Not Fully Address the
Concerns Raised by Plaintiffs and Others Following the
Issuance of the AA/DEIS.......................................... 11

          D.      Defendants Rejected Plaintiffs First Request For
A Supplemental EIS Based On Significant Changes
And Cuts In Service Made By Governor Hogan...................... 12

          E.      Defendants Also Rejected Plaintiffs' Second Request For
An SEIS, Even Though Based On New Information
And Analyses Of The Project...................................... 12

ARGUMENT....................................................... 13

    I.      STANDARD OF REVIEW ............................................ 13

II.   DEFENDANTS VIOLATED NEPA BY REFUSING TO
      PREPARE AN SEIS IN SPITE OF CHANGES TO THE
      PROJECT, ITS CIRCUMSTANCES, AND NEW INFORMATION, ........  15

      A.   Major Changes By Governor Hogan Require at Least an SEIS .............16

      B.   New Information and Circumstances Documented in
           Plaintiffs' October 2015 Request Require at Least an SEIS ................ 21

           1.   The Purple Line Justification Presumes A Robust Metro
                System But Metro Has Now Become Dysfunctional Losing
                Riders Since 2008 ...................................................  21

           2.   Memoranda From Transportation Experts Bill Allen
                And Sam Schwartz Show Defendants Have Continued
                To Hide Data And Assumptions Essential To The
                Alternatives Analysis .............................................  22

           3.   New Information And Analysis From A Former Senior
                Economist Of The World Bank Group Shows The
                Project Fails To Comply With Highway Act And
                NEPA Standards On The Assessment Of Ridership,
                Cost-Effectiveness, And Economic Viability Of
                Transit Alternatives ..............................................  22

           4.   New Information Submitted On The Impact On
                Wetlands And Waters Of The U.S. From The
                Former Head Of Regulatory Affairs Of The Army
                Corps Of Engineers Shows Defendants Used The
                Wrong Scale For Their Analysis And Failed To
                Assess Cumulative Impacts On The Aquatic Ecosystem  ...  23

           5.   A New Study Of Pollution From The Purple
                Line's Uncontrolled Stormwater Runoff Reveals
                Uncontrolled Stormwater Effects, Serious Hazardous
                Materials And Other Risks Never Revealed In The FEIS...  24

           6.   New Information On Harm To Floodplains Shows
                The FEIS To Be Outdated.........................................  24

           7.   Plaintiffs Provided New Information On Adverse Impacts
                To Federally-Protected Migratory Birds From A
                Former Senior Biologist In The Fish And Wildlife
                Service Office Of Migratory Birds ...............................  26

           8.   New Information From A Former Senior Consultant
                To The Department Of Defense On Noise Impacts
                Reveals Levels Harmful To Human Health That
                Were Previously Hidden From The Public.....................  26

9.      New Information From A Former Vice President Of The Long Island Railroad On The Cumulative Risks Inherent In The Project Shows The Probability Of Significant Failure Is 100% ....................................... 26

III.    DEFENDANTS VIOLATED THE CORE REQUIREMENTS OF NEPA BY FAILING TO FULLY AND FAIRLY ASSESS THE IMPACTS OF THE PROJECT AND ALTERNATIVES TO IT AND FAILING TO DOCUMENT PROPERLY HOW THE PROJECT WOULD COMPLY WITH APPLICABLE LAWS ................................................................. 27

A.      Defendants Failed To Fully And Fairly Describe The Preferred And Other Alternatives And Their Impacts................. 27

1.      Defendants Failed To Respond Meaningfully To Comments On The AA/DEIS And FEIS That They Had Not Disclosed Key Assumptions And Data And Otherwise Presented Misleading And Incorrect Descriptions Of The Ridership And Transportation Benefits Of The Various Alternatives......... 28

2.      Defendants Presented Misleading And Incorrect Descriptions Of Material Differences In Alignment, Or Route Options, And Of The Different Impacts Of Each........................................................................ 33

3.      Defendants Presented Misleading, Incorrect, And Altogether Incomplete Assessments Of Direct Impacts On The Natural Environment .................................... 34

4.      Defendants Failed To Fully And Fairly Assess The Indirect And Cumulative Impacts Of The Preferred And Other Alternatives............................. 35

B.      Defendants Failed To Document Properly How The Project Would Comply With Environmental Laws And Affect The Ambient Air, Water And Noise Pollution Limits Of The Affected Areas............................................ 37

C.      Defendants Failed To Assess The Extent To Which Mitigation Of Impacts Is Possible................................. 39

IV.     DEFENDANTS HAVE VIOLATED THE SUBSTANTIVE OBLIGATIONS IMPOSED BY THE HIGHWAY ACT AND OTHER STATUTES AND REGULATIONS GOVERNING TRANSPORTATION PROJECTS ................................................. 39

iii

A.   The AA/DEIS Presented A Misleading Assessment
Of The Performance Of Alternatives For Purposes Of
New Start Funding.................................................................   39

B.   In Contravention Of The Highway Act, The Project
Uses Parks Despite "Feasible Alternatives."............................   42

IV.   DEFENDANTS ARE VIOLATING WILDLIFE LAWS
AND FAILING TO PROTECT THE NATIONAL CAPITAL
AREA'S ONLY FEDERALLY LISTED ENDANGERED
AND CANDIDATE SPECIES, WHICH ARE AMONG THE
WORLD'S MOST RARE AND VULNERABLE SPECIES .........   44

A.   Defendants' Failure To Complete A Biological
Assessment And Biological Opinion Violates The
Endangered Species Act.......................................................   44

B.   Defendant Secretary Of The Interior Has Failed
Repeatedly To Implement An Effective
Monitoring System for the Candidate Kenk's
Amphipod, an Even more Vulnerable Species.......................   45

C.   Defendants have Violated the MBTA by
Authorizing and Implementing a Project
that will Kill Migratory Birds Without
an MBTA Permit Or Conservation Plan...........................   47

V.   CONCLUSION AND PROPOSED REMEDY ...........................   48

Exhibit 1.........................................................................................   1-13

# INTRODUCTION

At issue in this case is whether Defendants complied with federal law concerning their decisions to approve a proposed 16-mile two-track light rail line, named the Purple Line, with its western terminus adjacent to the Bethesda Metro station, its eastern terminus adjacent to the New Carrollton Metro station, and 19 other stops along the way (the "Project"). (AR1-1001900 -- FEIS Executive Summary ES-1).[1]  At its most recent cost estimate of $2.2-2.45 billion to build and roughly $50-53 million per year to operate, (AR5-006674 -- Lysy; FTA Summary Description 11/15[2] respectively), the Project would be among the most expensive capital projects ever undertaken by the State of Maryland.  In order to obtain that funding from the Federal, State and County Governments, the Project proponents had to complete an Environmental Impact Statement ("EIS") as required under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4331 *et seq.*  In addition, the federal Highway Act required that the Defendant Federal Transportation Administration ("FTA") conduct an analysis of alternative transportation solutions in the context of the NEPA process. 49 U.S.C. § 5309.

---

[1] The Administrative Record ("AR") consists of multiple parts ("AR1", "AR2", "AR3", "AR4", "AR5" and "FWS") to correlate with various agency records.  Plaintiffs' record citations will refer to the record being cited and then to the relevant bates-numbered page. Some documents that Plaintiffs presented earlier to Defendants that were not included in any of the records are included in, and are the subject of, a motion to supplement the record that will be separately filed forthwith. These are cited by name and by document number in that Supplemental Record ("SR") as SR-[page number].

[2] http://www.fta.dot.gov/documents/MD__Maryland_National_Capital_Purple_Line_Profile_FY17.pdf

To comply with these (and other) legal requirements, the FTA and MTA first prepared an Alternatives Analysis/Draft EIS ("AA/DEIS") and then a final EIS ("FEIS"). That process and its outcome -- the Statements and the Record of Decision ("ROD") it produced – were fatally flawed under NEPA and the Highway Act. From the outset, Defendants exaggerated the need for the project and improperly promoted an environmentally damaging, needlessly expensive alternative and alignment that fails to effectively serve the most riders at the lowest cost.

Defendants produced biased documents that undermined the ability of the affected public to comment on them, to have their comments publicly addressed in the process, and to allow decision-makers to make objective decisions. Defendants also undercut meaningful public review, in violation of regulations governing the EIS process, including by refusing to release, then releasing in an unusable format, information that was the basis for overly optimistic ridership estimates. The distorted evaluation of the Project that emerged then impaired the competitive process for the "New Start" federal funding essential to the Project.

As described inthe August 2013 FEIS, the Project had only minimal commitments to mitigation for the Project's extensive or undisclosed environmental impacts. These impacts include the loss of up to 48 acres of forest (FEIS AR1-002110) along its route; the likely unearthing of more than 229 medium to high-risk hazardous materials sites (FEIS AR1-002127); and scores of points at which undetermined but large amounts of uncontrolled and contaminated stormwater runoff would flow into the Rock Creek and Anacostia watersheds. The Project's other undisclosed or inadequately analyzed impacts include reduced air and in-stream water quality, and degraded parks and wildlife habitat, and other aspects of the public health and safety. Indeed, the inadequately evaluated environmental risks of the Project are so extensive that allowing it to go

forward on the basis of the FEIS constitutes actual or imminent violation of federal environmental laws as well.

After this lawsuit was filed challenging the Project's ROD and EIS, significant new information was obtained by Plaintiffs and presented to Defendants that further undermined Defendants' stated rationale for it and the adequacy of the FEIS. Also, Maryland's newly elected governor, Larry Hogan, conditioned his approval of the Project on a shift of costs to Montgomery and Prince George's Counties along with imposition of more than 40 "streamlining" measures. Many of these Project changes have significant environmental implications that have never been analyzed in any public document prepared pursuant to NEPA. Accordingly, Plaintiffs twice formally requested that Defendants supplement the EIS as required by NEPA and implementing regulations. Defendants have refused to do so, thereby compounding their pre-existing violations of law.

## BACKGROUND

### I.    RELEVANT STATUTES AND REGULATIONS

#### A.    NEPA Requires A Rigorous, Objective Evaluation Of <u>Reasonable Alternatives And  Environmental Impacts</u>

NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). The purpose of the statute is "to prevent or eliminate damage to the environment" and "to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321. To accomplish its objectives, NEPA requires all federal agencies to prepare a "detailed statement" regarding all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). This statement – the EIS – must describe "(i) the "environmental impact of the proposed action, (ii) any "adverse environmental

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
*Friends of the Capital Crescent Trail et al. v. FTA et al*, No. 1:14-cv-01471-RJL

3

effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action" and "(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." Id. § 4332(C)(i)-(iii), (v). The Council on Environmental Quality ("CEQ") has promulgated regulations implementing NEPA, 40 C.F.R. §§ 1500-1508, that are "binding on all Federal agencies." Id., § 1500.3.

The purpose of the EIS process is to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. §§ 1500.1(b). The CEQ regulations emphasize that the consideration of alternatives is the "heart of the [EIS]" and hence that the EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives...." 40 C.F.R. §§ 1502.14 (a).

The CEQ regulations define "environmental effects" that must be analyzed as "ecological...aesthetic, historic, cultural, economic, social, or health" aspects of a decision, "whether direct, indirect or cumulative." Id., § 1508.8. "Indirect effects" that must be analyzed are those that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." These include induced changes, density, and related effects on air and water and ecosystems. Id., § 1508.8(b). "Cumulative impacts" are those that "result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal or non-federal) or person undertakes such other actions." Id. § 1508.7.

Agencies must also make "diligent efforts to involve the public in preparing and implementing their NEPA procedures," Id. § 1506.6. To facilitate meaningful public review and comment, the CEQ regulations specifically provide that in EIS's, **"[m]aterial based on**

**proprietary data which is itself not available for review and comment shall not be incorporated by reference.**" 40 C.F.R. § 1502.21 (emphasis added).

The CEQ regulations further provide that if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts," the agency "[s]hall prepare" a supplement to its EIS. Id. § 1502.9(c)(1)(ii). The FTA's own NEPA implementing regulations provide that an EIS "shall be supplemented": when (1) **"[c]hanges to the proposed action** would result in significant environmental impacts that were not evaluated in the EIS" or (2) **"[n]ew information or circumstances** relevant to environmental concerns and bearing on the proposed action or its impacts would result in significant environmental impacts not evaluated in the EIS." 23 C.F.R. § 771.130 (emphasis added).

The Department of Transportation's ("DOT") own Regulations and Procedures state that, in the EIS, "a **rigorous** exploration and an **objective** evaluation of the environmental impacts of all reasonable alternative actions, particularly those that might **enhance** environmental quality or **avoid** some or all of the adverse environmental effects, are essential," including "alternatives requiring actions of a significantly different nature which would **provide similar benefits** with **different environmental impacts,** e.g. low capital intensive improvements" and  alternatives related to **different locations** or **designs or details** of the proposed action which would present different environmental impacts." DOT Procedures for Considering Environmental Impacts -- DOT Order 5610.1C, Attachment 2, 3.b., page 3 (emphasis added). An FTA EIS must be in compliance with Order 5610.1C, which includes requiring a detailed explanation of the impact of Project encroachment on base (100 year) floodplains and with DOT Orders 5660.1(A) and 5650, and with Executive Order 11988 (amended January 2015 to increase the protection of floodplains).

Joint FTA and Federal Highway Administration (FHA) regulations further require that the EIS "document compliance with requirements of all applicable environmental laws, Executive orders, and other related requirements," 23 C.F.R. § 771.133. Here, these include, *inter alia,* the Clean Air Act, 42 U.S.C. § 7401 *et seq.* (CAA), and Clean Water Act, 33 U.S.C. § 1251 *et seq.* (CWA). The CWA protects wetlands, waters of the U.S., and establishes stormwater runoff standards that all major construction Projects must meet. DOT requires its agencies to document how their actions would not only comply with applicable state and local environmental laws but also how their actions would affect the general "attainment and maintenance of **any** environmental standards established by law or administrative determination (e.g., noise, ambient air quality, water quality)." (DOT 5610.1C, Att. 2, ¶9.) (emphasis added).

### B. The Federal Highway Act Imposes Additional Obligations on Defendants

To ensure that taxpayer dollars fund the best and most cost-efficient transportation alternative, the federal Highway Act provides that the NEPA process shall be used to provide the factual basis for various substantive environmental, transportation, cost-effectiveness, financial, and other criteria each Project must meet.  49 U.S.C. §§ 5309(d), (f) and (g). Among other things, FTA must find that "local resources are available to recapitalize, maintain, and operate the overall existing and proposed public transportation system." Id., § 5309(f)(1).  The Highway Act further bans any indirect or direct "use" of parks unless there is no "feasible alternative."  23 U.S.C. § 138(a).

### C. The Endangered Species Act And Migratory Bird Treaty Act Impose Additional Duties On Defendants

Congress enacted the Endangered Species Act, 16 U.S.C. § 1531 *et seq.* (ESA) to ensure that "the ecosystems upon which endangered species and threatened species depend [are]

conserved, [and] to provide a program for the conservation of such endangered species and threatened species." Id., § 1531(b). Section 7 of the ESA requires every federal agency to assist in the recovery of listed species, 16 U.S.C. § 1536 (a)(1), and "insure that any action authorized, funded, or carried out by such agency…is not likely to jeopardize the continued existence of any endangered species or threatened species…." 16 U.S.C. § 1536(a)(2).  To carry out these obligations, the "action agency" must formally "consult" with the U.S. Fish and Wildlife Service (FWS) before the agency undertakes an action that may affect any listed species.  50 C.F.R. § 402.14. Such consultation, which must be based on the "best scientific…data available," 16 U.S.C. § 1536(a)(2), culminates in a "Biological Opinion" by FWS analyzing impacts of the action on the species. Id. § 1536(b). Re-initiation of consultation is required "where discretionary Federal involvement or control over the action has been retained or is authorized by law," and "**new information** reveals effects of the action that may affect listed species...in a manner or to an extent not previously considered." 50 C.F.R. § 402.16 (emphasis added). The ESA also requires FWS to "implement **a system to monitor effectively** the status [of "candidate" species being considered for listing] and make prompt use of [its emergency listing authority] to prevent a significant risk to the well being of any such species." 16 U.S.C. § 1533(b)(3)(C)(iii) (emphasis added).

The Migratory Bird Treaty Act of 1918, as amended, 16 U.S.C. § 703-712 (MBTA), is a domestic statute that affirms and implements four bilateral treaties between the U.S. and Canada, Mexico, Japan and Russia, respectively.  The law currently protects 1,027 species of birds, by prohibiting the killing or other "taking" of any such bird, egg, or nest without a permit from FWS. Id. § 703(a).

## II.    RELEVANT FACTS

### A.    The Affected Environment Includes Irreplaceable Natural Resources

The Capital Crescent Trail (CCT), which extends from Georgetown, DC to Rock Creek and Lyttonsville (next to Silver Spring, MD) is identified by Montgomery County as a "special park" that is "heavily used at all times" (AR1-000950).  The Georgetown Branch Trail section of the CCT ("the Trail") runs for 3 miles from Bethesda to Rock Creek and Lyttonsville. Plaintiffs and many others filed comments on the AA/DEIS and FEIS pointing out that the plan to route the Purple Line on the Trail would fundamentally change the character of this magnificent "special park" and irrevocably destroy the mature forest and tree canopy that line or abut a significant portion of the Trail.  An estimated 15 to 17 acres of forest canopy would be clear-cut along those 3 miles of Trail alone (AR1-011635-636; AR1-011642) and 48 acres of forest, in all, would be clear cut or impacted along the 16 miles of the Project (AR1-002110).  Plaintiffs and many others noted in their comments that this irretrievable loss of forest inside the Beltway and relocation of a paved trail adjacent to train tracks would deprive citizens of a nature sanctuary and green ccorridor between highly developed commercial areas and adjoining residential neighborhoods, while introducing serious safety concerns for users of the Trail and those who cross it to get to the schools and workplaces nearby. (AR1-000950-951).

The natural environment surrounding the Trail includes several wetlands and waterways that are tributaries to Rock Creek, including Coquelin Run, and to the Anacostia River. All are protected by the Clean Water Act. (AR5-006705; AR5-006740-741).   The watershed hosts a variety of birds and other wildlife, including freshwater shrimp-like creatures known as "amphipods" that inhabit seeps and springs in forested areas near the streams and Rock Creek. Three amphipod species are listed as endangered by either the federal (Hay's Spring Final Listing Rule, FWS523-525) or State governments (Stygobromus *Kenki* and Stygobromus *Sextarius*, AR2-

226567).  Leading threats to amphipods include stormwater runoff; chemical and thermal pollution (they need clean, cool water); forest clearing and destruction of seep locations; and indirect impacts on hydrology resulting from removal of forest buffers and increases in impervious surfaces. (Kenk's Species Assessment Report FWS000959-961, Culver FWS000317-318), Berg FWS000293-296).

## B. Expert Testimony Detailed the Lack of Rigor, Objectivity and Accuracy in the Analysis of Alternatives

Despite the unprecedented investment of taxpayer dollars sought for this Project, the entire EIS process, starting with, and even before, the AA/DEIS, avoided any serious assessment of transportation needs and of reasonable alternatives.  Defendants defined the Project's purpose and need within a narrowly selected east-west "Purple Line corridor" (AR1-011973). Within that corridor, Defendants presented a total of eight alternatives: a No Build alternative, a Transportation System Management (TSM) Alternative, and six Build alternatives (light, medium and high investment Bus Rapid Transit (BRT), and light, medium and high investment Light Rail Transit (LRT) (AA/DEIS, AR1-011958, AR1-011959).[3]

Comments on the AA/DEIS, including comments filed by the Columbia Country Club (CCC) and the Town of Chevy Chase (TOCC) both attaching statements of nationally known experts,[4] flagged numerous errors, biased assumptions, and misrepresentations that cumulatively

---

[3] TSM consists of improvements in the management and operation of the existing transportation system to improve mobility and traffic flow.  BRT consists of specialized buses that can run on roadways or dedicated lanes. LRT consists of trains comprised of one or two cars only (for tight turns) running on an electric-powered system on rails.

[4] For the Country Club, analyses by transportation experts Bill Allen, AR1-010993 to 11008 and Thomas Crowley (AR1-010941-992); rail/transit safety expert Paul Reistrup (AR1-011010 to 64). For the Town of Chevy Chase (hereinafter "TOCC" or "The Town") analyses by national

resulted in an understatement of the transportation and environmental performance of the No-Build, TSM, and low-investment BRT alternatives (which avoid all or most of the Trail respectively), and an overstatement of the performance and benefits of the LRT options.

The Preferred Alternative emerged from a combination of the most costly alternatives presented in the AA/DEIS. (AR1-012159, AR5-006672). Its cost to build is currently estimated, even after Governor Hogan's cuts, at 2.240 - 2.45 billion dollars (Lysy AR5-006674, FTA Summary Description, Nov. 2015[5]), that is, at least $140-50 million per mile (SR-25). This does not include environmental costs, implicitly valued at zero (Preferred Alternative Costs FEIS Chap. 2 AR1-001968-69).   The Project would cost another $50-53 million annually to operate and maintain over 30 years (AR5-006674). Repayment of the construction debt, maintenance and operating expenses would come each year, or be guaranteed, almost entirely from public funds as "MTA is assumed to be responsible for operation and maintenance of the Purple Line services and associated costs." [6](FEIS -- AR1-001969).  For half of that same annual *operating* cost, entirely *free* bus service could be provided on County systems that could carry four times as many riders, serving not just affluent areas but also the poorest communities of Montgomery and Prince George's counties. (Lysy, SR-21).

---

transportation expert Sam Schwartz Engineering (AR1-011634 to 640) as also reconfirmed by Allen's analysis of MTA responses to comments (AR5-006696 to 701).

[5] *Supra*, n. 2, p. 1.

[6] While the State will engage a private partner to build and operate the Purple Line, that private partner will pay for and risk little or nothing, serving largely as a vehicle for borrowing that the State could not afford to do directly under its guideline for the maximum debt to revenue ratio. (Professor David Lublin, "Seventh State" Blog, "The Giant Purple Credit Card"; SR-43 to 44).

These and other experts urged a far more rigorous and objective analysis, but it was never conducted. Nevertheless, the AA/DEIS was the foundation on which the "Preferred Alternative" and the entire FEIS and ROD were built, as the FTA and MTA chose not to conduct any further assessment of any but the preferred light rail "build" and the "no-action" alternatives.

### C.   The FEIS and ROD Did Not Fully Address the Concerns Raised by Plaintiffs and Others

In spite of the detailed analyses in formal comments filed by numerous experts that exposed the pervasive flaws and bias in the AA/DEIS, including but not limited to ridership calculations and other performance criteria needed to qualify for funding under the Highway Act, "[b]ased on the AA/DEIS findings...Governor Martin O'Malley identified a [Light Rail Transit] Locally Preferred Alternative (LPA) on August 4, 2009." (FEIS Executive Summary, AR1-001902).

Subsequently, Plaintiffs and other commenters on the FEIS reaffirmed that the omissions and misleading assertions they found in the AA/DEIS persisted in the FEIS. (FCCT AR1-000949, Town starting at AR2-226720), Fitzgerald, Real de Azua and Talberth AR1-001229-43). Plaintiffs also noted additional deficiencies, including failures to address the presence of endangered species and federally protected migratory birds in the areas affected by the Purple Line (AR1-001229-43). None of these flaws or omissions was fully addressed or rectified by Defendants as they issued their favorable ROD for the Project.

Meanwhile, between the issuance of the AA/DEIS in 2008 and the issuance of the FEIS in 2013, the cost of the Project soared from $1.517 billion to $2.2 billion (AR1-003491). Tellingly, in evaluating the relative effectiveness, the FEIS did not assess the impact of this increase in regard to the relative costs and benefits of the alternatives.

### D. Defendants Rejected Plaintiffs First Request For A Supplemental EIS Based On Significant Changes And Cuts In Service Made by Governor Hogan

Governor Hogan announced in June 2015 that he had decided to conditionally approve the Project based on a substantial shift in funding responsibility to the two Counties involved, reduction in the State's contributions by several hundred million dollars, and a commensurate reduction in various services and environmental standards and protections. (AR4-007432-34).

On July 14, 2015 Plaintiffs formally requested that the FTA undertake a Supplemental EIS (SEIS) (AR4-007411-26) to assess the impact of the Governor's 41 changes in design, including: "Green Track" – a measure that the ROD noted would be relied on to mitigate stormwater impacts (AR1-000185); a 25% reduction in the peak frequency of trains; replacement of steel bridges over Rock Creek adjacent to sensitive wetland area with much more massive structures; and dropping the "Leadership in Energy and Environmental Design" ("LEED") standards for Project-associated buildings (including at a sensitive location near Rock Creek). Plaintiffs requested that Federal Defendants undertake an SEIS to allow public and expert comment on the impact of Governor Hogan's Project changes, including whether those changes warranted a reassessment of Project alternatives. In September 2015, FTA advised Plaintiffs that it had decided not to prepare any supplement to the EIS as of that time. (AR4-000001-2).

### E. Defendants Also Rejected Plaintiffs' Second Request For An SEIS, Even Though Based On New Information And Analyses Of The Project

On October 9, 2015, the Plaintiffs submitted a renewed request that FTA supplement the EIS based on additional developments and new information coming. (AR5-006469-781). These included environmental effects revealed in Requests for Proposals (RFP) after the ROD was released, such as the call in the amended RFP for the private consortium to develop and implement

evacuation plans and routes in case the private builder were to lose control of highly contaminated earth, dust, or stormwater from any of 229 "medium to high risk" hazardous materials sites along the proposed route (AR5-00649-77, AR1-003855, AR1-003859-60). Plaintiffs' letter also pointed out that recent findings by the National Transportation Safety Board and the FTA (AR5-006470-1) that the Metro System, on which the Purple Line would heavily rely for Projected riders, had declined in service, safety and ridership over the past five years (AR5-006470-2).

Attached to Plaintiffs' October 9, 2015 letter for Defendants' consideration were, *inter alia,* extensive declarations from highly reputable environmental and economic experts. Also included was a new report entitled *Stormwater Runoff and Water Pollution from the Purple Line* (AR5-006702-81) – amplifying Plaintiffs' earlier critical evaluations of the Project. Several of the declarants have held senior positions in the Federal agencies responsible for enforcing the laws they addressed, in operations for multilateral banks, or in transportation Project finance at a long-established commuter rail line (Collinson AR5-006668, Lysy AR5-006675, MacGlashan AR5-006689, Saggese AR5-006691).

On January 8, 2016, FTA sent a letter to Plaintiffs stating that Defendants were again refusing to prepare an SEIS. (AR5-000001 to 43). The letter asserted that Plaintiffs had presented "no new information." (AR5-000004 to 6). However, FTA did attach to its letter two specially-commissioned new documents (AR5-000025-41) that attempted to address a narrow set of the points made in Plaintiffs' Stormwater Report (AR5-006702 to 81).[7] Neither document was subject to public comment.

---

[7] On February 8, 2016 Plaintiffs received from Defendants corrections to AR2 that included, for the first time, two sets of comments on the FEIS that appeared to have been misfiled, and in key cases, missing, from AR2 and from the publicly available ROD as posted in March

## ARGUMENT

### I.   STANDARD OF REVIEW

Under the APA, the Court "shall . . . set aside" an agency's decision if it is arbitrary, capricious, an abuse of discretion, or "otherwise not in accordance with law" or was adopted "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A),(D). Although this standard is deferential, "[d]eference, of course, does not mean blind obedience." *Garvey v. Nat'l Transp. Safety Bd.*, 190 F.3d 571, 580 (D.C. Cir. 1999). Rather, the Court must "perform a searching and careful inquiry into the facts underlying the agency's decision" in an effort to "ensure that the [agency] has examined the relevant data and has articulated an adequate explanation for its action." *Am. Farm Bureau Fed'n v. EPA*, 559 F.3d 512, 519 (D.C. Cir. 2009) (citations and quotation marks omitted). In addition, the Court "must consider whether the decision was based on a consideration of the relevant factors." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30-31 (1983). Thus, a decision is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency...." Id. at 43. Finally, in order to maintain this action, Plaintiffs must meet the standing requirements set forth in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).[8]

_____

2014, apparently until February 2016. These sets of comments were from "Elected Officials" (including the Town of Chevy Chase) and "Organizations".

[8] Plaintiffs' standing declarations are included in the motion. Among other considerations, they detail that Plaintiffs spend, and plan to spend, much time on the Trail and the parks adjacent to it. Their enjoyment of the Trail, adjacent parks and their native wildlife is seriously threatened by the

## II.   DEFENDANTS VIOLATED NEPA BY REFUSING TO PREPARE AN SEIS IN SPITE OF CHANGES TO THE PROJECT, ITS CIRCUMSTANCES, AND NEW INFORMATION

Even where a federal agency has prepared an adequate EIS in the first instance – which, as discussed further below, is certainly not the case here – the agency cannot discharge its NEPA obligations based on that document where there are important new developments bearing on environmental impacts that have never been analyzed in any NEPA document.  As the Supreme Court has explained, "[i]t would be incongruous with [NEPA's] approach to environmental protection, and with the Act's manifest concern with preventing uninformed action, for the blinders to adverse environmental effects, once unequivocally removed, to be restored prior to the completion of agency action simply because the relevant proposal has received initial approval." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 371 (1989).  Thus, the Court held, "[i]f there remains 'major Federal actio[n] to occur" – which is indisputably the case here [9]– "and if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered, a supplemental EIS **must be prepared**." Id. at 374 (quoting 42 U.S.C. § 4332(2)( c ) (emphasis added).

This requirement has also been embodied in the CEQ regulations implementing NEPA, which provide that if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts," the agency "[s]hall

---

harm that would be caused by the Project as proposed.  Accordingly, Plaintiffs easily satisfy the *Lujan* standards for Article III standing.

[9] For example, to the best of our knowledge the FTA has yet to approve a Full-Funding Agreement or the next phase in the development of the Project.

prepare" a supplement to its EIS.  40 C.F.R. § 1502.9 (c)(1)(ii)  Likewise, FTA's NEPA regulations provide that an EIS "shall be supplemented": when "[c]hanges to the proposed action would result in significant environmental impacts that were not evaluated in the EIS" or (2) "[n]ew information or circumstances relevant to environmental concerns and bearing on the proposed action or its impacts would result in significant environmental impacts not evaluated in the EIS."  23 C.F.R. § 771.130.

As set forth below, this is the paradigmatic case in which an SEIS must be prepared, both in light of the Project changes adopted by Governor Hogan – which have not undergone any NEPA review despite their environmental significance – and the other new information submitted by Plaintiffs.

## A.   Major Changes By Governor Hogan Require at Least an SEIS

As set forth in Plaintiffs' July 14, 2015, request for an SEIS (AR4-007411 to 246), the Project changes on which Governor Hogan has conditioned his approval for the Project plainly encompass "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1)(ii).  As described by the Governor's office (AR4-007432 to 434), several changes remove or weaken protection of the environment and public health:

**Change #31 (AR4-007433): Elimination of the "Green Track" that was presented in the FEIS and ROD as a mitigation measure.**  Green Track refers to a living mantle of low-profile plantings (8 inches high) along and between the tracks that reduces stormwater runoff -- the major water pollution problem in the region and one of the major environmental impacts associated with a this Project. (AR1-002110) In response to public comments raising concerns, the ROD unequivocally represented to the public that "MTA **will use green track** along the

Georgetown Branch right-of-way, and in locations in Prince George's County, **to minimize runoff**... Green Track allows for some water absorption within the planting medium, thereby reducing the movement of potential contaminants to surface water bodies [and] reduces stormwater runoff" (emphasis added). (AR1-000185).   Among other beneficial effects, Green Track would help offset the stormwater runoff that will be caused by clear-cutting 15-17 acres of forest on the Trail (and cutting or damaging 48 acres overall) to make way for the Project (AR1-011642).  In addition, Green Track was specifically relied upon by FWS as one of the reasons why the Project would not affect two imperiled amphipod species (FWS 000484): "It is our understanding that in areas to be filled, infiltration of water is likely to be increased because the fill [...] is to be covered in green track".

Green Track would also have helped reduce noise damage to Rock Creek park, the historic Columbia Country Club, and residential neighborhoods abutting the Purple Line. The FEIS describes Green Track as potential mitigation for noise (FEIS Noise Technical Report AR1-003578), and the ROD lists the use of Green Track in its response to public concern regarding noise (AR1-000265 to 266).

By any reasonable yardstick, dispensing with an important mitigation measure that the public was expressly told would be used to ameliorate adverse impacts constitutes a "substantial change" as well as "new circumstances or information" that are "relevant to environmental concerns," thus **mandating** preparation of an SEIS under the CEQ regulations. 40 C.F.R. § 1502.10(c)(1).

**Change #10 (AR4-007432): 25% reduction in frequency of trains (Light Rail Vehicles) at peak periods, reducing the already contested ridership potential and significantly degrading both the transportation effectiveness of the proposed Project and the**

cost-benefit assessment of alternatives. Governor Hogan's cut in the frequency of service from every 7 1/2 minutes to every 6 minutes at peak periods constitutes a "significant new circumstance" requiring reassessment of rejected alternatives. *Alaska Wilderness Recreation & Tourism v. Morrison*, 67 F.3d 723, 729-30 (9th Cir. 1995) ("Because consideration of alternatives is 'the heart of the environmental impact statement,'" where new developments "opened for consideration alternatives" that were previously rejected, this was an "event requiring serious and detailed evaluation" in an SEIS) (quoting 40 C.F.R. § 1502.14). Here, transportation alternatives were previously rejected for not accomplishing Project objectives such as ridership levels and frequency of service. But with the 25% reduction in service, several of the far less expensive (and less environmentally harmful) AA/DEIS bus alternatives needed re-evaluation. They could be found to operate more frequently than the light rail Purple Line will now run. Some of the frequency and service assumptions for such alternatives hinged on service intervals of minutes, and assumptions tended to underestimate the performance of bus service and overestimate that of rail. See Parts III.A.1. and IV.A.5, infra.

Change # 19 (AR4-007433): Replacement of the "parabolic steel" bridge over Rock Creek with a more massive structure that would require more digging in protected wetlands and release more polluted sediments into Rock Creek. The Governor's replacement of parabolic steel bridges over Rock Creek with much more massive but less expensive brick or other standard structures is also "relevant to environmental concerns." 23 C.F.R. § 771.130. Rock Creek at that location is a sensitive stream and wetland area, in protected parkland, hence the Governor's reminder that permits from two park and planning authorities will be required. Moreover, the ROD commits to "environmentally sensitive stream crossings at Sligo Creek, Long Branch, and Rock Creek." (AR1-000130). The change may also further complicate the securing of a "Section 404

permit" from the Army Corps of Engineers for wetlands impacts. The new bridges mean expanded, un-assessed dredging and filling, which will be combined with un-assessed potential contamination from local sewage outfalls and with stormwater laced with potential hazardous materials leaks from the Lyttonsville yard that abuts Rock Creek park at that location (AR5-006767-70). This obviously casts new doubt on the "environmentally sensitive stream crossing" design that Defendants promised in the FEIS. (22 AR1-000130).

**Change #41 (AR4-007434):  Elimination of the LEED Standards for the Project's buildings.**  This change, by definition, has environmental consequences. It may also worsen others. For example, the yard and building planned at Lyttonsville lie next to and above the sensitive wetlands of Rock Creek Regional Park, and to the bridge over Rock Creek.  The fact that the Lyttonsville yard would no longer be required to abide by LEED standards would compound the impacts discussed above (Change #19) and the concerns expressed by the Montgomery County Planning Board Department of Parks. (AR1-000130).

**Changes # 18 (AR4-007432):** Roadways shared with trains will now not require full-width repavement, posing additional risks to the safety of drivers, pedestrians and cyclists.  This change warrants reassessment, especially given the specific direction of DOT Order 5610.1C. App. 2.7.

**Change # 14 (AR4-007432): The "Alternate interim" Trail** for which Montgomery County would be mostly responsible may also pose more safety risks than previously assessed, as the County re-routes the CCT through residential and commercial areas.  Hundreds of cycling commuters will be pitted against pedestrians and cars on crowded streets, some in residential areas without sidewalks. (AR1-011010-64).

Taken together, these changes cry out for at least an SEIS – since they entail *both* "substantial changes in the proposed action that are relevant to environmental concerns" *and*

"significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.10(c)(1).[10]   Defendants have done precisely what NEPA forbids: ignoring NEPA's "manifest concern with preventing uninformed action" merely "because the relevant proposal has received initial approval." Marsh, 490 U.S. at 371.

Governor Hogan was certainly entitled to condition his approval for a massive public works project he viewed with great skepticism on cost-cutting measures that alter the nature, scope, and impact of the Project.   Once he did so, however, it was incumbent on Federal Defendants – who expect to commit enormous amounts of money to the undertaking – to prepare an SEIS analyzing, in light of the public and expert input that NEPA demands, the environmental significance of these changes and their implications for previously rejected – but far cheaper and environmentally safer – alternatives.[11]

---

[10] The FHA/FTA regulations repeat the three changes contained in CEQ's two subparagraphs, that is, changes in 1) the proposed action; or 2) new information about it, or 3) new circumstances. They go on to say in (e) that **"A supplemental draft EIS may be necessary for ... fixed guideway capital Projects... if there is a substantial change in the level of detail on Project impacts during Project planning and development."**; 23 CFR § 771.130 (emphasis added). That is plainly the case here.

[11] MTA's December 7, 2015 response to Plaintiffs' request for an SEIS purports to set forth various justifications for the changes made and why they did not entail such significant impacts as Plaintiffs contended. (AR5-000007-43) For example, MTA relied on entirely new post-FEIS stormwater documents – which have **never** been made available for public review and comment, as NEPA requires – to justify the elimination of Green Track. (AR5-000025-43).   Although Plaintiffs vehemently disagree with MTA's post-ROD justification, the simple – and sufficient -- answer here is that this is precisely the kind of new information that NEPA requires to be addressed **in an SEIS**, with the public review process mandated by the statute and implementing regulations.

### B. New Information and Circumstances Documented in Plaintiffs' October 2015 Request Require at Least an SEIS

Although the major Project changes wrought by the Governor are alone more than sufficient to necessitate preparation of an SEIS, Plaintiffs, in their request of October 9, 2015, presented additional overwhelming grounds for an SEIS, including new information bearing on the Project's interrelationship with the Metro system, documentation of other changed circumstances, and extensive expert analyses never previously considered in the NEPA process. The following are simply *some* of these materially changed circumstances and new information, which warrants an SEIS, if not an entirely new EIS.

### 1. The Purple Line Justification Presumes A Robust Metro System But Metro Has Now Become Dysfunctional Losing Riders Since 2008

The Purple Line, in concept and planned implementation, is dependent on a robust Metro system. The Project's ridership Projections assume that a large number of Metro riders will use the Purple Line and vice versa. The "name 'Purple Line' was adopted [...] to emphasize the connections with the existing Metrorail system" (AR1-001922), and an estimated 27 percent of the Purple Line boardings would be trips that also include riding Metrorail, "reflecting the ability of the Preferred Alternative to provide connectivity to the Metrorail system." (AR1-001973).

Plaintiffs' SEIS request presented defendants with recent evidence of declining ridership on Metro and of 78 serious deficiencies that the National Transportation Safety Board found needed to be fixed for the safe functioning of Metro, (AR5-006470 to 471) – developments that were never considered in the draft or final EIS in terms of ridership Projections and other implications for the Purple Line. Accordingly, such developments constitute quintessential "new circumstances," 40 C.F.R. § 1502.9(b)(1)(ii).

> **2.** **Memoranda From Transportation Experts Bill Allen And Sam Schwartz Show Defendants Have Continued To Hide Data And Assumptions Essential To The Alternatives Analysis**

Mr. Allen's memorandum presented by Plaintiffs cites a number of ways in which the FEIS used different studies and factors incorrectly and inconsistently, painting an overly optimistic picture of success based on a secret "proprietary model". (AR5-006696ff). He wrote: "The FEIS asserts that MDOT provided the ridership data that CCC [Columbia Country Club] requested but in truth it did not. ... The only reason for such secrecy in a publicly funded Project is the desire to hide from the public the risk that the Project might not be as cost effective as its promoters believe." Id. Sam Schwartz Engineering concurred and explained that the data that MTA continued to hold back as "proprietary" could not be read without the modeling software and the assumptions and data inserted into the model (SR 39).  Both experts explain that the asserted ridership was otherwise impossible to verify and implausible. They also confirm that Defendants failed to correct core flaws in spite of more than 250 pages of such expert comments submitted on the AA/DEIS, including their earlier requests for the information behind the ridership Projections asserted in the AA/DEIS.

> **3.** **New Information And Analysis From A Former Senior Economist Of The World Bank Group Shows The Project Fails To Comply With Highway Act And NEPA Standards On The Assessment Of Ridership, Cost-Effectiveness, And Economic Viability Of Transit Alternatives**

One of the Plaintiffs' expert submissions was from former senior World Bank Group economist Frank Lysy, Ph.D. He presented new information undermining the cost-calculation assumptions proffered in the EIS and showing that the flaws that commenters had pointed out at the time were more than confirmed by subsequent developments (AR5-006669 to 677).  The MTA's December 2015 response to Plaintiffs' SEIS request asserts that Dr. Lysy's analysis – as

well as that proffered by other experts on which Plaintiffs' request relied – did not present "new information" (AR5-000015). This is manifestly incorrect.  Dr. Lysy's points flow in part from known cost increases that have transpired since the DEIS, further showing how flawed and costly the choice of Light Rail continues to be (AR5-006673 to 674). His submission reinforced the concerns pointed out in 2008 that the Light Rail option cost estimates were overly optimistic.

4.      **New Information Submitted On The Impact On Wetlands And Waters Of The U.S. From The Former Head Of Regulatory Affairs Of The Army Corps Of Engineers Shows Defendants Used The Wrong Scale For Their Analysis And Failed To Assess Cumulative Impacts On The Aquatic Ecosystem**

Plaintiffs also submitted a Declaration by Harold S. Collinson, former head of the office of regulatory affairs of the Army Corps of Engineers – the agency principally responsible for addressing impacts on wetlands protected by the CWA. In that declaration, Mr. Collinson explained that the geographic scope (watershed size) used by Defendants is smaller than the Corps stipulates for the correct analysis of cumulative impacts. He also explained that Defendants' focus on linear feet of waters and acres of wetlands ignores the impacts on their ecosystems (AR5-006663 to 668), and that the FEIS had "essentially no meaningful discussion of the cumulative impacts on ecological functions and values of the wetlands [...]or sensitive species on an appropriate watershed basis." Thus, Mr. Collinson's affidavit is both new information and confirmation of environmental concerns by a former regulator who was one of the federal government's *own* undisputed wetlands experts.  Defendants utterly failed to come to grips with their obligations to evaluate this cumulative impact concern in the manner NEPA requires.[12]

---

[12]  MTA's response to Mr. Collinson's declaration does not dispute his expertise but, rather, assets that "[w]hile Mr. Collinson may disagree with some aspects of the methodology or conclusions,

5.   **A New Study Of Pollution From The Purple Line's Uncontrolled Stormwater Runoff Reveals Uncontrolled Stormwater Effects, Serious Hazardous Materials And Other Risks Never Revealed In The FEIS**

The study submitted by Plaintiffs revealed new information and new aspects of the Project pertaining to stormwater runoff and water pollution (AR5-006702 to 781). The study was undertaken by, *inter alia,* a former senior EPA Water Office official, a local engineer, and the former head of the regulatory office of the Army Corps of Engineers, and based on **post**-FEIS and ROD documents. The study revealed that the private partner charged with building and operating the Project would be responsible for securing plans and permits under several laws pertaining to the handling of highly hazardous materials in as many as 573 sites along the route of the Purple Line (AR5-006776), and that the private partner would have to develop and implement evacuation plans and routes should any of these hazardous materials escape into the environment. (AR5-006775 to 777)   The study revealed the large number of sites at which stormwater cannot be contained onsite, and will instead require local variances, many of them in the Rock Creek watershed, to permit mitigation far offsite.   This runoff is likely to have harmful local and downstream impacts not anticipated, revealed or assessed in the NEPA process, necessitating an SEIS assessment consistent with DOT Orders 5660 and 5650..

6.   **New Information On Harm To Floodplains Shows The FEIS To Be Outdated**

Plaintiffs' study on stormwater also pointed to a recent development bearing on the extent to which federally funded Projects should avoid affecting floodplains – including a January 2015

---

he has not demonstrated that the analysis was in any way insufficient." (AR5-000014)   On the contrary, Mr. Collinson's Declaration found that the wetlands cumulative impact analysis was not only insufficient, but essentially **non-existent**.

Executive Order expanding floodplains protections. (E.O. 11988 as amended January 2015) (AR5-006717 to 719 and AR5-006724 to 728). The Project as proposed will go directly through the most important floodplain in the heart of Washington, D.C. and its Maryland suburbs – that of Rock Creek and its tributaries. Stormwater runoff not treated at the site (see 5. above) and removal of trees will change and damage natural streams and floodplain, and those impacts have neither been fully assessed in the EIS process nor considered in the context of the new E.O., as required under DOT Orders 5610.1C, 5650 and 5660.1(A).

> 7.   **Plaintiffs Provided New Information On Adverse Impacts To Federally-Protected Migratory Birds From A Former Senior Biologist In The Fish And Wildlife Service Office Of Migratory Birds**

Plaintiffs' October 9, 2015 submission included an affidavit from Dr. Albert Manville, former Senior Wildlife Biologist with the Division of Migratory Bird Management, FWS. (SR 27-38). Dr. Manville was the FWS' national lead on issues related to anthropocentric causes of bird mortality from structures. Dr. Manville's affidavit explained that since the Project area is an important bird and Forest Interior Dwelling Species (FIDS) habitat (AR1-002110) that biologically connects larger habitats, the Project will have harmful impacts on migratory birds that were never addressed. He concluded that Defendants are choosing to act in disregard of the MBTA. Moreover, as part of his 41 Project changes Governor Hogan waived restrictions on night-time construction (AR4-007432), posing added problems for MBTA compliance, due to migratory bird disorientation and other effect of nighttime lightings in dark areas. None of these impacts on federally protected migratory birds has been taken into account.

> 8.   **New Information From A Former Senior Consultant To The Department Of Defense On Noise Impacts Reveals Levels**

**Harmful To Human Health That Were Previously Hidden From The Public**

Plaintiffs submitted a declaration by a retired engineer, Don MacGlashan, who served as a noise advisor to the Department of Defense and now serves a citizens' organization devoted to reducing airport noise. (AR5-006678 to 689). Mr. MacGlashan explained how the Purple Line FEIS noise assessments misled the affected public; how a four-foot noise wall may do little to reduce the noise heard for blocks; how the FEIS failed to document noise levels for pedestrians and cyclists using the relocated trail adjacent to the tracks; and how harmful those unreported and un-assessed noise levels would be for people using the trail. Mr. MacGlashan explained that a central failure of the FEIS was its use of average noise levels which are not at all the same as peak intermittent noise. (AR5-006679 to 81). FTA failed therefore to follow its own guidance for rail Projects, which requires assessment of peak intermittent noise. [13]

9.    **New Information From A Former Vice President Of The Long Island Railroad On The Cumulative Risks Inherent In The Project Shows The Probability Of Significant Failure Is 100%**

---

[13] Mr. MacGlashan's affidavit on the actual extent of the noise also makes it clear that the mitigation steps discussed in the FEIS – and which have subsequently been reduced – were completely inadequate. (AR5-006678 to 689.) Accordingly, MTA's December 2015 response to the affidavit – that Mr. MacGlashan "has not demonstrated that the analysis [in the FEIS] was in any way insufficient," is incorrect. Ironically, MTA persists in citing in its response the May 2006 FHA/FTA document, Transit Noise and Vibration Impact Assessment, that was already mentioned in Plaintiff comments on the FEIS (AR1 000960 to 961) for its specific admonition that, in the context of **environmental assessments for Transit** Projects, Part 3, the FTA should reveal and analyze in its NEPA process the actual "**peak** intermittent noise" of light rail Projects that people and wildlife will hear rather than the hypothetical **average** level of noise. Yet Defendants did not disclose "peak" noise levels in the FEIS, including for users of a relocated trail – thus rendering especially arbitrary MTA's reliance on the 2006 document as a basis for refuting Mr. MacGlashan's affidavit.

Plaintiffs' submission also included an expert declaration by Marty Saggese, a former Vice President of one of the nation's foremost commuter lines, The Long Island Railroad. He summarized the cumulative effect of the many flaws inherent in the Project, and showed that the statistical probability of Project failure along one or more dimensions was 100% (AR5-006690 to 695). This is consideration that is obviously relevant to the cost-benefit comparison between the Purple Line and far less costly and less environmentally harmful alternatives.

In sum, even if the Project modifications required by Governor Hogan did not themselves dictate the need for an SEIS, which they did, the overwhelming new information and circumstances that Plaintiffs documented in their October 9, 2015 letter should have triggered an SEIS. Defendants' refusal to prepare and subject such an SEIS to public scrutiny is the very essence of arbitrary and capricious agency action. These changes, new circumstances and new expert declarations are thus more than a sufficient basis for the Court to set aside the ROD and remand for full compliance with NEPA.

### III. DEFENDANTS VIOLATED THE CORE REQUIREMENTS OF NEPA BY FAILING TO FULLY AND FAIRLY ASSESS THE IMPACTS OF THE PROJECT AND ALTERNATIVES TO IT AND FAILING TO DOCUMENT PROPERLY HOW THE PROJECT WOULD COMPLY WITH APPLICABLE LAWS

Apart from Plaintiffs' claim that an SEIS is required, the DEIS and FEIS were woefully inadequate in and of themselves and entitle Plaintiffs to relief. As set forth in the comments of Plaintiffs and others, Defendants' NEPA compliance suffered from many grave flaws, omissions, and bias -- the opposite of the objective analysis required by law. Any one such flaw should require a new or Supplemental EIS. We highlight examples.

**A.    Defendants Failed To Fully And Fairly Describe The Preferred <u>And Other Alternatives And Their Impacts</u>**

Defendants failed, from the outset and throughout the entire NEPA process, to comply with CEQ and DOT requirements to "rigorously explore and objectively evaluate all reasonable alternatives" 40 C.F.R. §1502.14(a), "particularly those that might enhance environmental quality or avoid some or all of the adverse environmental effects." DOT NEPA Regulations, Part 5610.1C Attachment 2, 3.b. page 3. Some examples:

**1.    Defendants Failed To Respond Meaningfully To Comments On The AA/DEIS And FEIS That They Had Not Disclosed Key Assumptions And Data And Otherwise Presented Misleading And Incorrect Descriptions Of The Ridership And Transportation Benefits Of The Various Alternatives**

Knowledgeable commenters on the AA/DEIS pointed out errors and misleading assertions that showed that ridership projections for the rail alternative were overly optimistic, while those for less costly or differently-routed alternatives were under-estimated. These commenters said that the alternatives were not presented fairly or were impossible for the public to fully assess based on the information presented. (AR1-010993 to 011008; AR1-010941 to 992; AR1-011010 to 64; AR1-011634 to 640).  These experts and others familiar with the transportation demands of the

area rejected the ridership[14] and performance[15] estimates presented in the AA/DEIS, and the assumptions made to reach such estimates (including but not limited to travel time,[16] number of buses needed for the BRT alternatives, population and employment forecasts, fares, transfer times and the experience of any comparable system) for the various alternatives.[17]

In addition, MTA withheld some of the information it used to estimate ridership, to justify the costs of the Project, and to seek federal funds. MTA either refused to provide the information on the basis that it was "proprietary" or gave out information and data that was insufficient or unreadable and unusable even by experts. (AR1-010972 to 985). "By not providing the spreadsheets, which detail MTA's calculations and show underlying assumptions used to construct

---

[14] One example is the National Naval Medical Center's expression of incredulity that the MTA estimated in its AA/EIS that out of 10,500 employees by 2011 there, 18,000 at NIH already, 3180 at Suburban Hospital, and 2,400 new workers expected at NNMC alone given a base relocation, that the MTA would estimate at DEIS Pg. 2-7 that **only 60 of those new employees** would choose to use a BRT alternative route directly to NIH/Naval Medical Center despite a parking shortage at NNMC. (AR1-005822 to 833) The FEIS raised the estimate but only by a very small amount, not correcting it. (AR2-226732 to 734)

[15] As Mr. Allen noted, "The line was supposed to serve east-west demand, but MTA's own estimate of the high proportion of riders who need to transfer indicates that much of the demand is in fact radially oriented towards Washington. This suggests that short-haul feeder buses focused on each Metrorail station would have been a more cost-effective alternative." (AR1-010994).

[16] Among the many flawed assumptions for travel time, for example, Defendants failed to use standard assumptions for BRT, and, as a result, "Low Investment BRT travel time between Silver Spring and downtown Bethesda would be 17 minutes, rather than the 25 minutes MTA calculates." (AR1-011637 to 638). As the Town noted, "Given the critically important role that travel time plays in choosing between the various alternatives, MTA's biased assessment [...] denies decisionmakers of the type of objective comparative data that an environmental impact statement must provide." (AR1-011616).

[17] Indeed, regarding bus systems, a 2009 study **by the FTA itself** had shown the cost-effectiveness of buses and of marketing buses to the public including Bus Rapid Transit, over rail (AR2-226688).

the spreadsheets, MTA is hiding the true methodology" wrote transportation expert William Allen

in his comments on the AA/DEIS (AR1-010980), a point experts reiterated in comments on

Defendants' response (CCC supplemental comments AR1-011076 to 1119). As the Country Club

commented:

> MTA's failure to provide the missing data is unlawful.  Where, as
> here, a Project sponsor has included detailed quantifications of
> Project costs and benefits in an AA/DEIS, the data underlying the
> calculations must be made available for public inspection and
> comment.  The rationale for this rule is self-evident.  The purpose of
> the public comment process is to ensure that Project sponsors "make
> available the relevant information, and open to public scrutiny their
> decision making process." [18]  These goals are clearly defeated when
> the agency fails to make relevant data available since the lack of
> production precludes meaningful public scrutiny of the Project
> sponsor's decision making process.
>
> Full public disclosure of study data and analyses is particularly
> important because history has shown that New Starts Project
> sponsors typically understate Project costs, overstate Project
> ridership, and overstate Project benefits.   As summarized last year
> by FTA Administrator James Simpson:
>
>> Our experience across hundreds of major transit Projects
>> shows that planners routinely over-estimate the benefits
>> of mega-Projects, and under-estimate the costs…

---

[18] The legal authorities cited by the Club included <u>Sierra Club v. United States Forest Service</u>, 878 F. Supp. 1295, 1310 (D.S.D. 1993) ("an agency [must] reveal [] the data and assumptions upon which a computer model is based"); <u>Hughes River Watershed Conservancy v. Glickman</u>, 81 F.3d 437, 446 (4th Cir. 1996) ("misleading economic assumptions can defeat . . . the function of an EIS"); <u>American Radio Relay League, Inc. v. FCC</u>, 524 F.3d 227, 236 (D.C. Cir. 2008) ("Under [Administrative Procedure Act] notice and comment requirements, among the information that must be revealed for public evaluation are the technical studies and data upon which the agency relies") (internal quotation marks omitted); <u>Audubon Naturalist Society of the Central Atlantic States, Inc. v. United States Dep't of Transp.</u>, 524 F. Supp. 2d 642, 660-61 (D. Md. 2007); <u>accord Washington Trollers Ass'n v. Kreps</u>, 645 F.2d 684, 686 (9th Cir. 1981) ("To suppress meaningful comment by failure to disclose basic data relied upon is akin to rejecting comment altogether.") (Internal quotation marks omitted).

> [A]gencies systematically over-estimate ridership forecasts, and under-estimate Project costs.

> Remarks of James S. Simpson, APTA Rail Conference, San Francisco, CA (June 2, 2008), available at www.fta.dot.gov/regional_offices_8247.html.

This "hiding" of the methodology remains evident to this day, undermining the ability of experts to review, analyze and verify the assumptions and calculations used to estimate ridership (SR 39-42), and the unreadable contents of DVDs 5 and 6 of the AR of FTA/MTA (AR2-219964 and AR2-219965). This use of proprietary information subverts the NEPA process, and the Highway Act's reliance on both the AA/DEIS and FEIS processes for selecting Projects competing for FTA funding, in a manner that is **specifically forbidden** by the CEQ regulations. 40 C.F.R. § 1502.21

This failure to rigorously and objectively analyze ridership for each alternative, the failure to disclose assumptions and data necessary to verify Defendants' analysis, and the reliance on proprietary information all represent the sort of disdain for the public's role in agency decision-making that the Court of Appeals has repeatedly decried. *See Gerber v. Norton*, 294 F.3d 173, 181 (D.C. Cir. 2002) ("Our cases make clear that 'an agency may not turn the provision of notice into a bureaucratic game of hide and seek.' "); *Connecticut Light & Power Co. v. NRC*, 673 F.2d 525, 530 (D.C. Cir. 1982) ("[t]o allow an agency to play hunt the peanut with technical information, hiding or disguising the information that it employs, is to condone a practice in which the agency treats what should be genuine interchange as mere bureaucratic sport.").

2.    **Defendants Presented Misleading And Incorrect Descriptions Of Material Differences In Alignment, Or Route Options, And Of The Different Impacts Of Each**

Commenters on the AA/DEIS pointed out errors and misleading assertions that also

prevented reviewers from understanding the comparative *environmental* effects of the various alternatives. The AA/DEIS repeatedly claimed that "[a]ll alternatives have *very similar alignments* and station locations, and as a result, *the natural environment* [sic] *impacts are not appreciably different between alternatives*." (AR1-011965) (emphasis added).   But as commenters (TOCC AR1-011576 to 577, AR1-011588 to 604) pointed out, the National Capital Planning Commission explained that "[t]his could not be possible since the No Build and TSM alternatives do not propose transit ways through the stream valley parks or public lands, nor will these alternatives require any excavation for construction of aerial structures and tunnels, land acquisitions, property displacements and clearing of mature trees, as the Build Alternatives would require in varying degrees." (NCPC, AR1-005831). The failure to clearly identify these material differences and MTA's false characterization of their impact is also a failure to identify and present" the "natural resources requirement and conservation potential" of alternatives. 40 C.F.R. § 1502.16(f) Such a false characterization, at the outset of the NEPA process, of the comparative environmental features and impacts of the alternatives, including low-impact and No-Build alternatives (AR1-000954), violates the core NEPA requirement to "rigorously explore and objectively evaluate all reasonable alternatives, 40 C.F.R. § 1502.14, "particularly those that might enhance environmental quality or avoid some or all of the adverse environmental effects." DOT Order 5610.1C Att. 2, ¶3.b. [19]

---

[19] In North Carolina Wildlife Federation v. North Carolina Department of Transportation, 667 F. 3d 596 (4th Cir. 2012), the court confronted the same sort of false characterization of the facts coupled with a failure to disclose assumptions underlying the data and vacated the judgment of the district court upholding the adequacy of the EIS.

>           3.      **Defendants Presented Misleading, Incorrect, And Altogether
>                   Incomplete Assessments Of Direct Impacts On The Natural
>                   Environment**

Many commenters pointed out continuously throughout the EIS process and afterwards that Defendants failed to fully assess the impacts of the Project on public health (AR1-000935 to 937) and the environment, including the extensive forest loss caused by some of the alternatives presented in the AA/DEIS and the 48 acres of forest impacts that would be caused by the Preferred Alternative (AR1-011588 to 600; AR1-001236 to 237; AR1-000953 to 954; AR1-000968 to 971; AR5-006728-729). For example, the Coquelin Run headwaters run immediately adjacent to the Purple Line, where the clearing of trees will be quite intense in order to make way for double tracks, a relocated trail, supporting walls, and related features. (AR5-006740 to 741). Nevertheless, MTA asserted that: "no direct or long-term impacts to the Coquelin Run stream valley and its interior, such as tree clearing, are anticipated to occur by implementing the Preferred Alternative." (AR1-002382).

The EIS process did not disclose the locations, amounts, or content of the excess stormwater runoff to be caused by the Project during construction or afterward or assess the ecological impact. (AR1-000974). The mere listing of waterways and of applicable rules in the FEIS Water Technical Report does not constitute such an analysis. MTA's Concept Stormwater Management Report (AR5-000718ff), which was completed only **after** the FEIS process was closed, was flawed in several respects. (AR5-006745 to 764). Moreover, MTA's post-FEIS stormwater management conclusion that "variances" are "intended to be requested" and that the Project "will result in 27.34 acres of Offsite Water Quality Mitigation" (AR5-000747, AR5-001324) belies MTA's public claim in the FEIS that "Direct effects on surface waters are anticipated to be minor and localized, mainly associated with temporary construction activities and

stormwater runoff from newly created impervious surfaces at stations and yards." (AR1-002306 to 307).

MTA also failed to assess the levels of energy use and the resulting pollution by the Project and its alternatives. 40 C.F.R. § 1502.16 (e).  The World Resources Institute found in its analysis (AR1-011474 to 499) that BRT was not only more effective in terms of cost and ridership, but was also the lowest-risk build alternative in terms of environmental impact, including its reduction of carbon dioxide and other emissions compared to the use of coal-fired electric energy by the railcars of the Preferred Alternative. Physicist David Saltzman reached the same conclusion regarding BRT technology (AR1-011643 to 652). MTA's response (AR1-002378) is inadequate and misleading in that it cites the EPA guidelines that allow an EIS not to assess the pollution caused in the **production of materials** (for example the railcars), but those guidelines **do not allow the exclusion of** the energy to be used and pollution to be caused by moving those trains between 21 stops over 16 miles at 45 mph every 7 minutes for 30 years. Moreover, MTA did count and credit the Project with saving the fuel to power the few cars it would displace, further belying the notion that a "rigorous" and "objective" analysis was conducted. [20] Once again, most or all of this harm could be avoided via another alternative.

4.    **Defendants Failed To Fully And Fairly Assess The Indirect And Cumulative Impacts Of The Preferred And Other Alternatives**

The indirect and cumulative impacts of the Purple Line were assessed with such generalized and incorrect statements as: "In general, direct and indirect adverse impacts generated by the Purple Line Project would be localized to the Purple Line corridor," and "The Preferred

---

[20] The same disingenuousness is evident in MTA's assessment of noise impacts on homes and parks as noted in FCCT's FEIS comments. (AR1-000956 to 961).

Alternative is not anticipated to generate substantial cumulative resource effects in the cumulative effects study area." AR1-002303. The Town of Chevy Chase flagged the assertion in the AA/DEIS that all routes have "very similar alignments" and that therefore the "impacts are not appreciably different between alternatives" as highly misleading (AR1-011965). See part III.A.2., supra. This inaccuracy infects the assessment of cumulative impacts as well.

Many indirect and cumulative impacts were therefore, not surprisingly, grossly under-reported when mentioned at all. In particular, in spite of critical comments on the AA/DEIS regarding indirect and cumulative impacts (AR1-011590 to 592 and AR1-011620 to 624), the FEIS inadequately addresses the consequences of the pressure for increased residential and commercial development in the communities along its route.[21] Ongoing and expected development along the route must be properly assessed. DOT Order 5610.1C, Att.2, ¶¶3.e, 14.b. (AR1-002292 to 2302). For example, the only indirect impact listed for rapidly urbanizing Bethesda, a prime target station, is the temporary closure of one block -- "the cumulative effect of concurrent Project construction would be limited to closure of Elm Street between Wisconsin Avenue and Woodmont Avenue during the construction of the shaft containing the elevators and egress stairs that connect the Metrorail station and the surface." (AR1-002303). But this ignores substantial development directly tied to the Purple Line such as redevelopment of the site that includes the Bethesda Purple Line Station and Metro South entrance and use of Elm St. Park for the displaced Trail.[22]

---

[21] The lack of assessment of the indirect and cumulative impacts on members of environmental justice communities along the route is also an FEIS defect. DOT Order 5610.1C, Att. 2, ¶6 and 40 C.F.R. § 1508.14 (AR1-000961 to 964).

[22] Similarly, Montgomery County has been taking the Purple Line into account in approving increased density and heights in revising Sector plans, as in the Chevy Chase Lake Sector Plan of

The Preferred Alternative's cumulative impact -- including that of clear-cutting -- on 48 acres of forest is not analyzed in the EIS process, nor is it put in the context of the study area's continuing decline in forest cover (AR1-002305 to 306).  This cumulative loss of forest affects local air and water quality and other factors not analyzed.  In addition, the geographic scope (watershed size) used by Defendants is too small for the correct analysis of cumulative impacts on wetlands and waterways and no assessment of the cumulative impact on aquatic ecosystem functions was presented. (The new information from Collinson goes to the FEIS, as discussed, *supra*, Section II.B).[23]

Stormwater runoff is one of the major and growing water issues for the region, yet the FEIS fails to discuss not only direct and indirect, but also cumulative impacts of such runoff on the environment. The FEIS recognizes that the second phase of development approved under the Chevy Chase Lake Sector Plan (more than a million square feet) is induced by the Purple Line, but limits discussion of development impacts on water quality to this statement, also repeated in responses to comments (AR1-002385):

> It is anticipated that any negative impact to water quality from the increased development would be avoided through the requirements of state and federal water quality regulations and the stated intent of the community to restore Coquelin Run. (AR1-002296).

---

2013. (AR5-006702 to 781).  The cascading effects of this increased density were not assessed in the FEIS.

[23] In Oregon Natural Resources Council v. Marsh, 52 F.3d 1485 (9th Cir. 1995) the court required a third Supplemental EIS after the Army Corps failed to assess the cumulative impact of a third dam not just on the turbidity and temperature of the waters, but of the cumulative impact on the spawning and rearing habitats of coho salmon and steelhead trout.  Here, the FEIS is fatally flawed not just for too little assessment of the cumulative impact on the aquatic ecosystem, but for no assessment at all.

In response, the Town of Chevy Chase commented that "MTA did not properly evaluate the impact of the development at Chevy Chase Lake so that it could be compared with the environmental effects of other proposals" (AR1-011591) and that this failure "negatively affected the quality of the environmental analysis as well as decision-making based upon that analysis," (AR2-226722 to 723).

Finally, the FEIS has no assessment of cumulative effects of development that will be induced in the vicinity of the transit stations, despite zoning regulations that allow increased density on account of proximity to transit stations. Hence, the Purple Line, intended in part to spur development fails to assess **the need for more municipal services as required**. DOT Order 5610.1C Att. 2, ¶14. Land Use and Urban Growth.

        **B.**    **Defendants Failed To Document Properly How The Project Would Comply With Environmental Laws And Affect The Ambient Air, Water And Noise Pollution Limits Of The Affected Areas.**

The FTA's NEPA regulations require that an FEIS "document compliance with the requirements of all applicable environmental laws, executive orders, and other related requirements. If full compliance is not possible by the time the final EIS is prepared, the Final EIS should reflect consultation with the appropriate agencies and provide reasonable assurance that the requirements will be met," 23 C.F.R. § 771.133. This requirement was reiterated by the Maryland Department of Planning. (AR1-005862).

Specific actions by the FTA and MTA to bring the Project into compliance were not described in most cases for most of the permits that the FEIS and the RFP list as being necessary. The FEIS simply stated (AR1-002186) in several places that a compliance plan would be developed for most of them later. As Plaintiffs commented (AR1-000953), this is sidestepping,

rather than engaging in, the "hard look" that NEPA mandates. *Kleppe v. Sierra Club,* 427 U.S 390, 410 n.21 (1976).

DOT Order 5610.1C. Att. 2, ¶9, requires its agencies to demonstrate in the NEPA process how their actions will affect the attainment in general of ambient air, water and noise standards. But the FEIS does not describe in any meaningful way how the Project will comply with CWA requirements among others or affect the compliance of other emitters or pollution, or the affected jurisdictions as a whole. The FEIS just declares: "MTA is striving to minimize floodplain impacts and will be required to obtain stormwater management permits prior to construction," (AR1-002306). But as Plaintiffs detailed, stormwater runoff from the Preferred Alternative could negate years' worth of work by County programs that aim to restore water quality (AR5-006730 to 738).

Similarly, despite the obligation to make properly reasoned responses to comments, 40 C.F.R. § 1503.4, the FEIS disregarded comments demonstrating that the Project would cause increased levels of several of the most dangerous air pollutants, thereby harming local jurisdictions and placing them further behind in their attempts to comply with the CAA. Among the assumed benefits of the Preferred Alternative that were most often touted by Project proponents was a combination of getting cars off the road and a reduction of air pollution and greenhouse gases. The FEIS and ROD, however, reveal that the Project would take very few cars off the road (AR1-002345). [24] The FEIS also avoided the CEQ-required assessment of energy and pollution impacts

---

[24] The response of MTA notes that there **might be un-assessed amounts of collateral congestion relief** due to some traffic management improvements. (AR1-002345). This asserted incidental, potential improvement is but a small fraction of the congestion relief that a planned TSM option would provide (and therein lies another violation of NEPA and the Highway Act in not assessing the benefits of alternatives such as TSM).

associated with power generation to run its railcars. 40 C.F.R.  § 1502.16 (e).   Ozone is just one

of the pollutants for which coal-fired electricity is a major source, yet Defendants did not reveal

the extent to which the Project's dependence on coal-fired electric power would set back

compliance in Maryland with ambient air standards (AR1-002378).   Thus, even at its date of

issuance the FEIS was in violation of regulations that require assessment of the impact on

attainment of such standards. DOT Order 5610.1C. ¶ 9.

> **C.    Defendants Failed To Assess The Extent To Which Mitigation Of Impacts Is Possible**

CEQ regulations require that the Draft and Final EIS assess how any unavoidable impacts

of each of the alternatives might be mitigated by either the action agency or any other entity. 40

C.F.R.  §§  1502.14(f), 1502.16(h) Defendants failed to do this with any rigor for noise

(MacGlashan supra pp. 29-30, (AR1-000960) or air pollution.   See subparts A.4 and B, supra.

Regarding noise, Don MacGlashan found the promised mitigation measure, a 4-foot noise wall, to

be insufficient and even counter-productive. (Subpart B, supra.)   The cumulative noise impacts

will be huge, but no assessment of the effectiveness of alternatives or alternative mitigation steps

for Trail users or residents, e.g. sound proofing buildings, was offered.

> **IV.    DEFENDANTS HAVE VIOLATED THE SUBSTANTIVE OBLIGATIONS IMPOSED BY THE HIGHWAY ACT AND OTHER STATUTES AND REGULATIONS GOVERNING TRANSPORTATION PROJECTS**

> **A.    The AA/DEIS Presented A Misleading Assessment Of The Performance Of Alternatives For Purposes Of New Start Funding**

MTA is seeking federal "New Start" funding for the Project (AR1-012149 to 151; SR-23).

The FTA publishes ratings for proposed projects vying for funding under its competitive New

Starts programs. Although the FTA's FY17 "profile" of the Purple Line  New Start proposal

rating[25] omits "environmental benefits" and "congestion relief", the Highway Act, in 49 USC §5309 (d), (f) and (g), requires detailed findings and ratings as to the Project's environmental impact and transportation effectiveness, based on the AA/DEIS and the FEIS process set forth in § 5309(d)(2)(A).  Funding determinations by the Secretary are specifically predicated on how he rates the Project compared to alternatives assessed in the EIS process based on several criteria, including the following:

> (A) In general.—A new fixed guideway capital Project may advance to the engineering phase upon completion of activities required under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.), as demonstrated by a record of decision with respect to the Project, ... only if the Secretary determines that the Project --
>
> (d)(2)(A)(iii)
>
> …
>
> **(iii) is justified based on a comprehensive review of the Project's mobility improvements, the Project's environmental benefits, congestion relief associated with the Project, economic development effects associated with the Project, policies and land use patterns of the Project that support public transportation, and the Project's cost-effectiveness as measured by cost per rider;**

For the reasons enumerated below, Defendants have not demonstrated compliance with these criteria.

1.      As to environmental benefits, as demonstrated in sections II and III above, the Project would do far greater harm and pose greater risks than several other reasonable alternatives that cost less, avoid harm and reduce ambient pollution.

---

[25]            http://www.fta.dot.gov/documents/MD_-Maryland-National-Capital-Purple_Line_Profile_FY17.pdf

2.      As to congestion relief, Defendants admitted "the Project is not intended to reduce roadway congestion..." (FEIS Response to Comments) (AR1-002345).

3.      As to economic development, Defendants confuse forcing economic activity into a small set of zip codes with actual increases in productive economic activity that the market itself would deliver, and Defendants ignore the opportunity costs of sinking $2.2 billion into an outdated, energy-intensive transit Project that carries relatively few riders.

4.      As to policies and land use patterns that support transit, TOCC comments on the AA/DEIS noted that MTA misrepresented the local Master Plan (AR1-011579 to 788) in ways that favored the Preferred Alternative. The dispensing of greater development heights or densities to developers owning land where transit stations are to be located ignores almost all the other elements of the operative policies and land use laws that require sufficient school space, drinking water, sewer, fire, police, stormwater controls, and ambient air and water quality.

5.      As to cost-effectiveness per rider, the AA/DEIS and FEIS were riddled with biases and flaws on both cost and ridership estimates as previously detailed. This was further demonstrated  early enough to prevent this misrepresentation of a key alternative in the AA/DEIS in a memo sent on April 17, 2008 by the Town of Chevy Chase to MTA's Robert Porcari requesting that he redirect the BRT alternative to a more densely populated route (AR2-179754ff).  The 200+ pages of expert comments filed on the AA/DEIS by the Columbia Country Club's (CCC) and Town, confirmed since then in other expert memos (SR 1-46) are replete with other examples of MTA's misrepresentations in regard to fairly assessing alternatives. For half of the cost of operating the Purple Line "one could free bus service on the entire systems" of Montgomery and Prince George's Counties, whose RideOn and TheBus systems already carry double the Projected ridership of the Purple Line (Lysy, SR 21).

As the TOCC pointed out in its comments on the FEIS, (AR2-226720 to 226730, AR2-226728 to 30) when costs for the Preferred Alternative have increased so greatly after the Analysis of Alternatives in the DEIS as to make the comparison of alternatives no longer valid, as they have in the case of the Purple Line, then it voids that alternatives assessment. 40 C.F.R. § 1502.9(a).   Furthermore, when significant new design elements or features are added that have not been subject to the appropriate analysis in the DEIS, a new comparison is required.  23 C.F.R. 771.123(c) A new EIS that encompasses a new analysis of alternatives is the only appropriate remedy in the context of the New Starts program in which only one build alternative is considered in the FEIS.  (AR2-226728 to 30)

6.     The stable and secure local funding commitments required by 49 U.S.C. § 5309(d)(2)(A)(v) and (f) and (g), are less stable and secure than ever. Tracing this decline are the Comments of the Country Club of 2008 (AR1-010902-904, AR1-010910 to 913), the Town of Chevy Chase (AR2-226729), Plaintiffs' letter of October 9, 2015 (AR5-006470 to 471), and Lublin (SR 43 to 46).

Thus, in light of the many powerful critiques that have gone without substantive rebuttal - - from nearly 300 pages of expert comments on the AA/DEIS in early 2009 to detailed comments on the FEIS, to new material information in expert declarations presented by Plaintiffs on these very elements, it is virtually impossible for the Secretary to point to an ROD that can support the findings needed to justify the Project's exorbitant costs, and qualify for federal funding.

**B.     In Contravention Of The Highway Act, The Project**
**Uses Parks Despite "Feasible Alternatives."**

Section 4(f) of the Highway Act provides, in pertinent part, that the FTA "*shall not approve . . . any Project . . . which requires the use of any publicly owned land from a public park . . . unless*

. . . there is no feasible alternative to the use of such land." 23 U.S.C. § 138(a) (emphasis added). Defendants admit that 13 parks will be affected by Purple Line noise  (Table 5 AR1-003580) (AR1-000956). But Defendants underreported these noise impacts and other uses of parks and downplayed the difference between the uses by the Preferred Alternative and those of other alternatives that would not use parks.

For example, the FEIS danced around the unsettled fate of Elm Street Park in Bethesda, although the Project would cause its natural area to be permanently reduced and its noise increased, a violation of Section 4(f) of the Highway Act and DOT Order 5610.1C, Att. 2, ¶4.  Impacts on parks are not evaluated in relation to the "no feasible alternative" standard.  Rather, the FEIS states that "[t]he effects of the Purple Line action involve small portions of parks, primarily where the parks are adjacent to or are crossed by existing roadways."[26] (AR1-002304). Destruction of the Trail and its forested buffer between Bethesda and Lyttonsville has a direct and permanent impacts upon the parks through which it runs.  That impact is not fully assessed, despite the  loud noises and stormwater impacts on the parks that would result. That lack of assessment is also a violation of DOT Order 5610.1C, Att. 2, ¶7.

The FEIS characterizes its use of parks as either temporary or *de minimis*, yet in the RFP, Defendants admitted their use of parks and stated that the private consortium would need to seek a special use permit from park authorities.  (AR1-002177 to 179; AR1-002304; AR1-001237 to 1238; AR5-006469ff.). Most importantly, there is abundant evidence and expert analysis in the

---

[26] FCCT's comments traced MTA's reclassification of 7 parks, that remained the same, in the AA/DEIS from 1 (quiet) with ambient noise from 51 to 63 LEq(1hr)(dBA) to 3 (less sensitive to noise) with levels at (60-69) in the FEIS. That allowed far more rail noise. No explanation was given for this slight of hand to hide a violation of 4(f). (AR1-000956-8).

record[27] demonstrating that there are indeed "feasible alternatives to the use of such land," 23 U.S.C. § 138(a).

V.   **DEFENDANTS ARE VIOLATING WILDLIFE LAWS AND FAILING TO PROTECT THE NATIONAL CAPITAL AREA'S ONLY FEDERALLY LISTED ENDANGERED AND CANDIDATE SPECIES, WHICH ARE AMONG THE WORLD'S MOST RARE AND VULNERABLE SPECIES**

A.   **Defendants' Failure To Complete A Biological Assessment And Biological Opinion Violates The Endangered Species Act**

The FTA and the FWS are in violation of the ESA for failing to engage in formal consultation and for instead issuing and concurring in a "no effect" determination with respect to the endangered Hay's Spring Amphipod, and with respect to the Kenk's Amphipod, which is a "candidate" for listing as an endangered species. [28] This "no effect" posture appears to have been initially taken following one short meeting on July 22, 2014 between FTA, MTA and FWS during which there was no mention of numerous additional points of stormwater runoff, hazardous materials to which they may be exposed, the loss of the trees buffering the right of way, or the cumulative impact of induced development. (FWS000189-92).

The FWS has continued this posture despite new information and changes in the Project that undercut three of the most important reasons for the FWS "no effect" determination cited in its official ESA Section 7 determination of August 22, 2014. (FWS000482-7). These include dropping Green Track, which will result in increased runoff, and the revelation in Plaintiffs'

---

[27] Schwartz, Allen, Lysy (supra., Sections II and III) and O'Toole in this section give compelling evidence as to the better alternatives.

[28] FWS Consultation Handbook at 6.2 "Informal Conference" recommends an interagency conferral to consider how to conserve and not harm candidate and proposed species in the same areas as listed.

Stormwater Report and MTA's own recent Concept Stormwater Management Report that the Preferred Alternative will create many stormwater runoff points, lines, or areas. (AR5-006702-781; subpart III.A.3, supra). The FTA has also failed to complete a full Biological Assessment of the cumulative impact of the proposed action on, and options for, the conservation and recovery of the amphipods, which the FWS would review in rendering its formal Biological Opinion on whether the Project, or reasonable and prudent alternatives to it, would be likely to avoid taking or jeopardizing the continued existence or recovery of the species. (FWS Letter of August 22, 2014 to John Talberth *et al.* FWS000490-1; Letter of May 13, 2015 to Terry Garcia of FTA, FWS000510-19). The FWS and FTA have thus violated Section 7(a)(1) and (2) of the ESA, 16 U.S.C. § 1536(a), requiring each federal agency to "conduct a biological assessment" with respect to any endangered species or threatened species "which is likely to be affected by the Project" both to avoid jeopardizing the species and determine how the action agency can assist in its conservation and recovery.

   **B.    Defendant Secretary Of The Interior Has Failed Repeatedly To Implement An Effective Monitoring System for the Candidate Kenk's Amphipod, an Even more Vulnerable Species**

   The ESA requires the Secretary to implement "**a system** to monitor effectively the status [of candidate species] and make prompt use of [its emergency listing authority] to prevent a significant risk to the well being of any such species." 16 U.S.C. § 1533(b)(3)(C)(iii).   Kenk's amphipod was added to the list of candidate species in 2010 (Federal Register FWS000650).

   The FWS' most recent candidate status review of the Kenk's dated June 2014 (FWS-000966) describes the many threats to and vulnerabilities of the species and recommends a list of conservation measures, but FWS admits that it has **no monitoring system** other than very

infrequent measuring of seepage flows, with the most recent reported measurements of flows being from **2005**.  The record demonstrates that no actual monitoring system has been established despite preparations for completing a decision as to whether and how to list this species in the next two years.

There is no better example of the need for such monitoring than the Kenk's Amphipod. With the Project, it faces the prospect of intense increases in stormwater runoff and pollution by hazardous substances (Map FWS 000311), impairment to groundwater recharge, increased urbanization, and other indirect and cumulative threats (Berg FWS000293-96).  Following issuance of the FEIS, Plaintiffs learned from the RFPs that humans may have to evacuate if the builders of the Purple Line lose control of the PCBs and other hazardous materials (AR5-006767). Amphipods cannot evacuate. Several seeps close to the route -- recently discovered by Dr. David Culver, Professor at American University and a leading expert on the amphipods at risk (FWS000500) -- could be so poisoned that they would not be fit for use in the expansion, recovery and delisting of the Hay's and Kenk's and the State-listed Sextarius amphipod with its seep between the other two as shown on Dr. Culver's Map of seeps (FWS 000959-961; FWS 000317-8; FWS 000293-6).  Such dangers are the reason that Congress required the FWS to establish an effective monitoring system for every "candidate" species that warranted a listing process that the FWS did not have yet the funds to complete.  16 U.S.C. § 1533(b)(3)(C)(iii).

Indeed, the extremely endangered status of the Kenk's has led the FWS scientific team doing the status reviews to conclude that the species would warrant emergency listing if **any** specific threat were to be on its horizon (FWS 000956ff). But in the absence of a monitoring plan the status report reveals that the team has not considered **any** of the several threats posed by the direct or cumulative impacts of the Purple Line and the much-touted economic development atop

the already planned increases in development just upstream from the Kenk's. (FWS000956, FWS000965-6.)

The monitoring program for the Kenk's, as noted above and as FWS's official Kenk's status reports show (FWS000966), simply does not exist. This ESA violation could have calamitous consequences for a highly endangered species. Species Assessment Report 2014 (FWS000956ff); Hay's Amphipod 2013 5-year Review, pp.5-9 (8)2013 (FWS000616); Culver (FWS 000499-501); Berg (FWS 000290-99).[29]

### C.   Defendants have Violated the MBTA by Authorizing and Implementing a Project that will Kill Migratory Birds Without an MBTA Permit Or Conservation Plan

The FTA and MTA have failed to attempt to avoid the "take" of migratory birds, other than one colony of one species, and has not sought the required permit for the take of migratory birds that the Project will foreseeably cause. This failure violates 16 U.S.C. § 703 and its implementing regulations.  These require all persons, including federal agencies, to "obtain a valid permit before commencing an activity" that will take, capture or kill birds protected by the MBTA, 50 C.F.R. §§ 13.1; 21.11. Governor O'Malley's selection of the Preferred Alternative (AR1-001944) causes deforestation of the Georgetown Branch Trail and would impact Forest Dwelling Interior Species' habitat as well as other forest or wetland habitat of Migratory Birds.  The fact that this alternative is also among the more costly alternatives and not the only route available means that this taking of protected birds was avoidable.  Defendants therefore failed to take all reasonable measures

---

[29] Given that the FTA and MTA and potential private partners are continuing to make changes in the design and construction plans affecting the immediate upstream watershed of both species including potential recovery habitat for the Hays and Kenk's amphipods, Defendants' decision to not reinitiate conferral about the effect on the Kenk's is a violation of the duty to have an effective monitoring system as required by the ESA for "warranted but precluded" candidates.

either to **avoid** migratory bird take or to obtain a permit for such take, which is the type of proactive step that the MBTA requires of them when preparing to build and operate such a Project (Manville Affidavit, SR-31). The Preferred Alternative is likely to take migratory birds (Plaintiffs Comments on FEIS AR1-001224) but Defendants have not put forth a plan to seek such a permit in the FEIS and ROD. Moreover, new changes introduced by Governor Hogan (AR4-007432-4) including waiving Green Track and its stormwater controlling effects, and waiving restrictions on night-time construction to expedite construction, are likely to result in further take of migratory birds in violation of federal law. New information about the need for evacuation plans for spills of hazardous materials also calls for precautions to protect migratory birds from such materials.[30]

Defendants have also failed to complete an MBTA Conservation Plan as required by Executive Order (SR-35). 50 C.F.R. §§ 13.1; 21.11. The failure to comply with the MBTA is also arbitrary, capricious, and otherwise not in accordance with law within the meaning of the APA, 5 U.S.C. §706(1), § 706(2).

## V.      CONCLUSION AND PROPOSED REMEDY

In view of the foregoing legal violations, Defendants' acts and omissions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and "without observance of procedure required by law." 5 U.S.C. §§ 706(1),(2). Accordingly, Plaintiffs respectfully request that the Court issue appropriate declaratory relief and vacate the Record of Decision pending compliance with federal law. A Proposed Order is enclosed.

---

[30] See, United States v. FMC Corporation, 572 F. 2d 902 (2d Cir. 1978) (defendants' conviction for MBTA violations upheld despite their having taken some precautions to prevent birds from exposure to storage ponds containing pesticides); *see also* United States v. Corbin Farm Service, 578 F. 2d 259 (9th Cir. 1978).

Respectfully submitted,

**KNOPF & BROWN**

David W. Brown, Bar No. 415426
401 E. Jefferson Street, Ste. 206
Rockville, MD  20850
brown@knopf-brown.com
(301) 545-6100 phone
(301) 545-6103 fax

February 19, 2016

**Attorney for Plaintiffs**

DOT 5610.1C                                              Attachment 2
9-18-79                                                  Page 1

## FORMAT AND CONTENT OF ENVIRONMENTAL IMPACT STATEMENTS

1.   **Format.**

    a.   The format recommended in CEQ 1502.10 should be used for DOT EISs:

        (a)   Cover Sheet
        (b)   Summary
        (c)   Table of Contents
        (d)   Purpose and Need for the Action
        (e)   Alternatives Including the Proposed Action
        (f)   Affected Environment
        (g)   Environmental Consequences
        (h)   List of Preparers
        (i)   List of Agencies, Organizations, and Persons to Whom Copies of the Statement Are Sent
        (j)   Index
        (k)   Appendices (if any)

    b.   The cover sheet for each environmental impact statement will include the information identified in CEQ 1502.11 and will be headed as follows:

Department of Transportation

_____
(operating administration)

(Draft/Final) Environmental Impact Statement
Pursuant to Section 102(2)(C), P.L. 91-190

As appropriate, the heading will indicate that the EIS also covers the requirements of section 4(f) of the DOT Act, section 14 of the Mass Transportation Act, and/or sections 16 and 18(a)(4) of the Airport Act.

EXHIBIT 1

Attachment 2                                                    DOT 5610.1C
Page 2                                                          9-18-79

2.   Guidance as to Content of Statements.

   a.   Environmental impact statements shall include the information
        specified in CEQ 1502.11 through 1502.18.  The following paragraphs
        of Attachment 2 are intended to be considered, where relevant,
        as guidance regarding the content of environmental statements.

   b.   Additional information contained in research reports, guidance
        on methodology, and other materials relating to consideration
        of environmental factors should be employed as appropriate in
        the preparation of EISs and environmental assessments.  Examples
        of such materials include:

             U.S. Department of Transportation, Environmental Assessment
             Notebook Series:  Highways, 1975, Report No. DOT P 5600.4,
             available from the U.S. Government Printing Office, Washington,
             D.C. 20402, Stock Number 050-000-00109-1;

             U.S. DOT, Environmental Assessment Notebook Series:
             Airports, 1978, Report Number DOT P 5600.5, available from
             the U.S. Government Printing Office, Washington, D.C.
             20402, Stock Number 050-000-00138-5;

             U.S. DOT, FAA, Environmental Assessment of Airport Development
             Actions, 1977, available from the National Technical Information
             Service, 5284 Port Royal Road, Springfield, Virginia 22161,
             NTIS Catalog Number ADA-039274; and

             U.S. DOT, Guidelines for Assessing the Environmental Impact
             of Public Mass Transportation Projects, 1979, Report Number
             DOT P 79 001, available from the National Technical Information
             Service, Springfield, Virginia 22161.

3.   General Content.  The following points are to be covered.

   a.   A description of the proposed Federal action (e.g. "The proposed
        Federal action is approval of location of highway..." or "The proposed
        Federal action is approval of a grant application to construct..."),
        and a statement of its purpose.

   b.   Alternatives, including the proposed action, and including, where
        relevant, those alternatives not within the existing authority of
        the responsible preparing office.  Section 102(2)(E) of NEPA requires
        the responsible agency to "study, develop, and describe appropriate
        alternatives to recommended courses of action in any proposal
        which involves unresolved conflicts concerning alternative uses

of available resources." A rigorous exploration and an objective evaluation of the environmental impacts of all reasonable alternative actions, particularly those that might enhance environmental quality or avoid some or all of the adverse environmental effects, are essential. Sufficient analysis of such alternatives and their environmental benefits, costs, and risks should accompany the proposed action through the review process in order not to foreclose prematurely options which might enhance environmental quality or have less detrimental effects. Examples of such alternatives include: the alternative of not taking any action or of postponing action pending further study; alternatives requiring actions of a significantly different nature which would provide similar benefits with different environmental impacts, e.g. low capital intensive improvements, mass transit alternatives to highway construction; alternatives related to different locations or designs or details of the proposed action which would present different environmental impacts. In each case, the analysis should be sufficiently detailed to reveal comparative evaluation of the environmental benefits, costs, and risks of each reasonable alternative, including the proposed action. Where an existing impact statement already contains such an analysis, its treatment of alternatives may be incorporated, provided such treatment is current and relevant to the precise purpose of the proposed action.

c.   Affected environment.

(1)   The statement should succinctly describe the environment of the area affected as it exists prior to a proposed action, including other related Federal activities in the area, their interrelationships, and cumulative environmental impact. The amount of detail provided in such descriptions should be commensurate with the extent and expected impact of the action, and with the amount of information required at the particular level of decision making (planning, feasibility, design, etc.).

(2)   The statement should identify, as appropriate, population and growth characteristics of the affected area and any population and growth assumptions used to justify the project or program or to determine secondary population and growth impacts resulting from the proposed action and its alternatives (see paragraph 3e(2)). In discussing these population aspects, the statement should give consideration to using the rates of growth in the region of the project contained in the projections compiled for the Water Resources Council by the Bureau of Economic Analysis of the Department of Commerce and the Economic Research Service of the Department of Agriculture (the OBERS projection).

Attachment 2                                    DOT 5610.1C
Page 4                                          9-18-79

    d.    <u>The relationship of the proposed action</u> and how it may conform
to or conflict with adopted or proposed land use plans, policies,
controls, and goals and objectives as have been promulgated by
affected communities. Where a conflict or inconsistency exists,
the statement should describe the extent of reconciliation and
the reasons for proceeding notwithstanding the absence of full
reconciliation.

    e.    <u>The probable impact of the proposed action on the environment.</u>

        (1)    This requires assessment of the positive and negative effects
of the proposed action as it affects both national and international
human environment. The attention given to different environmental
factors will vary according to the nature, scale, and location
of proposed actions. Primary attention should be given in
the statement to discussing those factors most evidently
impacted by the proposed action.

        (2)    Secondary and other foreseeable effects, as well as primary
consequences for the environment, should be included in
the analysis. Secondary effects, such as impacts on existing
community facilities and activities inducing new facilities
and activities, may often be even more substantial than
the primary effects of the original action itself. For example,
the effects of the proposed action on population and growth
may be among the more significant secondary effects. Such
population and growth impacts should be estimated and an
assessment made on their effects upon the resource base,
including land use, water, and public services, of the area
in question.

    f.    <u>Any probable adverse environmental effects which cannot be avoided</u>
(such as water or air pollution, noise, undesirable land use patterns,
or impacts on public parks and recreation areas, wildlife and waterfowl
refuges, or on historic sites, damage to life systems, traffic congestion,
threats to health, or other consequences adverse to the environmental
goals set out in section 101(b) of NEPA). This should be a brief
summary of those effects discussed in paragraph 3c that are adverse and
unavoidable under the proposed action. Included for purposes
of contrast should be a clear statement of how all adverse effects
will be mitigated.

g.  The relationship between local short-term uses of man's environment
and the maintenance and enhancement of long-term productivity.
This discussion should cover the extent to which the proposed action involves
tradeoffs between short-term environmental gains at the expense
of long-term losses, or vice versa, and a discussion of the extent
to which the proposed action forecloses future options.

h.  Any irreversible and irretrievable commitments of resources that
would be involved in the proposed action should it be implemented.
This requires identification of unavoidable impacts and the extent
to which the action irreversibly curtails the range of potential
uses of the environment. "Resources" means not only the labor
and materials devoted to an action but also the natural and cultural
resources lost or destroyed.

i.  An indication of what other interests and considerations of Federal
policy are thought to offset the adverse environmental effects
of the proposed action identified pursuant to subparagraphs (e)
and (f) of this paragraph. The statement should also indicate
the extent to which these stated countervailing benefits could
be realized by following reasonable alternatives to the proposed
action (as identified in subparagraph (b) of this paragraph) that
would avoid some or all of the adverse environmental effects.
In this connection, cost-benefit analyses of proposed actions, if
prepared, should be attached, or summaries thereof, to the environmental
impact statement, and should clearly indicate the extent to which
environmental costs have not been reflected in such analyses.

j.  A discussion of problems and objections raised by other Federal
agencies, State and local entities, and citizens in the review process,
and the disposition of the issues involved and the reasons therefor.
(This section may be added to the final environmental statement
at the end of the review process.)

   (1)  The draft and final statements should document issues raised
        through consultations with Federal, State, and local agencies
        with jurisdiction or special expertise and with citizens, of
        actions taken in response to comments, public hearings,
        and other citizen involvement proceedings.

   (2)  Any unresolved environmental issues and efforts to resolve
        them, through further consultations or otherwise, should
        be identified in the final statement. For instance, where

an agency comments that the statement has inadequate
analysis or that the agency has reservations concerning
the impacts, or believes that the impacts are too adverse
for approval, either the issue should be resolved or the final
statement should reflect efforts to resolve the issue and
set forth any action that will result.

(3)     The statement should reflect that every effort was made
to discover and discuss all major points of view on the environmental
effects of the proposed action and alternatives in the draft
statement.  However, where opposing professional views
and responsible opinion have been overlooked in the draft
statement and are raised through the commenting process,
the environmental effects of the action should be reviewed
in light of those views.  A meaningful reference should be
made in the final statement to the existence of any responsible
opposing view not adequately discussed in the draft statement
indicating responses to the issues raised.

(4)     All substantive comments received on the draft (or summaries
of responses from the public which have been exceptionally
voluminous) should be attached to the final statement, whether
or not each such comment is thought to merit individual
discussion in the text of the statement.

k.     Draft statements should indicate at appropriate points in the text
any underlying studies, reports, and other information obtained
and considered in preparing the statement, including any cost-
benefit analyses prepared.  In the case of documents not likely
to be easily accessible (such as internal studies or reports), the
statement should indicate how such information may be obtained.
If such information is attached to the statement, care should be
taken to insure that the statement remains an essentially self-
contained instrument, capable of being understood by the reader
without the need for undue cross reference.

4.     Publicly Owned Parklands, Recreational Areas, Wildlife and Waterfowl
Refuges and Historic Sites.  The following points are to be covered:

a.     Description of "any publicly owned land from a public park, recreational
area or wildlife and waterfowl refuge" or "any land from an historic
site" affected or taken by the project.  This includes its size, available
activities, use, patronage, unique or irreplaceable qualities, relationship
to other similarly used lands in the vicinity of the project, maps,

plans, slides, photographs, and drawings showing in sufficient scale and detail the project.  This also includes its impact on park, recreation, wildlife, or historic areas, and changes in vehicular or pedestrian access.

b.  Statement of the "national, State or local significance" of the entire park, recreation area, refuge, or historic site "as determined by the Federal, State or local officials having jurisdiction thereof."

  (1)  In the absence of such a statement, lands will be presumed to be significant.  Any statement of "insignificance" by the official having jurisdiction is subject to review by the Department as to whether such statement is capricious.

  (2)  Where Federal lands are administered for multiple uses, the Federal official having jurisdiction over the lands shall determine whether the subject lands are in fact being used for park, recreation, wildlife, waterfowl, or historic purposes.

c.  Similar data, as appropriate, for alternative designs and locations, including detailed cost estimates (with figures showing percentage differences in total project costs) and technical feasibility, and appropriate analysis of the alternatives, including any unique problems present and evidence that the cost or community disruptions resulting from alternative routes reach extraordinary magnitudes.  This portion of the statement should demonstrate compliance with the Supreme Court's statement in the Overton Park case, as follows:

   "The very existence of the statute indicates that the protection of parklands was to be given paramount importance.  The few green havens that are public parks were not to be lost unless there were truly unusual factors present in a particular case or the cost or community disruption resulting from alternative routes reached extraordinary magnitudes.  If the statutes are to have any meaning, the Secretary cannot approve the destruction of parkland unless he finds that the alternative routes present unique problems."

d.  If there is no feasible and prudent alternative, description of all planning undertaken to minimize harm to the protected area and statement of actions taken or to be taken to implement this planning, including measures to maintain or enhance the natural beauty of the lands traversed.

(1)  Measures to minimize harm may include replacement of
land and facilities, providing land or facilities, or provision
for functional replacement of the facility (see 49 C.F.R.
25.267).

(2)  Design measures to minimize harm; e.g. tunneling, cut
and cover, cut and fill, treatment of embankments, planting,
screening, maintenance of pedestrian or bicycle paths and
noise mitigation measures, all reflecting utilization of appropriate
interdisciplinary design personnel.

e.  Evidence of concurrence or description of efforts to obtain concurrence
of Federal, State or local officials having jurisdiction over the
section 4(f) property regarding the action proposed and the measures
planned to minimize harm.

f.  If Federally-owned properties are involved in highway projects,
the final statement shall include the action taken or an indication
of the expected action after filing a map of the proposed use of
the land or other appropriate documentation with the Secretary
of the Department supervising the land (23 U.S.C. 317).

g.  If land acquired with Federal grant money (Department of Housing
and Urban Development open space or Heritage Conservation
and Recreation Service land and water conservation funds) is involved,
the final statement shall include appropriate communications
with the grantor agency.

h.  The General Counsel will determine application of section 4(f)
to public interests in lands, such as easements, reversions, etc.

i.  A specific statement that there is no feasible and prudent alternative
and that the proposal includes all possible planning to minimize
harm to the "section 4(f) area" involved.

5.  Properties and Sites of Historic and Cultural Significance.  The statement
should document actions taken to preserve and enhance districts, sites,
buildings, structures, and objects of historical, architectural, archaeological,
or cultural significance affected by the action.

a.  Draft environmental statements should include identification, through
consulting the State Historic Preservation Officer and the National
Register and applying the National Register Criteria (36 C.F.R. Part 800), of
properties that are included in or eligible for inclusion in the National Register

of Historic Places that may be affected by the project. The Secretary of the Interior will advise whether properties not listed are eligible for the National Register (36 C.F.R. Part 63).

b. If application of the Advisory Council on Historic Preservation's (ACHP) Criteria of Effect (36 C.F.R. Part 800) indicates that the project will have an effect upon a property included in or eligible for inclusion in the National Register of Historic Places, the draft environmental statement should document the effect. Evaluation of the effect should be made in consultation with the State Historic Preservation Officer (SHPO) and in accordance with the ACHP's Criteria of Adverse Effect (36 C.F.R. Part 800).

c. Determinations of no adverse effect should be documented in the draft statement with evidence of the application of the ACHP's Criteria of Adverse Effect; the views of the appropriate State Historic Preservation Officer, and submission of the determination to the ACHP for review.

d. If the project will have an adverse effect upon a property included in or eligible for inclusion in the National Register of Historic Places, the final environmental statement should include either an executed Memorandum of Agreement or comments from the Council after consideration of the project at a meeting of the ACHP and an account of actions to be taken in response to the comments of the ACHP. Procedures for obtaining a Memorandum of Agreement and the comments of the Council are found in 36 C.F.R. Part 800.

e. To determine whether the project will have an effect on properties of State or local historical, architectural, archaeological, or cultural significance not included in or eligible for inclusion in the National Register, the responsible official should consult with the State Historic Preservation Officer, with the local official having jurisdiction of the property, and, where appropriate, with historical societies, museums, or academic institutions having expertise with regard to the property. Use of land from historic properties of Federal, State and local significance as determined by the official having jurisdiction thereof involves section 4(f) of the DOT Act and documentation should include information necessary to consider a section 4(f) determination (see paragraph 4).

Attachment 2                                    DOT 5610.1C
Page 10                                         9-18-79

6.  <u>Impacts of the Proposed Action on the Human Environment Involving
    Community Disruption and Relocation.</u>

    a.  The statement should include a description of probable impact
        sufficient to enable an understanding of the extent of the environmental
        and social impact of the project alternatives and to consider whether
        relocation problems can be properly handled.  This would include
        the following information obtainable by visual inspection of the proposed
        affected area and from secondary sources and community
        sources when available.

        (1)  An estimate of the households to be displaced including
             the family characteristics (e.g. minorities, and income levels,
             tenure, the elderly, large families).

        (2)  Impact on the human environment of an action which divides
             or disrupts an established community, including, where pertinent,
             the effect of displacement on types of families and individuals
             affected, effect of streets cut off, separation of residences
             from community facilities, separation of residential areas.

        (3)  Impact on the neighborhood and housing to which relocation
             is likely to take place (e.g. lack of sufficient housing for
             large families, doublings up).

        (4)  An estimate of the businesses to be displaced, and the general
             effect of business dislocation on the economy of the community.

        (5)  A discussion of relocation housing in the area and the ability
             to provide adequate relocation housing for the types of families
             to be displaced.  If the resources are insufficient to meet
             the estimated displacement needs, a description of the actions
             proposed to remedy this situation including, if necessary,
             use of housing of last resort.

        (6)  Results of consultation with local officials and community
             groups regarding the impacts to the community affected.
             Relocation agencies and staff and other social agencies
             can help to describe probable social impacts of this proposed
             action.

        (7)  Where necessary, special relocation advisory services to be
             provided the elderly, handicapped and illiterate regarding
             interpretations of benefits, assistance in selecting replacement

housing, and consultation with respect to acquiring, leasing, and occupying replacement housing.

    b.    This data should provide the preliminary basis for assurance of the availability of relocation housing as required by DOT 5620.1, Replacement Housing Policy, dated 6-24-70, and 49 C.F.R. 25.57.

7.    <u>Considerations Relating to Pedestrians and Bicyclists</u>.  Where appropriate, the statement should discuss impacts on and consideration to be given in the development of the project to pedestrian and bicycle access, movement and safety within the affected area, particularly in medium and high density commercial and residential areas.

8.    <u>Other Social Impacts</u>.  The general social groups specially benefitted or harmed by the proposed action should be identified in the statement, including the following:

    a.    Particular effects of a proposal on the elderly, handicapped, non-drivers, transit dependent, or minorities should be described to the extent reasonably predictable.

    b.    How the proposal will facilitate or inhibit their access to jobs, educational facilities, religious institutions, health and welfare services, recreational facilities, social and cultural facilities, pedestrian movement facilities, and public transit services.

9.    <u>Standards as to Noise, Air, and Water Pollution</u>.  The statement shall reflect sufficient analysis of the effects of the proposed action on attainment and maintenance of any environmental standards established by law or administrative determination (e.g. noise, ambient air quality, water quality), including the following documentation:

    a.    With respect to water quality, there should be consultation with the agency responsible for the State water pollution control program as to conformity with standards and regulations regarding storm sewer discharge, sedimentation control, and other non-point source discharges.

    b.    The comments or determinations of the offices charged with administration of the State's implementation plan for air quality as to the consistency of the project with State plans for the implementation of ambient air quality standards.

    c.    Conformity to adopted noise standards, compatible, if appropriate, with different land uses.

Attachment 2
Page 12

DOT 5610.1C
9-18-79

10. <u>Energy Supply and Natural Resources Development</u>. Where applicable, the statement should reflect consideration of whether the project or program will have any effect on either the production or consumption of energy and other natural resources, and discuss such effects if they are significant.

11. <u>Floodplain Management Evaluation</u>. When an alternative under consideration encroaches on a base (100-year) floodplain, the statement should describe the anticipated impacts on natural and beneficial floodplain values, any risk to or resulting from the transportation action, and the degree to which the action facilitates additional development in the base floodplain. The necessary measures to address floodplain impacts, including an evaluation of alternatives to avoid the encroachment in appropriate cases, should be described in compliance with Executive Order 11988, "Floodplain Management," and DOT Order 5650.2, "Floodplain Management and Protection."

12. <u>Considerations Relating to Wetlands or Coastal Zones</u>. Where wetlands or coastal zones are involved, the statement should reflect compliance with Executive Order 11990, Protection of Wetlands, and DOT 5660.1A and should include:

   a. Information on location, types, and extent of wetlands areas which might be affected by the proposed action.

   b. An assessment of the impacts resulting from both construction and operation of the project on the wetlands and associated wildlife, and measures to minimize adverse impacts.

   c. A statement by the local representative of the Department of the Interior, and any other responsible officials with special expertise, setting forth his views on the impacts of the project on the wetlands, the worth of the particular wetlands areas involved to the community and to the Nation, and recommendtions as to whether the proposed action should proceed, and, if applicable, along what alternative route.

   d. Where applicable, a discussion of how the proposed project relates to the State coastal zone management program for the particular State in which the project is to take place.

13. <u>Construction Impacts.</u> In general, adverse impacts during construction will be of less importance than long-term impacts of a proposal. Nonetheless, statements should appropriately address such matters as the following, identifying any special problem areas:

    a.    Noise impacts from construction and any specifications setting maximum noise levels.

    b.    Disposal of spoil and effect on borrow areas and disposal sites (include specifications where special problems are involved).

    c.    Measures to minimize effects on traffic and pedestrians.

14. <u>Land Use and Urban Growth.</u> The statement should include, to the extent relevant and predictable:

    a.    The effect of the project on land use, development patterns, and urban growth.

    b.    Where significant land use and development impacts are anticipated, identify public facilities needed to serve the new development and any problems or issues which would arise in connection with these facilities, and the comments of agencies that would provide these facilities.

15. (Deleted)

16. <u>Projects under Section 14 of the Mass Transportation Act: Mass Transit Projects with a Significant Impact on the Quality of the Human Environment:</u> The statement should include:

    a.    Evidence of the opportunity that was afforded for the presentation of views by all parties with a significant economic, social or environmental interest.

    b.    Evidence that fair consideration has been given to the preservation and enhancement of the environment and to the interests of the community in which the project is located.

    c.    If there is an adverse environmental effect and there is no feasible and prudent alternative, description of all planning undertaken to minimize such adverse environmental effect and statement of actions taken or to be taken to implement the planning; or a specific statement that there is no adverse environmental effect.