# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DISTRICT OF COLUMBIA

|  |  |
|---|---|
| FRIENDS OF THE CAPITAL CRESCENT TRAIL, *et al*., | ) No. 1:14-cv-01471-RJL )  ) ) |
| Plaintiffs, | ) ) |
| v. | ) Hon. Richard J. Leon ) |
| FEDERAL TRANSIT ADMINISTRATION, *et al*., | ) ) ) |
| Federal Defendants, | ) ) |
| -and- | ) ) |
| MARYLAND TRANSIT ADMINSTRATION, | ) ) |
| Defendant-Intervenor. | ) ) ) |

# FEDERAL DEFENDANTS' MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## GLOSSARY OF ACRONYMS

| | |
|---|---|
| AA/DEIS | Alternatives Analysis/Draft Environmental Impact Statement |
| BRT | Bus Rapid Transit |
| CEQ | Council on Environmental Quality |
| CNOR | Candidate Notice of Review |
| DOI | U.S. Department of Interior |
| DOT | U.S. Department of Transportation |
| ESA | Endangered Species Act |
| FFGA | Full Funded Grant Agreement |
| FTA | Federal Transit Administration |
| FWS | U.S. Fish and Wildlife Service |
| LEED | Leadership in Energy and Environmental Design |
| LPA | Locally Preferred Alternative |
| LRV | Light Rail Vehicle |
| MBTA | Migratory Bird Treaty Act |
| MTA | Maryland Transit Administration |
| NEPA | National Environmental Policy Act |
| NPS | National Park Service |
| Section 4(f) | Section 4(f) of the Department of Transportation Act |
| SEIS | Supplemental Environmental Impact Statement |
| TSM | Transportation System Management |
| WMATA | Washington Metropolitan Area Transit Authority |

## **CHRONOLOGY**

| Date | Event |
|------|-------|
| 1985 | CSX Transportation ("CSX") abandoned service on the Georgetown Branch and announced that the right-of-way would become available for sale. AR1_001920. |
| 1988 | Montgomery County purchased the Georgetown Branch right-of-way and undertook a more detailed study analyzing two distinct alternatives for the Bethesda to Silver Spring portion of the right-of-way: one with transit and a trail, and one with only a trail.  AR1_001920-21. |
| 1990 | Montgomery County adopted a Master Plan amendment, which embraced the concept of using the Georgetown Branch right-of-way for a light rail transit system and a paved, 10-foot-wide hiker/biker trail.  AR2_218154 |
| Sep. 3, 2003 | FTA and MTA published an a notice of intent to prepare an Environmental Impact Statement that proposed multiple alternatives: a no-action alternative, a transportation system management alternative ("TSM"), and a range of bus rapid transit ("BRT") and light rail transit alternatives for connecting Bethesda to New Carrollton.  68 Fed. Reg. 52452 (Sep. 3, 2003); AR2_208610. |
| 2003-2008 | FTA and MTA examined various alternatives and design concepts, retaining eight alternatives and several design options for further study in the Alternatives Analysis/Draft Environmental Impact Statement ("AA/DEIS"). |
| Oct. 17, 2008 | The Notice of Availability of the AA/DEIS was published in the Federal Register on October 17, 2008, and a 90-day public comment period extended from October 17, 2008 to January 14, 2009. 73 Fed. Reg. 61,859 (Oct. 17, 2008).  Four public hearings in November 2008 attracted over 750 participants and the overall process yielded over 3,300 comments. AR1_000002. |
| Aug. 4, 2009 | The State of Maryland primarily chose the Medium Investment light rail alternative as defined in the AA/DEIS, with elements of the High Investment light rail alternative as the Locally Preferred Alternative ("LPA"). AR1_001945; AR1_000002. |
| Oct. 11, 201 | FWS responds to FTA's ESA inquiry, stating that that no listed species are known to exist in the project area and that no biological assessment or further consultation was required.  FWS_5-6. |

| Date | Event |
|------|-------|
| Aug. 9, 2012 | In accordance with 23 C.F.R. Part 771.12923, MTA prepared a re-evaluation because more than three years had passed since publication of the AA/DEIS. AR2_064519. |
| Oct. 2, 2012 | FTA concurred with MTA's reevaluation.  AR2_061614. |
| Sep. 6, 2013 | MTA and FTA release Final Environmental Impact Statement and Draft Section 4(f) Evaluation ("FEIS"), which examined the Preferred Alternative, including the refinements since the AA/DEIS. |
| Dec. 16, 2013 | Based on FEIS comments raising concerns about the Project's potential to affect the Hay's Spring amphipod, a federally listed endangered species, FTA and MTA reached out to the U.S. Fish and Wildlife Service ("FWS") to discuss the issue.  AR2_001788; AR1_001830. |
| Jan. 7, 2014 | FWS confirmed that the closest known location of the Hay's Spring amphipod was approximately 4.5 miles downstream from the project and stated that no effect the Hay's Spring amphipod is expected because of this distance.  FWS concluded that the candidate species, Kenk's amphipod would also not be affected because the closest known location was 40 vertical feet above Coquelin Run and hydrologically separated.  AR2_001664-65. |
| Mar. 19, 2014 | FTA's Regional Administrator signed the Record of Decision ("ROD") selecting the Preferred Alternative. |
| June 25, 2014 | The Friends of the Capital Crescent Trail ("FCCT") and other groups submitted a letter to FTA and FWS, asserting that new information about the presence of the Hay's Spring amphipod (and another species, the Kenk's amphipod) required FTA to re-initiate Section 7 consultation under the Endangered Species Act ("ESA").  AR3_000352.  Attached to the notice was a report authored by Dr. Culver documenting sampling he had done in April 2014, but reported that he found no amphipods.  AR3_000366-71. |
| Aug. 20, 2014 | MTA responded to Dr. Culver's report, which included a memorandum from a Maryland Department of Natural Resources ("MDNR") expert on amphipods, Mr. Daniel Feller, who reported that he had extensively investigated that areas sampled by Dr. Culver, and had found no amphipods, and considered the areas to be poor-quality.  AR3_000016-54 |
| Aug. 22, 2014 | Based on the Culver Report, FWS re-confirmed that the Project would have "no effect" on the Hay's Spring and Kenk's amphipods.  AR3_000004. |

| Date | Event |
|------|-------|
| April 2015 | Dr. Culver submitted a new report to MDNR after going back in the field in the fall of 2014, but again found no Hay's Spring or Kenk's amphipods.  AR3 000393. |
| May 5, 2015 | Mr. Feller from MDNR responded that based on his review of the new 2015 Culver Report there are no endangered or threatened amphipods in the immediate vicinity of the Purple Line or in adjacent areas to the south or north.  AR3_000388. |
| May 13, 2015 | In a letter to FTA, FWS summarized its assessment of Dr. Culver's latest report and again confirmed its "no effect" finding for the Hay's Spring and Kenk's amphipods. AR3 000375. |
| May 19, 2015 | Based on MTA's and FWS's assessment of the Culver reports, FTA concluded that the information regarding the Hay's Spring or Kenk's amphipods did not require a supplemental EIS ("SEIS"). AR3_000001. |
| July 10, 2015 | Governor Larry Hogan announces that the Purple Line project will go forward with 41 cost-saving measures.  AR4_007432-35. |
| July 14, 2015 | FCCT sends a letter to FTA and FWS requesting FTA to prepare an SEIS to address the 41 cost-saving measures, among other issues.  AR4_007411-26. |
| Sept. 24, 2015 | FTA determines that no SEIS is required with respect to the 41 cost-saving measures.  AR4_000001-02. |
| Oct. 9, 2015 | FCCT sends a letter to FTA and FWS requesting FTA to prepare an SEIS to address myriad issues, primarily including stormwater concerns. AR5_006469-77. |
| Jan. 7, 2016 | FTA determines that no SEIS is required with respect to the issues raised in FCCT's letters of July 14 and October 9, 2015.  AR5_000001-06. |

Purple Line Final Environmental Impact Statement, Figure 2-5.  Purple Line Preferred Alternative.



AR1_001954.

Purple Line Final Environmental Impact Statement, Figure 1-2.  Georgetown Branch Interim Trail.



AR1_001921.

Purple Line Final Environmental Impact Statement, Figure 2-6.  Typical Section in Georgetown Branch Right-of-way.



AR1_001955.

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

STATUTORY BACKGROUND ........................................................................... 2

I.      National Environmental Policy Act. ...................................................... 2

II.     The Federal Transit Act and the "New Starts" program. ...................... 3

III.    Section 4(f) of the Department of Transportation Act. ......................... 4

IV.     The Endangered Species Act. ................................................................ 5

V.      The Migratory Bird Treaty Act. ............................................................ 7

FACTUAL BACKGROUND ............................................................................... 8

I.      The NEPA process for the Purple Line ................................................. 8

II.     FTA and the Service completed informal consultation under the ESA. .......................... 11

STANDARD OF REVIEW ................................................................................ 13

ARGUMENT ..................................................................................................... 14

I.      Plaintiffs' NEPA claims challenging FTA's ROD lack merit. ............ 14

        A.      FTA adequately responded to public comments on the Project. ......................... 15

        B.      FTA's descriptions of the build-alternatives were not misleading. ...................... 16

        C.      FTA took a "hard look" at the Project's direct impacts. ....................... 17

        D.      FTA adequately considered the Projects' indirect and cumulative impacts. ........ 20

        E.      The FEIS adequately explains how the Project will comply with other laws. ..... 22

        F.      The Project's consideration of mitigation measures for noise impacts were adequate. ........................ 22

II.     Plaintiffs' claims that FTA was required to prepare an SEIS lack merit. ......................... 23

        A.      FTA properly determined that the Governor's 41 cost-saving measures do not constitute new or significant information. ........................ 25

                1.      Green Track ....................................................... 26

                2.      Frequency of Trains ........................................... 27

3.    Parabolic Steel Bridge.................................................................. 28

4.    LEED Standard for Maintenance Facility................................. 29

5.    Alternate Interim Trail ............................................................. 29

B.    FTA properly concluded that the issues raised in Plaintiffs' letters of July 14 and October 9, 2015 do not constitute significant new information requiring supplementation. ............................................................................... 30

1.    Metro Ridership Levels............................................................. 30

2.    Post-ROD Declarations............................................................. 30

3.    FCCT's Stormwater Paper ....................................................... 33

4.    Floodplains................................................................................ 35

5.    Manville Declaration ............................................................... 35

III.    Plaintiffs' Federal Transit Act claim fails to identify a final agency action reviewable under the APA........................................................................................... 37

IV.    FTA complied with Section 4(f). .................................................................. 39

A.    FTA properly concluded the impact to Elm Street Park is a temporary occupancy and not a "use" under Section 4(f). ......................................................... 39

B.    FTA's determination that the Georgetown Branch Right-of-way is not a Section 4(f) resource is sound. ..................................................................... 40

C.    FTA properly concluded that impacts to the Baltimore-Washington Parkway are *de minimis*. ................................................................................ 41

V.    Plaintiffs' ESA claims lack merit. ............................................................... 42

A.    The Agencies complied with ESA Section 7(a)(2)............................... 42

B.    The Service fulfilled its duty to implement a system to monitor the status of the Kenk's amphipod. ............................................................................. 44

VI.    Plaintiffs' MBTA claim lacks merit. ............................................................ 47

VII.    Plaintiffs have not demonstrated that they are entitled to the relief they seek. ............... 49

CONCLUSION.................................................................................................... 50

# TABLE OF AUTHORITIES

CASES

*Apache Survival Coal. v. United States*,
  21 F.3d 895 (9th Cir. 1994) ................................................................................ 31, 32

*Ark Initiative v. U.S. Forest Serv.*,
  660 F.3d 1256 (10th Cir. 2011) ................................................................................ 25

*Bennett v. Spear*,
  520 U.S. 154 (1997) ................................................................................................. 37

*Bldg. Indus. Ass'n of Superior Cal. v. Norton*,
  247 F.3d 1241 (D.C. Cir. 2001) ................................................................................ 47

*Blue Ridge Envtl. Def. League v. Nuclear Regulatory Comm'n*,
  716 F.3d 183 (D.C. Cir. 2013) .................................................................................. 24

*BNSF Ry. Co.*,
  No. CIV 06-866-HA, 2006 WL 3408035 (D. Or. Nov. 27, 2006) .......................... 38

*Bryant v. Gates*,
  532 F.3d 888 (D.C.Cir.2008) ........................................................................ 26, 27, 28

*Cal. Native Plant Soc'y v. Norton*,
  No. 03-cv-1540, 2005 WL 768444 (D.D.C. Mar. 24, 2005) ................................... 47

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ................................................................................................. 49

*Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*,
  667 F. Supp. 2d 111 (D.D.C. 2009) .......................................................................... 13

*Chesapeake Climate Action Network v. Exp.-Imp. Bank of the U.S.*,
  78 F. Supp. 3d 208 (D.D.C. 2015) ............................................................................ 48

*Citizens Against Burlington, Inc. v. Busey*,
  938 F.2d 190 (D.C. Cir. 1991) ............................................................................ 14, 23

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) .............................................................................................. 5, 13

*City of Waukesha v. EPA*,
  320 F.3d 228 (D.C. Cir. 2003) .......................................................... 23, 25, 36, 37

*Coleman v. D.C.*,
  794 F.3d 49 (D.C. Cir. 2015) .................................................................................... 26

*Conservation Cong. v. U.S. Forest Serv.*,
   720 F.3d 1048 (9th Cir. 2013) ....................................................................... 42, 43

*Ctr. For Biological Diversity v. U.S. Dep't of the Interior*,
   563 F.3d 466 (D.C. Cir. 2009) ...................................................................... 6, 7, 43

*Defenders of Wildlife v. Jackson*,
   791 F. Supp. 2d 96 (D.D.C. 2011) ....................................................................... 49

*Dep't of Transp. v. Pub. Citizen*,
   541 U.S. 752 (2004) ................................................................................................ 31

*Friends of Boundary Mountains v. U.S. Army Corps of Eng'rs*,
   24 F. Supp. 3d 105 (D. Me. 2014) ....................................................................... 48

*Gas & Elec. Co. v. NRDC*,
   462 U.S. 87 (1983) ................................................................................. 13, 14, 17

*Hein v. Freedom From Religion Found., Inc.*,
   551 U.S. 587 (2007) ................................................................................................ 39

*Humane Soc'y v. Glickman*,
   217 F.3d 882 (D.C. Cir. 2000) ...................................................................... 8, 9, 47

*Kleppe v. Sierra Club*,
   427 U.S. 390 (1976) ................................................................................................ 21

*Lakes & Parks All. of Minneapolis v. Metro. Council*,
   120 F. Supp. 3d 959 (D. Minn. 2015) ................................................................. 38

*Marsh v. Or. Nat. Res. Council*,
   490 U.S. 360 (1989) ................................................................................................ 24

*Metro. Edison Co. v. People Against Nuclear Energy*,
   460 U.S. 766 (1983) ........................................................................................ 30, 32

*Mississippi v. EPA*,
   744 F.3d 1334 (D.C. Cir. 2013) ..................................................... 15, 16, 33, 34

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 ............................................................................................................. 49

*Montgomery Cnty. v. Bhatt*,
   446 Md. 79 (2016) ................................................................................................... 40

*Nat'l Oilseed Processors Ass'n v. Occupational Safety & Health Admin.*,
   769 F.3d 1173 (D.C. Cir. 2014) ........................................................................... 19

*Nat'l Ass'n of Home Builders v. U.S. Fish & Wildlife Serv.*,
786 F.3d 1050 (D.C. Cir. 2015) ............................................................................. 5

*North Carolina v. EPA*,
550 F.3d 1176 (D.C. Cir. 2008) ............................................................................ 50

*Pac. Shores Subdivision, Cal. Water Dist. v. U.S. Army Corps of Engineers*,
448 F. Supp. 2d 1 (D.D.C. 2006) ..................................................................... 36, 42

*Protect Our Cmtys. Found. v. Chu*,
No. 12cv3062 L(BGS), 2014 WL 1289444 (S.D. Cal. Mar. 27, 2014) .................... 48

*Protect Our Cmtys. Found. v. Jewell*,
No. 13cv575JLS (JMA), 2014 WL 1364453 (S.D. Cal. March 25, 2014) ............... 48

*Protect Our Water v. Flowers*,
377 F. Supp. 2d 844 (E.D. Cal. 2004) .................................................................. 44

*Pub. Employees for Envtl. Responsibility v. Beaudreau*,
25 F. Supp. 3d 67 (D.D.C. 2014) ........................................................................ 48

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) ........................................................................ 2, 3, 17, 18

*Russell Country Sportsmen v. U.S. Forest Serv.*,
668 F.3d 1037 (9th Cir. 2011) ....................................................................... 34, 37

*Se. Conf. v. Vilsack*, 684 F. Supp. 2d 135, 142 (D.D.C. 2010) .................................... 14

*Seattle Audubon Soc'y v. Evans*,
952 F.2d 297 (9th Cir. 1991) ............................................................................. 48

*SEC v. Banner Fund Int'l*,
211 F.3d 602 (D.C.Cir.2000) ............................................................................. 26

*Sierra Club v. Peterson*,
228 F.3d 559 (5th Cir. 2000) ............................................................................. 38

*Small Refiner Lead Phase–Down Task Force v. EPA*,
705 F.2d 506 (D.C. Cir. 1983) ........................................................................... 13

*States Power Co. v. Fed. Transit Admin.*,
No. 01-295 JRT/FLN, 2001 WL 1618532 (D. Minn. May 24, 2001) ...................... 38

*Sugar Cane Growers Co-op. of Fla. v. Veneman*,
289 F.3d 89 (D.C. Cir. 2002) ......................................................................... 49, 50

*Sw. Ctr. for Biological Diversity v. Babbitt*,
215 F.3d 58 (D.C. Cir. 2000) ............................................................................. 47

*Taylor v. Mills,*
    892 F. Supp. 2d 124 (D.D.C. 2012) ................................................................. 20

*Theodore Roosevelt Conservation P'ship v. Salazar,*
    605 F. Supp. 2d 263 (D.D.C. 2009) ............................................................. 2, 14

*Theodore Roosevelt Conservation P'ship v. Salazar,*
    616 F.3d 497 (D.C. Cir. 2010) ............................................................. 2, 31, 36

*Theodore Roosevelt Conservation P'ship,*
    661 F.3d ....................................................................................... 14, 30, 34

*Tinicum Twp., Pa. v. U.S. Dep't of Transp.,*
    685 F.3d 288 (3d Cir.2012) ........................................................................ 14

*Town of Secaucus v. U.S. Dep't of Transp.,*
    889 F. Supp. 779 (D.N.J. 1995) ................................................................... 37

*Valley Cmty. Pres. Comm'n v. Mineta,*
    231 F. Supp. 2d 23 (D.D.C. 2002) ......................................................... passim

*Vill. of Bensenville v. FAA,*
    457 F.3d 52 (D.C. Cir. 2006) ...................................................................... 48

*Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,*
    435 U.S. 519 (1978) ................................................................................... 2

*Wasco Prods., Inc. v. Southwall Techs., Inc.,*
    435 F.3d 989 (9th Cir. 2006) ................................................................. 20, 21

*WildEarth Guardians v. Bureau of Land Mgmt.,*
    8 F. Supp. 3d 17 (D.D.C. 2014) ....................................................... 2, 14, 15, 20

*Winter v. NRDC,*
    555 U.S. 7 (2008) ................................................................................ 49, 50

STATUTES

16 U.S.C. § 1241 ............................................................................................ 40

16 U.S.C. § 1533 ............................................................................................. 5

16 U.S.C. § 1533(b)(1)(A) ............................................................................ 45, 46

16 U.S.C. § 1533(b)(3)(A) ................................................................................. 5

16 U.S.C. § 1533(b)(3)(B) ................................................................................. 5

16 U.S.C. § 1536(a)(1) ..................................................................................... 44

16 U.S.C. § 1536(a)(2) .................................................................................. 6, 42

16 U.S.C. § 1536(b)(4) ...................................................................................... 42

16 U.S.C. § 1536(c)(1) ...................................................................................... 42

16 U.S.C. § 1540(g)(1)(A) ................................................................................ 47

16 U.S.C. § 703 ................................................................................................... 1

16 U.S.C. § 703(a) ......................................................................................... 7, 48

16 U.S.C. § 707(a) ............................................................................................... 7

16 U.S.C. §§ 1531 ............................................................................................... 1

23 U.S.C. § 138 ............................................................................................... 1, 4

23 U.S.C. § 138(a) ............................................................................................... 4

23 U.S.C. § 139(c)(3) .......................................................................................... 3

33 U.S.C. § 1313 ............................................................................................... 32

42 U.S.C. § 4321 ................................................................................................. 1

42 U.S.C. § 4332(2)(C) ................................................................................. 2, 14

49 U.S.C. § 303 ................................................................................................... 4

49 U.S.C. § 303(c) ............................................................................................... 4

49 U.S.C. § 5301 ............................................................................................... 37

49 U.S.C. § 5309 ..................................................................................... 1, 37, 38

49 U.S.C. § 5309(b)(1) ....................................................................................... 3

49 U.S.C. § 5309(c)-(d) ...................................................................................... 3

49 U.S.C. § 5309(d)(1)(A) .................................................................................. 4

49 U.S.C. § 5309(d)(2) ....................................................................................... 4

49 U.S.C. § 5309(d)(2)(A) ................................................................................ 38

49 U.S.C. § 5309(k)(2)(A) ................................................................................ 38

49 U.S.C. §§ 107 ................................................................................................. 3

49 U.S.C. §§ 5303(c) ................................................................................................ 3

5 U.S.C. § 551(13) ................................................................................................... 38

5 U.S.C. § 552 ................................................................................................... 15, 31

5 U.S.C. § 701(a)(2) ............................................................................................... 47

5 U.S.C. § 702(1) .................................................................................................... 49

5 U.S.C. § 704 ......................................................................................................... 37

5 U.S.C. §§ 701-706 ............................................................................................... 13

5 U.S.C. §§ 702 ........................................................................................................ 8

REGULATIONS

23 C.F.R. § 771.129 ................................................................................................ 10

23 C.F.R. § 771.130 ................................................................................................ 24

23 C.F.R. § 771.130(c) ...................................................................................... 24, 25

23 C.F.R. § 774.1 ..................................................................................................... 4

23 C.F.R. § 774.11(h) ............................................................................................. 41

23 C.F.R. § 774.13(d) ............................................................................................. 39

23 C.F.R. § 774.15 .................................................................................................. 40

23 C.F.R. § 774.17(5)(2) ......................................................................................... 41

23 C.F.R. Part 771 ................................................................................................... 3

33 C.F.R. 332.8(d)(6) ............................................................................................. 32

40 C.F.R. § 1501.3 ................................................................................................... 2

40 C.F.R. § 1502.14(a) ........................................................................................... 14

40 C.F.R. § 1502.21 ................................................................................................ 15

40 C.F.R. § 1503.4(a)(5) ......................................................................................... 15

40 C.F.R. § 1508.18(a) ............................................................................................. 4

49 C.F.R. § 611.207 ................................................................................................. 4

49 C.F.R. § 622.101 ........................................................................................................... 3

49 C.F.R. §§ 611.101(b)(3) ............................................................................................... 4

49 C.F.R. §§ 611.105 ......................................................................................................... 4

50 C.F.R. § 10.12 .......................................................................................................... 7, 48

50 C.F.R. § 402.12(d) .................................................................................................... 6, 42

50 C.F.R. § 402.12(d)(1) ............................................................................................... 6, 42

50 C.F.R. § 402.13 ........................................................................................................... 11

50 C.F.R. § 402.14(a) ......................................................................................................... 6

50 C.F.R. § 424.14(b)(1) .................................................................................................... 5

50 C.F.R. §§ 17.11 .............................................................................................................. 5

50 C.F.R. §§ 402.13(a) ................................................................................................ 42, 43

50 C.F.R. pt. 21 .................................................................................................................. 7

## INTRODUCTION

Plaintiffs challenge the Federal Transit Administration's ("FTA") March 19, 2014 Record of Decision ("ROD") and the U.S. Fish and Wildlife Service's related approvals for the Purple Line Project ("Project"), a 16.2-mile light rail transit project in Montgomery and Prince George's Counties, Maryland.  The Purple Line is a critical component of the region's transportation infrastructure and will provide a much-needed east-west corridor between the New Carrolton Washington Metropolitan Area Transit Authority ("WMATA") Metro station in Prince George's County and the Bethesda Metro station in Montgomery County, Maryland to serve the area's growing transportation needs.  AR1_000001.[1]  The existing Metro system primarily serves passengers travelling in a north-south orientation to and from Washington D.C.  The Purple Line, however, was designed to "[p]rovide faster, more direct, and more reliable east-west transit service connecting the major activity centers."  *Id.*  The Project will benefit the communities it serves by "better link[ing] people to employment and activities in the corridor and beyond."  *Id.*

Plaintiffs raise a myriad of claims under the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, the Federal Transit Act, 49 U.S.C. § 5309, Section 4(f) of the Department of Transportation Act, 23 U.S.C. § 138, the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*, and the Migratory Bird Treaty Act, 16 U.S.C. § 703.  But the record demonstrates the exhaustive analyses, careful planning, and transparent decision-making process undertaken by the agencies over more than a decade.  Despite this robust evaluation, Plaintiffs claim the agencies should have done more.  In short, "[P]laintiffs' complaint . . . is that [the agencies] did not analyze certain issues in the manner or level of detail plaintiffs would have preferred, and therefore this Court should vacate the FEIS.  Unfortunately for [P]laintiffs, the applicable standard of review

---

[1] Federal Defendants cite to the agencies' administrative records as "AR1_", "AR2_", "AR3_", "AR4_", "AR5_", or "FWS_" followed by the applicable Bates number.

neither contemplates nor countenances that type of judicial second-guessing of agency

decisionmaking." *WildEarth Guardians v. Bureau of Land Mgmt.*, 8 F. Supp. 3d 17, 31 (D.D.C.

2014).  Because Plaintiffs fail to demonstrate the agencies' decisions were arbitrary and

capricious, the Court should grant the agencies' motion for summary judgment.

## STATUTORY BACKGROUND

### I.      National Environmental Policy Act.

NEPA serves the dual purpose of informing agency decision-makers of the significant

environmental effects of proposed major federal actions and ensuring that relevant information is

made available to the public so that they "may also play a role in both the decisionmaking

process and the implementation of that decision."  *See Robertson v. Methow Valley Citizens*

*Council*, 490 U.S. 332, 349 (1989); *see also Theodore Roosevelt Conservation P'ship v. Salazar*,

616 F.3d 497, 503 (D.C. Cir. 2010) ("It is an 'essentially procedural' statute, meant to ensure 'a

fully informed and well-considered decision, not necessarily' the best decision") (quoting *Vt.*

*Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978)).  To

meet these dual purposes, NEPA requires that an agency prepare an Environmental Impact

Statement ("EIS") for "major Federal actions significantly affecting the quality of the human

environment."  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.3.  An EIS should take a "hard look"

at the impacts of the proposed action and compare the proposal to other reasonable alternatives.

*Theodore Roosevelt Conservation P'ship*, 616 F.3d at 503; 42 U.S.C. § 4332(2)(C)).

A court's review of an agency's NEPA compliance is limited.  *Theodore Roosevelt*

*Conservation P'ship v. Salazar*, 605 F. Supp. 2d 263, 271 (D.D.C. 2009).  Its role is to determine

"whether the decision was based on a consideration of the relevant factors and whether there has

been a clear error in judgment." *Id.*  "The Court must not substitute its judgment for that of the

agency's, as 'NEPA merely prohibits uninformed—rather than unwise—agency action.'" *Id.* at

271-72 (quoting *Robertson,* 490 U.S. at 351).

**II.     The Federal Transit Act and the "New Starts" program.**

FTA awards financial grants and supports states and local agencies in planning,

developing, and improving mass transportation facilities.  *See* 49 U.S.C. §§ 107, 5303(a), 5304,

5314(a).  Under the Federal Transit Act (Urban Mass Transportation Act of 1964) ("Federal

Transit Act"), Pub. L. No. 88-365, 78 Stat. 302 (1964) (codified as amended at 49 U.S.C. § 5301

*et seq.*), FTA provides federal financing to local transit systems, but the local agencies generally

develop the details of their projects.  *See* 49 U.S.C. §§ 5303(c), 5309.  Before FTA approves

grant applications, it must ensure that the local agency meets various statutory and regulatory

prerequisites.  *See, e.g., id*. § 5309(d); 49 C.F.R. § 622.101; 23 C.F.R. Part 771.  Therefore, FTA

and the local agency serve together as "joint lead agenc[ies]" for complying with NEPA.  23

U.S.C. § 139(c)(3).  Congress allows the local agency to "prepar[e]" the NEPA document as

long as the FTA "furnishes guidance" on it, "independently evaluates" it, and approves it.  *Id*.

Here, Maryland Transit Administration ("MTA") is the project sponsor and will design,

construct, and operate the Purple Line.  AR1_000001, 1969, 2172.  MTA has applied for a

federal grant under the "New Starts" component of FTA's Capital Investment Grant program to

cover a portion of construction costs.  AR1_1936, 1968-69; AR2_208610, 97852.  FTA

administers the Capital Investment program to support locally planned and operated transit

projects.  *See* 49 U.S.C. § 5309(b)(1), (d); 49 C.F.R. § 611.101(a); AR1_2206, 12149-50.

Under the statute governing the program, FTA evaluates and rates proposed major transit

capital investments against specific statutory criteria to ensure that prospective grant recipients

demonstrate the technical and financial capability to implement the project.  49 U.S.C. §

5309(c)-(d); 49 C.F.R. §§ 611.203-611.205; AR1_001968-69, 12149-50.  During the project

development phase, the applicant must develop a NEPA analysis and sufficient information for

FTA to evaluate and rate the project against the statutory criteria.  49 U.S.C. § 5309(d)(1)(A); 78

Fed. Reg. 1992, 1992 (Jan. 9, 2013); AR1_1968-69, 1249-50.  A NEPA analysis is performed

because NEPA generally applies to all "projects and programs entirely or partly financed . . . by

federal agencies."  40 C.F.R. § 1508.18(a).

After the NEPA process and other steps are completed by the project sponsor, FTA must

evaluate and rate the project to determine whether it may advance into the Engineering phase.

49 U.S.C. § 5309(d)(2); 49 C.F.R. § 611.207; 78 Fed. Reg. at 1992.  During Engineering, the

scope of the proposed project is finalized; estimates of project cost, benefits, and impacts are

refined; project management plans and fleet management plans are updated; and final

construction plans, detailed specifications, final construction cost estimates, and bid documents

are prepared.  The project sponsor must also obtain commitments of all non-Capital Investment

Grant funding.  49 C.F.R. §§ 611.105, 611.211(a).

At the conclusion of Engineering, FTA may approve the project for a Full Funding Grant

Agreement, which defines the scope of the project, the amount of Capital Investment Grant funds

that will be contributed, and other terms and conditions.  49 U.S.C. § 5309(k)(2)(A)-(C); 49

C.F.R. §§ 611.101(b)(3), 611.105, 611.211(b); 78 Fed. Reg. at 1992.

## III.     Section 4(f) of the Department of Transportation Act.

Although NEPA is a procedural statute, the Department of Transportation Act ("DOT

Act") substantively restricts FTA's decision-making authority in certain respects.  DOT Act §

4(f), Pub. L. No. 89-670, 80 Stat. 931, 933 (Oct. 15, 1966) (codified as amended at 49 U.S.C. §

303 and 23 U.S.C. § 138); 23 C.F.R. § 774.1.  Commonly known as Section 4(f), that provision

constrains the Secretary of Transportation's authority to approve transportation projects that

"requir[e] the use of any publicly owned land of a public park . . . ."  49 U.S.C. § 303(c); (accord

23 U.S.C. § 138(a)).  FHWA may approve projects that "use" more than a *de minimis* amount of

those resources only if "(1) there is no prudent and feasible alternative" and (2) "the program or project includes all possible planning to minimize harm to the . . . [resource] resulting from the use." *Id*. FTA's Section 4(f) determination "is entitled to a presumption of regularity." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971).

## IV.   The Endangered Species Act.

The Endangered Species Act ("ESA") provides for the listing of species as threatened or endangered and the designation of their critical habitat.  16 U.S.C. § 1533.  The Secretary of the Interior is responsible for listing terrestrial plants and animals, including the endangered Hay's spring amphipod, and inland fish species.  The Secretary administers the ESA through the U.S. Fish and Wildlife Service ("Service").  *See id.* § 1532(15); 50 C.F.R. §§ 17.11, 402.01(b).

Under ESA Section 4, the public may petition the Service to list a species as endangered or threatened.[2]  After receiving a petition to list or delist a species, the Service must, "[t]o the maximum extent practicable," make a finding within 90 days of receiving the petition "as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted."  16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(b)(1).  A "negative" 90-day finding ends the listing or delisting process, and the ESA authorizes judicial review of such a finding.  16 U.S.C. § 1533(b)(3)(C)(ii).  However, if the Service makes a "positive" 90-day finding, then within twelve months of receiving a petition, the Service must determine if listing is warranted, not warranted, or warranted but precluded.  16 U.S.C. § 1533(b)(3)(B).  A warranted-but-precluded finding places a species on the candidate list and defers a final listing determination so the agency can focus its resources on higher priority determinations.  *See Nat'l Ass'n of Home Builders v. U.S. Fish & Wildlife Serv.*, 786 F.3d 1050,

---

[2] The Service may also initiate its own status review to determine whether listing is warranted.

1051 (D.C. Cir. 2015).  The Service must "implement a system to monitor effectively the status of all species" determined to be warranted-but-precluded.  16 U.S.C. § 1533(b)(3)(C)(iii).  However, candidate species otherwise "have no legal status and are accorded no protection under the Act."  50 C.F.R. § 402.12(d); 51 Fed. Reg. 19,926; 19,946 (June 3, 1986); FWS_483 n.1.

Listed species are entitled to a variety of protections under the Act.  ESA Section 7(a)(2) directs each federal agency proposing an action (the "action agency") to insure, in consultation with (as is relevant here) the Service, that the action "is not likely to jeopardize the continued existence of any [listed] species or result in the destruction or adverse modification" of critical habitat.  16 U.S.C. § 1536(a)(2).  If the Service advises that no listed species or critical habitat is present in the action area, or the action agency determines that its action will have no effect on listed species or critical habitat, the consultation requirement is not triggered.  *See* 50 C.F.R. § 402.12(d)(1); *Ctr. For Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 474-75 (D.C. Cir. 2009).  If, however, the action agency determines that its action "may affect listed species or critical habitat," then it must consult with the Service.  50 C.F.R. § 402.14(a).

ESA Section 7 consultation may be formal or informal.  *See id.* §§ 402.13-402.14.  Informal consultation is "an optional process that includes all [inter-agency] discussions, correspondence, etc.," that are developed to aid the agencies in "determining whether formal consultation … is required."  *Id.* § 402.13(a).  If the action agency determines that the action is not likely to adversely affect a listed species or critical habitat and obtains written concurrence from the Service, "the consultation process is terminated, and no further action is necessary."  *Id.*

If the action agency or the Service determines that the action is likely to adversely affect listed species or critical habitat, then formal consultation is required.  *Id.* § 402.14(b)(1).  Formal consultation concludes with the Service's issuance of a "biological opinion" as to whether the

proposed action is likely to jeopardize the continued existence of any listed species or destroy or adversely modify designated critical habitat. *Id.* § 402.14(h).

Even after the consultation has been concluded, the action agency may need to reinitiate consultation when it retains discretionary involvement or control over the action and, *inter alia*, "new information reveals effects of the action that may affect listed species, or critical habitat in a manner or to an extent not previously considered." *Id.* § 402.16(b).

## V.     The Migratory Bird Treaty Act.

The Migratory Bird Treaty Act ("MBTA") provides that, "[u]nless and except as permitted by regulations" promulgated by the Secretary of the Interior, "it shall be unlawful . . . to pursue, hunt, take, capture, kill, [or] attempt to take, capture, or kill . . . any migratory bird . . . included in the terms of the conventions between the United States and Great Britain [on behalf of Canada] . . . [Mexico] . . . Japan . . . and the [Soviet Union]." 16 U.S.C. § 703(a). Regulations implementing the MBTA explain that the term "take" means to "pursue, hunt, shoot, wound, kill, trap, capture, or collect." 50 C.F.R. § 10.12. Under § 707(a), "any person, association, partnership, or corporation" is "guilty of a misdemeanor" if they "violate any provisions" of the Act or any implementing regulation. 16 U.S.C. § 707(a).

The Secretary of the Interior administers the MBTA through the Service. Under the MBTA regulations, the Service may permit the take of migratory birds in certain circumstances not relevant here. *See* 50 C.F.R. pt. 21. The regulations do not establish a comprehensive permitting scheme for the take of migratory birds incidental to other lawful activities. Nor does the statute or regulations mandate that a federal agency obtain a permit prior to authorizing third-party activities that may incidentally take migratory birds. *See id.*

The MBTA does not contain a citizen-suit provision that allows private citizens to bring enforcement suits against federal agencies or other third parties. However, the D.C. Circuit has

held that the MBTA prohibits federal agencies from directly taking migratory birds without authorization and that persons challenging agency action allegedly taken in violation of the MBTA may bring suit under the Administrative Procedure Act, 5 U.S.C. §§ 702, 704.  *See Humane Soc'y v. Glickman*, 217 F.3d 882, 888 (D.C. Cir. 2000).

## FACTUAL BACKGROUND

### I.  The NEPA process for the Purple Line.

The purpose of the Purple Line Project is to provide faster, more direct, and more reliable east-west transit service that will connect major activity centers, provide better connections to other transit lines, and improve the connection between communities located in Maryland's Montgomery and Prince George's counties.  AR1_001900.  To accomplish these goals, the Purple Line will connect five major activity centers including, Bethesda, Silver Spring, Takoma and Langley Park, College Park, and the transit hub of New Carrollton.  *Id*.  The Project will include 21 stations and connect to four lines of the region's Metrorail lines, MARC commuter rail, Amtrak passenger rail, and regional and local bus systems.  AR1_001903-04.  The Project will also include the expansion of the Capital Crescent Trail from Bethesda to Silver Spring, Maryland, replacing the current trail, which includes unpaved portions, with a new permanent trail that will run parallel to the light rail line.  AR1_001903-05.

The transitway will be at grade, or level with, the adjacent roadways with the exception of three elevated sections and one short tunnel.  AR1_000001.  The Purple Line will operate primarily in dedicated lanes and will include twenty-one stations, two storage and maintenance facilities, and a number of other ancillary facilities.  *Id*.

The existing transit system was developed to connect the suburbs to downtown Washington, D.C.  AR1_001900.  As such, it consists of a series of routes that extend outward from downtown D.C. into each of the surrounding jurisdictions.  *Id*.  For the past 20 years,

regional studies and local land use plans have identified a deficiency in east-west transit services in Montgomery and Prince George's Counties.  *Id.*  Because of the growing population and employment in these counties, roadways have become increasingly congested.  AR1_001918, 25-26.  While east-west bus service does exist, the buses operate on these same congested roads, which greatly limits the speed and reliability of bus trips.  AR1_001926-30.  When fully operational, passengers will be able to travel the length of the Purple Line in approximately 63 minutes, as opposed to 108 minutes by bus if the Project were not built.  AR1_001903.  By 2040, MTA and FTA project over 74,000 trips per day on the Purple Line.  AR1_001904.

In 1985, CSX Transportation abandoned service on the Georgetown Branch, and in 1988 Montgomery County purchased it to support a transit corridor between Bethesda and Silver Spring.  AR1_001920.  In 1996, Montgomery County removed the railroad tracks and ties, and built a temporary interim trail between Bethesda and Lyttonsville, Maryland named the Georgetown Branch Interim Trail, which is a segment of the larger Capital Crescent Trail that extends 7-miles southwest to Georgetown, D.C.  AR1_001920.  The Georgetown Branch Interim Trail was built as a temporary trail until a decision could be made on the construction of a transitway in this same corridor.  *See id.*

On September 3, 2003, MTA and FTA initiated the NEPA process for the Purple Line by publishing a Notice of Intent to prepare an Environmental Impact Statement.  68 Fed. Reg. 52,452, 52,452 (Sep. 3, 2003); AR2_208610.  The modal alternatives identified for evaluation were a no-action alternative, a transportation system management ("TSM") alternative, as well as a range of bus rapid transit ("BRT") and light rail transit alternatives for connecting Bethesda to New Carrollton.  AR2_208610; AR1_001903.  Between 2003 and 2008, MTA conducted 280 public meetings, convened eight community focus groups, and held four public scoping meetings

in the Purple Line corridor.  AR1_011996; AR2_206898 (summarizing scoping comments).

This extensive screening process identified eight alternatives to analyze in the Alternatives

Analysis/Draft Environmental Impact Statement ("AA/DEIS"), including: (1) the no-action

alternative, (2), TSM, (3) three BRT alternatives (high, medium, and low investment), and (4)

three light-rail alternatives (high, medium, and low investment).  AR1_012023-28.

Within these alternatives, the agencies considered realigning the Project onto Jones Mill

Road through light rail and BRT, but that alternative was eliminated because of the impacts on

traffic and difficulty in acquiring land from the National Institutes of Health.  AR1_011998;

AR1_002357.  The agencies found that light rail on Georgetown Branch would better meet the

Project's purposes because it would provide faster and more reliable travel times, greater

capacity for growth, lower emissions, and a direct connection to downtown Bethesda.

AR1_001935-36, AR1_001940-41; AR2_150110-13; AR2_133946.

On August 4, 2009, MTA chose the Medium Investment light rail alternative as defined

in the Alternatives Analysis/Draft Environmental Impact Statement ("AA/DEIS"), with elements

of the High Investment light rail alternative as the Locally Preferred Alternative ("LPA")

because of the ability of light rail to accommodate growth in demand for transit service beyond

2030.  AR1_001945; AR1_000002.  Based on the LPA, MTA conducted additional technical

studies, continued agency coordination, and refined and developed its analysis.  AR2_064519-

20; AR2_061614.  In accordance with 23 C.F.R. § 771.129, On August 8, 2012, MTA issued a

re-evaluation because more than three years had passed since publication of the AA/DEIS,

AR2_064519, and on October 2, 2012, FTA concurred with MTA's reevaluation.  AR2_061614.

On September 6, 2013, MTA and FTA released the Purple Line Final Environmental

Impact Statement and Draft Section 4(f) Evaluation ("FEIS"), which examined the Preferred

Alternative, including the refinements since the AA/DEIS.  AR1_001884- AR1_011943.  The

FEIS included responses to 3,300 comments received on the AA/DEIS, which MTA grouped

into 20 topical categories and summarized before providing its response. AR1_006023-11943.

During the 45-day comment period on the FEIS, FTA received 968 additional comments.  AR_1

000101.  On March 19, 2014, FTA's Regional Administrator signed the Record of Decision

("ROD") selecting the Preferred Alternative, which selected the LPA as modified by subsequent

design refinements.  AR1_001953-69 (describing Preferred Alternative); AR1_000001, 32

(approving the Preferred Alternative).

## II.    FTA and the Service completed informal consultation under the ESA.

Prior to executing the ROD, MTA contacted the Service to determine if any listed species

were present in the Project Area.  The Service advised that, except for occasional transient

individuals, no listed species are known to exist within the Project Area and that, as a result, no

biological assessment or further ESA consultation was required.  FWS_5-6.

In response to information provided in public comments, FTA and MTA engaged in

additional informal consultation with the Service pursuant to 50 C.F.R. § 402.13 to verify that

the Hay's Spring and Kenk's amphipods are not known to occur in the Project Area and would

not be affected by the Project.  FWS_3-6, 66-70, 94-95, 482.  The Hay's Spring amphipod

(*Stygobromus hayi*) is a small crustacean occurring exclusively in groundwater springs and seeps

on the slopes adjacent to Rock Creek in Washington, D.C.  FWS_3-6, 66-70, 94-95, 482.  The

Service listed the species as endangered in 1982 and determined that it was not prudent to

designate critical habitat for the species.  FWS_523-25.  The Kenk's amphipod (*Stygobromus*

*kenki*) is also a small crustacean known to occur in five spring sites in Washington, D.C., and

Maryland.  The species is a candidate for listing for which the Service has made a warranted-but-

precluded finding, but it is not currently listed or proposed for listing.  FWS_646, 650.

On January 7, 2014, the Service confirmed that neither species is known to occur in the Project Area and that the Project would have no effect on either species.  FWS_94-95.  The closest known location of the Hay's Spring amphipod is in a spring adjacent to Rock Creek, approximately 4.5 miles downstream of the Purple Line's crossing of the creek.  FWS_94, 483.  The Service found that the Project would have no effect on the species or its supporting groundwater systems due to the distance to the known species locations and the unlikelihood of adverse effects on the flow and water quality of Rock Creek.  FWS_94-95.  The Service likewise found that the Project would not effect on the Kenk's amphipod because the closest occurrence is a quarter mile from the Project in a spring separated from groundwater sources in the project area.  *Id.*  FTA incorporated the Service's "no effect" finding into its ROD.  AR1_31, 203-04.

On June 25, 2014, Plaintiffs gave FTA and the Service notice of their intent to sue, claiming that "new research" undermined the agencies' "no effect" findings.  FWS_140.  On August 22, 2014, after meeting with FTA and the Plaintiffs and considering the Maryland Department of Natural Resources' expert assessment of the information Plaintiffs had provided, the Service reaffirmed its "no effect" finding.  FWS_482-87, 490, 361-64; AR3_10-69.  The Service noted that the new surveys cited by the Plaintiffs failed to locate either amphipod species in the Project Area.  FWS_483, 485.  The Service also found that the Purple Line would not adversely impact water quality in Rock Creek in a manner that could affect the Hay's Spring amphipod.  FWS_484.  The Service explained that significant increases in stormwater runoff are unlikely because most construction will take place within an existing railroad right of way, best management practices required under state law will reduce silt runoff, and the proposed use of green track would increase water infiltration.  *Id.*  The Service also noted that the "most important" threats to both amphipod species "are those that have a direct impact on the recharge

area (drainage basin) of seepage springs.  The Purple Line will not impact any of the recharge

areas of seepage springs known to support Kenk's or Hay's Spring amphipods."  FWS_484-85.

In their notice of intent to sue, Plaintiffs indicated that new surveys were planned for the

fall of 2014.  FWS_145.  The Service received the results of those surveys, along with Maryland

Department of Natural Resources' assessment, in the spring of 2015.  FWS_497-501, 506-12.

Once again, the surveys failed to locate either species or occupied habitat in the action area.  *Id.*

at 511.  Accordingly, the Service concluded that its original finding that neither species is known

to occur in the Project Area or would be affected by the Project "remains unchanged" and that

there was no need for further ESA consultation.  FWS_511.

## <u>STANDARD OF REVIEW</u>

Plaintiffs' challenge is governed by the judicial review provisions of the Administrative

Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  Under the APA, review is limited to a

determination of whether the agency acted in a manner that was "arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law."  *Id.* at § 706(2)(A).  Although this

inquiry is thorough, the standard of review is narrow and highly deferential to the agency.

*Citizens to Pres. Overton Park, Inc.*, 401 U.S. at 416.  The agency's action is presumed to be

valid, and must be upheld if it meets "minimal standards of rationality."  *Small Refiner Lead

Phase–Down Task Force v. EPA*, 705 F.2d 506, 521 (D.C. Cir. 1983).  The Court's review is

limited to the administrative record before the agency at the time that it took the challenged

action.  *See Citizens to Pres. Overton Park*, 401 U.S. at 420; *Cape Hatteras Access Pres. All. v.

U.S. Dep't of Interior*, 667 F. Supp. 2d 111, 114 (D.D.C. 2009).  And "a reviewing court must

remember that the [Agency] is making predictions, within its area of special expertise, at the

frontiers of science.  When examining this kind of scientific determination, as opposed to simple

findings of fact, a reviewing court must generally be at its most deferential."  *Balt. Gas & Elec.*

*Co. v. NRDC*, 462 U.S. 87, 103 (1983).

Summary judgment is the proper mechanism "for deciding whether as a matter of law agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Se. Conf. v. Vilsack*, 684 F. Supp. 2d 135, 142 (D.D.C. 2010); *see also Theodore Roosevelt Conservation P'ship*, 605 F. Supp. 2d at 271 (noting motions for summary judgment are "especially appropriate" in cases based on review of an agency's record).

## ARGUMENT

### I.    Plaintiffs' NEPA claims challenging FTA's ROD lack merit.

NEPA requires that an agency consider "alternatives to the proposed action" in an EIS, including a "no action" alternative and "all reasonable alternatives." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.14(a), (d). A "rule of reason governs 'both *which* alternatives the agency must discuss, and the *extent* to which it must discuss them.'" *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991). An agency's analysis of alternatives should be upheld "so long as the alternatives are reasonable and the agency discusses them in reasonable detail." *Id.* at 196. "While additional data might enable a more detailed environmental analysis, NEPA does not require maximum detail. Rather, it requires agencies to make a series of line-drawing decisions based on the significance and usefulness of additional information." *Tinicum Twp., Pa. v. U.S. Dep't of Transp.*, 685 F.3d 288, 296 (3d Cir.2012).

As discussed below, Plaintiffs' claims challenging FTA's ROD amount to no more than minor complaints and improper "flyspecking" of the NEPA analysis. *See Theodore Roosevelt Conservation P'ship*, 661 F.3d at 75 ("We have consistently declined to 'flyspeck' an agency's environmental analysis, looking for any deficiency no matter how minor." (quoting *Balt. Gas & Elec. Co.*, 462 U.S. at 97-98)); *WildEarth Guardians*, 8 F. Supp. 3d at 31 ("[T]he Court's role is not to flyspeck an agency's environmental analysis, looking for any deficiency no matter how

minor.").  The record contains exhaustive discussion of the Project's alternatives, the resulting

direct, indirect, and cumulative impacts, as well as the agencies' mitigation commitments to

minimize those impacts.  NEPA does not require more and Plaintiffs' motion should be denied.

A.  FTA adequately responded to public comments on the Project.

Plaintiffs' claim that the agencies failed to adequately respond to comments on the

ridership levels and transportation benefits, Pls.' Br. 28-29, 31, is a thinly veiled attempt to invite

the Court to engage in an impermissible "battle among experts."  *Mississippi v. EPA*, 744 F.3d

1334, 1348 (D.C. Cir. 2013) ("We repeat: it is not our job to referee battles among experts; ours

is only to evaluate the rationality of [the agency's] decision.").  Plaintiffs assert that

"[k]nowledgeable commenters . . . pointed out errors and misleading assertions" in the

AA/DEIS, Pls.' Mot. 28, that undermine the ridership estimates.[3]  While Plaintiffs disagree with

the agencies' responses, that disagreement does not establish a violation of NEPA.  *See*

*WildEarth Guardians*, 8 F. Supp. 3d at 31.

Council on Environmental Quality ("CEQ") regulations require agencies to "assess and

consider comments both individually and collectively" and respond with an explanation as to

"why the comments do not warrant further agency response, citing the sources, authorities, or

reasons which support the agency's position . . . ."  40 C.F.R. § 1503.4(a)(5).

Here, the agencies evaluated the comments on ridership forecasts for the Project and

noted that commenters had concerns that the agencies either under- or overestimated the

ridership projections.  AR1_002367.  The agencies set forth their methodologies in the FEIS,

---

[3] To the extent that Plaintiffs argue that MTA failed to provide certain information to the
Country Club, Pls.' Br. 29-31, this does not represent any purported failing on the part of FTA.
In fact, neither Plaintiffs nor the Country Club ever requested the information from FTA through
a Freedom of Information Act, 5 U.S.C. § 552, request or otherwise.  In any event, 40 C.F.R. §
1502.21 is inapplicable here because FTA did not incorporate "proprietary data" by reference
into the NEPA analysis, nor did it withhold any data as proprietary.

AR1_001970-71, *see also* AR1_005299-379, and responded to commenters that "[t]he methodologies for travel demand analysis are established in the transportation planning industry and are reviewed and approved by FTA," AR1_002368, and addressed the concerns regarding "trip ends" and user benefits.  *Compare* AR1_010993-1008, *with*, AR1_002367-69.  The agencies also responded to commenters' concerns regarding the cost effectiveness, AR1_002352, and requests to optimize the Low Investment BRT alternative.  AR1_002356-57.  Plaintiffs simply restate the comments and make no attempt to demonstrate a flaw in the ridership forecast or explain why the agencies' response to the comments is inadequate.

This argument amounts to no more than a request for the Court to substitute the commenters' judgment for that of the agencies, which is not allowed under the APA.  *See Mississippi*, 744 F.3d at 1348.  Plaintiffs wholly fail to demonstrate that the agencies' response to comments is inadequate and FTA is entitled to summary judgment on this claim.

B.  FTA's descriptions of the build-alternatives were not misleading.

In support of their argument that the NEPA analysis is misleading with respect to the differences between the alternatives studied, Pls.' Br. 32, Plaintiffs point to one sentence in a summary table contained in the AA/DEIS that explains that the direct impacts to natural resources "are not appreciably different between alternatives" because the "alternatives have very similar alignments and station locations."  AR1_011965.  What Plaintiffs omit, however, is the further explanation that "[t]he Build alternatives would impact between 1 and 1.4 acres of wetland, 13.5 to 15.1 acres of floodplains, and 3,892 to 5,719 linear feet of stream."  *Id.*  Moreover, this summary table lacks the context provided in the full discussion in the AA/DEIS that makes clear this comparison only applies to the build alternatives with alignments and stations, but does not reference the No-Build or TSM alternatives (which do not have alignments or stations).  *See* AR1_012116.  This minor complaint does not amount to a NEPA violation.

C. FTA took a "hard look" at the Project's direct impacts.

Plaintiffs again cite to various comments on the AA/DEIS to support their argument that the agencies failed to fully evaluate the Project's direct impacts, but fail to provide any evidence that the agencies' analysis was lacking. *See* Pls.' Br. 33-34.

The purpose of NEPA is to "ensur[e] that agencies will take a 'hard look' at environmental consequences" of their actions before deciding to proceed. *Robertson*, 490 U.S. at 333. "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Id*. at 350. Here, the agencies prepared a robust discussion of the Project's direct impacts. *See* AR1_001970-93 (transportation effects); AR1001994-2171 (environmental effects); AR1_002318-25 (evaluation of alternatives). Despite this thorough analysis, Plaintiffs claim that a number of impacts remain unaddressed.

First, Plaintiffs cite to their own comment regarding the Coquelin Run watershed, AR5_006740-41, to support their claim that the impact to forests will be "quite intense." Pls.' Br. 33. Whether this impact is "intense" as Plaintiffs suggest, is not the issue here. The question is whether the agencies considered and disclosed the impacts. *Balt. Gas & Elec. Co.*, 462 U.S. at 97-98 ("The role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions."). The agencies fully examined and disclosed the impacts of tree-clearing in the Project area. They explained that "a total of 48 acres of forested habitat" will be impacted by the Project. AR1_002110. This impact will result largely "at the edges of forested habitat" where "partial property acquisitions" are required. *Id*. And the FEIS specifically states that there will be no tree-clearing in the Coquelin Run stream valley, nor will there be direct or long-term impacts. AR2_002111. Thus, contrary to Plaintiffs' assertion, the agencies fully evaluated the Project's impacts to forested areas.

Second, Plaintiffs claim that the agencies failed to "disclose the locations, amounts, or content of the excess stormwater runoff." Pls.' Br. 33. But Plaintiffs misunderstand the level of detail required in the NEPA analysis. Plaintiffs complain that the Concept Stormwater Management Report, AR5_000718-1325, which provides the detailed plans for mitigating stormwater impacts, was prepared after the ROD. Pls.' Br. 33. Plaintiffs, however, fail to appreciate that this is not only permissible, it is routine. *See Valley Cmty. Pres. Comm'n v. Mineta*, 231 F. Supp. 2d 23, 41 (D.D.C. 2002) (upholding a decision that "identifie[d] several mitigation plans, such as a Visual Impact Mitigation Plan, a Tree Replacement Plan, a Revegetation Plan, and a Wetland Mitigation plan, that will be implemented as needed."). The reason for this is obvious. The agencies need not expend the resources to prepare a "fully developed plan detailing what steps *will* be taken to mitigate adverse environmental impacts," *Robertson*, 490 U.S. at 332, 352-54, 359, before they have made a decision on the preferred course of action. "[I]t would be inconsistent with NEPA's reliance on procedural mechanisms— as opposed to substantive, result-based standards—to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act." *Id*. at 353.

In any event, the agencies conducted a thorough evaluation of the Project's stormwater impacts in the FEIS. AR1_002120-23. The agencies noted that the Project will result in an increase in impervious surfaces, which could affect the quality of stormwater runoff. AR1_002120. But the FEIS explains that "[a]ny surface runoff would be directed to suitable outfalls through approved stormwater management facilities or treated through infiltration into the local groundwater through the use of approved environmental site design (ESD) stormwater techniques." AR1_002121. And the agencies committed to comply with the State's strict stormwater permitting requirements. *See* AR1_002004 ("MTA will obtain applicable

environmental permits for water resources" and "develop an Erosion and Sediment Control Plan, in accordance with the [Maryland] Stormwater Management Act of 2007."); AR1_002121 ("[T]he project stormwater [best management practices] designed in coordination with the [Maryland Department of the Environment] would minimize adverse effects.").  Plaintiffs' cursory argument falls short of showing that the agencies failed to take a "hard look" at the Project's stormwater impacts.

Plaintiffs' third argument claims that the agencies "failed to assess the levels of energy use and the resulting pollution."[4]  Pls.' Br. 34.  This too lacks merit.  With respect to energy use, the AA/DEIS evaluated the Project's expected impacts on both direct and indirect energy use and concluded that it would have "little or no effect on overall energy consumption in the [P]roject area."  AR1_012135-37.

With respect to "pollution," Plaintiffs appear to take issue with the agencies' response to comments on air quality and greenhouse gas emissions, AR1_002377-78, and state that the agencies' "response is inadequate."  Pls.' Br. 34.  In the AA/DEIS, the agencies explained that "the BRT alternatives are predicted to produce slightly lower [carbon dioxide] emission burdens as compare to the No Build alternative," and that "the LRT alternatives are predicted to have slightly higher [carbon dioxide] emission burdens as compared to the BRT alternatives due to the larger power requirements."  AR1_012097; *see also* AR1_012095-96.  In fact, the agencies concluded that given the small size of the predicted impacts the "emission burdens for the alternatives can be considered insignificant and are not measurably different from the No Build

---

[4] Plaintiffs conclusory assertion in a footnote that the agencies failed to adequately assess "noise impacts on homes and parks," Pls.' Br. 34 n.20, without more, should not be considered by the Court.  *Nat'l Oilseed Processors Ass'n v. Occupational Safety & Health Admin.*, 769 F.3d 1173, 1184 (D.C. Cir. 2014) ("[T]the court generally declines to consider an argument if a party buries it in a footnote and raises it in only a conclusory fashion.").

alternative."  AR1_012097.  Contrary to Plaintiffs' claim, the agencies thoroughly evaluated the "energy to be used and pollution to be caused," Pls.' Br. 34, and Plaintiffs' claim that the NEPA analysis is inadequate with respect to energy use and pollution is unavailing.

D.  FTA adequately considered the Projects' indirect and cumulative impacts.

NEPA requires agencies to analyze indirect (later in time or farther removed in distance) and cumulative (considered together with past, present, and reasonably foreseeable future actions) impacts for a project.  *WildEarth Guardians*, 8 F. Supp. 3d at 31.  In the FEIS, the agencies provided a robust discussion of the indirect and cumulative impacts for the entire 16-mile corridor, *see* AR1_002286-309, yet Plaintiffs argue that these effects were "grossly under-reported when mentioned at all."[5]  Pls. Br. 35.

Contrary to Plaintiffs' assertion that the indirect effect of "[o]ngoing and expected development along the route" was not properly evaluated, Pls.' Br. 35, the analysis addressed the existing and planned growth around each planned station.  AR1_002286-309.  In their example, Plaintiffs complain that the only indirect effect analyzed in Bethesda is the concurrent construction by Montgomery County of the South Bethesda Metro Station.  Pls.' Br. 35.  But Plaintiffs' myopic focus on the analysis of indirect impacts overlooks the evaluation of cumulative effects—in this case reasonably foreseeable future projects—that are, indeed, what Plaintiffs complain are missing.  *Id*. at 35-36 (asserting that the analysis "ignores substantial development directly tied to the Purple Line").  One need only look at the summary list of

---

[5] Plaintiffs argue, Pls.' Br. 35 n.21, but do not allege environmental justice claims in any of their respective pleadings and, thus, this argument is not properly before the Court and should not be considered.  *See Taylor v. Mills*, 892 F. Supp. 2d 124, 137 (D.D.C. 2012) ("[P]laintiff is not permitted to raise new claims at the summary judgment stage, where those claims were not pleaded in the complaint."); *Wasco Prods., Inc. v. Southwall Techs., Inc*., 435 F.3d 989, 992 (9th Cir. 2006) ("Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings.").  In any event, the agencies thoroughly evaluated environmental justice issues in the FEIS and Plaintiffs fail to demonstrate this analysis is inadequate.  AR1)002136-62.

cumulative effects evaluated in Bethesda, AR1_002292, to see that the agencies looked well beyond the concurrent construction of the South Bethesda Station.  In the same vein, Plaintiffs intimate that the indirect effects of induced growth remain unanalyzed.  Pls.' Br. 35 n.22, 37.  But again, Plaintiffs fail to acknowledge that the FEIS fully considered this issue.  *See* AR1_002287; 2297-98; 2304.

Plaintiffs next argue the analysis of the "cumulative loss of forest" is lacking.  Pls.' Br. 36.  Not so.  The FEIS explains that the forest cover trends declined between 2002 and 2010 by approximately 3 percent, which is in line with the reduction statewide.  AR1_002305.  But the cumulative effects study area is primarily characterized by "locations without extensive forest coverage . . . or are locate[d] in areas with some forest protections in place." *Id.*  Given that the Project is sited in a highly urbanized area with local regulations governing forest protection, the agencies' conclusion that the cumulative effects will be minimal is sound.

Plaintiffs further contend that "the geographic scope (watershed size) used by [the agencies] is too small for the correct analysis of cumulative impacts."  Pls.' Br. 36.  But courts afford agencies considerable deference in determining the geographic scope of their cumulative effects analysis.  *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976) ("determination of the extent and effect of these factors, and particularly identification of the geographic area within which they may occur, is a task assigned to the special competency of the appropriate agencies").  The agencies defined the study area for indirect effects as the "portion of the corridor that potentially would be affected by development induced by the construction and operation" of the Project.  AR1_002287.  The cumulative effects study area is larger "because it encompasses resources, primarily natural resources, which are potentially affected by multiple projects considered in aggregate." *Id.*  Plaintiffs' conclusory statement that the geographic scope is improper fails to

overcome the substantial deference afforded agencies in designating the scope of the analysis.

Plaintiffs next argue that the cumulative impacts analysis for "stormwater runoff" is inadequate, but Plaintiffs' own argument acknowledges that the agencies evaluated this issue. Pls.' Br. 36; *see also* AR1_002306-07.  Plaintiffs simply disagree with the agencies' conclusion that Maryland's strict stormwater regulations would serve to minimize the cumulative effects of development in the area.  AR1_002296.

None of Plaintiffs' minor complaints about the Project's indirect and cumulative impacts demonstrate that the analysis is lacking.  Plaintiffs fail to demonstrate a violation of NEPA and the agencies are entitled to summary judgment on this claim.

E. The FEIS adequately explains how the Project will comply with other laws.

While Plaintiffs acknowledge that the FEIS explains that the Project will comply with other laws, including the Clean Water Act, Pls.' Br. 37-38, Plaintiffs contend that this is not enough.  This argument lacks merit.

The FEIS provides a thorough treatment of the permits that the Project will require, AR1_002168-70, documents the agencies' coordination with the entities that will issue those permits, AR1_002170, and provides a sufficient basis to conclude that there will be no significant issues preventing the Project from obtaining the required permits.  Plaintiffs confuse NEPA's procedural mandate to evaluate the potential environmental impacts and a range of alternatives, with a substantive requirement to have a permit-ready project before the ROD can issue.  NEPA does not require that level of finality.  *Valley Cmty. Pres. Comm'n*, 231 F. Supp. 2d at 41.  Plaintiffs fail to make any showing that the Project will not comply with applicable law or obtain the necessary permits, thus, this claim must be dismissed.

F. The Project's consideration of mitigation measures for noise impacts were adequate.

Plaintiffs make the bald, and erroneous, assertion that the agencies failed to "assess the

extent to which mitigation of impacts is possible," with respect to noise impacts.  Pls.' Br. 39.

The FEIS includes a robust evaluation of the Project's noise impacts, AR1_002094-102, and

MTA committed to mitigation measures aimed at minimizing those impacts.  AR1_002101

("LRT vehicles will be designed to include vehicle skirt panels to reduce noise" and "noise walls

and retaining walls would be incorporated . . . to reduce operational noise for the adjacent

communities").  In addition, the agencies explained that mitigation measures are not reasonable

or feasible in some areas.  AR1_002100 ("eliminating the transit horn is not possible due to

safety concerns" and "construction of noise walls is not feasible . . . because these barriers would

block driveways").  NEPA does not require more.  *See Busey*, 938 F.2d at 206 ("CEQ regulations

and NEPA itself compel only 'a reasonably complete discussion of possible mitigation

measures'").  By describing the mitigation measures reasonably completely and by analyzing

their effectiveness, the agencies complied with NEPA.

## II.     **Plaintiffs' claims that FTA was required to prepare an SEIS lack merit.**

After the ROD was issued, Plaintiffs twice submitted information that they claim is

"new" and requested FTA to supplement its NEPA analysis.  AR4_007411-26; AR5_006469-

786.  Plaintiffs raise myriad issues in their letters of July 14 and October 9, 2015 arguing that

FTA was required to supplement its NEPA analysis for the Purple Line.  But Plaintiffs proffered

no new or significant information requiring FTA to supplement its analysis and FTA is entitled

to summary judgment on Plaintiffs' SEIS claims.[6]

---

[6] Plaintiffs' claims not raised in their summary judgment brief have been abandoned and summary judgment should be entered for Federal Defendants.  *See City of Waukesha v. EPA*, 320 F.3d 228, 241 (D.C. Cir. 2003) ("We generally will not entertain arguments omitted from an appellant's opening brief.").  With respect to Plaintiffs' NEPA claims, Plaintiffs waived any claim that a supplemental Environmental Impact Statement was required to respond to alleged new information regarding the Kenk's or Hay's Spring amphipods.  *See* Plaintiffs' First Am. Compl. ¶¶ 126-27 (ECF No. 20).

Under NEPA, agencies are required to prepare supplemental analysis "only when presented with 'substantial changes in the proposed action that are relevant to environmental concerns' or 'new and significant circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts' after the EIS is assembled." *Blue Ridge Envtl. Def. League v. Nuclear Regulatory Comm'n*, 716 F.3d 183, 196 (D.C. Cir. 2013) (quoting 10 C.F.R. § 51.92(a)(1)-(2)); *see also* 40 CFR § 1502.9(c)(i)-(ii); 23 C.F.R. § 771.130. "[A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized.  To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373 (1989).   The agency, however, must take a "hard look" at the proposed impacts and then the "rule of reason" guides whether supplemental analysis is necessary.  *See id.* at 373-74.

"Where [FTA] is uncertain of the significance of the new impacts, the applicant will develop appropriate environmental studies . . . to assess the impacts of the changes, new information, or new circumstances.  If, based upon the studies, [FTA] determines that a [SEIS] is not necessary, [FTA] shall so indicate in the project file."  23 C.F.R. § 771.130(c).  An agency's decision not to supplement its analysis is afforded substantial deference.  *Blue Ridge Envtl. Def. League*, 716 F.3d at 195.  Indeed, "[t]he determination as to whether information is either new or significant 'requires a high level of technical expertise'; thus, [courts must] 'defer to the informed discretion of the [agency].'"  *Id.* at 197 (quoting *Marsh*, 490 U.S. at 377).

FTA and MTA evaluated the information provided by Plaintiffs and FTA determined that nothing in Plaintiffs' letters constitutes "new" information requiring supplementation under NEPA.  AR4_000001-02; AR5_000001-06; *see also* AR4_002849-91; AR5_000007-6549.

These determinations are entitled to substantial deference and Plaintiffs' claims must fail.

A. FTA properly determined that the Governor's 41 cost-saving measures do not constitute new or significant information.

On June 25, 2015, the Governor of Maryland announced that the State would move "forward with a more cost effective and streamlined version of the Purple Line," AR4_007435, and provided 41 cost-saving measures to achieve that goal.  AR4_007430-34, 49-50.  Plaintiffs contend that five[7] of those measures require FTA to prepare an SEIS.  Pls.' Br. 16-20; Supplemental Complaint for Injunctive and Declaratory Relief (ECF No. 33) ¶¶ 7, 17; Second Supplemental Complaint for Injunctive and Declaratory Relief (ECF No. 42) ¶¶ 8-10, 18-19.  Plaintiffs fail to carry their burden to show supplemental NEPA is required.

As contemplated in 23 C.F.R. § 771.130(c), MTA evaluated each of the 41 cost-saving measures and provided a detailed explanation supporting its conclusion that an SEIS was not required to FTA.[8]  AR4_002849-91.  FTA concurred in MTA's conclusions and decided not to prepare an SEIS.  AR4_000001-02.  As explained further below, Plaintiffs' allegations rest on bald assertions and conclusory statements that an SEIS is required.  *See City of Waukesha*, 320 F.3d at 254 ("[P]etitioners' only references to this argument in their opening brief were two sentences that also referred to [the agency's] failure . . . without explaining the legal implication

---

[7] Plaintiffs also briefly mention a sixth measure regarding the width of pavement replacement, AR4_007433 ("Shared lanes will not require full width pavement replacement."), and note without elaboration that "[t]his change warrants reassessment . . . ."  Pls.' Br. 19.  Indeed, this argument leaves the agencies wondering what Plaintiffs are challenging as violative of NEPA. *See Ark Initiative v. U.S. Forest Serv.*, 660 F.3d 1256, 1262 (10th Cir. 2011) ("The agency needs something more to go on, and Plaintiffs cannot merely mention broad categories of potential impacts with little or no analysis.").  Plaintiffs' bald conclusion falls far short of demonstrating an SEIS was required.

[8] Plaintiffs' argument that it was improper for the agencies to rely on "entirely new post-FEIS stormwater documents—which have never been made available for public review and comment," Pls. Br. 20 n.11, is belied by the plain text of 23 C.F.R. § 771.130(c).  Contrary to Plaintiffs' claim, preparing environmental studies to assess the information submitted by Plaintiffs does not violate NEPA, it is expressly permitted.  *Id.*

of that failure.  This is the type of 'asserted but unanalyzed' contention that the court will not

address." (quoting *SEC v. Banner Fund Int'l*, 211 F.3d 602, 613 (D.C.Cir.2000)); *Coleman v.

D.C.*, 794 F.3d 49, 65 (D.C. Cir. 2015) ("It is not and should not be enough merely to mention a

possible argument in the most skeletal way in one sentence on the fortieth page of a brief, and

then leave the court . . . to do counsel's work."  (quoting *Bryant v. Gates*, 532 F.3d 888, 898

(D.C.Cir.2008)).  Plaintiffs fail to demonstrate that the agencies' conclusion that the proffered

information is not "new" is incorrect and Plaintiffs cannot overcome the substantial deference

the agencies' conclusions enjoy.

### 1.    Green Track

Plaintiffs contend that "green track"[9] was first required, but "dispensed with," resulting in

unmitigated impacts to stormwater and noise that the agencies failed to evaluate.[10]  Pls.' Br. 16-

17; *see also* AR4_007433 ("Ballasted track may be used in locations where [g]reen [t]rack was

previously required.").  This is incorrect.  Based on a single sentence, Plaintiffs claim that the

"ROD unequivocally represented to the public that" green track would be required.  Pls.' Br. 16-

17.  While the agencies did state in the ROD that green track "will" be used, AR1_000207

("MTA will use green track along the Georgetown Branch right-of-way and in locations in

Prince George's County to minimize runoff."), a full reading clarifies that green track was only

one of a number of methods considered for managing stormwater runoff.  *See e.g.,* AR1_002120

("MTA is *considering* using green track . . . along the Georgetown Branch right-of-way and the

---

[9] "Green track . . . is trackway where plant material is grown between the rails."  AR1_001962.
[10] To the extent that Plaintiffs argue that green track "was specifically relied upon by the Service as one of the reasons why the Project would not affect two imperiled amphipod species," Pls.' Br. 17 (citing FWS_484), and imply that the agencies should have re-initiated consultation under Section 7 of the ESA, there is no corresponding claim in their Supplemental and Second Supplemental Complaints, ECF Nos. 33, 42, and the claim is, therefore, not properly before the Court.  *See infra* § V.A.  To the extent the Court considers the claim, it is refuted below.

CSXT right-of-way.") (emphasis added); AR1_001962 ("Four types of track (ballasted,

embedded, direct fixation, and green track) are being considered for the project."); *id*. ("Green

track is . . . being evaluated for portions of the Purple Line.  Green track . . . *may be used* to

address stormwater management requirements.") (emphasis added).  The agencies plainly

explained that "[i]n some locations there is no choice of track type . . . [but] [i]n other areas the

track type is being evaluated based on operations, maintenance, cost, and aesthetics."  *Id*.  In fact,

green track was not listed as a "commitment" in the ROD.  See AR1_000033-42.

      In responding to Plaintiffs' request for an SEIS, the agencies explained that the

elimination of the green track "requirement" does not require supplementation because "green

track was simply discussed as an option . . .and was not assumed as the basis for the impacts

analysis."  AR4_002865.  Further, "the same stormwater discharge standard will apply to the

project under Maryland law regardless of whether green track is used," and the agencies will

simply meet those standards by other means in the event that green track is not used.  *Id*.

      Plaintiffs also argue that green track would have "reduce[d] noise damage to Rock Creek

park, the historic Columbia Country Club, and residential neighborhoods abutting the Purple

Line."  Pls.' Br. 17.  But the agencies explained that "the noise modeling did not account for any

reduction due to the use of the [g]reen [t]racks, which is being considered within the existing

Georgetown Branch right-of-way."  AR4_002865; AR1_003578 (same).  Because green track

was not relied upon in the noise analysis, eliminating the "requirement" has no effect.

      The agencies properly concluded that eliminating the green track "requirement" does not

create any noise or stormwater impacts that were not already evaluated in the NEPA analysis and

that no supplementation is required.  This determination is entitled to deference.

## 2.     Frequency of Trains

      Plaintiffs make the incorrect assertion that under the Governor's measures there will be a

"25% reduction in frequency of trains," Pls.' Br. 17, because "[t]he initial light rail vehicle

(LRV) fleet will be for 7.5-minute peak period service instead of 6-minute peak period service."

AR4_002855; AR4_007432.  Specifically, Plaintiffs claim that this change undermined the

alternatives analysis and requires an SEIS.  Pls.' Br. 17-18.  This claim, however,

misunderstands the NEPA analysis.  Indeed, the agencies explained that "[t]he transportation

effects analysis in the FEIS was based on a horizon year of 2040" and "assumed that headways

would be 6 minutes in the peak periods and 10 minutes in off-peak in order to accommodate

projected ridership in 2040."  AR4_002855; *see also* AR1_001968.  The analysis addressed train

frequency in 2040, but never specified or required a particular frequency in the "initial years of

operation (prior to 2040)."  AR4_002855.  A slight change in train frequency in the initial years

of operation does nothing to undermine the ridership forecasts in the FEIS and does not represent

new information requiring an SEIS.

### 3.    Parabolic Steel Bridge

Plaintiffs take issue with the agencies using a "standard"—rather than "parabolic"—steel

bridge over Rock Creek.  Pls.' Br. 18-19; *see also* AR4_007433 ("Standard bridge over Rock

Creek is permitted (rather than parabolic steel box girder bridge).").  Plaintiffs misunderstand the

NEPA analysis in arguing that this change "obviously casts new doubt on the 'environmentally

sensitive stream crossing' design that [the agencies] promised in the FEIS."  Pls.' Br. 19.

The FEIS explains that the Project will use "modern steel truss bridges" over Rock

Creek, but contrary to Plaintiffs claim, does not specify "parabolic" steel bridges.  AR1_002078.

Allowing a "standard" steel bridge is consistent with the representations in the FEIS.

AR4_002861.  And "[a]ll commitments in the ROD regarding the design of these bridges remain

in effect . . . ."  *Id.*  Plaintiffs claim is without merit.

4.     **LEED Standard for Maintenance Facility**

Plaintiffs' assertion that eliminating the Leadership in Energy and Environmental Design ("LEED") standard for the Project's buildings "by definition, has environmental consequences," Pls.' Br. 19, overstates the impact of the cost-saving measure.  *See* AR4_007434; AR4_002858 ("Compliance with the LEED Silver standard is optional for Maintenance Facility.").  Indeed, this measure only addresses the Glenridge Maintenance Facility.  The FEIS, however, explains that the "maintenance facility will be included as part of the [P]roject, and discusses the overall layout and function of the maintenance facility; it does not specify the type or amount of equipment to be provided at the facility, nor does it discuss or require compliance with LEED Silver standard."  AR4_002858.  Accordingly, the agencies concluded that this change does not alter the conclusions in the FEIS and ROD.

5.     **Alternate Interim Trail**

Plaintiffs object to Montgomery County assuming a larger role in the location of the alternate interim Capital Crescent Trail, *see* AR4_007432 ("Montgomery County will take on a greater role in providing the alternate interim Capital Crescent Trail."), because it "may [] pose more safety risks than previously assessed, as the County re-routes the [trail] through residential and commercial areas."  Pls.' Br. 19.  As the agencies explained, "[t]his change only involves the allocation of funding and implementation roles, not a change in the design of the project itself; therefore the "greater role" for the County is consistent with the impacts analysis in the FEIS and the ROD."  AR4_002863.

Plaintiffs simply disagree with the agencies' conclusions, but their unadorned arguments and conclusory statements that these minor changes lie outside the impacts considered in the NEPA analysis and require the agencies to prepare an SEIS are simply unpersuasive.  The agencies evaluated the cost-saving measures and concluded that they do not require further

consideration.  This conclusion is entitled to deference and NEPA does not require more.

> B. <u>FTA properly concluded that the issues raised in Plaintiffs' letters of July 14 and October 9, 2015 do not constitute significant new information requiring supplementation.</u>

As with the 41 cost-saving measures, none of the information provided by Plaintiffs in their letters of July 14 and October 9, 2015 is new. The information largely consists of untimely comments criticizing the FEIS and ROD and information unrelated to the environmental impacts and outside the scope of Plaintiffs' NEPA claims.  At best, the submissions "flyspeck" the analysis seeking issues to highlight, no matter how minor.  *See Theodore Roosevelt Conservation P'ship*, 661 F.3d at 75.  The agencies' administrative records are replete with analysis on the Project's environmental impacts and Plaintiffs' submissions do nothing to undermine the quality of that analysis, nor do they identify any information that should have been considered, and was not.  As discussed further below, Plaintiffs' remaining SEIS claims wholly fail.

### 1.  Metro Ridership Levels

Plaintiffs suggest that "recent evidence of declining ridership," Pls.' Br. 21, on the Washington Metropolitan Area Transit Authority ("WMATA") subway system somehow undermines the Purple Line analysis.  As MTA explained, "the financial or other issues currently being experienced by WMATA do not involve the Purple Line, and they have no relationship to the environmental impacts of the Purple Line.  Therefore, the WMATA-related issues cited in [Plaintiffs'] letter provide no basis for preparing an SEIS."  AR5_000009; *see Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 767, 772-74 (1983) (explaining that NEPA requires agencies to address only impacts that have "reasonably close causal relationship between a change in the *physical environment* and the effect at issue.") (emphasis added).

### 2.  Post-ROD Declarations

After the ROD was issued, Plaintiffs submitted five declarations to the agencies alleging

that they contain "new" information.  Plaintiffs, however, provide no excuse for why these

declarations—which are largely critiques of the FEIS—were not submitted to the agencies

during the public comment period and for that reason alone, may not be the basis for a SEIS.  *See*

*Theodore Roosevelt Conservation P'ship*, 616 F.3d at 514-15 ("Persons challenging an agency's

compliance with NEPA must 'structure their participation so that it . . . alerts the agency to the

[parties'] position and contentions.'" (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752,

764 (2004))); *see also Apache Survival Coal. v. United States*, 21 F.3d 895, 912 (9th Cir. 1994)

("Had the [plaintiff] participated in the [administrative] process, the [plaintiff] could not now

claim that the information that it subsequently brought to the [agency's] attention was 'new.'").

Indeed, Plaintiffs participated in the public comment process, but chose to wait until that process

concluded before presenting the documents they now claim are "new."  Yet even if the Court

considers Plaintiffs' untimely submissions, they do not present new information warranting an

SEIS.  *See* AR5_000014-16.

  First, the Allen Memorandum,[11] AR5_006696, reviews the ridership forecasts and related

analyses in the FEIS.  Pls.' Br. 22.  Mr. Allen also complains that MTA failed to provide

ridership data to the Country Club.  AR5_006696.  The memorandum provides no new

information, only Mr. Allen's comments on the FEIS, which could have been timely submitted

during the public comment period.  The FEIS thoroughly evaluated the projected ridership for

the Project, AR1_001970-77, and the Allen Memorandum does not raise any new issues.

  Second, Plaintiffs submit the Lysy declaration, AR5_006669-77, which addresses the

---

[11] To the extent Plaintiffs rely upon the Sam Schwartz Engineering Memorandum—which is not
properly before the Court—to support their argument that the agencies failed to provide ridership
data, FTA's policy is to respond to all requests for information under the Freedom of Information
Act, 5 U.S.C. § 552.  No such request was made by Plaintiffs here.  Plaintiffs cannot now be
heard to complain that they did not receive information they never requested.

Project's cost estimates and claims that increases occurring after the DEIS now require the agencies to prepare an SEIS. Pls.' Br. 22. But the cost increases Mr. Lysy opines on are already addressed in the FEIS, AR1_002363-68, and the ROD. AR1_000227-31.

Third, Plaintiffs turn to the Collinson declaration, AR5_006663-68, which comments on the analysis of wetland impacts in the FEIS. Pls.' Br. 23. Yet Mr. Collinson conflates the substantive requirements of the Clean Water Act ("CWA"), 33 U.S.C. § 1313, with the procedural requirements under NEPA. *Id.* He opines that additional analyses will be required to obtain a CWA Section 404 permit, which is unrelated to whether the agencies' analysis comports with NEPA. *See* 33 C.F.R. 332.8(d)(6). Moreover, contrary to Mr. Collinson's claim, the FEIS did consider functions and values of the wetlands affected by the Project. AR1_002114; 5476.

Fourth, the MacGlashan declaration, AR5_006678-89, evaluates the noise analysis included in the FEIS and argues that it was inadequate. Pls.' Br. 26. Mr. MacGlashan's untimely comments do nothing to undermine the substantial analysis addressing noise impacts and presents no new issues. *See* AR1_002100.

Fifth, Plaintiffs assert that the Saggese declaration, AR5_006690-95, "summarized the cumulative effect of the many flaws inherent in the Project, and showed that the statistical probability of Project failure . . . was 100%." Pls.' Mot. 27. Again, these comments could have, and should have, been made during the public comment process. Further, Mr. Saggese's comments are irrelevant. Indeed, the risk of "project failure" is not an environmental impact that the agencies must consider in their NEPA analysis. *See Metro. Edison Co.*, 460 U.S. at 772-74.

In short, none of the declarations provide "new" information requiring an SEIS. The record shows that the agencies adequately evaluated the issues Plaintiffs' declarants address. Plaintiffs are simply inviting the Court to engage in an improper "battle among experts,"

*Mississippi*, 744 F.3d at 1348, by opining on the sufficiency of the FEIS without offering any excuse as to why their declarants' views were not provided during the administrative process.

While Plaintiffs disagree with the NEPA analysis, these declarations fail to demonstrate that the agencies' conclusions were arbitrary and capricious and the information provided in Plaintiffs letters does not trigger a requirement for the agencies to prepare supplemental analysis.

### 3. FCCT's Stormwater Paper

Plaintiffs present a paper "regarding stormwater run-off and water pollution," AR5_006702-81, that they claim is "new" information requiring an SEIS. Pls.' Br. 24. Notably, Plaintiffs fail to mention that they authored the September 30, 2015 paper, which was not submitted by Plaintiffs during the comment period, but only prepared and provided to the agencies—a year and a half after the ROD was issued—with their letter of October 9, 2015. As with Plaintiffs' declarations, this paper provides no new information. *See* AR5_000007-43.

Plaintiffs claim that this paper "revealed new information and new aspects of the Project pertaining to stormwater runoff." Pls.' Br. 24. Specifically, Plaintiffs argue that the paper highlights new information revealing that the Project will require "permits under several laws pertaining to handling of highly hazardous materials" and "evacuation plans and routes should any of these hazardous materials escape into the environment." *Id.* But this is not new information and the record demonstrates that the agencies fully considered handling of hazardous waste in the NEPA analysis. For example, the FEIS describes in detail the location and type of hazardous waste sites in the vicinity of the Purple Line. The hazardous materials chapter of the FEIS, AR1_002126-31, summarizes the results of a Phase I Environmental Site Assessment and explains that a Phase II Environmental Site Assessment will be required prior to construction, which will "account for cleanup activities, contamination removal, or remediation" as necessary. AR1_002131. In addition, the agencies identified mitigation measures to address any risks

associated with construction in contaminated areas.  *Id.*

Moreover, the agencies explained that "MTA will develop a site-specific health and safety plan," which will include "[p]rocedures for monitoring of contaminant exposures" and "[i]dentification of the contractor's chain of command for health and safety."  AR1_002166. And "MTA will coordinate with [Maryland Department of the Environment] to determine the mitigation response and reporting required should a release of hazardous materials occur during operations."  AR1_002167.  While the term "evacuation route" was not specifically used, it is clear that it was within the spectrum of issues evaluated.  *See Russell Country Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1045 (9th Cir. 2011) ("CEQ guidance provides that supplementation is not required when . . . the new alternative is '*qualitatively within the spectrum of alternatives* that were discussed . . . .'" (quoting Forty Most Asked Questions Concerning CEQ's NEPA Regulations, 46 Fed. Reg. 18,026, 18,035 (Mar. 23, 1981)).  Plaintiffs are quibbling over wording, but at best this argument amounts to "flyspecking" the analysis.  *See Theodore Roosevelt Conservation P'ship*, 661 F.3d at 75.

Plaintiffs' paper also takes issue with the need for local variances where stormwater cannot be contained on site.  Pls.' Br. 24; *but see* AR5_000007-43.  But the FEIS provided a thorough treatment of this issue.  Indeed, the FEIS explains that the Project will meet Maryland's stormwater management requirements, AR1_002004, and the agencies noted that stormwater could be treated off-site where on-site measures are not feasible.  AR1_005519.  It is not new information that some amount of stormwater may be treated off-site.  That was specifically contemplated in the Water Resources Technical Report.  AR1_005519.

Plaintiffs' untimely submission of a paper attacking the analysis in the FEIS does not constitute new information and FTA properly concluded that no SEIS was required.

### 4.    Floodplains

Plaintiffs' paper also argues that "recent developments bearing on the extent to which federally funded Projects should avoid affecting floodplains," Pls. Br. 24, have not been fully evaluated in the FEIS.  Specifically, Plaintiffs assert that the agencies have not adequately determined whether the Project complies with Executive Order No. 11988, 42 Fed. Reg. 26951 (May 24, 1977), as amended by Exec. Order No. 13690, 80 Fed. Reg. 6425 (Jan. 30, 2016).  *Id.* at 25; *see also* Guidelines for Implementing Exec. Order 11988, Floodplain Management, as Revised, 80 Fed. Reg. 6530-01 (Feb. 5, 2015) (seeking comment on draft proposed guidelines).

Here, the FEIS explains that "MTA will submit project plans to [Maryland Department of the Environment] for approval of structural evaluations, fill volumes, proposed grading elevations, structural floodproofing, and flood protection measures in compliance with [the Federal Emergency Management Agency] requirements, . . . and Executive Order 11988." AR1_002166.  And the ROD confirms this commitment to comply with Executive Order 11988. AR1_000039; *see also* AR5 000017-18.  This issue was adequately addressed in the FEIS and ROD and Plaintiffs have presented no new information requiring supplemental analysis.

### 5.    Manville Declaration

Plaintiffs state that their letter of October 9, 2015, "included an affidavit from Dr. Albert Manville," addressing alleged impacts to migratory birds.  Pls.' Br. 25.  It did not.  Nor did the letter reference Dr. Manville, the MBTA, or any issues related to birds.  AR5_006469-77.  The agencies have not been afforded the opportunity to consider or respond to Dr. Manville's declaration because Plaintiffs never submitted it for review.  *See* Federal Defendants' Opp. to Plaintiffs' Mot. to Supplement the Administrative R. 9-15 (ECF No. 52).  Because this declaration was never reviewed by the agencies, and is not properly before the Court, Plaintiffs' argument that the agencies must supplement the NEPA analysis based on the information it

contains, must be disregarded.  *Pac. Shores Subdivision, Cal. Water Dist. v. U.S. Army Corps of Engineers*, 448 F. Supp. 2d 1, 4 (D.D.C. 2006) ("[T]he administrative record should not include materials that were not considered by agency decisionmakers.").  The affidavit is also improper because Plaintiffs have not shown that it contains information that could not have been presented to the agencies during the public comment periods.  *See Theodore Roosevelt Conservation P'ship*, 616 F.3d at 514-15.  In fact, Plaintiffs, Fitzgerald and Real de Azua, submitted comments on the FEIS that explicitly addressed migratory bird impacts, to which FTA responded when finalizing its ROD.  *See* AR1_93, 204-05, 1213, 1223-25.

        Even if the Court were to consider the Manville declaration (which it should not), the declaration contains no "new" information requiring supplemental analysis.  Plaintiffs' argument rests on the conclusory statement that "the Project will have harmful impacts on migratory birds that were never addressed."  Pls.' Br. 25.  This asserted but unanalyzed argument should be disregarded.  *City of Waukesha*, 320 F.3d at 254.  Plaintiffs then argue that the Governor's cost-saving measure extending work hours, AR4_007432 ("Extended work hours . . . will be permitted."), will "pos[e] added problems for MBTA compliance."  Pls.' Br. 25.

        In responding to Plaintiffs' request for an SEIS, the agencies explained that "[t]he FEIS did not set a limit on construction times; it only describes construction durations that would 'typically' exist."  AR4_002862; *see* AR1_002173 ("Typically, surface and above ground construction activities would occur 6 days a week, 15 hours per day.  There would be instances when certain construction activities could take place during weekends or other times.").  The "extended" work hours included in the Governor's announcement "vary by roadway, but at most, go from 8:30am to 4:00pm (7.5 hours)," AR4_002862, which is substantially less than the periods described in the FEIS.  The agencies concluded that the change was consistent with, and

within the spectrum of, the impact analysis in the FEIS and ROD and no SEIS is required here.

*Id.*; *see also Russell Country Sportsmen*, 668 F.3d at 1045.

### III.     Plaintiffs' Federal Transit Act claim fails to identify a final agency action reviewable under the APA.

Plaintiffs next reconfigure their NEPA argument into a claim alleging a substantive

violation of the Federal Transit Act, 49 U.S.C. § 5309.  Pls.' Br. 39-42.  Specifically, Plaintiffs

claim that FTA has "not demonstrated compliance with" the requirements of the "New Starts"

funding criteria.  *Id.* at 40.  But FTA issues its "New Starts" funding—and confirms that a

project complies with the provisions of 49 U.S.C. § 5309—only when it executes a Full Funding

Grant Agreement ("FFGA"), not when it issues its ROD.  Because an FFGA has not been

executed (and FTA's discretionary decision to execute an FFGA is not subject to judicial review

in any event), Plaintiffs' claim is not justiciable.

The Federal Transit Act does not provide for a private right of action.  *See Town of*

*Secaucus v. U.S. Dep't of Transp.*, 889 F. Supp. 779, 788 (D.N.J. 1995) (evaluating a prior

version of 49 U.S.C. § 5301 *et seq.* and finding that the statute "addresses environmental and

social factors by requiring the Secretary to make written findings that such factors were

considered . . . . Those requirements do not, however, evince congressional intent to provide a

private right of action under the statute to those who disagree with the Secretary's conclusions.").

Thus, Plaintiffs' claim, is subject to review, if at all, only under the APA.  The APA operates as a

waiver of the United States' sovereign immunity only for "[a]gency action made reviewable by

statute and final agency action for which there is no other adequate remedy in a court."  5 U.S.C.

§ 704; *see also Bennett v. Spear*, 520 U.S. 154, 175 (1997) ("The APA, by its terms, provides a

right to judicial review of all 'final agency action for which there is no other adequate remedy in

a court' . . . ." (quoting 5 U.S.C. § 704)).  "Agency action" under the Act is defined as "the

whole or a part of an agency rule, order, license, sanction, relief, or the equivalent denial thereof, or failure to act[.]"  5 U.S.C. § 551(13).  Plaintiffs bear the burden of establishing a "final agency action" that confers jurisdiction upon the district court under the APA.  *Sierra Club v. Peterson*, 228 F.3d 559, 565 (5th Cir. 2000) ("Absent a specific and final agency action, we lack jurisdiction to consider a challenge to agency conduct.").  Plaintiffs have not met their burden.

As discussed above, FTA provides federal funding through the Capital Investment Grant program authorized in 49 U.S.C. § 5309, by executing an FFGA with the project proponent.  49 U.S.C. § 5309(k)(2)(A) ("[A] new fixed guideway capital project or core capacity improvement project shall be carried out through a full funding grant agreement."); *see also AT & T Commc'ns-E., Inc. v. BNSF Ry. Co.*, No. CIV 06-866-HA, 2006 WL 3408035, at *2 (D. Or. Nov. 27, 2006); *Lakes & Parks All. of Minneapolis v. Metro. Council*, 120 F. Supp. 3d 959, 963 n.4 (D. Minn. 2015) (same); *N. States Power Co. v. Fed. Transit Admin.*, No. 01-295 JRT/FLN, 2001 WL 1618532, at *2 (D. Minn. May 24, 2001) (same).

Here, FTA is still evaluating whether the Purple Line qualifies for "New Starts" funding and will not execute an FFGA until it is satisfied that the program requirements are met by ensuring that there has been "a comprehensive review of the project's mobility improvements" and "environmental benefits" among other factors.  49 U.S.C. § 5309(d)(2)(A)(iii); *see* AR1_000001 ("If FTA provides financial assistance for the final design and/or construction of the Project, FTA will require MTA to design and build the Project as presented in the FEIS and this ROD.").  This determination, however, is not made until after "completion of activities required under [NEPA]" as evidenced by the ROD.  49 U.S.C. § 5309(d)(2)(A).

Plaintiffs mistakenly suggest that the ROD made the funding decision they are challenging.  It did not.  The final NEPA decision is a prerequisite to federal funding.  If FTA

ultimately determines that it will award federal funding for the Purple Line, that decision will be evidenced by an FFGA.  Because an FFGA has not been issued, FTA has taken no final agency action under the Federal Transit Act that could be reviewable under the APA.[12]  Accordingly, Plaintiffs' Federal Transit Act claim must be dismissed.

## IV.    FTA complied with Section 4(f).

### A.    FTA properly concluded the impact to Elm Street Park is a temporary occupancy and not a "use" under Section 4(f).

Plaintiffs argue that FTA violated Section 4(f) by failing to evaluate the impacts to Elm Street Park in Bethesda, Maryland under the "no feasible alternative" standard.  Pls.' Br. 43. This standard is incorrect and FTA properly found that the temporary occupancy of the park is not a "use" within the meaning of Section 4(f) so that the requirement to consider feasible and prudent alternatives does not apply.

Five factors must be present to conclude that a "[t]emporary occupanc[y] of land [is] so minimal as to not constitute a use within the meaning of Section 4(f)."  23 C.F.R. § 774.13(d). The factors are that: (1) the "[d]uration must be temporary" and "there should be no change in ownership of the land," (2) the "[s]cope of the work must be minor," (3) there can be "no anticipated permanent adverse physical impacts," nor any "interference with the protected activities, features, or attributes of the property, on either a temporary or permanent basis," (4) [t]he land being used must be fully restored, and (5) "[t]here must be documented agreement" with the entity with jurisdiction.  *Id*. § 774.13(d)(1)-(5).  Each factor is present here.

Elm Street Park is an approximately 2.1-acre park, AR1_001673, operated by the Maryland National Capital Park Planning Commission and the Montgomery County Department

---

[12] Moreover, it is doubtful that Plaintiffs could demonstrate the requisite injury necessary to establish standing to challenge an FFGA, if issued.  *See Hein v. Freedom From Religion Found., Inc*., 551 U.S. 587, 593 (2007) (discussing "the general rule against federal taxpayer standing").

of Parks and qualifies as a Section 4(f) resources based on its "playgrounds, gazebo, picnic tables, benches, trails, and public art."  AR1_001667.  MTA will temporarily occupy approximately 0.02-acres (871 square feet) of the park in order to connect the park to the Capital Crescent Trail.  AR1_001652-53, 66, 73.  "The land to be temporarily used includes a portion of an existing path, an undeveloped corner of a playground, and a grassy area adjacent to the path."  AR1_001673; *see also* AR1_001675.  FTA evaluated the five factors and properly determined that the preferred alternative constitutes merely a temporary occupancy, AR1_001642, and Montgomery County provided its concurrence.  AR1_001777.

Plaintiffs make the bald statement that "the Project would cause [the park's] natural area to be permanently reduced," Pls.' Br. 43, but do not explain how and fail to articulate how FTA's determination is lacking.  FTA evaluated the potential noise impacts on the park and concluded that there would be no constructive use.  AR1_001676, 2215; *see also* 23 C.F.R. § 774.15.  Section 4(f) does not require more.

B.  <u>FTA's determination that the Georgetown Branch Right-of-way is not a Section 4(f) resource is sound.</u>

Plaintiffs next argue that impacts on the Georgetown Branch Interim "Trail and its forested buffer between Bethesda and Lyttonsville" are not fully assessed.  Pls.' Br. 43.  But the right-of-way at issue is not a Section 4(f) resource requiring evaluation.  FTA evaluated whether the right-of-way met the definition of a "park" for purposes of Section 4(f) compliance and determined that it does not qualify.  AR1_001664.  The right-of-way was formerly the Georgetown Branch of the Baltimore & Ohio (B&O) Railroad and was transferred to Montgomery County for "railbanking" under the National Trails System Act, 16 U.S.C. § 1241 *et seq. Montgomery Cnty. v. Bhatt*, 446 Md. 79, 82-83 (2016).

Because "Section 4(f) does not apply to land that has been temporarily used for

recreational or park purposes if the . . . local government with jurisdiction . . . officially indicated

prior to allowing the temporary park or recreational use, that the land was intended for a

transportation use," FTA's conclusion that the right-of-way is not a Section 4(f) property is

sound.  *See* AR1_001664-65; 23 C.F.R. § 774.11(h) ("When a property formally reserved for a

future transportation facility temporarily functions for park . . . in the interim, the interim

activity, regardless of duration, will not subject the property to Section 4(f).").  Montgomery

County concurred in FTA's determination.  AR2_002772-73; 2779-82; 2785-87.

 Plaintiff's claim that FTA failed to evaluate impacts to the right-of-way and, therefore,

violated Section 4(f), is incorrect and FTA is entitled to summary judgment on this claim.

 C.  FTA properly concluded that impacts to the Baltimore-Washington Parkway are
   *de minimis*.

 Plaintiffs final argument claims that the "need to seek a special use permit from park

authorities" undermines FTA's determination that the use of parks is *de minimis*.  Pls.' Br. 43.

Plaintiffs appear to reference the crossing at the Baltimore-Washington Parkway, which will

require a special use permit from the National Park Service.  *See* AR1_001709-12.  But FTA

properly concluded that the anticipated impacts to the Parkway property are *de minimis* under

Section 4(f) and no further evaluation was required.  *See* 23 C.F.R. § 774.17(5)(2) ("For parks, . .

. a *de minimis* impact is one that will not adversely affect the features, attributes, or activities

qualifying the property for protection under Section 4(f).").

 Construction will require temporary use of approximately 3.82 acres of park property and

2.90 acres of Parkway roadway as well as permanent use of approximately 0.61 acre of Parkway

property.  AR1_001673; AR1_001707-08.  MTA committed to implement various mitigation

measures to minimize the impact and will exchange land with the NPS to "mitigate for the

permanent use of approximately 0.6 acres" of Parkway property.  AR1_001311.  The agencies

concluded that the park and Parkway property will not be adversely affected by the Project, AR1_001712, and the "NPS concurred with FTA's *de minimis* use determination." AR1_001823-25; *see also* AR1_001712.  Section 4(f) does not require more.

## V.    Plaintiffs' ESA claims lack merit.[13]

### A.    The Agencies complied with ESA Section 7(a)(2)

Plaintiffs argue that FTA violated ESA Section 7(a)(2), 16 U.S.C. § 1536(a)(2), by not engaging in formal consultation with the Service to assess the effects of the Purple Line on the endangered Hay's Spring amphipod and the Kenk's amphipod, a candidate for listing.  Pls.' Br. 44-45.  This claim fails because the agencies concurred after *informal* consultation that the Purple Line will have no effect on either species.  AR1_31; FWS_510-18; *supra* at 11-14.   As a result of that finding, formal consultation was not required.  *See* 50 C.F.R. §§ 402.13(a), 402.14(b)(1); *ESA Consultation Handbook* at 3-12, FWS_1536-37.[14]

Plaintiffs' claim that FTA had to conduct a "Biological Assessment of the cumulative impact of the proposed action," Pls.' Br. 45, also lacks merit.  "[T]here is simply no statutory mandate to consider cumulative effects during informal consultation."  *Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1055 (9th Cir. 2013).  Nor is a biological assessment required where, as here, no listed species are found in the action area.  *See* 16 U.S.C. § 1536(c)(1); 50

---

[13] Plaintiffs waived any claim that FWS violated its alleged duty "to emergency list" the Kenk's amphipod, *see* Plaintiffs' First Am. Compl. ¶¶ 107, 118, 121, 132, or to designate critical habitat and prepare a recovery plan for any listed species, *see id.* ¶¶ 108, 113.  *See supra* n.6.

[14] Any alleged effects on the Kenk's amphipod would not trigger consultation in any event because candidate species and "are accorded no protection under the Act." 50 C.F.R. § 402.12(d); 51 Fed. Reg. 19,926, 19,941 (June 3, 1986); FWS_483 n.1.  Plaintiffs' suggestion that the *ESA Consultation Handbook* required a "formal conference" over the Kenk's amphipod is incorrect.  The excerpt Plaintiffs cite refers to the conferencing requirement for species proposed for listing and states that an action agency can "voluntarily consider[]" candidate species. FWS_1623, 1493-94; *see* 16 U.S.C. § 1536(b)(4).  FTA went beyond any requirement of the ESA or guidance in the *Handbook* by informally consulting with the Service.

C.F.R. § 402.12(d)(1); FWS_5; *ESA Consultation Handbook* at 3-3, 3-7; FWS_1526, 1530; *see also* 51 Fed. Reg. at 19,945 ("Although a Federal agency may prepare a biological assessment while involved in informal consultation with the Service, there is no requirement that it do so.").

Even when a biological assessment is required, the contents are largely discretionary; the only requirement is that it "'determine whether any [listed] species or [critical] habitat are likely to be adversely affected by the action.'" *Conservation Cong.*, 720 F.3d at 1056 (quoting 50 C.F.R. § 402.12(a)). Here, the agencies thoroughly evaluated whether the project may adversely affect the Hay's Spring and Kenk's amphipods and found that it would have no effect. FWS_511-18. As a result of that finding, "no further action [was] necessary" under ESA Section 7(a)(2). 50 C.F.R. § 402.13(a); *Ctr. For Biological Diversity*, 563 F.3d at 474-75.

Plaintiffs also assert that the agencies should have reinitiated consultation based on "new information" undermining the "most important reasons" for the Service's "no effect" finding, including the elimination of "[g]reen Track, which will result in increased runoff," and alleged "revelations" in Plaintiffs' October 2015 petition that the Purple Line "will create many stormwater runoff points, lines, or areas." Pls.' Br. 44-45. This argument fails for at least two reasons. First, the green track requirement was not one of the "most important" reasons for the Service's "no effect" determination. AR5_20-21; FWS_485. Rather, the Service explained that the "most important" threats to both amphipod species "are those that have a direct impact on the recharge area (drainage basin) of seepage springs." FWS_485. The Service found that the Purple Line "will not impact any of the recharge areas of seepage springs" known to support either species, *id.*, and Plaintiffs do not contest that finding.

Second, the record supports FTA's conclusion that "the absence of the 'green track' from the Project design is unlikely to affect storm water infiltration and runoff in a manner that would

lead to unanticipated effects on the amphipod species."  AR5_6, 12-14, 20-21, 25-41.  Although

the project allows but no longer requires green track, the same stormwater discharge standards

apply regardless of whether green track is used.  AR4_2865; AR5_12-14, 20-21.  The record also

shows that the stormwater treatment measures described in the preliminary report forming the

basis for Plaintiffs' claim would result in a net improvement in stormwater treatment in the Rock

Creek watershed *regardless* of whether green track is used.  AR5_20-21.  Thus, Plaintiffs do not

identify any new information regarding stormwater impacts that undermines the agencies'

finding that the Project will have no effect on the Hay's Spring (or Kenk's) amphipod.[15]

B.  The Service fulfilled its duty to implement a system to monitor the status of the Kenk's amphipod.

Under ESA Section 4, the Service must implement a "system to monitor effectively the

status of all species [that are warranted but precluded]."  16 U.S.C. § 1533(b)(3)(C)(iii).

Plaintiffs allege that the Service has "no monitoring system" for the Kenk's amphipod, a

candidate for listing for which the Service has made a warranted-but-precluded finding, other

than "infrequent" surveys of the species' habitat.  Pls. Br. at 45-46.  However, as demonstrated

below, the Service has fulfilled the statutory requirement to monitor candidate species through its

annual candidate assessment and review process.

The Service reviews each species' warranted-but-preclude status annually through the

Candidate Notice of Review ("CNOR").  The CNOR serves several purposes.  One purpose, by

its own terms, is to "document compliance with the statutory requirement to monitor the status"

of warranted-but-precluded species to "ascertain if they need emergency listing"; the "CNOR

---

[15] Although Plaintiffs also allege that the agencies violated ESA Section 7(a)(1) by failing to properly assess the effects of the Purple Line, Pls.' Br. 45, Section 7(a)(1) does not require a biological assessment or any other project-specific analysis.  *See* 16 U.S.C. § 1536(a)(1); *Protect Our Water v. Flowers*, 377 F. Supp. 2d 844, 870 (E.D. Cal. 2004).

and accompanying species assessment forms constitute the Service's annual finding on the status of petitioned species pursuant to section 4(b)(3)(C)(i)."  *See* FWS_647, 654 (2010 CNOR). Thus, the Service utilizes the annual CNOR process to monitor candidate species.

The CNOR identifies, and requests information on the status of, those species that are candidates for listing.  *See, e.g.*, FWS_653-54.  The CNOR plays an important role in the Service's ability to monitor candidate species by providing public notice that the agency is "actively seeking information regarding the status of these [candidate] species."  *Id.* at 975, 971 (requesting the public to "submit any new information, materials, comments, or questions pertaining to a particular species"), 1011 (requesting the public "submit any further information on the species named in this notice as soon as possible or whenever it becomes available," and providing eight factors to guide the content of new information submitted).

The Service also contacts the relevant state and local governments, as well as other federal agencies, to obtain information on potential threats to the species and conservation efforts.  FWS_966 (listing state and federal coordination for the Kenk's).  The Service seeks information from academic, professional, and nongovernmental organizations, and performs its own review of the scientific literature.  FWS_962, 967-68 (summarizing and listing scientific literature relevant to the Kenk's), 965 (documenting personal communication with state amphipod expert).  These efforts help to ensure that the Service has the most current information on the species, and is able to make listing decisions based on the "best scientific and commercial data available," as required by the Act. 16 U.S.C. § 1533(b)(1)(A).

Through this monitoring system and other efforts, the Service has considered 52 surveys for Kenk's amphipod conducted at 45 spring sites in Washington, D.C., and Montgomery County, Maryland.  FWS_1441, 1452-53.  In addition, FWS has learned of surveys conducted in

2014 by Dr. Culver near the site of the proposed Purple Line, but failed to find any confirmed or

suspected Kenk's amphipod sites.  FWS_499-501 (Culver report), 508 (state response to Culver

report), 510-11 (FWS response to Culver report).[16]

Finally, the Service recently assessed and documented through the CNOR whether

emergency listing of the Kenk's amphipod was warranted and found that it was not because,

among other reasons, "extinction is not imminent."  FWS_965-66.  The Service's assessment

used the best available data, including information obtained through its monitoring system.

In sum, the Service has implemented a monitoring system for the Kenk's amphipod and

is appropriately using information gained through that system to insure that any listing decision

will be based upon the best available data.  None of this information indicates that the Purple

Line will have an effect on the species or require that it be emergency listed.

Plaintiffs' contrary arguments fail to grasp two key aspects of the ESA.  First, Plaintiffs

mistakenly assume that the duty to implement a monitoring system means that the Service must

essentially conduct its own surveys and generate its own data regarding the species.  *See* Pls. Br.

at 45-46 (arguing that the Service has not established an actual monitoring system because it has

not obtained any recent measurements of seepage flows).  This is incorrect.  The purpose of the

monitoring system is to facilitate listing determinations for candidate species, and under Section

4 of the ESA, all listing determinations must be based "solely on the basis of the best *available*

scientific and commercial data." 16 U.S.C. § 1533(b)(1)(A) (emphasis added).  The requirement

---

[16] Plaintiffs' claim that there is no monitoring system for the Kenk's amphipod is independent of
their challenge to the decision documents for the Purple Line, which are supported by the
administrative records filed in this case.  While those records suffice to demonstrate the
existence of the monitoring system, the Service's monitoring of the species is ongoing and
continually updated with new information.  If requested by the Court, Federal Defendants will
produce or move to supplement the record with additional, publicly-available information
confirming the Service's ongoing monitoring of the species.

that the information be "available" means that the Service has no obligation to conduct surveys

or generate new data as part of its monitoring of or decision-making for candidate species.  *See*

*Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000) (holding that the

"'best available data' requirement makes it clear that the Secretary has no obligation to conduct

independent studies."); *Bldg. Indus. Ass'n of Superior Cal. v. Norton*, 247 F.3d 1241, 1246 (D.C.

Cir. 2001) (distinguishing "best scientific data available" from "best scientific data possible.").

 Second, a claim is cognizable under the ESA's citizen-suit provision only if it seeks to

compel performance of a "nondiscretionary duty."  16 U.S.C. § 1540(g)(1)(A).  Thus, where, as

here, the Service has complied with its duty to monitor the species, the effectiveness of the

Service's monitoring is not reviewable.  "[T]he word 'effectively' renders discretionary the

details of how the command is executed," and "[t]he ESA's citizen suit provisions are therefore

inapplicable."  *Cal. Native Plant Soc'y v. Norton*, No. 03-cv-1540, 2005 WL 768444, at *9

(D.D.C. Mar. 24, 2005); *see also* 5 U.S.C. § 701(a)(2) (exempting discretionary duties from APA

review).  Because Plaintiffs are essentially challenging the effectiveness of the Service's

monitoring system for the Kenk's amphipod, their claim is not justiciable and Federal

Defendants are entitled to summary judgment as a matter of law.

## VI.  Plaintiffs' MBTA claim lacks merit.

 Plaintiffs next allege that FTA is violating the MBTA by taking migratory birds without a

permit.  Pls.' Br. 47-48.  This argument fails for two reasons.  First, although a federal agency

may not directly engage in activities that take migratory birds without prior authorization from

the Service, *Humane Soc'y*, 217 F.3d at 885, no court has held that the take prohibition extends

to a federal agency that is acting in its regulatory capacity under a separate statue to authorize

third-party activity that allegedly may cause take.[17]

That is precisely the situation here.  Although Plaintiffs contend that the Purple Line will harm migratory birds, FTA will not construct or operate the project.  Rather, FTA's role is limited to evaluating whether the project qualifies for a federal grant that would cover a portion of MTA's construction costs.  *See supra* at 3-4.  This type of regulatory review does not implicate the MBTA's take prohibition.  *See Protect Our Cmtys. Found. v. Jewell*, 2014 WL 1364453, at *21 ("Federal agencies are not required to obtain a permit before acting in a regulatory capacity to authorize activity … that may incidentally take protected birds.").

Second, as the record shows, construction and operation of the Purple Line is unlikely to take migratory birds.  *See* AR1_204-05; AR1_38.  Tree-clearing activities are prohibited from April through August to minimize the risk of take, *id.*, and, contrary to Plaintiffs' assertions, tree removal or habitat modification, standing alone, is not a take.  *See* 16 U.S.C. § 703(a); 50 C.F.R. § 10.12 (defining "take"); *Seattle Audubon Soc'y v. Evans*, 952 F.2d 297, 302 (9th Cir. 1991) (MBTA and implementing regulations "make no mention of habitat modification or destruction").  Thus, even if FTA were responsible for take caused by the Purple Line (which it is not), Plaintiffs have not shown that construction or operation is likely to take protected birds.[18]

---

[17] *See, e.g., Pub. Employees for Envtl. Responsibility v. Beaudreau*, 25 F. Supp. 3d 67, 117-18 (D.D.C. 2014), *appeal docketed*, Nos. 14-5301, 14-5303 (D.C. Cir. Dec. 9, 2014); *Friends of Boundary Mountains v. U.S. Army Corps of Eng'rs*, 24 F. Supp. 3d 105, 114 (D. Me. 2014); *Protect Our Cmtys. Found. v. Jewell*, No. 13cv575JLS (JMA), 2014 WL 1364453, *20-21 (S.D. Cal. March 25, 2014); *Protect Our Cmtys. Found. v. Chu*, No. 12cv3062 L(BGS), 2014 WL 1289444 (S.D. Cal. Mar. 27, 2014); *see also Vill. of Bensenville v. FAA*, 457 F.3d 52, 64 (D.C. Cir. 2006) ("The receipt of public funds, even of 'virtually all' of an entity's funding, is not sufficient to fairly attribute the entity's actions to the government.").

[18] Although Plaintiffs cite the extra-record "Manville Affidavit" in support of their MBTA claim, Pls.' Br. 48, the affidavit is not properly before the Court.  *See* ECF No. 52.  Nor have Plaintiffs shown that the affiant's opinions are "based on sufficient facts or data" and "the product of reliable principles and methods."  Fed. R. Evid. 702; *See Chesapeake Climate Action Network v. Exp.-Imp. Bank of the U.S.*, 78 F. Supp. 3d 208, 219 (D.D.C. 2015).  On the contrary, they are

Finally, Plaintiffs assert that FTA "failed to complete an MBTA Conservation Plan as required by Executive Order [13,186, 66 Fed. Reg. 3,853, 3,856 (Jan. 10, 2001)]." Pls.' Br. 48. However, the Executive Order does not mandate the completion of an "MBTA Conservation Plan," and it is unenforceable in any event. *See Defenders of Wildlife v. Jackson*, 791 F. Supp. 2d 96, 120-21 (D.D.C. 2011). Plaintiffs' MBTA claim lacks merit.

## VII.    Plaintiffs have not demonstrated that they are entitled to the relief they seek.

Plaintiffs request the Court to vacate FTA's ROD, but have not demonstrated a violation of law supporting their request. Pls.' Br. 48; ECF No. 20 at 59 ¶ 3. Even if Plaintiffs prevail on the merits of their claims, Plaintiffs' request for vacatur should be denied.

In crafting a remedy, a court has "many remedial tools at its disposal" to advance the public interest. *Winter v. NRDC*, 555 U.S. 7, 33 (2008). A court may set aside all or part of the agency decision, stay all or part of the judgment, enter a narrowly-tailored injunction, issue declaratory relief, or use a combination of these tools. *See id.*; 5 U.S.C. § 702(1). The Supreme Court directs courts to craft the least drastic remedy that would alleviate any imminent, irreparable harm to the relief seeking party—to only harms that the legal violation caused. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66; *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

A court need not, therefore, vacate every agency decision that violates a law. *See Sugar*

---

based on limited and questionable information, including a single afternoon visit to one part of the Purple Line corridor at a time of year when migratory birds were not present, and at a time of day when birds are less likely to be active. SR_29-30. The affiant's assessment is also based largely on speculation about which migratory birds might inhabit the area, and his vague conclusions are unsupported by evidence or analysis. *Id.* at 36. Even if the affiant's opinion testimony were admissible, the affidavit does not show that construction or operation of the Purple Line will take migratory birds. The affiant does not address the April-August tree-clearing restriction, let alone demonstrate how construction will cause take notwithstanding the restriction. His claim that the Purple Line poses an increased risk of bird electrocutions is also erroneous. *See* AR1_000204.

*Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 98 (D.C. Cir. 2002) ("Appellants insist

that we have no discretion in the matter; if the [agency] violated the APA—which it did—its

actions must be vacated.  But that is simply not the law.").  Indeed, courts may leave in place

flawed decisions while the agency follows the necessary procedures to correct its action.  *See*

*North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008) (explaining that "a remand

without vacatur is appropriate" in some cases).  And courts decide whether to vacate an agency

action depending on how serious the agency's errors are and the disruptive consequences of an

interim change that may itself be changed.  *Sugar Cane Growers Co-op. of Fla.*, 289 F.3d at 98.

Plaintiffs here have failed to make any showing that equitable relief is warranted and the

Court should deny Plaintiff's request for vacatur.  If the Court concludes that the agencies have

failed to fully comply with federal law, the Court should remand the matter to the agencies to

correct any errors, but allow the Purple Line to proceed during the remand.  *See, e.g., Winter*,

555 U.S. at 33 (permitting continuation of naval training exercises despite NEPA violation).  In

the event the Court rules in Plaintiffs' favor on any issues, Federal Defendants respectfully

request an opportunity for further supplemental briefing on the appropriate remedy.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Summary

Judgment and grant Federal Defendants' Cross-Motion for Summary Judgment.


Respectfully submitted this 11th day of April, 2016.

                                    JOHN C. CRUDEN
                                    Assistant Attorney General
                                    United States Department of Justice
                                    Environment & Natural Resources Division
                                     /s/  *Tyler L. Burgess*
                                    TYLER L. BURGESS (NC 46989)
                                    Trial Attorney

Natural Resources Section
PO Box 7611
Washington, DC  20044-7611
Tel: (202) 616-4119
Email: tyler.burgess@usdoj.gov

KEVIN W. McARDLE (DC 454569)
JEREMY HESSLER (CA 281462)
Trial Attorneys
Wildlife and Marine Resources Section
PO Box 7611
Washington, DC  20044-7611
Tel: (202) 305-0219 (McArdle)
Tel: (202) 305-0431 (Hessler)
Email: kevin.mcardle@usdoj.gov
Email: jeremy.hessler@usdoj.gov

*Attorneys for Federal Defendants*

OF COUNSEL
JAY M. FOX, Regional Counsel
Federal Transit Administration, Region III

DAVID S. ROTHSTEIN, Assistant Regional Solicitor
U.S. Department of the Interior
Office of the Regional Solicitor—Northeast Region

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 11th day of April, 2016, I filed the foregoing document

electronically through the CM/ECF system, which caused all parties or counsel of record to be

served by electronic means, as more fully reflected on the Notice of Electronic Filing.


_____
/s/  *Tyler L. Burgess*
Tyler L. Burgess
Attorney for Federal Defendants