**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**


| | | |
|---|---|---|
| FRIENDS OF THE CAPITAL CRESCENT TRAIL, et al., | * | Civil Case No. 14-01471 (RJL) |
| | * | |
| | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | Hon. Richard J. Leon |
| | * | |
| FEDERAL TRANSIT ADMINISTRATION, et al., | * | |
| | * | |
| Defendants, | * | |
| | * | |
| and | * | |
| | * | |
| The STATE OF MARYLAND, | * | |
| | * | |
| Defendant – Intervenor | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*


**STATE OF MARYLAND'S MEMORANDUM IN SUPPORT OF**
**CROSS-MOTION FOR SUMMARY JUDGMENT**
**AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND ............................................................................... 3

    A.    Project History .......................................................................... 3

        1.    Initial Planning for a Bethesda-to-Silver Spring Transitway.................... 3

        2.    Georgetown Branch DEIS and Transition to a "Bi-County" Project ........ 4

    B.    The NEPA Process for the Purple Line ....................................... 5

        1.    Scoping .......................................................................... 5

        2.    Development and Screening of Alternatives ............................ 6

        3.    The Alternatives Analysis/Draft Environmental Impact Statement .......... 7

        4.    Transition from AA/DEIS to FEIS .......................................... 10

        5.    The Final Environmental Impact Statement ............................ 12

        6.    The Record of Decision .................................................... 16

    C.    Procurement of a Public-Private Partnership .............................. 17

    D.    Responses to Requests for Additional NEPA Review....................... 17

        1.    The Amphipod Issue ........................................................ 17

        2.    The Cost-Saving Refinements ............................................. 19

        3.    Stormwater and Other Issues .............................................. 20

STANDARD OF REVIEW .................................................................................. 20

ARGUMENT ......................................................................................................... 22

I.    THE AA/DEIS AND FEIS MET ALL NEPA REQUIREMENTS............................... 22

    A.    Courts Apply a "Rule of Reason" When Assessing the Adequacy of an EIS.............................................................................. 22

    B.    The FEIS Responded to Comments Regarding Ridership Forecasts.................. 23

    C.    FTA and MTA Sufficiently Disclosed Technical Data and Assumptions.......... 24

    D.    The AA/DEIS Clearly Described Differences Among the Alternatives. ........... 27

    E.    The FEIS Adequately Considered Impacts on Natural Resources. .................... 28

        1.    Forest Impacts.............................................................. 28

        2.    Stormwater Impacts ....................................................... 29

        3.    Energy Use and Air Emissions ........................................... 31

    F.    The FEIS Adequately Considered Indirect and Cumulative Impacts................. 32

# TABLE OF CONTENTS

(continued)

| | | |
|---|---|---|
| | G. | The FEIS Adequately Documented Compliance With Other Laws ................... 34 |
| | H. | The FEIS Adequately Addressed Possible Mitigation Measures ....................... 35 |
| II. | | FTA PROPERLY DETERMINED THAT A SUPPLEMENTAL EIS WAS NOT REQUIRED. ............................................................................................................. 36 |
| | A. | A Supplemental EIS is Required Only if New Information or Project Changes Present a Seriously Different Picture of the Environmental Impacts. .............................................................................................................. 36 |
| | B. | MTA's Cost Saving Changes Do Not Warrant a Supplemental EIS. ................. 37 |
| | | 1. Green Track ............................................................................................ 37 |
| | | 2. "Parabolic" Steel Bridge ...................................................................... 38 |
| | | 3. Other Cost-Saving Changes .................................................................. 39 |
| | C. | The Declarations Attached To FCCT's October 9 Letter Do Not Require Preparation of a Supplemental EIS. ................................................................. 39 |
| | | 1. Allen Memorandum (Ridership) ............................................................ 40 |
| | | 2. Lysy Declaration (Cost Estimates) ....................................................... 41 |
| | | 3. Collinson Declaration (Wetlands) ......................................................... 41 |
| | | 4. MacGlashan Declaration (Noise) .......................................................... 42 |
| | | 5. Saggese Declaration ("Risk Of Failure") ............................................. 43 |
| | D. | The Stormwater Report Attached to FCCT's October 9 Letter Does Not Warrant Preparation of a Supplemental EIS ...................................................... 43 |
| | E. | None of the Other Issues Raised in FCCT's July 14 or October 9 Letters Require Preparation of a Supplemental EIS. ..................................................... 45 |
| III. | | FTA COMPLIED WITH SECTION 4(F). ....................................................................... 46 |
| | A. | FTA Properly Made a Temporary Occupancy Finding For Elm Street Urban Park. ...................................................................................................... 47 |
| | B. | FTA Properly Determined That the Georgetown Branch Right-Of-Way Is Not a Park Protected By Section 4(f) .................................................................. 48 |
| IV. | | THE REQUIREMENTS OF THE ENDANGERED SPECIES ACT ARE SATISFIED. .................................................................................................................. 48 |
| V. | | FCCT'S MIGRATORY BIRD TREATY ACT CLAIM HAS NO MERIT. .................. 49 |
| VI. | | FCCT FAILS TO STATE A CLAIM UNDER THE NEW STARTS PROGRAM. ........ 50 |
| CONCLUSION ................................................................................................................................. 50 |

# TABLE OF AUTHORITIES

**Page**

Cᴀsᴇs

*American Radio Relay League, Inc. v. FCC*,
  524 F.3d 227 (D.C. Cir. 2008) ................................................................................27

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................50

*Audubon Naturalist Soc. v. U.S. Dep't of Transportation*,
  524 F. Supp. 2d 642 (D. Md. 2007) ........................................................................22

*B&J Oil & Gas v. FERC*,
  353 F.3d 71 (D.C. Cir. 2004) ..................................................................................37

*Baltimore Gas and Electric Co. v. Natural Res. Def. Council, Inc.*,
  426 U.S. 87 (1983) ..................................................................................................22

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................50

*California v. Block*,
  690 F.2d 753 (9th Cir. 1982) ..................................................................................30

*Camp v. Pitts*,
  411 U.S. 138 (1973) ...........................................................................................21, 22

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ...........................................................................................21, 22

*City of Olmsted Falls, OH v. F.A.A.*,
  292 F.3d 261 (D.C. Cir. 2002) ................................................................................21

*City of Waukesha v. EPA*,
  320 F.3d 228 (D.C. Cir. 20013) .........................................................................47, 48

*Coalition on Sensible Transportation, Inc. v. Dole*,
  826 F.2d 60 (D.C. Cir. 1987) ..................................................................................23

*Dep't of Transp. v. Public Citizen*,
  541 U.S. 752 (2004) .......................................................................................23, 40, 46

*Gerber v. Norton*,
  294 F.3d 173 (D.C. Cir. 2002) ................................................................................21

# TABLE OF AUTHORITIES
(continued)

**Page**

*Grand Canyon Trust v. FAA,*
290 F.3d 339 (D.C. Cir. 2002) ................................................................32, 33

*Hughes River Watershed Conservancy v. Glickman,*
81 F.3d 437 (4th Cir. 1996) ...........................................................................26

*Marsh v. Or. Natural Res. Council,*
490 U.S. 360 (1989) .................................................................................21, 36

*Metropolitan Edison Co. v. People Against Nuclear Power,*
460 U.S. 766 (1983) .................................................................................37, 43

*Nat'l Wildlife Fed'n v. EPA,*
286 F.3d 554 (D.C. Cir. 2002) .......................................................................21

*National Committee for the New River, Inc. v. FERC,*
373 F.3d 1323 (D.C. Cir. 2004) ...............................................................36, 37

*Nevada v. Dep't of Energy,*
457 F.3d 78 (D.C. Cir. 2006) .........................................................................40

*Robertson v. Methow Valley Citizens Council,*
490 U.S. 332 (1989) .................................................................................22, 35

*Sierra Club v. Forest Service,*
878 F. Supp. 1295 (D.S.D. 1993) ...................................................................26

*Theodore Roosevelt Conserv. Partnership v. Salazar,*
661 F.3d 66 (D.C. Cir. 2011) .........................................................................20

*Turtle Island Restoration Network v. U.S. Dep't. of Commerce,*
438 F.3d 937 (9th Cir. 2006) .........................................................................49

*Washington Trollers Ass'n v. Kreps,*
645 F.2d 684 (9th Cir. 1981) .........................................................................27

*\*WildEarth Guardians v. BLM,*
8 F. Supp. 3d 17 (D.D.C. 2014) ...............................................................21, 23

*WildEarth Guardians v. Jewell,*
738 F.3d 298 (D.C. Cir 2013) ........................................................................28

## STATUTES

5 U.S.C. §§ 701–706 (Administrative Procedure Act) ...............................20, 21, 22, 47

# TABLE OF AUTHORITIES
(continued)

**Page**

16 U.S.C. §§ 703-712 (Migratory Bird Treaty Act) ................................................46, 49

16 U.S.C. §§ 1531-1544 (Endangered Species Act)........................................... passim

16 U.S.C. §§ 1801-1882 (Fishery Conservation and Management Act of 1976)........................27

33 U.S.C. §§ 1251-1375 ........................................................................ passim

42 U.S.C. §§ 4321-4347 (National Environmental Policy Act) ............................. passim

42 U.S.C. § 4332(C) ...........................................................................22

49 U.S.C. § 303 (Department of Transportation Act)...................................46

49 U.S.C. § 5309 (Federal Highway Act)...........................................5, 50

Maryland Code Ann., State Govt., § 10-611 ...............................................24

## REGULATIONS

23 C.F.R. 771.113(a)................................................................30

23 C.F.R. 774.13(d) ..............................................................47

33 C.F.R. 332.8(d)(6)...........................................................42

40 C.F.R. 1502.2(b) .............................................................23

40 C.F.R. 1502.21 ................................................................24

40 C.F.R. 1508.14 ................................................................37

50 C.F.R. 402.12(c)...............................................................49

50 C.F.R. 402.12(d)(1)...........................................................49

65 Fed. Reg. 76,864 (Dec. 7, 2000) .............................................5

# INTRODUCTION

The court should grant summary judgment in favor of the Federal Defendants and the Intervenor-Defendants State of Maryland and Maryland Transit Administration ("MTA").  As explained below, the administrative record amply demonstrates the basis for the agencies' decisions.  The plaintiffs are unable to satisfy their burden of showing that the government's actions were arbitrary, capricious, or not in accordance with law.

The Purple Line project is among the State of Maryland's the most important transportation infrastructure projects.  Once constructed, this light-rail transit line and recreational trail will cross two of the State's most densely populated and rapidly growing counties.  The 16.1- mile light-rail line will connect with four different Metrorail lines, as well as commuter rail, Amtrak, and bus systems.  The project will provide a faster way to travel to and from major employment and commercial centers, including Bethesda, Silver Spring, Takoma/Langley Park, the University of Maryland, and New Carrollton.  By following existing transportation rights-of-way, the project will largely avoid impacts on natural resources and communities.  Environmental agencies and advocacy groups have praised the project, describing its impacts "relatively low" and even "minimal" for a project of this size.

Support for the Purple Line is broad, ranging from the Chamber of Commerce to the Sierra Club.  Both counties in which the project is located – Montgomery and Prince George's – have included the project in their transportation and land use plans and are contributing substantial funds toward its completion.  Federal agencies, including the U.S. Environmental Protection Agency and the National Capital Planning Commission, have submitted comments supporting the project.  The regional body responsible for multimodal transportation planning – the Metropolitan Washington Council of Governments – has incorporated the project into its long-range transportation plan for the national capital region.  Maryland's new Governor, after

conducting an in-depth review of the project's financial feasibility, strongly endorsed the project in June 2015, and has kept the project on course for financing and construction. And just recently, on April 6, 2016, Maryland's Board of Public Works formally approved the Public-Private Partnership ("P3A") contract for the Purple Line, clearing the way for construction to begin in November 2016.

Opposition to the Purple Line has been concentrated primarily within the Town of Chevy Chase. The opposition has centered on a 3.3-mile section of a former freight rail line known as the Georgetown Branch, which crosses through the Town from east to west. Montgomery County acquired the Georgetown Branch in the 1980s specifically for transportation use and adopted a Master Plan amendment in 1990 designating the Georgetown Branch as a future transitway and trail. Throughout this period, some County residents have sought to prevent the Georgetown Branch from ever being used as a transitway, arguing that any new transitway should be built along a less direct route using Jones Bridge Road. Opposition to the project has been especially pronounced among residents whose backyards directly abut the Georgetown Branch right-of-way.

After more than 20 years of public debate, including years of environmental review, the responsible governmental agencies decided to construct the Purple Line as a ligh- rail transit project using the Georgetown Branch. A few remaining opponents[1] now seek to thwart the outcome of this process by demanding additional environmental review to address purportedly "new" environmental issues. But, as shown in the administrative record in this case, the Federal Transit Administration ("FTA") met its responsibility to consider the environmental impacts of the Purple Line in accordance with the National Environmental Policy Act ("NEPA"), 42 U.S.C.

---

[1] Plaintiffs in this case are Friends of the Capital Crescent Trail ("FCCT"), John Macknight Fitzgerald and Christine Real de Azua. This brief will refer generally to plaintiffs as FCCT.

§§ 4321-4347, and other applicable federal laws.  The plaintiffs disagree with the outcome of that process, but have failed to establish that FTA's approval was arbitrary, capricious, or not in accordance with law.  Because the plaintiffs have not met their burden, summary judgment should be granted in favor of the defendants on all issues.

## FACTUAL BACKGROUND

### A.     Project History

#### 1.       Initial Planning for a Bethesda-to-Silver Spring Transitway

Planning for the Purple Line began in October 1970, when Montgomery County's planning board adopted a master plan for the Bethesda-Chevy Chase area, that identified the "Georgetown Branch Corridor" between Bethesda and Silver Spring for public transportation use.  In 1972, Montgomery County (the "County") requested that the Bethesda Metrorail station be designed to allow a future east-west transit line in the Georgetown Branch Corridor ("Georgetown Branch").  In June 1976, the County adopted a plan for the Bethesda Central Business District, which recommended using the Georgetown Branch for a rapid transit link between Bethesda and Silver Spring.  AR2_217065.[2]  All of these planning actions were taken while the Georgetown Branch still remained in active use as a freight railroad.  AR2_218305.

Freight railroad service on the Georgetown Branch was discontinued in 1985.  AR2_218305.  In 1986, the County released a study finding that there was sufficient demand to support a transitway between Bethesda and Silver Spring.  The study recommended acquiring the Georgetown Branch for that purpose.  AR2_218750.  Later that year, the County amended its

---

[2] Citations to the Administrative Records will be as follows: AR*_****.  "AR*" indicates the volume of the AR; the page numbers follow the "underscore."  The five volumes are organized as follows.  AR1 includes the core NEPA documents such as the FEIS and ROD.  AR2 includes project file documents relating to the development of the FEIS and ROD.  AR3, AR4 and AR5 each contain documents related to the three decisions by FTA not to supplement the FEIS.

Master Plan to designate the Georgetown Branch as a "public right-of-way intended to be used for public purposes such as conservation, recreation, transportation, and utilities." AR2_218154.

The County purchased the Georgetown Branch in 1988 for $10.5 million[3] and started a more detailed study analyzing two alternative uses for the Bethesda to Silver Spring portion of the right-of-way: one with a transitway and trail, and one with only a trail. AR2_218295. In January 1990, the County amended its Master Plan to designate the Georgetown Branch for use as a light-rail transitway with a paved trail. AR2_218137.

By the mid-1990s, when it had become clear that the construction of the transitway would take longer than expected, the County removed the remaining freight rail tracks to create an "interim trail." In approving $391,000 for this purpose, the County reiterated that the Georgetown Branch "was purchased . . . for transportation purposes (including both transit and trail), and that the section between Bethesda and Silver Spring remains designated as a transportation corridor in which an interim trail is permitted until the master planned transit and trail facility is approved and funded consistent with the master plan." AR2_002788.

### 2.    Georgetown Branch DEIS and Transition to a "Bi-County" Project

In response to various studies establishing the need for "circumferential transit" opportunities in Montgomery and Prince George's counties,[4] MTA and FTA jointly initiated an environmental impact statement ("EIS") in 1994 for a proposed "Georgetown Branch Transitway and Trail" from Bethesda to Silver Spring. AR2_218037. After the Draft EIS was issued for that proposal, the Maryland State Highway Administration, in 1998, modified an ongoing study of the Capital Beltway (I-495) to analyze options for improving circumferential travel, including

---

[3] The purchase included the entire length of the right-of-way in Maryland, from Silver Spring through Chevy Chase and Bethesda to the D.C. line.

[4] See, e.g., AR2_217067 (Maryland Department of Transportation ("MDOT") Study) and AR2_218053 (Metropolitan Washington Council of Governments ("MWCOG") study).

a wide range of options for east-west transit routes both within and outside the Capital Beltway in Maryland.  AR1_001922.  That analysis culminated in a 2002 report, which recommended constructing a light-rail transit system connecting Bethesda to New Carrollton via Silver Spring. *Id.*  That study adopted the name "Purple Line" to describe this new east-west rail transit connection, to be consistent with the names used for the existing Metrorail lines.  *Id.*  The Washington Metropolitan Area Transit Authority ("WMATA") then initiated a separate study for a possible light-rail line from Silver Spring to New Carrollton.  The two projects became known as "Purple Line West" (Bethesda to Silver Spring) and "Purple Line East" (Silver Spring to New Carrollton).  AR1_012011.  In 2003, after the election of a new Governor, the "Purple Line East" and "Purple Line West" were combined and re-named the "Bi-County Transitway." AR1_011975.

### B.    The NEPA Process for the Purple Line

In September 2003, FTA and MTA initiated an EIS for the proposed Bi-County Transitway.  AR2_208608.  They also announced that MTA planned to seek federal funding for the project under FTA's New Starts program, requiring development of a separate "Alternatives Analysis," distinct from the requirement for an EIS.[5]  AR2_208610.  Therefore, FTA and MTA prepared the Purple Line Alternatives Analysis/Draft EIS ("AA/DEIS").

### 1.    Scoping

As required by NEPA, FTA and MTA initiated a scoping process to invite input from the public and other agencies on the alternatives to be considered in the EIS.  FTA and MTA presented both Bus Rapid Transit ("BRT") and light-rail transit alternatives at the scoping meetings.  They also considered alignments that avoided the use of the Georgetown Branch

---

[5] *See* 65 Fed. Reg. 76,864 (Dec. 7, 2000) (adopting final rule for development of major capital projects under the New Starts program); *id.* at 76,868 (explaining alternatives analysis requirement under 49 U.S.C. § 5309(e)(1)).

right-of-way by routing the transit project along a more northerly route using Jones Bridge Road. Scoping comments reflected sharply divergent views of the two main route alternatives. Residents of Chevy Chase and some users of the interim trail opposed using the Georgetown Branch and advocated instead for a BRT system via Jones Bridge Road.   Residents of neighborhoods along Jones Bridge Road objected, with similar vigor, to using their street for a BRT transit line.  AR2_206898.

### 2.    Development and Screening of Alternatives

Between 2003 and 2008, MTA held over 280 meetings with community and civic associations to discuss the development of alternatives.   AR1_011996.   MTA also convened eight "community focus groups" at various locations along the corridor in Montgomery and Prince George's counties to provide an additional avenue for public input.  The community focus groups met regularly with project team members to review and provide input on alternatives.  *Id.*

FTA and MTA evaluated a number of different transit technologies and alignments, but ultimately concluded that two modes – BRT and light-rail – could meet the project's purpose at an acceptable cost.[6]  For each mode, FTA and MTA considered a range of "investment levels" – designated as high, medium, and low.  The higher investment levels reflect a greater degree of investment in building physical structures (e.g., overpasses) to separate the transit line from traffic on the road system, thereby allowing for higher travel speeds.  Eight alternatives were selected for detailed study in the AA/DEIS:  No Action, Traffic Systems Management ("TSM"), three BRT alternatives (high, medium, and low investment) and three light-rail alternatives (high, medium, and low investment), together with a variety of "design options" for those alternatives and a "service concept" for each alternative.  AR1_012001 - 28.

---

[6] The AA/DEIS also considered, but eliminated, alternatives using "heavy rail" and "monorail" technology,  as well as a range of potential alignments for BRT and light rail alternatives.  AR1_011996 - 012001.

A BRT system using Jones Bridge Road was studied in detail in the AA/DEIS as part of the low-investment BRT alternative.  FTA and MTA also conducted a separate analysis of this concept as part of the "medium-investment" BRT concept.  AR1_012011; AR1_012159; AR1_001940 - 42.  The concept of building a light-rail line along Jones Bridge Road was also considered, but was not carried forward due to its impacts to traffic patterns, impacts on adjacent property owners, and opposition from the National Institutes of Health ("NIH").  AR1_011998; see also AR1_002357 - 58.

### 3.      The Alternatives Analysis/Draft Environmental Impact Statement

The AA/DEIS included a detailed analysis of the No Action, Transportation Systems Management, BRT, and light-rail alternatives.  AR1_011996.  These eight alternatives were compared based on five broad sets of criteria, which reflected the factors considered by FTA when choosing projects for funding under the New Starts program:  Effectiveness, Impacts, Cost Effectiveness, Financial Feasibility, and Equity.  AR1_001942.  Chapter 6 of the AA/DEIS included a table that summarized each alternative's performance on these criteria.  AR1_012153.

The AA/DEIS found that the light-rail alternatives provided greater transportation benefits in the forecast year (2030) than the BRT alternatives.  For example, it found that the Medium and High Investment light-rail alternatives achieved a *9 minute* travel time between Bethesda and Silver Spring, while BRT using Jones Bridge Road achieved a 25 minute travel time and the no build scenario achieved a 35 minute travel time.  AR1_012153.  The AA/DEIS also noted that light-rail has inherently higher capacity than BRT, and thus had greater potential to accommodate long-term growth in transit demand beyond 2030.  AR1_012158.

The AA/DEIS also disclosed the environmental impacts of the alternatives, noting that the BRT and light-rail alternatives would impact between 1 and 1.4 acres of wetland, 13.5 to 15.1 acres of floodplains, and 3,892 to 5,719 linear feet of stream, as well as up to 11 parks, five

open space areas, five trails, and one historic structure.  AR1_012155.  The AA/DEIS acknowledged the adverse impacts of using the Georgetown Branch, noting that the Build alternatives "would remove essentially all the trees within the narrower portions of the right-of-way."  AR1_012157.

FTA signed the AA/DEIS on September 30, 2008.  AR1_011945.  A 90-day public comment period was established, and later extended to allow comments to be submitted by January 14, 2009.  AR1_002316.  FTA and MTA held four public hearings, and each one included an opportunity for attendees to speak directly with project staff in an open-house format.  More than 3,300 comments were submitted, including written comments and oral testimony.  Commenters included elected officials, community organizations, government agencies, residents, and non-profit organizations.  *Id*.  In addition, 12 petitions were submitted with thousands of signatures.  *Id*.

The U.S. EPA, which is required by law to review and comment on all federal EISs, gave the Purple Line AA/DEIS its highest rating: LO-1, which means a "lack of objection to the project" and that the document itself is considered complete.  AR1_005843.  EPA also observed that "*Environmental impact*s of each alternative *are relatively low* for a 16 mile transitway" and that "Impacts to resources are minimized as the transitway follows existing roadway or former rail guideway."  AR1_005843 - 44 (emphasis added).  Neither EPA nor any other federal, state, or county government objected to the range of alternatives considered in the AA/DEIS, or to the completeness or objectivity of the AA/DEIS's analysis.

The concept of building a light-rail transit and trail along the Georgetown Branch attracted support from a diverse range of citizens, stakeholders, and elected officials.

AR1_002316.  Supporters included major environmental groups,[7] smart growth organizations,[8] bicycling advocates in Montgomery and Prince George's counties,[9] public transit advocates,[10] the business community,[11] and thousands of individuals.  Supporters emphasized that light-rail on the Georgetown Branch route was superior to BRT on Jones Bridge Road because it would provide faster and more reliable travel times, greater capacity for growth, lower emissions, and a direct connection to downtown Bethesda, the corridor's largest employment center.  The Chesapeake Bay Foundation commented favorably on the project's "modest" environmental impacts, noting that "forested area impacts will be minimal overall" and that 1.4 acres of wetland impacts "are modest with a project of this scale, and can be mitigated."  AR1_010842 - 43 (emphasis added).

The Town of Chevy Chase and many of its residents, members of the Columbia Country Club (the "Club"), and some users of the Interim Trail continued to express strong opposition to the use of the Georgetown Branch for public transportation, and instead urged selection of the Jones Bridge Road BRT line.  AR1_002316; AR1_011572.  They claimed that a busway along Jones Bridge Road would better serve the NIH and the Medical Center, which was expanding due to relocation of the former Walter Reed Hospital.

The concept of building a busway along Jones Bridge Road attracted strong opposition. The NIH opposed the Jones Bridge Road alignment because it would encroach on the NIH campus, impacting an area designated for a stormwater management pond, destroying a vegetated buffer along the campus perimeter, and requiring excavation in an area with sensitive

---

[7] *See, e.g.,* AR1_010793 (1000 Friends of Maryland); AR1_010842 (Chesapeake Bay Foundation); AR1_011405 (Sierra Club of Montgomery County); AR1_010870 (Clean Water Action).
[8] AR1_010876 (Coalition for Smarter Growth).
[9] AR1_011247 (Montgomery Bicycle Advocates); AR1_010811 (Prince George's County Bicycle and Trails Advisory Group).
[10] AR1_010799 (Action Committee for Transit); AR1_011304 (Purple Line NOW!); AR1_011254 (National Association of Railroad Passengers).
[11] See, e.g., AR1_011175 (Greater Bethesda Chamber of Commerce).

archeological resources.   AR1_005836.   Neighborhood associations also strongly objected strongly to the Jones Bridge Road alternatives, due to the increased traffic volumes and the physical impacts of widening Jones Bridge Road in certain locations.   AR1_011159 (Forest Grove Citizens Association and Northmont Citizens Association); AR1_011258 (North Chevy Chase Citizens Association); AR1_011162 (Glenbrook Village Homeowners Association).   The neighborhood groups reminded FTA and MTA that "One has to look at the whole picture, not just attempt to make a case for not in my back yard, but okay in yours!"  AR1_011162.

### 4.      Transition from AA/DEIS to FEIS

Following the AA/DEIS comment period, Montgomery County endorsed the "medium investment" light-rail alternative, including construction through the Georgetown Branch right-of-way to downtown Bethesda.  AR2_154656 - 57.  Prince George's County adopted a Master Plan Amendment endorsing construction of the Purple Line as a light-rail project, with either the high-investment or medium-investment design as defined in the AA/DEIS.  AR2_145466.  The Transportation Planning Board of the Metropolitan Washington Council of Governments voted unanimously to include the Purple Line, with light-rail through Georgetown Branch, in the region's long-range transportation plan. AR2_145128.  All of the members of the Montgomery and Prince George's county delegations to the State's House of Delegates unanimously endorsed the Purple Line "as a light rail mode running the full 16 miles from Bethesda to New Carrollton with its preferred alignment along the existing Georgetown Branch railroad right-of-way."  *Id.* Residents of the Jones Bridge Road community wrote a "communal letter" to the Governor, reiterating their opposition to converting their neighborhood street to an express bus route. AR2_150087.

Throughout this period, MTA continued to meet with the Town of Chevy Chase and its representatives, in response to the Town's continued efforts to push for further analysis of a BRT

route on Jones Bridge Road.[12]  By mid-summer 2009, MTA had held more than 55 meetings in the Chevy Chase area, including meetings with the Town, the Country Club, individual property owners and businesses, and various civic organizations.  AR2_133997.

At the Town's request, MTA analyzed a variation on the Jones Bridge Road alternative proposed by the Town's consultant.  The Town's BRT alternative included dedicated BRT lanes within the existing footprint of Jones Bridge Road, which would take away a lane for other traffic.  AR2_150110.  MTA noted that such a change may not be acceptable to Montgomery County, which operates the road, or to the Maryland State Highway Administration, whose roads would absorb the traffic diverted off Jones Bridge Road.  AR2_150113.  After reviewing the proposal, MTA concluded that "the travel time savings expected from providing dedicated BRT lanes are expected to be minor and would not be expected to substantially change the ridership projections or cost-effectiveness values for alternatives which follow Jones Bridge Road between Rock Creek Park and Rockville Pike."  *Id.*

On July 30, 2009, Maryland's Secretary of Transportation wrote to the Town's Mayor to convey the agency's decision against BRT on Jones Bridge Road.  The letter concluded that

> [t]he larger issue associated with using Jones Bridge Road as an alternative alignment continues to be one of travel times.  Any Purple Line alternative utilizing Jones Bridge Road results in travel time delays for the larger travel market which is destined for the Bethesda Central Business District.

AR2_133946 - 47.

On August 4, 2009, the Governor of Maryland identified the medium-investment light-rail alternative through Georgetown Branch as the Locally Preferred Alternative ("LPA").  The decision to select light-rail was based on light-rail's superior benefits in 2030, and its greater capacity to accommodate growth in demand for transit service beyond 2030.  AR1_001945.

---

[12] See, e.g., AR2_179754; AR2_178719; AR2_160905; AR2_160813; AR2_160568; AR2_160104; AR2_159983; AR2_156958; AR2_149807; AR2_133946.

Following additional design work, MTA requested approval to advance into the preliminary engineering stage of project development and to receive an FTA funding recommendation in FTA's next annual report on candidates for New Starts funding.  AR2_010228.  FTA granted that approval on October 7, 2011; the approval authorized MTA to incur costs for preliminary engineering while retaining eligibility for future reimbursement for those costs.  AR2_097852 - 53.  Using the New Starts evaluation criteria, FTA gave the Purple Line an overall rating of "Medium High."  *Id.*

After approval to enter preliminary engineering, FTA and MTA worked together to conduct detailed environmental and engineering studies on the Locally Preferred Alternative, continuing to make additional refinements to improve the project's operation and reduce its impacts and cost.  Public involvement continued throughout this period.  In 2012, MTA prepared a reevaluation that assessed all of the refinements that had been made since the AA/DEIS.  MTA concluded that none of the refinements involved significant impacts that were not previously evaluated, and therefore a supplemental EIS was not required.  AR2_064519.  FTA concurred with that conclusion on October 2, 2012.  AR2_061614.

## 5.    The Final Environmental Impact Statement

In the Final EIS, FTA and MTA summarized the alternatives analysis contained in the AA/DEIS; the State's rationale for choosing light-rail transit through Georgetown Branch as the LPA; the design refinements that had been made to the Locally Preferred Alternative; and several additional design refinements that had been considered but not adopted.  AR1_001934 - 51.  The FEIS then described in detail the Preferred Alternative, which consisted of the LPA as modified by all of the subsequent design refinements.  AR1_001953 - 69.  The Preferred Alternative in its entirety is shown in Figure 2-5 in the FEIS.  AR1_001954; and Figure 2-6

shows a typical cross-section of the Preferred Alternative (showing both transitway and trail) within the Georgetown Branch.  AR1_001955.

The FEIS demonstrated that the Preferred Alternative will dramatically improve the efficiency and reliability of east-west transit service for trips that occur partly or entirely within the Purple Line corridor.  The Preferred Alternative would reduce the average travel time between Bethesda and Silver Spring by 47% and from College Park to New Carrollton by 20%; for those traveling the entire distance from Bethesda to New Carrollton, the travel time would drop by 42%.  As a result, it was projected that transit trips in the corridor would increase by 11% and the number of failing (highly congested) intersections would drop by 11%. AR1_001904.

The FEIS analyzed the impacts of the Preferred Alternative in 18 resource categories, both during construction and in operation.  The FEIS also documented efforts made to avoid and minimize impacts, as well as mitigation commitments that had been incorporated into the project.  Table 4-1 in the FEIS summarizes the impacts of the project in 18 different resource categories, and lists the minimization and mitigation commitments in each of those categories. AR1_001999.  Section 4.22 disclosed the need to obtain a "Section 404 individual permit" from the U.S. Army Corps of Engineers, as well as "Stormwater Management Approval" under Maryland regulations.  AR1_002168 - 69.

The FEIS noted that MTA was considering the possibility of entering into a Public-Private Partnership ("PPP") under which one entity would design, build, finance, operate and maintain the Purple Line.  Still, the FEIS assured that "[u]nder any method of constructing and operating the Purple Line, MTA will remain responsible for the Purple Line and will be

responsible for honoring all commitments made as part of this NEPA process."  AR1_001908; see also AR1_002162.

The FEIS included responses to the 3,300 comments received on the AA/DEIS.  FTA and MTA grouped the comments into 20 topical categories, summarized the comments within each category, and then provided responses for each topic.  AR1_002338.  In response to comments addressing the rationale for choosing light-rail over BRT, the FEIS acknowledged that BRT alternatives required a lower initial cost and had a better cost-effectiveness rating than the LRT alternatives.  However, on balance, FTA concluded that light-rail was the "more viable long-term option" because of its consistency with the Montgomery County Master Plan, its higher projected ridership, its shorter travel times, and the fact that it would better support transit-oriented development.  AR1_002352.

The FEIS also responded to comments from the Town and the Club regarding technical aspects of how the AA/DEIS's addressed the Jones Bridge Road BRT alternative.  The response explained that the ridership forecasts for the BRT alternatives had in fact considered the relocation of Walter Reed Hospital to the National Naval Medical Center, and found that additional trips resulting from that relocation would be "minuscule" relative to the total of 40,000 to 68,000 trips projected to use the Purple Line each day.  AR1_002354 - 55.  The response also explained that total employment in Bethesda would remain far greater than in the Medical Center area even with future growth taken into account.  AR1_002355.  The response noted that the Jones Bridge Road alignment had been considered with the "medium investment" scenario, and even under that scenario, it performed more poorly than any alternative using Georgetown Branch.  AR1_002356.  Finally, the response explained that "optimization" of the low-investment BRT alternative (e.g., changing traffic signal priorities to favor buses and

- 14 -

allowing "queue jumps" by buses) would not fundamentally alter the performance of that alternative.  AR1_002356 - 57.

FTA signed the FEIS on August 28, 2013.  AR1_001885.  Although not required to do so, FTA established a public comment period for the FEIS, ending on October 21, 2014.  FTA received 968 comments from agencies, organizations, elected officials, and individuals.  AR1_000101.  Comments from the Town of Chevy Chase and others – including the FCCT in this case – continued to press for the Jones Bridge Road BRT alternative and to criticize various aspects of the environmental analysis of the Preferred Alternative.[13]  The Town also questioned the project's prospects for obtaining federal funding and argued that the project was unlikely to meet FTA's criteria for funding under the New Starts program.  The Club submitted no comments on the FEIS, having previously reached agreement with MTA on design refinements that resolve the Club's concerns about the project's effects on the layout of the Club's golf course.  AR2_026461 - 86.

In their comments on the FEIS, plaintiffs Fitzgerald and de Azua raised for the first time their concerns about the project's potential to affect the Hay's Spring amphipod, a federally listed endangered species, and the Kenk's amphipod, which has no legal protection under the ESA, but is a candidate for listing.  AR2_226852.  During preparation of the FEIS, the USFWS had informed FTA and MTA that no federally listed species were present in the project area.  AR2_092113.  In response to the comment, FTA and MTA contacted the USFWS for additional guidance and met with the agency on December 16, 2013.  AR2_001788.  On January 7, 2014, USFWS transmitted a letter to FTA confirming that the closest known location of the Hay's Spring amphipod was approximately 4.5 miles away from the project area and stated unequivocally that "No effect on the groundwater systems supporting the Hay's Spring

---

[13] These comments are included in the record at AR2_226834, AR2_226773, and AR2_226722, respectively.

Amphipod is expected because of the miles separating these systems from the project construction area." AR2_001664. The letter also confirmed that Kenk's amphipod "[has] no legal protection" under the ESA and, in any case, the project is expected to have "no effect" on that species. AR2_001664 - 65.

### 6.     The Record of Decision

On March 19, 2014, FTA signed the Record of Decision ("ROD") approving the Preferred Alternative for the Purple Line project. AR1_000001 - 32. In the ROD, FTA explicitly considered a series of objections and concerns raised by the Town and other comments, including concerns about the loss of certain aesthetic attributes of the Georgetown Branch interim trail. See AR1_000026 - 32. FTA acknowledged that "The existing trees and vegetation in the [Georgetown Branch] right-of-way will need to be removed. New landscaping with native species will be planted, but it will not be similar to what exists today." AR1_000026. FTA explained that, notwithstanding these impacts, "an alignment along the Georgetown Branch right-of-way remains the most desirable route for providing fast, efficient, and reliable transit" and that "the adjacent Capital Crescent Trail can be safe and attractive." AR1_000027. As a condition of its approval, FTA required implementation of the environmental commitments and mitigation measures that had been incorporated into the project, and also required MTA to submit written reports documenting its compliance with these commitments. AR1_000014. Attachment A to the ROD includes an updated commitments list. AR1_000033.

The ROD also responded in detail to comments received on the FEIS. Altogether, the responses addressed comments on more than 50 distinct topics, including the plaintiffs' concerns regarding the Jones Bridge Road alignment (AR1_000158); the Georgetown Branch right-of-way (AR1_000161); the Hay's Spring amphipod (AR1_000203); the noise impact assessment

methodology (AR1_000195); and issues related to cost, funding, and use of public-private partnership.  AR1_000227 - 231.[14]

C.    **Procurement of a Public-Private Partnership**

MTA initiated the PPP procurement process by issuing a request for proposals ("RFP") on July 28, 2014.  Since then, MTA has issued a series of addenda to the RFP, culminating in the 7th addendum, which was issued on November 25, 2015.  On March 2, 2016, MTA announced the selection of a developer team, which initiates a 30-day public review period for the contract documents.  The State's Board of Public Works held a hearing on April 6, 2016, and approved the contract.[15]  Construction is anticipated to begin in November 2016 and it is projected that  the project will be in operation by the end of 2022.

D.    **Responses to Requests for Additional NEPA Review**

In the two years since the ROD was issued, the plaintiffs have repeatedly claimed that new information or changed circumstances require the environmental review process to be re-opened.   FTA and MTA carefully considered each of the plaintiffs' assertions and have concluded that there is no basis for preparing a supplemental EIS under NEPA, and no basis for re-initiating consultation under the federal Endangered Species Act, 16 U.S.C. §§ 1531-1544.

1.    **The Amphipod Issue**

On June 25, 2014, FCCT and other groups submitted a letter to FTA and the U.S. Fish and Wildlife Service ("USFWS"), asserting that new information about the presence of the Hay's Spring amphipod (and the Kenk's amphipod) required FTA to re-initiate section 7 consultation under the Endangered Species Act.  AR3_000352.  The principal basis for the demand was a report prepared by Professor David Culver, documenting "sampling" he had done with several

---

[14] The ROD also reviewed design refinements that were instituted after the FEIS and determined that no supplemental EIS was needed.  AR1_001868.
[15] The approved contract is posted on MTA's website: http://www.purplelinemd.com/en/p3.

students in Rock Creek Park in April of 2014.  He reported finding no amphipods, but stated that the Hay's Spring amphipod "potentially" occurs in certain seeps and springs.  AR3_000366 (Culver Report).

Representatives of FTA, USFWS, and MTA met with Culver and other representatives of FCCT on August 11, 2014.  On August 20, 2014, MTA submitted a lengthy response to the issues raised in the FCCT letter, including a memorandum from a Maryland Department of Natural Resources expert on amphipods, Mr. Daniel Feller.  Feller stated that he had extensively investigated the areas sampled by Culver, found no amphipods, and considered the areas to be poor-quality habitat.  AR3_000016; AR3_000047.  After reviewing all of the submitted information, the USFWS re-affirmed its previous finding – that the Purple Line project has no effect on the endangered Hay's Spring amphipod.  The USFWS also concluded that the project has no effect on the Kenk's amphipod, which has no legal protection but has been identified as a "candidate" for listing.  AR3_000004.

In his April 2014 report, Culver indicated that he intended to conduct further studies in the winter of 2014/2015, because winter is considered the optimal season for amphipod surveys.  He requested and received a permit from MDNR to conduct the surveys, and submitted a new report to the Maryland Department of Natural Resources in April, 2015.  The new Culver report stated that he had gone back into the field in the "fall of 2014," and again found no Hay's Spring or Kenk's amphipods.  AR3_000393.  Feller was again asked to assess the latest Culver report.  Feller's report, dated May 5, 2015, states that "[b]ased on my review, it is clear that no rare species of Stygobromus were documented in the immediate vicinity of the proposed Purple Line or in adjacent areas to the south or north, substantiating the negative findings of past survey

efforts."  AR3_000388.   On the same day, MTA transmitted Feller's report to the USFWS.

AR3_000386.

On May 13, 2015, in a letter to FTA, the USFWS summarized its assessment of Culver's

latest report and again confirmed its "no effect" finding for the Hay's Spring and Kenk's

amphipods.  The letter states: "after considering Dr. Culver's report to MDNR, and MDNR's

memorandum, the Service's original determination that the Purple Line project will have no

effect on both species remains unchanged.  Therefore, there is no need for further consultation

with the Service under Section 7 of the ESA."  AR3_000375.  Subsequently, FTA concluded that

the "new" information submitted by FCCT regarding the amphipod did not require a

supplemental EIS.  AR3_000001.

<h3 align="center">2.      The Cost-Saving Refinements To State's RFP</h3>

On June 25, 2015, the Governor of Maryland announced a package of 41 cost-saving

refinements to the Purple Line Request For Proposals, most of which involved minor changes to

construction methods or operational aspects of the project.  AR4_007430 - 435.  On July 14,

2015, plaintiffs submitted a joint letter to FTA, asserting that a supplemental or new EIS

("SEIS") should be prepared to address the cost-saving changes because in their view, the

changes would significantly increase the project's impacts.  AR4_007411.  On September 10,

2015, MTA submitted a letter to FTA, enclosing a report describing each of the 41 changes to

the RFP and assessing each change relative to the environmental impacts analysis in the FEIS.

AR4_002849.   MTA requested FTA's concurrence that the 41 changes did not involve

significant new impacts or changed circumstances, and therefore did not require an SEIS.  On

September 24, 2015, FTA provided its concurrence that the cost-saving changes do not require

an SEIS.  AR4_000001.

### 3.    Stormwater and Other Issues

On October 9, 2015, FCCT submitted another letter demanding an SEIS based on the cost-saving changes and several other arguments raised in the July 14 letter in support of their demand for an SEIS.  AR5_006469.  The October 9 letter included numerous attachments, including declarations from several individuals commenting on various aspects of the environmental analysis in the FEIS, and an 80-page "report" on stormwater management issues.  AR5_006478 - 6781.  The stormwater "report" asserted that certain changes made, or contemplated, by MTA would cause the project's stormwater run-off impacts to increase, and potentially would result in non-compliance with the State's stormwater requirements.  AR5_006702.

On October 23, 2015, FTA informed the FCCT that their request was being considered, and that FTA had asked MTA to prepare a response.  See, e.g., AR5_006466 - 468.  MTA's response included two reports from MTA's stormwater expert, explaining that (1) no changes made by MTA or allowed under the RFP, including the elimination of the requirement to use "green track," would materially alter the project's stormwater impacts; and (2) MTA will fully comply with Maryland's stormwater management requirements, which are among the most stringent in the country.  AR5_000007.  On January 7, 2016, FTA sent a letter to MTA, concurring that the issues raised by FCCT in its July 14 or October 9 letters do not warrant a supplemental EIS.  AR5_000001; AR5_000003.

### STANDARD OF REVIEW

FCCT's claims against FTA are subject to review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706.[16]  *See Theodore Roosevelt Conserv. Partnership v. Salazar,*

---

[16] FCCT's claims regarding violation of the New Starts Funding program should be dismissed for failure to state a claim.  See Argument , p. 50.

661 F.3d 66, 72 (D.C. Cir. 2011) (NEPA claim); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413-14 (1971) (Section 4f claim); *Gerber v. Norton*, 294 F.3d 173, 178 (D.C. Cir. 2002) (ESA claim). Under the APA, federal agency action must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Camp v. Pitts*, 411 U.S. 138, 142 (1973). This "narrow" standard of review is "'[h]ighly deferential'" and "'presumes the validity of agency action.'" *WildEarth Guardians v. BLM*, 8 F. Supp. 3d 17, 25 (D.D.C. 2014) (citations omitted). "'[T]he party challenging an agency's action as arbitrary and capricious bears the burden of proof.'" *City of Olmsted Falls, OH v. F.A.A.*, 292 F.3d 261, 271 (D.C. Cir. 2002) (citations omitted).

In applying this standard, the reviewing court asks whether "the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Overton Park,* 401 U.S. at 416). The Court's inquiry should be searching and careful, but "the ultimate standard of review is a narrow one." *Id.; see also Overton Park*, 401 U.S. at 415 (the reviewing court must presume that the agency has acted lawfully).

It is well accepted that the Court may not substitute its judgment for that of the agency. *Overton Park*, 401 U.S. at 416; *WildEarth Guardians,* 8 F. Supp. 3d at 25. Deference is especially appropriate where, as here, the action involves matters within the agency's area of technical expertise. *Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 560 (D.C. Cir. 2002). It is not the role of the Court to choose among competing proposals, methodologies, or expert opinions. When experts disagree on technical conclusions, the Court must defer to the agency's qualified experts "even if, as an original matter, a court might find contrary views more persuasive." *Marsh*, 490 U.S. at 378.

Under the APA, a court's review of agency decision-making is confined to the administrative record before the agency.  *Overton Park*, 401 U.S. at 420.  As the Supreme Court emphasized, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."  *Camp*, 411 U.S. at 142.  Claims brought under the APA are reviewed on the basis of the existing administrative record and are properly decided on summary judgment.  *Audubon Naturalist Soc. v. U.S. Dep't of Transportation*, 524 F. Supp. 2d 642, 660 (D. Md. 2007).

## ARGUMENT

## I.      THE AA/DEIS AND FEIS MET ALL NEPA REQUIREMENTS.

FCCT contends that the AA/DEIS and FEIS were "woefully inadequate" and briefly describes five "examples" of these supposed flaws.  Pltf. Br. 28.  FCCT's arguments reflect nothing more than disagreements with the methodologies used or conclusions stated in the NEPA documents, or at most quibbles over wording.  None of the examples cited by FCCT provides any reason to find the EIS inadequate.

### A.      Courts Apply a "Rule of Reason" When Assessing the Adequacy of an EIS.

Congress enacted NEPA in 1969 as a framework to foster informed decision-making and informed public participation with respect to "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  "[I]t is . . . well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  Thus, in enacting NEPA, Congress "did not require agencies to elevate environmental concerns over other appropriate considerations."  *Baltimore Gas and Electric Co. v. Natural Res. Def. Council, Inc.*, 426 U.S. 87, 97 (1983).  Instead, "it required only that the agency take a 'hard look' at the environmental consequences before taking a major action."  *Id.*

As courts have long recognized, review of an EIS is governed by a rule of reason. *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 767 (2004).  Under the rule of reason, if the EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences, the role of the reviewing court "is not to flyspeck an agency's environmental analysis, looking for any deficiency no matter how minor." *Wildearth Guardians*, 8 F. Supp. 3d at 31 (quotations omitted).  The EIS should discuss environmental impacts of the proposed action "in proportion to their significance" and need provide only a "brief discussion of other than significant issues."  40 C.F.R. 1502.2(b).  As the D.C. Circuit has noted, it is "always possible to explore a subject more deeply and to discuss it more thoroughly," but "[t]he line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts." *Coalition on Sensible Transportation, Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987).

### B.     The FEIS Responded to Comments Regarding Ridership Forecasts.

FCCT contends that "knowledgeable commenters ... showed that ridership projections for the rail alternative were overly optimistic, while those for less costly or differently-routed alternatives were under-estimated."  Pltf. Br. 28.  They support this argument only in a series of footnotes, citing various comments on the AA/DEIS.  Pltf. Br. 29.  None of their assertions demonstrates any flaw in the forecasts.

First, the FEIS addressed the comment regarding the relocation of Walter Reed Hospital to the Naval Medical Center, noting that the relocation would only result in at most 300 additional daily passengers, assuming "the highest possible figure for passengers who are patients and family members."   AR1_002354.   The FEIS also addressed comments that expressed a preference for bus alternatives on cost-effectiveness grounds, acknowledging that BRT alternatives indeed scored higher on cost-effectiveness criteria.  AR1_002352.  Finally, the FEIS addressed the Town's comments regarding the low-investment BRT alternative, explaining

- 23 -

why the Town's proposed modifications were not practicable. AR1_002356-57.  FCCT does not

even attempt to identify any inadequacy in these responses to comments.

> ### C.    FTA and MTA Sufficiently Disclosed Technical Data and Assumptions.

FCCT claims that MTA withheld certain data needed to "review, analyze and verify the

assumptions and calculations used to estimate ridership" thereby undermining the ability of

"experts to review, analyze and verify the assumptions and calculations used to estimate

ridership…."  Pltf. Br. 31.  This argument mischaracterizes the record, overlooks the response

provided by FTA when these concerns were raised, and fails to demonstrate that the information

provided was insufficient to meet NEPA requirements.

First, there is no truth to FCCT's assertion that MTA withheld data that was necessary for

informed comment on the NEPA documents.  The record shows that MTA received detailed

public-information requests from the Town and the Country Club in late 2008, during the

comment period on the AA/DEIS.  MTA responded promptly and provided a wealth of data

related to the ridership forecasts, cost estimates, and other issues covered in the requests.  MTA

denied only a small number of the requests, citing specific grounds for its nondisclosure of

requested information under the Maryland Public Information Act ("PIA"), Md. Code Ann.,

State Govt., § 10-611 et seq.[17]  In each response, MTA also advised the requesting party of its

right to appeal the denial of any request.  See, e.g., AR2_157046; AR2_156531; AR2_129727.

In addition, MTA held multiple in-person meetings with the Town and the Country Club to

discuss issues related to ridership forecasts.[18]  After receiving the data provided in the PIA

responses and the in-person meetings, the Town and the Club submitted detailed comments on

---

[17] FCCT's reliance on 40 C.F.R. 1502.21 is misplaced.  Section 1502.21 has no bearing on the issues in this case, because FTA did not incorporate by reference the data in the FEIS and did not withhold "proprietary data."  To the contrary, MTA provided all of the data requested.  MTA simply did not provide proprietary *software* that was not in MTA's possession.  Nothing in Section 1502.21 or elsewhere in the CEQ regulations requires agencies to purchase licenses allowing the general public to use all of the software applications used in developing the FEIS.
[18] See, e.g., AR2_156958 (listing meetings with Town of Chevy Chase residents).

the AA/DEIS, demonstrating an in-depth understanding of the methods used to develop ridership

forecasts and cost estimates.  Despite being represented by counsel, the Town and the Club never

exercised their right to appeal MTA's handling of any of their PIA requests, nor did they ever

request any data directly from FTA.  In short, MTA responded promptly and thoroughly to the

public-record requests it received, and the requesting parties chose not to pursue those requests

further.[19]

Second, FCCT ignores the fact that the AA/DEIS and FEIS included technical reports

containing the data, assumptions, and methodology used in developing ridership forecasts and

cost estimates.   The AA/DEIS technical reports included the Capital Cost Estimating

Methodology Technical Report (AR1_014496), the Operating and Maintenance Cost Estimate

Technical Report (AR1_017183), the Traffic Analysis Technical Report (AR1_018124), and the

Travel Demand Forecasting Technical Report (AR1_019279).   The FEIS technical reports

included the Capital Costs Technical Report (AR1_003480), the Traffic Analysis Technical

Report (AR1_005246), and the Travel Forecasts Results Technical Report (AR1_005299).

FCCT has not even attempted to explain why the information provided in these reports was

inadequate to allow for informed comment on the AA/DEIS or FEIS.

Third, FCCT overlooks the response that FTA provided to these issues in the FEIS.

Responding to the issues involving disclosure of data and assumptions used in developing cost

estimates and ridership forecasts in the AA/DEIS, FTA stated:

> As requested by certain parties the MTA provided additional
> supporting information in [the] manner required under the
> Maryland Public Information Act. The information provided by the
> MTA was sufficient to allow for an informed review of the
> information contained in the Purple Line AA/DEIS.

---

[19] The plaintiffs in this case did not submit public-record requests to MTA or FTA seeking any of the information
that the plaintiffs now assert should have been disclosed in response to requests submitted by others.

AR1_002364; AR1_002367.   In light of the extensive information provided in the technical reports, as well as the additional information provided by MTA in response to PIA requests and through meetings with the Town and the Club, FTA's response to this comment is reasonable and supported by the record.[20]

FCCT's reliance on the cases in footnote 18 of their summary judgment brief to support their argument that MTA inappropriately withheld information is misplaced.   From the decision in *Sierra Club v. Forest Service,* 878 F. Supp. 1295 (D.S.D. 1993), FCCT selectively extracts fourteen words from a 62 word sentence, adds a few extra words, and then argues that the case supports their "hiding information" claim.   When placed into context, those fourteen words take on a different meaning that supports the FTA's decisionmaking process here.   The full sentence states:

> As long as an agency reveals the data and assumptions upon which a computer model is based, allows and considers public comment on the use or results of the model, and ensures that the ultimate decision rests with the agency, not the computer model, then the agency use of a computer model to assist in decision making is not arbitrary and capricious.

*Id.* at 1310 (citations omitted).   Here, as noted in the body of the argument, the data and assumptions underlying the model were disclosed, numerous reports prepared and provided to the public, and substantial and detailed comments regarding the model forecasts were submitted to the agency.

In *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437 (4th Cir. 1996), the "misleading economic assumption" there concerned the agency's reliance on an analysis of *gross* benefits of the project when it claimed to be relying on *net* benefits.   *Id.* at 446-47.   No such fundamental error in the characterization of the analysis exists here.   Similarly inapposite is

---

[20] None of the comments submitted on the FEIS raised any issues or concerns regarding a lack of disclosure in the preparation of the FEIS or at any other time in the NEPA process.   Therefore, FTA's responses to comments on the FEIS do not address issues related to disclosure of assumptions, data, or other information.

*American Radio Relay League, Inc. v. FCC,* 524 F.3d 227 (D.C. Cir. 2008), where the court found that the agency had failed to adequately explain why it had rejected certain studies that suggested that a different assumption relating to access to broadband services was a more appropriate to use when analyzing the issue facing the agency.  Here, the FTA responded fully to substantial comments submitted by the Town and the Country Club regarding the data and assumptions used to generate ridership forecasts for the DEIS, and explained why the ridership forecast was accurate and the criticisms not warranted.  Finally, *Washington Trollers Ass'n v. Kreps*, 645 F.2d 684 (9th Cir. 1981), did not involve any NEPA requirement, but instead addressed  a requirement for a "summary" of information used by the Commerce Department in establishing certain fishing quotas under the Fishery Conservation and Management Act of 1976, 16 U.S.C. §§ 1801-1882.  The court there found that the agency had not included the type of summary of information required by that specific statute.  NEPA does not impose a similar requirement to produce a "summary" of information relied upon.  Here, the record shows that all of the facts and assumptions used to produce ridership forecasts were produced to the Town and the Country Club.[21]

### D.     The AA/DEIS Clearly Described Differences Among the Alternatives.

FCCT asserts that the DEIS "repeatedly claims that '[a]ll alternatives have very similar alignments and station locations, and as a result, the natural environment [sic] impacts are not appreciably different between alternatives.'"  Pltf. Br. 32.  In support, FCCT cites a single page in the Executive Summary of the AA/DEIS.  AR1_011965.  The cited page includes a summary table comparing all of the AA/DEIS alternatives based on their transportation benefits,

---

[21] There is no indication in the record that any of the plaintiffs submitted comments during the NEPA process raising an issue related to MTA's response to public information requests submitted by others.

environmental impacts, and cost.  FCCT takes the quoted sentence out of context.  The full

quotation is:

> All alternatives have *very similar alignments and station locations*, and as a result, the natural environment impacts are not appreciably different between alternatives.  *The Build alternatives* would impact between 1 and 1.4 acres of wetland, 13.5 to 15.1 acres of floodplains, and 3,892 to 5,719 linear feet of stream.

*Id.* (emphasis added).  The context for this statement makes clear that the sentence refers to the

*Build alternatives* – that is, the BRT alternatives and the light-rail alternatives, which have

"alignments and station locations," and not the No Build and TSM alternatives, which do not

involve construction of any new facilities.  Any imperfection in the drafting of this single

sentence constitutes no more than a "flyspeck" and not the type of defect that warrants finding

the entire EIS inadequate.  *WildEarth Guardians v. Jewell,* 738 F.3d 298, 308 (D.C. Cir 2013).

Moreover, the AA/DEIS itself includes descriptions of both the No Build alternative and the

TSM alternative, which make crystal clear that those alternatives do not involve the building of

new infrastructure, and thus would not have the same impacts as the Build alternatives.

AR1_012116.  FCCT's attempt to fly-speck the NEPA document should be rejected.

> ### E.  The FEIS Adequately Considered Impacts on Natural Resources.

FCCT argues that the EIS fails to fully assess impacts of the project on forests,

stormwater, and energy use.  Pltf. Br. 33-34.  When reviewed under the rule of reason, it is clear

that the EIS takes a hard look at all of these impacts.

> #### 1.  Forest Impacts

FCCT argues that the EIS fails to assess impacts resulting from the loss of 48 acres of

forest, asserting that "the clearing of trees will be quite intense" in the "headwaters of Coquelin

Run." Pltf. Br. 33.[22]  In fact, forest impacts were thoroughly considered, and the project avoids tree-clearing in the Coquelin Run stream valley.  The FEIS describes the project's impacts on forested areas, explaining that forest impacts would occur along the 16-mile length of the project and "would primarily take the form of partial property acquisitions at the edges of forested habitat, affecting a total of 48 acres of forested habitat and 194 specimen trees."  AR1_002110. The FEIS also considers the impacts on forest interior dwelling species ("FIDS") habitat, noting that the 48 acres of tree removal "would affect FIDS by slightly reducing the overall size of FIDS habitat within the project area."  *Id*.  The FEIS then discusses in detail the impacts on FIDS habitat, specifically including the loss of 23.4 acres of FIDS habitat within the Georgetown Branch right-of-way.  *Id.*  The FEIS also acknowledges the presence of a heron colony in Coquelin Run, but finds that "the colony is located outside the LOD [limits of disturbance] approximately one-quarter mile from the proposed transitway alignment and is buffered by an intervening roadway and residences."  AR2_002111.  The FEIS also specifically states that there will be no tree-clearing in the Coquelin Run stream valley.  *Id*.  FCCT does not articulate any reason for finding this analysis insufficient.

### 2. Stormwater Impacts

FCCT claims that the stormwater impacts analysis in the FEIS was inadequate because it did not include "the *locations, amounts, or content* of the excess stormwater runoff to be caused by the Project during construction or afterward."  Pltf. Br. 33 (emphasis added).  The FEIS did address the issue of stormwater runoff as part of the water quality impacts analysis.  It acknowledged that "the project would increase impervious surfaces in the study area, which could increase the amount of surface runoff and potentially increase the level of contaminants such as heavy metals, salt, organic molecules, and nutrients in the surface runoff."

---

[22] FCCT's citation to AR1_002382 is incorrect.  That page does not address tree cutting or Coquelin Run.

AR1_002120.  The FEIS also noted, however, that the project would be required to comply with the State regulations that require use of "environmental site design" to manage stormwater run-off.  The FEIS found that "[s]ince the study area is already developed and the Preferred Alternative includes proposed infrastructure to effectively manage stormwater runoff generated by the project, increases in nutrient and sediment levels from the project are unlikely to affect overall TMDL [total maximum daily load] management."  AR1_002121.[23]

Moreover, as a practical matter, it is not possible to provide the level of detail demanded by FCCT's insistence on identifying the "location, amount, and content" of stormwater run-off. Specific calculations of stormwater run-off amounts and locations are developed as part of final design, which can occur only after completion of the NEPA process.  23 C.F.R. 771.113(a). FCCT points to no regulation or other authority to support their claim that such a high level of detail is required.

Finally, the Maryland stormwater management regulations are some of the most stringent in the Nation.  They require a project developer, including the State, to mitigate not only for new impervious area created by the project, but also for existing impervious area.  As a result, once the project is implemented, stormwater impacts in the watershed will be reduced below the pre-project level.  AR5_000026 - 28.  The need to comply with these stringent State requirements further undermines FCCT's demand for a hyper-detailed analysis of the stormwater impacts.  See *California v. Block,* 690 F.2d 753, 761 (9th Cir. 1982) ("[t]he detail that NEPA requires in an EIS depends upon the nature and scope of the proposed action.").

---

[23] The EPA and the Maryland Department of the Environment both reviewed the FEIS, and neither raised any objections or concerns regarding the stormwater impacts analysis nor the extent of the project's stormwater impacts.

### 3.      Energy Use and Air Emissions

FCCT argues that MTA fails to consider "the levels of energy use and the resulting pollution" caused by the energy used to power the project.  Pltf. Br. 34.  FCCT seems to confuse the issues of energy consumption and air quality analysis and misinterpret the response given in the FEIS to comments on this issue.  First, the AA/DEIS and FEIS included an analysis of energy usage, including the energy used to operate the vehicles.  The AA/DEIS estimated energy usage for all alternatives and found that "[a]ll changes in energy consumption are less than 0.10 percent, making them essentially immeasurable."  AR1_012137.  The FEIS included an energy usage analysis for the preferred alternative, which found that the preferred alternative would reduce total energy consumption in the corridor by 0.043 percent, compared to the No Build Alternative, in 2040.  AR1_002135.  In both the AA/DEIS and the FEIS, this analysis included the energy consumed in both construction and operation of the project.   AR1_012135; AR1_002133.  FCCT offers no support for its challenge to the energy usage analysis.

Second, the AA/DEIS and FEIS also included an analysis of air emissions, including greenhouse gas emissions.   The AA/DEIS found that the medium-investment and high-investment BRT alternatives would very slightly reduce greenhouse gas emissions (by 0.02% and 0.05%, respectively), while the light-rail alternatives would very slightly increase greenhouse gas emissions (by 0.04%), but also noted that "differences in the predicted $CO_2$ emission burdens for the alternatives can be considered insignificant and are not measurably different from the No Build alternative."  AR1_012097.  The commenter cited by FCCT actually agreed with the AA/DEIS's conclusion, and offered only technical suggestions to improve clarity.  See AR1_011491.  The commenter did not suggest that the greenhouse gas emissions analysis was inadequate in any way.

- 31 -

Finally, FTA responded reasonably to a comment that suggested the air emissions analysis should have considered air emissions from the power plants used to generate electricity for the project.  FTA explained that the air emissions analysis in the AA/DEIS focuses on emissions from the project itself, not emissions from upstream sources such as the power plants that generate electricity used for the project.  The response noted that "the electricity generated to power the Purple Line could be produced by a variety of methods, some of which produce fewer emissions over the current energy mix," and that "implementation of advanced emission reduction technologies at power plants would decrease air pollutant emissions of particulate matter, sulfur dioxide, nitrogen oxides, and mercury."  AR1_002378.  The response further noted that this approach was based on EPA's guidance.  *Id*.  By providing this explanation, FTA satisfied its obligations under NEPA.

## F.     The FEIS Adequately Considered Indirect and Cumulative Impacts

FCCT argues that the assessment of the indirect and cumulative impact of the project was too "generalized" or otherwise "incorrect."  Pltf. Br. 34.  Under NEPA, an "indirect" effects analysis covers impacts caused by the project but removed in time and space, such as the impacts resulting from induced development.  Cumulative impacts analysis covers the combined effects of the proposed action and other past, present, and reasonably foreseeable future actions, including other actions with no causal relationship to the project.  The cumulative impacts "must give a realistic evaluation of the total impacts and cannot isolate a proposed project, viewing it in a vacuum."  *Grand Canyon Trust v. FAA,* 290 F.3d 339, 342 (D.C. Cir. 2002).

The FEIS contains a 24-page cumulative and indirect effects analysis, covering the reasonably foreseeable cumulative and indirect effects along the entire 16-mile length of the Purple Line.  The indirect effects analysis evaluated existing and planned growth around each station area.  AR1_002286 - 2309.  For each station area, the indirect effects analysis considered

local land use plans.  At station areas where the applicable county had conditioned development on completion of the Purple Line, the FEIS acknowledged that connection and described that additional development as an indirect effect of the Purple Line.  For example, the FEIS acknowledged that Montgomery County's adopted land use plans recommend a two-step amendment to the zoning for the Chevy Chase Lake station – with the first step being allowed right away, and the second step (with more than 1 million square feet of mixed used development) being allowed only after the Purple Line project is funded.  AR1_00229.  The FEIS specifically notes the potential water quality impacts of this private development, but also notes that the private developer will be required to mitigate those impacts (just as MTA is required to mitigate the impervious area created by the Purple Line).  *Id.*

Building on this analysis of indirect effects, the cumulative effects analysis considered the Purple Line's direct and indirect effects in combination with the effects of other actions. This assessment included a table listing present and reasonably foreseeable future projects within the cumulative effects study area (Table 7-4; AR1_002292 - 93) and a table listing present and reasonably foreseeable future public projects within the cumulative effects study area (Table 7-5; AR1_002294 - 95).  The cumulative effects analysis considered cumulative effects on a range of resources, including: neighborhoods and community facilities, parks and recreational facilities, cultural resources, forests, floodplains, water quality, and wetlands.  AR1_002303 - 07.

The analysis addressed cumulative impacts on forest impacts in seven different study areas, and shows that the project will impact 0.6% of the total forested area within the cumulative effects study areas.  AR1_002305.  It also addressed cumulative impacts on water quality.  This analysis recognizes that the project is located in a highly urbanized area where existing impervious surfaces contribute to degradation of water quality, and that water quality

impairments occur in all three watersheds crossed by the project.  In light of these factors, the FEIS concluded that "the role of the Purple Line in cumulative effects on surface water resources is negligible given the current and proposed amount of urban development."  AR1_002306 - 07.

Like their other arguments, FCCT's demand for more detail in the indirect and cumulative effects analysis is simply that – an unsupported assertion that "more" is needed, without showing that the level of detail provided in the FEIS was inadequate.  On this issue, FCCT's arguments are contradicted by comments submitted by EPA on the FEIS, where EPA expressed its appreciation for the "efforts taken to improve and update the environmental justice analysis and the cumulative effects analysis for the FEIS."  AR1_000108.  This analysis of indirect and cumulative effects more than satisfies the "hard look" required by NEPA.

### G.    The FEIS Adequately Documented Compliance With Other Laws

FCCT acknowledges that the FEIS identifies the approvals required for the project, including a permit under Section 404 of the Clean Water Act, 33 U.S.C. §§ 1251-1375.  They do not suggest that this information is inaccurate, but rather contend that the discussion of Section 404 should have included more detail on how that requirement will be met.  Pltf. Br. 37-38.

Section 4.22 of the FEIS identifies all permits and approvals that are anticipated to be needed for the project, and summarizes the coordination that occurred with each of the permitting agencies.  AR1_002168 - 70.  On issues related to compliance with Section 404, the FEIS notes that MTA has been coordinating with permitting agencies throughout the NEPA process, including the U.S. Army Corps of Engineers.  *Id.*  The FEIS also included a Water Resources Technical Report, which describes the Section 404 permitting requirements; gives the breakdown of impacts to wetlands and stream by type; gives the mitigation quantities required for each type of impact; and identifies the specific mitigation sites identified for wetland and stream impacts through field visits with the Corps and MDE.  AR1_005519 - 27.  The record

reveals extensive coordination with the Corps, with no indication that the project will face any difficulty in obtaining a Section 404 permit.  AR1_002168 - 70.  This information more than satisfied FTA's NEPA obligation to identify permitting requirements.

FCCT also asserts that the project "would cause increased levels of several of the most dangerous air pollutants, thereby harming local jurisdictions and placing them further behind in their attempts to comply with the CAA."  Pltf. Br. 38.  This statement has no basis in fact. Section 4.10 of the FEIS includes an air quality analysis, which documents projected emissions of all relevant pollutants under the Build and No Build alternatives.  It found that the project would cause a very slight decrease in pollutant emissions regionally (0.1 to 0.3%) and would not cause or contribute to violations of any air quality standards.  AR1_002090.[24]

**H.     The FEIS Adequately Addressed Possible Mitigation Measures**

FCCT claims that the FEIS fails to adequately address mitigation measures for noise impacts.  Pltf. Br. 39.  This claim has no merit.  In *Methow Valley,* 490 U.S. at 352, the Supreme Court makes clear that NEPA requires only "that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated."  The FEIS has a wealth of discussion addressing noise mitigation.

The noise analysis in the FEIS was conducted in accordance with the applicable FTA guidance, "Transit Noise and Vibration Impact Assessment (FTA 2006)."  AR1_002094.  The FTA guidance calls for identifying noise impacts (based on criteria specified in the guidance) and then assessing "reasonable and feasible" measures to reduce those impacts.  AR1_002094 - 2106.  In compliance with the guidance, FTA and MTA estimated project-related sound levels for each of 83 representative sites.  AR1_002100.  It found that "moderate" noise impacts would

---

[24] FCCT incorrectly asserts that FTA and MTA have "touted" the reduction of vehicle trips and greenhouse gas emissions as a benefit of the project.  Pltf. Br. 38.  The FEIS does note that the project would reduce daily vehicle trips by 16,790 trips – but acknowledges that this is only 0.06% reduction on a regional basis.  AR1_001980.

occur at 11 residential properties.  *Id.*  The FEIS committed to include noise minimization measures, including a four-foot noise wall and requiring "skirts" on the light-rail vehicles to shield "wheel squeal."  *Id.*  The FEIS explains why additional mitigation measures were not considered reasonable and feasible.  *Id.*  Nothing further was required.

## II.    FTA PROPERLY DETERMINED THAT A SUPPLEMENTAL EIS WAS NOT REQUIRED.

FCCT also argues that FTA violated NEPA by failing to prepare an SEIS for the Purple Line project based on what FCCT claims is "new information."  Pltf. Br. 15-27.  The new information that FCCT relies upon falls into two categories: (1) changes in contract requirements adopted by MTA in an attempt to reduce the overall cost of the project; and (2) information submitted by FCCT in two letters to FTA after the ROD was issued.  None of what FCCT claims is "new information" meets the standard governing the need to prepare a supplemental EIS.  The FTA did not abuse its discretion in rejecting FCCT's requests for the preparation of an SEIS.

### A.    A Supplemental EIS is Required Only if New Information or Project Changes Present a Seriously Different Picture of the Environmental Impacts.

The standard governing the need to prepare a supplemental EIS is well established in this Circuit.  An SEIS is required "only …where new information provides a seriously different picture of the environmental landscape."  *National Committee for the New River, Inc. v. FERC*, 373 F.3d 1323, 1330 (D.C. Cir. 2004) (quotations omitted).  The reviewing court applies the "rule of reason" in reviewing the issue.  *Marsh*, 490 U.S. at 373.  That is, "an agency need not supplement an [environmental impact statement] every time new information comes to light after the EIS is finalized."  *Id.*  An agency's determination that the new information is not significant enough to warrant preparation of an SEIS is entitled to deference.  *National Committee for the New River*, 373 F.3d at 1330.  Where that determination involves evaluation of scientific data within the agency's area of expertise, an "extreme degree of deference to the agency" is

warranted.  *Id.* at 1327, quoting *B&J Oil & Gas v. FERC,* 353 F.3d 71, 76 (D.C. Cir. 2004).

Also, NEPA does not require an agency to analyze every impact of a proposed action, but only

those impacts that can be shown to have a direct connection to the "natural or physical

environment."  40 C.F.R. 1508.14.  See *Metropolitan Edison Co. v. People Against Nuclear

Power*, 460 U.S. 766, 772 (1983).  Because none of the "new information" relied upon by FCCT

presents a "seriously different picture of the environmental landscape" of the Purple Line, FTA's

determinations that no SEIS was needed should be upheld.

**B.     Cost Saving Changes to the State's RFP Do Not Warrant an SEIS.**

FCCT argues that six of the 41 measures cost-saving measures adopted by MTA in June

2015 involve "significant new circumstances or information relevant to environmental concerns

and bearing on the proposed action or its impacts."  Pltf. Br. 16.  MTA September 10, 2015 letter

addresses all 41 changes and explains in detail why they do not require an SEIS.  AR4_002849 -

50.  FCCT does not even attempt to show why MTA's explanation was incorrect.  Thus, FCCT

has failed to satisfy its burden of supplying a basis for overturning FTA's finding that these

changes did not require an SEIS.

**1.     Green Track**

The change in contract requirements regarding "green track" will not result in any

increase in the project's overall stormwater impacts or other impacts.  The FEIS consistently

noted that "green track" – which involves a vegetated track bed within the transitway – was

being considered as one possible stormwater control measure.  In a response to comments, it was

stated that green track "will" be used as part of the project, which was consistent with MTA's

then-current plans to require green track in the draft RFP.  But the ROD did not list green track

as a project commitment, leaving MTA with flexibility to use alternate measures to manage

stormwater run-off.  AR1_000033 - 42.  With the cost-saving changes announced in June 2015,

MTA modified its contract documents (the RFP) to allow the flexibility to use green track or other equivalent measures to meet the state's stormwater requirements.  As MTA noted, this additional flexibility has absolutely no effect on the requirement to meet Maryland's stringent stormwater requirements.  Under State law, the project is legally required to treat all stormwater run-off with methods known as "environmental site design" ("ESD") to the maximum extent practicable, and must provide stormwater treatment that exceeds the run-off generated by the project itself – resulting in a net improvement in the watershed.  AR5_000025 - 31.  As the record reflects, green track is simply one of several "environmental site design" methods that can be used to meet the standards.  The decision about the specific ESD methods that will be used for this project will be made during the final design stage – with review by the State regulator. *Id.*

### 2.    "Parabolic" Steel Bridge

FCCT contends that eliminating the contract requirement for a "parabolic steel bridge" will result in a "more massive structure that would require more digging in protected wetlands and release more polluted sediments into Rock Creek."  Pltf. Br. 18.  However, the analysis of impacts resulting from construction of the bridge assumes construction of "modern steel truss bridges," not a "parabolic steel" bridge.  AR1_002078.  The requirement for a parabolic steel design was simply a contract specification that MTA chose to include in early versions of the RFP.  MTA's change simply allowed the contractor flexibility to use a "standard bridge over Rock Creek" rather than a parabolic steel box girder bridge.  AR4_002861.  FCCT's assertion that this change will result in a "more massive" bridge has no support in the record.  Because there was no change in design relative to the design specified in the FEIS, FTA properly concluded that it does not require an SEIS.

### 3.      Other Cost-Saving Changes

The other four issues raised by the FCCT fail on their face to "paint a seriously different picture of the environmental landscape."  First, the proposal to reduce train frequency (Pltf. Br. 17) only applies to the initial start of service on the line.  As MTA explained, the impact analysis in the FEIS was based on the year 2040, and MTA has not made any change in the train-frequency requirement for that year.  The more gradual start-up in service will not change the findings in the FEIS.  AR4_002855.  Second, the need to comply with LEED standards[25] (Pltf. Br. 19) was a contract specification, not a requirement of the FEIS or ROD.  A change in a contract specification does not result in any change in the environmental impacts analysis in the FEIS.  AR4_002858.  Third, the extent of repaving required for existing roads (Pltf. Br. 19) was never specified in the FEIS or ROD; this cost-saving changes also is simply a change in contract specifications.  As MTA explained, the extent of repaving a road after construction does not change any of the environmental impacts analysis in the FEIS.  AR4_002857.  Fourth, the change requiring Montgomery County to assume a greater role in providing the "alternate interim Capital Crescent Trail" (Pltf. Br. 19) is simply a matter of allocating funding responsibility, and clearly does not affect the project's environmental impacts.  The change only involves only allocation of funding and implementation roles.  AR4_002863.

### C.      The Declarations Attached To FCCT's October 9 Letter Do Not Require Preparation of a Supplemental EIS.

In its October 9, 2015, FCCT asserted that an SEIS was needed for the Purple Line based on purported "new information," which consisted of a set of four declarations and a report prepared long after the Purple Line FEIS and ROD were issued.  MTA considered all of these materials and responded in detail in a letter to FTA dated December 7, 2015.  AR5_000007 - 43.

---

[25] This claim is now moot in any event because the developer has agreed in its contract to build to the "LEED" standards.  See P3A, Exhibit 2, Section 1 http://www.purplelinemd.com/en/p3. P3A, Exhibit 2, Section 1, p. 2.

As the letter demonstrates, the substance of the declarations and the report do not constitute the type of "new information" that can be the basis for an SEIS.  The declarations and report are, at best, comments on the FEIS that could have been submitted during the NEPA process.  Moreover, nothing in the declarations or report present the type of a seriously different picture of the project's environmental impacts that support the need for an SEIS.

FCCT offers no reason or excuse for failure to provide these comments during the established comment periods.  The declarants' opinions are not facts and do not establish a need an SEIS.  "As the Supreme Court has long admonished, '[p]ersons challenging an agency's compliance with NEPA must structure their participation so that it … alerts the agency to the [parties'] position and contentions' in order to allow the agency to give the issue meaningful consideration."  *Nevada v. Dep't of Energy,* 457 F.3d 78, 88 (D.C. Cir. 2006) (quoting *Dep't of Transp. v. Pub. Citizen,* 541 U.S. 752, 764 (2004)).  Here, FCCT chose to structure its participation in the NEPA process by choosing to wait until long after the conclusion of the process to provide its comments on the adequacy of the documents.  Having chosen that course of action, they cannot now claim that the comments are "new information" requiring an SEIS.

### 1.    Allen Memorandum (Ridership)

The Allen memorandum is dated May 9, 2014 (approximately two months after the ROD was issued).  AR5_006696.  It consists of a review of ridership forecasts and other analyses in the Purple Line FEIS, criticizes those forecasts on various grounds, and objects to MTA's handling of the Country Club's requests for data relating to forecasts in the AA/DEIS.  Pltf. Br. 22.  As with FCCT's other declarations, the Allen memorandum offer no new facts, but simply provides comments and opinions of the author that could have been – but were not – timely submitted in response to the FEIS.  In the absence of new information regarding the project's environmental impacts, the submittal of additional opinions regarding forecasts or other aspects

of the methodology used in the FEIS provide no basis for requiring preparation of an SEIS. AR5_000003; AR5_000015.

### 2.      Lysy Declaration (Cost Estimates)

The Lysy declaration consists primarily of an assertion that because costs have increased since FTA first published cost estimates in the DEIS (in 2008), the cost estimates were required to be recalculated using current costs in a supplemental EIS.  AR5_006669 - 77.  FCCT also asserts that the Lysy declaration "reinforced concerns" that the 2008 cost estimates for the light-rail alternatives "were overly optimistic."  Pltf. Br. 22-23.

There is no merit to FCCT's claim that the Lysy declaration is "new information."  First, the FEIS addresses those cost increases.  AR1_002363 - 67.  In addition, comments on the FEIS also addressed increases in costs since the AA/DEIS, and are addressed in the ROD. AR1_000227 -31.  Because the Lysy declaration offers no "new information" regarding the project's environmental impacts, FTA properly denied FCCT's request for preparation of a supplemental EIS on this issue.  AR5_000003; AR5_000015.

### 3.      Collinson Declaration (Wetlands)

The Collinson declaration consists of the opinions of a former employee of the U.S. Army Corps of Engineers regarding the wetland impacts analysis in the FEIS and his predictions regarding additional analyses that may be required by the Corps as part of Section 404 permitting for the project.  AR5_006663 - 68.  Here, too, the FCCT submitted new opinion, not new facts. Moreover, Collinson's assertions are misleading because they conflate Section 404 permitting requirements with NEPA requirements.  For example, Collinson implies that the watershed scale used in the FEIS was too large, citing a Corps' regulation that purportedly "establishes USGS 8-digit HUC as the preferred watershed size" for such an analysis.  What Collison fails to acknowledge is that the regulation applies to the geographic scope of a mitigation bank or in-

lieu-fee program for mitigating wetlands impacts under the Section 404 program; it has nothing to do with a NEPA analysis. *See* 33 C.F.R. 332.8(d)(6).  Given the content of the Collinson declaration and the failure to raise this comment at the appropriate time in the NEPA process, FTA reasonably determined that this declaration provides no basis for preparing an SEIS.[26] AR5_000003; AR5_000014.

### 4.    MacGlashan Declaration (Noise)

FCCT claims that the MacGlashan declaration demonstrates that the noise analysis in the FEIS was inadequate and that an SEIS is required.  Pltf. Br. 26.  The MacGlashan declaration was submitted long after the NEPA process ended and merely presents his opinion – not new facts.  AR5_006678 - 89.  Principally, MacGlashan, who claims expertise in analyzing noise at airport, objected to the FTA's choice of noise analysis methodology and the adequacy of noise mitigation measures.  Because this declaration provided no new information, FTA properly rejected FCCT's claim for an SEIS on this issue.

Moreover, the FEIS contains a robust noise analysis that addresses the issues raised in the MacGlashan declaration.  The noise analysis performed for the FEIS was based on the assumption that the project will include a four-foot noise wall on each side.  The FEIS explains that noise for users of the trail would be further attenuated by "skirt panels" that will be part of the trains.  It further states that, for portions of the Purple Line corridor near the four-foot high walls, the combination of both measures will provide a 12-decibel noise reduction.  *Id.*

In addition,  with regard to noise impact methodology, FTA explained its decision not to include "single event noise levels" in the FEIS.  In the ROD, FTA explained that its noise guidance "recognizes that a single-event noise level can be calculated using a metric known as

---

[26] In addition, contrary to Collinson's assertions, the FEIS did consider functions and values of the wetlands affected by the project.  See AR1_002114 and AR1_005476.

'Lmax,'" but explained that this calculation is not required in a NEPA document "because it does not take into account the number and duration of transit events, which is important to people's reaction to noise." AR1_000166. FTA properly rejected the MacGlashan declaration as a basis for preparing a supplemental EIS. AR5_000003; AR5_000014 - 15. [27]

5.      **Saggese Declaration ("Risk Of Failure")**

FCCT asserts that the Saggese declaration (AR5_ 006690 - 95), which provides his opinion that the "statistical probability of Project failure along one or more dimensions was 100%," establishes the need for an SEIS. Pltf. Br. 27. Nothing in the FCCT's brief or in the declaration discloses a new fact related to the environmental impacts of the project. FCCT again seeks to have the Court find that an SEIS can be triggered by a single person's opinion that the project is likely to fail. The risk of "project failure" is not an environmental impact within the scope of a NEPA analysis. *Metropolitan Edison*, 460 U.S. at 772. FTA properly rejected FCCT's request for an SEIS on this issue. AR5_000003; AR5_000015.

D.      **The Stormwater Report Attached to FCCT's October 9 Letter Does Not Warrant Preparation of a Supplemental EIS**

FCCT claims that a "new study" of stormwater impacts from the Purple Line revealed "new information" about the Purple Line's stormwater runoff impacts. Pltf. Br. 24. The September 30, 2015 "report" was prepared by a team of people, including FCCT's attorney and two of the individual plaintiffs (Fitzgerald and de Azua), and submitted to FTA as an attachment to FCCT's October 9, 2015 letter. FCCT claims that the report establishes that the project's stormwater impacts have increased since the FEIS, citing as evidence a report prepared by MTA that FCCT views as confirming an increased reliance on "off-site" stormwater mitigation

---

[27] FCCT also claims that green track would help reduce noise levels is meritless. FCCT Br. at 17. The record establishes that the noise modeling conducted for the project did not assume any reduction in noise impacts from the use of green track. AR4_002865. Thus, if the developer eventually chooses not to use green track, there will be no change in noise levels from the project.

measures.  FCCT also claims that contractors' flexibility to use "green track" or other measures will somehow result in increased stormwater impacts.  Based on the detailed analysis provided by MTA in its letter dated December 7, 2015 (AR5_000007 - 43), FTA properly concluded that this stormwater report does not require an SEIS.  AR5_000003 - 06.

First, the assertion that stormwater impacts have increased simply has no basis in fact.  See AR5_000007, 11-14.  The FEIS acknowledges that the project must meet the stringent stormwater management requirements imposed by Maryland.  AR1_002004.  The FEIS itself made no assumptions regarding the particular combination of on-site and off-site stormwater mitigation measures that would be used for the project.  The water resources technical report in the FEIS specifically acknowledged that off-site treatment could be used when on-site measures were not feasible.  AR1_005519.  These statements confirm that both on-site and off-site treatment of stormwater run-off were assumed in the FEIS.

Second, there has been no change in the project design that in any way increases the project's stormwater run-off impacts.  The elimination of the contract specification requiring green track simply allows the contractor a broader range of design options for satisfying the State's stringent stormwater management requirements.  This design flexibility does not alter the underlying requirement to incorporate "environmental site design to the maximum extent practicable."  AR5_000012.  The Environmental Site Design standard is met "when post-development hydrology is restored to natural hydrologic conditions assuring that channel stability is maintained, *predevelopment groundwater recharge is replicated*, and nonpoint source pollution is minimized for the 1-year 24-hour frequency storm event."  AR5_000028.  As a practical matter, the requirement to restore predevelopment conditions compels projects to include mitigation that more than offset the project's impacts.  AR5_000026.

Third, there is no basis in fact for FCCT's assertion that the elimination of green track (if, in fact, it were to happen) would result in a dramatic increase in the project's reliance on off-site stormwater treatment.   MTA's response explained that stormwater run-off from the project "would be more than offset by on-site stormwater treatment measures – by a ratio of more than 2:1 –   even if green track is omitted from the project and replaced entirely with off-site treatment."  AR5_000041.[28]

### E.   None of the Other Issues Raised in FCCT's July 14 or October 9 Letters Require Preparation of a Supplemental EIS.

FCCT claims three other pieces of "new information" require preparation of an SEIS: changes in Metro ridership, a new executive order addressing floodplains impacts, and migratory bird impacts.  None of these claims support a decision to prepare an SEIS.  First, FCCT claims that the recent decrease in the number of passengers riding the Washington Metro system and the safety deficiencies found by the National Transportation Safety Board render the Purple Line ridership forecast inaccurate because of the relationship between Purple Line ridership and level of ridership on Metro.  Pltf. Br. 21.  However, because the influence of Metro ridership on Purple Line ridership would be the same for all alternatives, a decrease in Metro passengers would affect all alternatives equally.  Also, as MTA notes in its response letter, "the financial or other issues currently being experienced by WMATA do not involve the Purple Line, and they have no relationship to the environmental impacts of the Purple Line."  AR5_000009.

There is similarly no merit to FCCT's contention that an SEIS is needed to analyze floodplain impacts in light of a recently amended Executive Order regarding development in

---

[28] FCCT claims that the stormwater report prepared by MTA in response to FCCT's claims regarding stormwater impacts is "precisely the kind of new information that NEPA required to be addressed in an SEIS with the public review process mandated by the statute and implementing regulations."  Pltf. Br. at fn 11.  However, FCCT's comments on storm water issues related to the Project were sent to FTA more than two years after the ROD had been issued.  MTA's stormwater overview (AR5_000025 - 43) simply responds to the issues raised – for the first time – in FCCT's letter.

floodplains.  The ROD includes commitments requiring all project design plans to comply with floodplain-related requirements, including Executive Order 11988.  AR1_000039.  FTA properly determined that an SEIS was not needed to address how the recently amended floodplains Executive Order affects the Purple Line project.

Finally, FCCT makes a general assertion that impacts on bird species protected by the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. §§ 703-712, were not fully analyzed in the FEIS.  Pltf. Br. 48.  According to FCCT, an affidavit from Albert Manville, a former wildlife biologist employed by the Fish and Wildlife Service, provides "new information."  Because FCCT never submitted this declaration to FTA, FCCT cannot now rely on it to establish the need for an SEIS.[29]  *Public Citizen*, 541 U.S. at 764.  However, even if the declaration had been presented, it does not present any new facts regarding possible impacts of the project on migratory birds protected by the MBTA.  As FCCT states in its brief, the declaration simply asserts that "harmful impacts on migratory birds were never addressed" in the FEIS, but never explains what impacts were ignored and why those impacts were relevant to the project.  Pltf. Br. 25.  Having failed to articulate any cogent argument or present any analysis of the issue, FCCT's claim for an SEIS on this issue should be rejected.

## III.    FTA COMPLIED WITH SECTION 4(F).

FCCT argues that FTA violated Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303, in determining that the Purple Line did not use parkland protected by the statute.  FCCT claims there are feasible and prudent alternatives to the use of parkland, in particular for Elm Street Urban Park and the interim Capitol Crescent Trail.  Pltf. Br. 42-44.  This claim is

---

[29] Even if the declaration had been attached to FCCT's October 9 letter to FTA, that letter contained no reference to the declaration itself.  Because FCCT's October 9 letter fails to rely on any information provided in the declaration, they waived any argument concerning that declaration.  *Public Citizen*, 541 U.S. at 764.

meritless.  FTA prepared a 160-page evaluation of Section 4(f) issues for the Purple Line. AR1_001641 - 1770.  The evaluation explains that there are different levels of "use" for purposes of applying Section 4(f) – permanent use, temporary use, and constructive use. AR1_001644.  The evaluation also describes two exceptions to the application of Section 4(f) prohibition on the use of parkland – temporary occupancy and de minimis use.  AR1_001643. FCCT is wrong on both the facts and the law.  Its claims are reviewed under the arbitrary and capricious standard established under Section 706 of the APA.

> **A.     FTA Properly Made a Temporary Occupancy Finding For Elm Street Urban Park.**

Elm Street Park covers 2.1 acres in Chevy Chase, Maryland, and borders the Purple Line right-of-way.  The park is under the jurisdiction of the Maryland National Capital Park Planning Commission and the Montgomery County Department of Parks.   In order to construct a connection to the Capital Crescent Trail from the Park, MTA will temporarily occupy approximately 0.02 acres of the park.  AR1_001673.  The occupancy will not interfere with any current activities, features or attributes of the park.  *Id.*  Applying the factors in 23 C.F.R. 774.13(d), FTA concluded that the Purple Line would constitute a temporary occupancy of the Park, not a use.  *Id.*  As required by 23 C.F.R. 774.13(d)(5), FTA obtained the concurrence of the Montgomery County Department of Parks, in a letter dated December 17, 2013.  AR1_001777.

FCCT does not challenge any of the FTA's detailed findings addressing the temporary occupancy of the Elm Street Urban Park for the purposes of Section 4(f).  Having failed to challenge those findings, they have waived that argument. See *City of Waukesha v. EPA*, 320 F.3d 228, 251 n.22 (D.C. Cir. 20013).  Because the facts demonstrate that FTA properly determined that the Project would result in only a temporary occupancy of the Park, defendants are entitled to summary judgment on this issue.

**B.  FTA Properly Determined That the Georgetown Branch Right-Of-Way Is Not a Park Protected By Section 4(f).**

FCCT also alleges that the project violates Section 4(f) by failing to consider impacts to the Georgetown Branch right-of-way.  Pltf. Br. 43.  Because FCCT never challenges FTA's determination that the Georgetown Branch right-of-way (which functions as the interim Capitol Crescent Trail - see pp. 3-4 above) is not within the scope of Section 4(f), FCCT has waived this argument.  See *City of Waukesha*, 320 F.3d at 251 n.22.  Even if they have not waived this claim, it is clear that defendants are entitled to summary judgment.

FTA determined that the Georgetown Branch right-of-way is not a park within the scope of Section 4(f) because it was acquired as a transportation right-of-way and has been treated as such by the County from the time it was acquired.  AR1_001664 - 65.  Montgomery County, as the owner of the right-of-way, concurred in this determination.  See AR2_002772 - 90.  FTA did not abuse its discretion in determining that the Georgetown Branch right-of-way was not within the scope of Section 4(f).  Defendants are entitled to summary judgment on this issue.

**IV.  THE REQUIREMENTS OF THE ENDANGERED SPECIES ACT ARE SATISFIED**

FCCT claims that FTA and MTA should have engaged in formal consultation with the U.S. Fish and Wildlife Service ("FWS") on impacts to a species listed under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544 – the Hay's Spring Amphipod – and a species that is a "candidate" for listing under the Act – the Kenk's Amphipod.  FCCT claims that FTA and MTA should have prepared a Biological Assessment for the two amphipods.  FCCT's claims should be rejected. [30]

---

[30] MTA offers no response to FCCT's argument that FWS should have implemented a monitoring system for Kenk's amphipod.  The claim is not properly raised against MTA.

As required by the regulations implementing the ESA, the MTA contacted the FWS in February of 2007, asking if there were any ESA listed species in the project area of the Purple Line. 50 C.F.R. 402.12(c); AR2_189475. The FWS responded, saying that there were no species present in the project area. AR3_000061. MTA again contacted FWS in September, 2011, asking if any ESA listed species were within the project area. AR2_097985. FWS confirmed its earlier letter, saying "Except for occasional transient individuals, no federally proposed or listed endangered or threatened species are known to exist within the project area. Therefore, no Biological Assessment or further section 7 consultation with the U.S. Fish and Wildlife Service is required." AR3_000063.

When no species listed under the ESA are in the project area, the section 7 process comes to an end. The ESA implementing regulations state "If the Director advises that no listed species or critical habitat may be present, the Federal agency need not prepare a biological assessment and further consultation is not required." 50 C.F.R. 402.12(d)(1). Absent a listed species in the project area, there is simply nothing to "consult" about. Here, FWS confirmed two times that there are no listed species in the area. Because no listed species were present, there was no obligation to prepare a Biological Assessment and no further consultation is required.

## V.     FCCT'S MIGRATORY BIRD TREATY ACT CLAIM HAS NO MERIT.

FCCT claims that MTA has violated the Migratory Bird Treaty Act by failing "to attempt to avoid take of migratory birds …" and by not seeking a "permit for the take of migratory birds that the Project will foreseeably cause." Pltf. Br. 47. Because there is no private right of action under the MBTA, FCCT has failed to state a claim, and no relief can be afforded to FCCT. See *Turtle Island Restoration Network v. U.S. Dep't. of Commerce,* 438 F.3d 937, 942 (9th Cir. 2006).

## VI.    FCCT FAILS TO STATE A CLAIM UNDER THE NEW STARTS PROGRAM.

FCCT argues that FTA violated various provisions of the New Starts Funding program, 49 U.S.C. § 5309.  Pltf. Br. 39-42.  However, FCCT makes no reference in its original or amended complaints to 49 U.S.C. § 5309.  The only reference to New Starts is in paragraph 20 of the second supplemental complaint.[31]  ECF No. 42.  No other allegations concerning funding under 49 U.S.C. § 5309 are included in the second supplemental complaint.  Because the complaint fails to provide any factual allegations relating to the claim, it fails to "raise a right to relief above the speculative level" and is insufficient "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  *See also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While the complaint need not provide a dissertation regarding the events giving rise to a claim, a mere "formulaic recitation of the elements of a cause of action" is clearly insufficient.  *Twombly*, 550 U.S. at 555.  Here the single reference to 49 U.S.C. § 5309, without any elaboration in either the supplemental complaint or motion for summary judgment, is simply not sufficient to state a claim for relief that survives summary judgment.

### CONCLUSION

For the foregoing reasons, the Court should grant MTA's motion for summary judgment and deny FCCT's motion for summary judgment.

Dated:  April 11, 2016                  Respectfully Submitted,

                                                   BRIAN E. FROSH
                                                   Attorney General of Maryland

                                                   */s/ Linda M. Strozyk DeVuono*
                                                   LINDA M. STROZYK DeVUONO (Bar No. 429514)
                                                   Assistant Attorney General
                                                   100 S. Charles Street, Tower II, Suite 700
                                                   Baltimore, Maryland 21201

---

[31] That paragraph states "Defendant's Final Decision also violates the Federal Highway Act, 49 U.S.C. § 5309(d), (e)(2)(A) and § 5309(f)(1)(A)."

(410) 451-3722
Email: ldevuono@sha.state.md.us

*/s/ Albert M. Ferlo*
ALBERT M. FERLO, JR. (Bar No. 290395)
PERKINS COIE LLP
700 13th Street, NW Suite 600
Washington, DC 20005
(202) 654-6262
Email: aferlo@perkinscoie.com

Attorneys for Defendant-Intervenor

**CERTIFICATE OF SERVICE**

I hereby certify that on April 11, 2016, a copy of the foregoing document was served via

the CM/ECF system on the following counsel of record.


David Brown
Knopf & Brown
brown@knopf-brown.com

Kevin W. McArdle
U.S. Department of Justice
Kevin.mcardle@usdoj.gov

Jeremy Hessler
U.S. Department of Justice
Jeremy.hessler@usdoj.gov

Tyler L. Burgess
U.S. Department of Justice
Tyler.burgess@usdoj.gov


*/s/ Linda M. Strozyk DeVuono*
LINDA M. STROZYK DeVUONO

Attorney for Defendant-Intervenor