# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRIENDS OF THE CAPITAL CRESCENT TRAIL *et al.*, | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Civil Case No. 14-01471 (RJL) |
| FEDERAL TRANSIT ADMINISTRATION *et al.*, | )<br>)<br>) |
| Federal Defendants. | )<br>) |
| v. | )<br>) |
| STATE OF MARYLAND, | )<br>) |
| Defendant-Intervenor. | ) |

**FILED**
**MAY 22 2017**
Clerk, U.S. District and Bankruptcy Courts

## MEMORANDUM OPINION
(May 22, 2017) [Dkts. ## 47, 115, 116]

On November 22, 2016, I issued an opinion and order instructing the FTA to critically evaluate the significance of Washington Metropolitan Area Transit Authority ("WMATA") Metrorail's recent safety issues and ridership decline to determine whether a supplemental Environmental Impact Statement ("SEIS") was required for the Purple Line Project. Mem. Op. and Order. [Dkts. ## 109, 110]. Three weeks later, the FTA issued a seven-page memorandum that was based largely on a Maryland Transit Authority ("MTA") assessment that *preceded* my November 22nd Order and concluded that an SEIS was not required. Shortly thereafter, FTA notified the Court of its decision that an SEIS was not necessary. Notice [Dkt. #113]. As such, both the FTA and Maryland filed renewed

cross-motions for summary judgment on December 16, 2016. Fed. Defs.' Renewed Cross-Mot. for Summ. J. [Dkt. # 115]; Def.-Intervenor Maryland's Renewed Cross-Mot. for Summ. J. [Dkt. # 116]. After further briefing from plaintiffs and defendants, and the filing of the Joint Appendix, the renewed motions became ripe for a ruling at the end of January 2017 and are now pending before this Court.

Defendant-intervenor Maryland filed a motion two months later—on March 31—effectively demanding that the Court issue a ruling on all remaining issues no later than April 28, arguing that the Purple Line "hangs in the balance" and is on the "brink of cancellation" if the ROD is not reinstated imminently. Mot. to Expedite and Mem. in Supp. [Dkts. #133, 133-1]. Not surprisingly, plaintiffs opposed that motion, contending that the defendants set forth no justification for the April 28 deadline and pointing out that defendants' tactical decision to litigate the necessity of an SEIS, rather than proceed with preparing one, inevitably played a role in prolonging the litigation.[1] Pls.' Resp. to Mot. to Expedite [Dkt. # 114].

While the Court has been working diligently to resolve the myriad of issues raised in the renewed motions for summary judgment, and intends to issue an opinion on these remaining issues in the next few weeks, it seems prudent to issue today my ruling on the

---

[1] Maryland's desire for a speedy resolution of the case is understandable, but hardly unique amongst federal litigants, and it is the very job of a District Court judge to "weigh competing interests and maintain an even balance" in "controlling the disposition of causes on its docket . . . ." *Landis v. North American Co.*, 299 U.S. 248, 255 (1936). Since the renewed cross-motions became ripe in late January, I have issued more than 22 written opinions and presided over more than 60 hearings in a wide range of civil and criminal matters. The fact that I am issuing this opinion today, rather than as soon as Maryland would have liked, is not due to judicial neglect or disregard for the parties' interests, but rather the byproduct of the very type of intricate docket juggling that is performed daily by District Court judges around the country.

2

overarching issue that has been the focus of this litigation since my opinion last November: the necessity of an SEIS addressing the potential impact of WMATA's ridership and safety issues. After careful consideration of the motions, the applicable law, and the entire record in this case, I find that defendants have failed to take the requisite "hard look" at the potential impact that WMATA's ridership and safety issues could have on the Purple Line Project and conclude for the following reasons that an SEIS that addresses these issues is in fact required. As a result, I GRANT IN PART plaintiffs' motion for summary judgment [Dkt. # 47] and DENY IN PART defendants' and defendant-intervenor's renewed cross-motions for summary judgment [Dkts. ## 115, 116].

## BACKGROUND

On March 19, 2014, the FTA issued a Record of Decision ("ROD") approving the Purple Line Project, a 16.2-mile light rail project in Montgomery and Prince George's Counties, Maryland. As a result, plaintiffs Friends of the Capital Crescent Trail ("FCCT"), John MacKnight Fitzgerald, and Christine Real de Azua ("plaintiffs") filed suit in this Court against the FTA, the U.S. Fish and Wildlife Service ("FWS"), the Department of Transportation, and the Department of the Interior (collectively, "federal defendants").[2] Plaintiffs' suit challenges the ROD (as well as related approvals by the FWS) under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and raises claims under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq., the Federal Transit Act, 49 U.S.C. § 5309, the Federal-Aid Highway Act, 23 U.S.C. § 138, the

---

[2] The State of Maryland joined the defendants as a defendant-intervenor after the filing of the complaint. *See* Minute Order (July 15, 2015).

Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*, and the Migratory Bird Treaty Act, 16 U.S.C. § 703. *See generally* Am. Compl. [Dkt. # 20]; First Supp. Compl. [Dkt. # 33]; Second Supp. Compl. [Dkt. # 42].

On August 3, 2016, I granted partial summary judgment to plaintiffs and found that the FTA's conclusion that Metrorail's ridership and safety issues would have no effect on the Purple Line was arbitrary and capricious. As a result, I vacated the ROD and instructed the defendants to prepare an SEIS as expeditiously as possible addressing these issues. Mem. Op. and Order Granting Partial Summ. J [Dkts. ## 96, 97]. In response, federal defendants and Maryland filed motions pursuant to Federal Rule of Civil Procedure 59(e), asking me to alter or amend my judgment. Motions to Alter Judgment [Dkts. ## 98, 99]. On November 22, 2016, I granted in part and denied in part their Rule 59(e) motions. Although I declined to reinstate the ROD, I amended my judgment to give the FTA an opportunity to critically evaluate WMATA's ridership and safety issues, and determine what level of additional NEPA analysis was required for the Purple Line. Mem. Op and Order [Dkts. ## 109, 110].

On remand, FTA considered whether WMATA's safety and ridership issues constituted "new information or circumstances relevant to environmental concerns and bearing on the proposed action" such that an SEIS was required. 23 C.F.R. § 771.130(a)(1)(2). In doing so, FTA relied heavily on a November 3, 2016 technical assessment that MTA prepared in consultation with FTA experts. AR6_000533–67. The assessment discussed the likely results of five separate WMATA ridership scenarios, ranging from a situation where WMATA's recent ridership decline ends in 2017 and then

4

recovers at the previously expected rate from 2017 to 2040, to a "most extreme" scenario where no Purple Line trips include any transfers to or from WMATA Metrorail. AR6_00554. MTA concluded that, under any of those five scenarios, the Purple Line's footprint (and its environmental consequences) will remain unchanged, and the project will still meet its established purposes and needs. AR6_000566–57. In December 2016, the FTA prepared a memorandum that agreed with MTA's analysis and formally concluded that the FTA was not required to (and would not) prepare an SEIS, on the grounds that "the recent declines in WMATA ridership, even if they were to continue, would neither change the environmental impacts previously evaluated in the FEIS, nor undermine the Purple Line Project's ability to meet the identified Purpose and Need." AR6_000916–23. Unfortunately, defendants did not provide any written evaluation of the expert declarations submitted by plaintiffs in the days following my November 22, 2016 Order. Thereafter, federal defendants and defendant-intervenor Maryland filed on December 16, 2016 renewed cross-motions for summary judgment, which are now pending before the Court.

## STANDARD OF REVIEW

Summary judgment is warranted when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing challenges to agency action under the APA, 5 U.S.C. § 551 *et seq.*, the court's review is "based on the agency record" and is confined to determining whether the agency acted "arbitrarily or capriciously." *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (citing 5 U.S.C. § 706). The scope of review is narrow, and the court "may not substitute its judgment for that of

agency"; instead, agency action is arbitrary and capricious if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for a decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

## ANALYSIS

The National Environmental Policy Act ("NEPA") sets forth a series of procedural requirements that are intended to ensure that federal agencies "carefully consider[] . . . [the] significant environmental impacts" of proposed federal actions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). For example, federal agencies are required to issue an Environmental Impact Statement ("EIS") whenever a proposed government action qualifies as a "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Summarized briefly, the EIS must include "a full and fair discussion of [the project's] significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

Under certain circumstances, agencies are required to prepare a supplemental EIS ("SEIS") after they have completed the original EIS. Specifically, agencies are obligated to prepare an SEIS whenever "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40

CFR § 1502.9(c)(1); *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 371 (1989). Although this obligation is not triggered "every time new information comes to light," an agency must prepare an SEIS whenever "new information provides a *seriously* different picture of the environmental landscape." *Id.* at 373; *Nat'l Comm. for the New River v. FERC*, 373 F.3d 1323, 1330 (D.C. Cir. 2004) (citation omitted); *City of Olmsted Falls v. FAA*, 292 F.3d 261, 274 (D.C. Cir. 2002).

Like other APA challenges, courts review an agency's decision to undertake or forego an SEIS under the arbitrary and capricious standard. *City of Olmsted Falls v. FAA*, 292 F.3d 261, 274 (D.C. Cir. 2002). The court's review is limited, and it may not interject itself into the agency's discretion to choose the substantive action that will be taken. *Kleppe v. Sierra Club*, 427 U.S. 390, 411 n.21 (1976). Instead, the court's "role is to [e]nsure that the agency has taken a 'hard look' at the environmental consequences." *Id.* As such, the Supreme Court has instructed that courts "reviewing a decision not to supplement an EIS . . . should . . . carefully review[] the record and satisfy[] themselves that the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information." *Marsh*, 490 U.S. at 378 (1989).

As mentioned above, FTA's evaluation of WMATA's safety issues and ridership decline relied heavily on a ridership analysis that MTA included in its November 3 Technical Assessment. *See* AR6_00552-55 (MTA Technical Assessment); AR6_00916 (FTA Memorandum). The analysis discussed five potential scenarios for WMATA's ridership trends between now and 2040. Under the first two scenarios, WMATA's current ridership decline continues through 2017, but then recovers and grows (at different rates)

7

through 2040. In the third scenario, WMATA's ridership decline continues through 2017, but then stabilizes and neither grows nor declines through 2040. In the fourth scenario, WMATA's ridership continues to decline through 2040 at the same rate at which it has declined from 2008 to 2015. In the fifth scenario, there are no Metrorail transfers to or from the Purple Line. Under the five scenarios, total Purple Line ridership in 2040 declines by 3.7%, 6.7%, 9.4%, 13%, and 27.4%, respectively. AR6_000554.

Surprisingly, neither FTA nor MTA attempted to critically assess or discern which of these five wildly disparate scenarios is actually most likely to occur. MTA's technical assessment includes a very general statement that "underlying population and employment growth" make it reasonable to expect that Metrorail ridership will "gradually return to a growth rate," AR6_000552, and FTA's decision memorandum asserts that the fifth scenario is "highly unlikely," AR6_000922, but MTA makes clear that the five scenarios are "for analytic purposes only, and are not statements or representations of future Metrorail ridership levels." AR6_000554. Instead, FTA concluded that under any of the five scenarios, the Purple Line will have exactly the same construction footprint (and therefore the same environmental impact), *and* will still meet all of its identified purposes, and thus there is no need for an SEIS.

In effect, FTA boldly concluded that there is no need for an SEIS, and the Purple Line will meet its established purposes, *no matter what* happens to WMATA Metrorail. To say the least, this is a curious conclusion when one considers that one of the three explicit purposes identified for the Purple Line was to "[p]rovide better connections to

8

Metrorail services. . . ." AR1_000003 (ROD); AR1_001918 (FEIS),[3] and given that FTA itself concedes that this purpose "is directly implicated by potential ridership declines in the WMATA Metrorail system." Fed. Defs.' Mem. in Supp. of Renewed Cross-Mot. for Summ. J. at 8 [Dkt. #115-1].[4]

In any event, FTA failed to consider relevant information when making its decision not to prepare an SEIS. On November 25, 2016, plaintiffs submitted letters and attached materials to the FTA, including declarations from economist Dr. Frank Lysy, former railroad executive Dr. Martin Saggese, and professional transportation planner William G. Allen. AR6_000298–307; AR6_000308–23; AR6_000324–43. Plaintiffs' expert declarations provide additional information and raise questions about the impact that WMATA's ridership trends could have on the Purple Line and the issues at the heart of MTA's technical assessment and FTA's memorandum declining to prepare an SEIS. For example, Mr. Lysy's declaration discusses information that calls into question MTA's conclusion that it is reasonable to expect that Metrorail's current ridership decline will likely return to a growth rate, and argues that service improvements and a population growth will not necessarily result in ridership growth. AR6_000308–10.

In response to plaintiffs' letter and submission, FTA replied in a letter that it "was aware of its obligations under NEPA," but provided no substantive response to plaintiffs. AR6_000904. Afterward, MTA drafted a memorandum to the FTA that concluded that

---

[3] The other two purposes were to provider "faster, more direct, and more reliable east-west service" in the Purple Line corridor and to "improve connectivity to the communities in the corridor." AR1_000003.

9

plaintiffs' submissions did not support an SEIS, but the memorandum included no analysis, nor even a mention, of plaintiffs' expert declarations and their criticisms of MTA and FTA's Metrorail ridership assumptions. AR6_000909–15. Although FTA's final memorandum states that the agency "considered and reviewed," *inter alia*, plaintiffs' letter and attachments, there is absolutely no discussion or analysis of those submissions, including plaintiffs' expert declarations, and FTA's mere recitation that it considered them is insufficient. *See Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002) ("Stating that a factor was considered—or found—is not a substitute for considering or finding it."(internal quotation marks omitted)); *Getty v. Fed. Sav. and Loan Ins. Corp.*, 805 F.2d 1050, 1057 (D.C. Cir. 1986) (holding that a "conclusory recitation" that a factor was considered is insufficient to establish that the agency engaged in "reasoned consideration"). This wholesale failure to consider plaintiffs' expert declarations was arbitrary and capricious.

To be clear, I am not suggesting that the FTA was obligated to defer to the substantive conclusions included in those declarations. Defendants are absolutely right that agencies are entitled to an "extreme degree of deference" when they are evaluating scientific data, *National Committee for the New River v. FERC*, 373 F.3d 1323, 1327 (D.C. Cir. 2004), and are entitled to rely on the reasonable opinions of their own experts. *Marsh*, 490 U.S. at 378. However, the fact that the agency is entitled to its own discretion does not mean that it can disregard materials that were included in the administrative record on remand. The situation here is analogous to that in *Public Employees for Environmental Responsibility v. Hopper*, 827 F.3d 1077 (D.C. Cir. 2016). In that case, plaintiffs challenged the Fish and Wildlife Service's issuance of an incidental take statement under

the Endangered Species Act. The district court agreed with plaintiffs, vacated the take statement, and remanded to the FWS to conduct an independent assessment of the proposed mitigation measures. *Id.* at 1089. On remand, plaintiffs submitted scientific and economic data to the FWS in support of a particular mitigation measure, but the FWS ignored those submissions. On appeal, our Circuit Court concluded that the FWS's failure to consider plaintiffs' submissions was arbitrary and capricious. *Id.* at 1090. The facts here could not be more similar.

Here, plaintiffs' expert declarations, at a minimum, raise serious questions about the defendants' assumptions about WMATA Metrorail and its future impact on the Purple Line. By failing, yet again, to grapple with plaintiffs' submissions, the FTA failed to take a *hard look* at all of the information in the administrative record that could inform the agency about the impact that WMATA Metrorail's ridership issues could have on the Purple Line Project. As such, the FTA's resulting refusal to prepare an SEIS was arbitrary and capricious. Accordingly, it is hereby ordered that, consistent with NEPA's procedural requirements, the defendants shall prepare an SEIS addressing them as expeditiously as possible.

## CONCLUSION

For all of the reasons stated above, the Court GRANTS IN PART plaintiffs' motion for summary judgment [Dkt. # 47] and DENIES IN PART defendants' Renewed Cross-Motion for Summary Judgment [Dkt. # 115] and defendant-intervenors' Renewed Cross-Motion for Summary Judgment [Dkt. # 116]. An Order consistent with this decision accompanies the Memorandum Opinion.

/s/ Richard J. Leon
RICHARD J. LEON
United States District Judge