| | | |
|---|---|---|
| **FRIENDS OF THE CAPITAL CRESCENT TRAIL** *et al.,* | ) ) ) ) | |
| **Plaintiffs,** | ) ) ) | |
| **v.** | ) ) ) | **Civil Case No. 14-01471 (RJL)** |
| **FEDERAL TRANSIT ADMINISTRATION** *et al.,* | ) ) ) ) ) | **FILED** |
| **Federal Defendants.** | ) ) ) | **JUN – 9 2017** |
| **v.** | ) ) ) ) | Clerk, U.S. District & Bankruptcy Courts for the District of Columbia |
| **STATE OF MARYLAND,** | ) ) ) | |
| **Defendant-Intervenor.** | ) ) | |

**MEMORANDUM OPINION**

(June ___, 2017) [Dkts. ## 47, 54, 56, 115, 116]

    In March 2014, the Federal Transit Administration ("FTA") issued a Record of Decision ("ROD") approving the Purple Line Project, a planned 16.2-mile light rail transit system in Montgomery and Prince George's Counties, Maryland. Friends of the Capital Crescent Trail ("FCCT"), John MacKnight Fitzgerald, and Christine Real de Azua ("plaintiffs") filed suit in this Court, challenging the ROD and related approvals by the

U.S. Fish and Wildlife Service ("FWS," together with FTA and the Department of Transportation and the Department of Interior, "federal defendants").[1] Plaintiffs raise a plethora of claims under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–706, and five substantive statutes: (1) the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*; (2) the Federal Transit Act, 49 U.S.C. § 5309; (3) Section 4(f) of the Department of Transportation Act, 23 U.S.C. § 138; (4) the Endangered Species Act, 16 U.S.C. §§ 1531–1544; and (5) the Migratory Bird Treaty Act, 16 U.S.C. § 703. *See generally* Am. Compl. [Dkt. # 20]; First Suppl. Compl. [Dkt # 33]; Second Suppl. Compl. [Dkt # 42].

I already determined that the FTA did not meet its obligations under NEPA when it failed to properly consider the effects that Washington Metropolitan Area Transit Authority ("WMATA") Metrorail's recent safety issues and ridership decline could have on the Purple Line Project, and ordered the defendants to prepare a supplemental Environmental Impact Statement ("SEIS") addressing those issues. *See* Aug. 3, 2016 Mem. Op. and Order [Dkts. ## 96, 97]; Nov. 22, 2016 Mem. Op. and Order [Dkts. ## 109, 110]; May 22, 2017 Mem. Op. and Order [Dkts. ## 138, 139].

However, as mentioned above, plaintiffs raised a variety of other claims that are unrelated to WMATA's ridership and safety concerns. On May 30, 2017, I entered final judgment in this case, and granted summary judgment to defendants on plaintiffs' remaining NEPA claims and their claims under the Endangered Species Act, the Migratory

---

[1] The State of Maryland joined the case as a defendant-intervenor in July 2015. July 15, 2015 Minute Order on Mot. to Intervene.

Bird Treaty Act, Section 4(f) of the Department of Transportation Act, and the Federal Transit Act. Final Judgment [Dkt. # 142]. At that time, I informed the parties that I would issue an opinion explaining my reasoning by the end of this week. Order on Mot. to Expedite at 2 [Dkt. # 141]. This memorandum opinion explains my reasons for that judgment in detail.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Whenever the Court sits in review of agency action under the APA, its review "is based on the agency record and limited to determining whether the agency acted arbitrarily or capriciously." *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009). Whereas "the role of the agency [is] to resolve factual issues," the sole "function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006). The Court must determine "whether the agency acted within the scope of its legal authority, . . . explained its decision, . . . relied [on facts that] have some basis in the record, and . . . considered the relevant factors." *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995) (citing *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

The scope of review under the "arbitrary and capricious" standard is "narrow," and "a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). Nevertheless, the Court must

satisfy itself that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action, including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). An agency's action is arbitrary and capricious if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

## ANALYSIS

I.    **National Environmental Policy Act ("NEPA")**

A.    **Plaintiffs' NEPA Claims Challenging the Alternatives Analysis/Draft Environmental Impact Statement and the Final Environmental Impact Statement lack merit.**

The National Environmental Policy Act sets forth procedures intended to ensure that agency decision-makers "carefully consider[] detailed information concerning significant environmental impacts" and make the public aware of those environmental effects before the proposed action is chosen. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); *see also Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 503 (D.C. Cir. 2010). The Council on Environmental Quality "CEQ" has promulgated regulations implementing NEPA that are binding on all agencies. 40 C.F.R. §§ 1500–08.

As part of the NEPA process, a federal agency must prepare an Environmental Impact Statement ("EIS") whenever a proposed government action qualifies as a "major Federal action[] significantly affecting the quality of the human environment." 42

U.S.C. § 4332(C). The EIS must include a "full and fair discussion of [the project's] significant environmental impacts and shall inform decision makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

In September 2003, MTA and FTA published a Notice of Intent to prepare an Environmental Impact Statement "to address the need to improve transit access, reduce travel times and improve connectivity in response to regional growth, traffic congestion, and land use plans" for the Bi-County Transitway in Montgomery and Prince George's Counties. Notice of Intent to Prepare an Environmental Impact Statement (EIS), 68 Fed. Reg. 52,452, 52,452 (Sept. 3, 2003). In 2008, after conducting hundreds of meetings with the public about possible alternatives, FTA and MTA published an Alternatives Analysis/Draft Environmental Impact Statement ("AA/DEIS"). AR1_012023–28. The AA/DEIS studied eight alternative projects in detail: a no action alternative, a traffic systems management ("TSM") alternative, three alternatives involving bus rapid transit ("BRT"), and three light rail alternatives—a high investment alternative, a medium investment alternative, and a low investment alternative. AR1_011994–012028. In August 2009, Maryland announced that it had chosen the medium investment light rail alternative (with elements from the high investment alternative) as the Locally Preferred Alternative for the project. AR1_001945. In August 2012, MTA issued a reevaluation of the project because more than three years had passed since the AA/DEIS's publication, and FTA concurred with the re-evaluation. AR2_061614. In September 2013, MTA and FTA released a Final Environmental Impact Statement, which examined the Locally Preferred

Alternative and included the agencies' responses to thousands of public comments about the project. AR1_001884–011943. Finally, in March 2014, the FTA's Regional Administrator signed a Record of Decision approving the Locally Preferred Alternative. AR00001–32.

Plaintiffs raise a number of claims challenging the sufficiency of the AA/DEIS and the FEIS. When Courts review agencies' environmental impact statements, they apply a "rule of reason" to assess "*which* alternatives the agency must discuss, and the *extent* to which it must discuss them.'" *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991). The Court's obligation is simply to determine that the agency has taken a "hard look" at the project and "has adequately considered and disclosed the environmental impact of its actions." *Nevada v. Dep't of* Energy, 457 F.3d 78, 93 (D.C. Cir. 2006). Generally, an agency's alternatives analysis should be upheld "so long as the alternatives are reasonable and the agency discusses them in reasonable detail." *Citizens Against Burlington, Inc.*, 938 F.2d at 196, and courts will not "'flyspeck' an agency's environmental analysis, looking for any deficiency no matter how minor." *Theodore Roosevelt Conservation P'ship*, 661 F.3d at 75.

Plaintiffs raise a number of complaints about the AA/DEIS and FEIS, arguing *inter alia* that MTA and FTA failed to respond adequately to public comments about the Project, failed to clearly articulate the environmentally-related differences between the alternatives, and failed to examine various aspects and/or environmental impacts of the Preferred Alternative in sufficient detail. Pls.' Mem. in Supp. of Mot. for Summ. J. at 27–39 [Dkt. # 47-1]. I have reviewed the administrative record carefully in light of plaintiffs'

arguments. Although I need not discuss in detail each discrete issue that plaintiffs raised, I am convinced that the FTA reasonably considered and the project's possible alternatives and has carefully considered the environmental impacts of the project. Plaintiffs do not identify any fatal flaw in the AA/DEIS or the FEIS; instead, their claims boil down to an argument that the agencies did not consider certain issues with the level of detail they would have liked, or did not reach the substantive conclusion they desired, but that is not sufficient. As just one example, plaintiffs argue that the defendants did not sufficiently explain the stormwater effects of the project. Pls.' Mem. in Supp. of Mot. for Summ. J. at 36–37 [Dkt. # 47-1]. But the record shows that the defendants did consider and explain the project's stormwater effects during the NEPA process, *see, e.g.*, AR1_002120–23, and subsequently developed a detailed, comprehensive Concept Stormwater Management Report after the Preferred Alternative was selected, as they are permitted to do. AR5_000718–001325. Plaintiffs' argument simply boils down to a claim that the agencies should have assessed the project's stormwater effects in more detail and at an earlier stage than they did. I disagree. The law only requires that defendants take a "hard look" at the project's environmental impacts during the NEPA process, and it is clear to me that they did so.

In addition, plaintiffs argue that MTA refused to provide some of the data underlying ridership estimates "on the basis it was 'proprietary' or gave out information and data that was insufficient or unreadable and even unusable by experts." Pls.' Mem. in Supp. of Mot. for Summ. J. at 29 (citing AR1_010972–75). In July 2014, MTA responded to a public information request and provided the Town of Chevy Chase with travel

ridership forecast data and three reports relying on the data. That same information was then provided to the plaintiffs as part of the administrative record. AR2_219964–65. MTA, however, did not purchase and provide the Town of Chevy Chase (or plaintiffs) with a copy of Cube, the commercially available software that they used to run their ridership models. Plaintiffs rely on 40 C.F.R. § 1502.21, which states that "material based on proprietary data which is itself not available for review and comment shall not be incorporated by reference [into an EIS]," and argue that defendants are inappropriately withholding relevant data or providing it in an unreadable format. But the regulation is inapposite to the situation here. Defendants did not rely on or withhold any "proprietary data"; they made their ridership data available to the plaintiffs and told them how they could purchase their own license to run the proprietary software. NEPA obligates agencies to make information *reasonably* available to the public; it does not obligate government agencies to purchase and provide commercially available software for private parties.

**B.    With the Exception of WMATA Metrorail's Safety and Ridership Issues, Plaintiffs Have Not Identified Any New Circumstances or Information that Necessitate a Supplemental Environmental Impact Statement.**

Even after the preparation of an FEIS, an agency is obligated to prepare a supplemental EIS (SEIS) if there remains "major Federal action to occur and if the new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 374 (1989). This obligation, of course, is not triggered "every time new

information comes to light," *id.* at 373 (1989), but only when "new information provides a *seriously* different picture of the environmental landscape." *Nat'l Comm. for the New River v. FERC*, 373 F.3d 1323, 1330 (D.C. Cir. 2004).

When reviewing an agency's decision to create or forego an SEIS, the court's review is limited, because the "determination as to whether information is new or significant requires a high level of technical expertise, and courts must defer to the informed discretion of the agency." *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976); *see also Blue Ridge Envtl. Def. League v. NRC*, 716 F.3d 183, 195 (D.C. Cir. 2013). As a result, the court should "carefully review[] the record and satisfy[] [itself] that the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information." *Marsh*, 490 U.S. at 378.

In July and October 2015, plaintiffs provided the agency with information that plaintiffs believed warranted the preparation of SEIS and asked the agencies to prepare an SEIS. I have reviewed the materials that plaintiffs presented, and the agencies' responses to them. With the exception of the new information about WMATA Metrorail's safety and ridership issues, for which I have already ordered the preparation of SEIS, I find that none of the information is so clearly significant that the failure to prepare an SEIS *as to these issues* is arbitrary and capricious.

1. **Governor Hogan's Changes to the Purple Line Project Do Not Require an SEIS.**

In June 2015, Maryland Governor Larry Hogan announced a number of "cost-saving" changes to the Purple Line Project. AR4_007432–50. On July 14, 2015, plaintiffs

submitted a request for an SEIS that argued that six of those proposed changes encompassed "significant new circumstances" warranting an SEIS: (1) the elimination of "Green Track" plantings underneath the Purple Line tracks; (2) a 25% reduction in peak train service when the Project opens; (3) allowing a standard bridge to be built over Rock Creek rather than a parabolic steel box bridge; (4) a decision to make LEED compliance optional for the project's buildings; (5) a decision that shared lanes will not require full width repaving; and a (6) requirement that Montgomery County will play a greater role in providing the alternate interim Capital Crescent Trail. AR4_007411–26. In September 2015, FTA advised plaintiffs that it had reviewed the materials and would not prepare an SEIS. AR4_000001–2.

I have reviewed the six changes, and I find that defendants' conclusion that they do not present significant new circumstances was neither arbitrary nor capricious. The elimination of Green Track and the decision to make LEED compliance optional for the project's buildings are both related to the environmental consequences of the project, but the record shows that neither Green Track nor LEED compliance were required, essential elements of the FEIS. *See, e.g.*, AR1_002120; AR1_001962; AR1_000033–42; AR4_002858. The decision to reduce peak service when the project *initially* opens has no bearing on the peak services frequency discussed in the FEIS, which discussed service in "horizon year" 2040. AR4_002855. Plaintiffs do not point to any clear evidence showing that a standard bridge over Rock Creek, rather than a parabolic steel box bridge, will have significant environmental impacts on the project. Lastly, plaintiffs do not explain how no longer requiring full-width pavement replacement for shared lanes will have any

10

environmental impacts, nor do they articulate any reason why giving Montgomery County more responsibility over the alternate interim trail will have any environmental impact on the project.

### 2. None of the Issues Identified in Plaintiffs' October 9, 2015 Request Mandate an SEIS.

Plaintiffs submitted a renewed request for an SEIS on October 9, 2015. AR5_006469-7821. In January 2016, defendants responded to the October request and explained to the plaintiffs that they were declining to prepare an SEIS. AR5_000001–43. With the exception of the new information detailing WMATA Metrorail's ridership decline and safety issues, the record shows that the agency took a hard look at the information and reasonably concluded that none of the information presented in the letter requires the preparation of an SEIS.

As part of their request, plaintiffs submitted five declarations or memoranda addressing the following issues: (1) Purple Line ridership issues (Allen Memorandum, AR5_006696); (2) the Project's cost estimates and potential increases (Lysy Declaration, AR5_006669); (3) the FEIS's wetlands analysis impact (Collinson Declaration, AR5_000663–68); (4) the project's noise impacts (MacGlashan Declaration, AR5_006678–89); and (5) a catchall, conclusory criticism of the project that predicted project failure (Saggese Declaration; AR5_0006690–95). However, a review of the declarations and the prior administrative record shows that the agencies already considered the issues or criticisms raised in the declarations, and therefore they do not constitute "new information." *See, e.g.*, AR1_001970–77 (assessing ridership issues); AR1_002363–68

(assessing project costs); AR1_002114, AR1_005476 (considering wetlands impact); AR5_0006678-89 (conducting noise analysis).

Plaintiffs also submitted a "Stormwater Runoff and Water Pollution" paper as part of their request, but none of the information in that document constitutes the sort of "new information" that would require FTA to supplement its EIS. AR5_006702–81. For example, plaintiffs argue that recent requests for proposals (RFPs) related to the project reveal that private partners affiliated with the Project will need to obtain permits related to the storage of hazardous materials and will be required to develop "evacuation plans and routes should any of these hazardous materials escape into the environment." Pls.' Mem. in Supp. of Mot. for Summ. J. at 24 [Dkt. # 47-1]. But it is clear from the record that the agencies considered the risk of hazardous materials and the need for mitigation and remediation issues in the original FEIS process. AR1_002126–31, AR1_002166–67. Plaintiffs also raise concerns about the need for local variances related to stormwater storage, but the record shows that the agencies already considered this issue. AR1_002004; AR1_005519; AR1_002166.

## II.    Federal Transit Act, 49 U.S.C. § 5309

Maryland is seeking a significant amount of federal funding for the Purple Line through the "New Starts" component of the FTA's Capital Investment Grant program. AR1_012149–51. Under 42 U.S.C. § 5309, the FTA is statutorily required to rate a proposed project and determine that it meets specific criteria before it can issue any "New Start" funding. Plaintiffs allege that defendants failed to make those required findings in the Purple Line's March 2014 ROD and have therefore violated § 5309.

However, plaintiffs conflate the overlapping but distinct requirements of NEPA and § 5309. Plaintiffs argue that the FTA must make its § 5309 findings "concurrently" with the NEPA analysis and include the § 5309 findings in the Project's ROD, which they characterize as the formal decision as to "whether or not to approve federal grant money before the project." Pls.' Reply in Supp. of Mot. for Summ. J. at 17–18. I disagree. Section 5309 and its implementing regulations both clearly presume that the FTA will have the benefit of all NEPA analysis before making § 5309 findings, which indicates that all NEPA analysis must be completed before, not concurrently with, § 5309 findings. *See* 49 U.S.C. § 5309(d)(2)(A) (stating that a FTA can issue findings allowing a project to advance to engineering phases "at the completion of the process required under the National Environmental Policy Act"); 49 C.F.R. § 611.203(a) ("To perform the statutorily required evaluations and assign ratings for project justification, FTA will evaluated information developed locally through the planning and NEPA processes."). The ROD represents the conclusion of the NEPA analysis process. It is separate from the FTA's decision to grant funds under § 5309, which occurs in a separate full-funding grant agreement ("FFGA") that follows. 49 U.S.C. § 5309(k)(2). Defendants have not executed a Full Funding Grant Agreement for the Purple Line Project.

In sum, plaintiffs allege that the defendants have not made the necessary § 5309 findings, but defendants have not yet executed the FFGA that obligates them to make those findings. Therefore, plaintiffs' claim "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all," and is therefore not ripe for judicial decision. *In re Aiken Cty.*, 645 F.3d 428, 435 (D.C. Cir. 2011).

### III. Section 4(f) of the Department of Transportation Act

Section 4(f) of the Department of Transportation Act prohibits the FTA from approving any "program or project . . . which requires the use of any publicly owned land from a public park" unless there "is no feasible and prudent alternative to the use" and the program "includes all possible planning to minimize harm to such park." 23 U.S.C. § 138(a). In their motion for summary judgment, plaintiffs argue that defendants violated Section 4(f) in three primary ways: (1) by failing to evaluate the project's impacts on Elm Street Park in Bethesda under the "no feasible alternative" standard; (2) by failing to assess the Purple Line's impacts on the Georgetown Interim Branch Trail "and its forested buffer between Bethesda and Lyttonsville"; and (3) by concluding that the Purple Line's use of parks is *de minimis,* even though the defendants recognize that the private partners need to obtain a special use permit from the National Park Service. Pls. Mem. in Supp. of Mot. for Summ. J. at 39–43 [Dkt. # 47-1].[2] All three of plaintiffs' arguments fail. How so?

Elm Street Park is a small, 2.1-acre park in Bethesda, Maryland that qualifies as a Section 4(f) park. AR1_001673. In order to connect the Capital Crescent Trail to the Park as part of the Purple Line Project, MTA will *temporarily* occupy 0.02 acres of the park for construction easements and will "use a portion of an existing path, an undeveloped corner

---

[2] In their summary judgment papers, plaintiffs also point to the FEIS's "Noise Analysis Summary", AR1_003580, and note that "Defendants admit that 13 parks will be affected by Purple Line noise." Mem. in Supp. of Pls.' Mot. for Summ. J. at 43 [Dkt. # 47-1]. However, they do not move beyond this barebones assertion to articulate any clear legal theory as to how the FTA's analysis of noise impacts demonstrates a violation of Section 4(f), and the Court will not conjure up arguments the plaintiffs did not articulate. *Coleman v. Dist. of Columbia,* 794 F.3d 49, 65 (D.C. Cir. 2015) ("It is not enough and should not be enough merely to mention a possible argument in the most skeletal way . . . , and then leave the court . . . to do counsel's work." (internal quotation marks omitted)).

of a playground, and a grassy area adjacent to the path." AR1_001673–75. Plaintiffs argue

that defendants failed to evaluate the impacts on the park under the "no feasible alternative

standard" and thus violated Section 4(f). Pls.' Mem. in Supp, of Summ. J. at 43 [Dkt.

# 47-1]. However, plaintiffs apply the wrong standard. The regulations governing Section

4(f) permit the FTA to conclude that a "temporary occupancy" of park land is "so minimal

as to not constitute a use within the meaning of Section 4(f)," and thus exempt it from the

"no feasible alternative" standard. 23 C.F.R. § 774.13(d). In order for the agency to

conclude that a temporary occupancy is not a use, the following factors must be present:

(1) the "duration must be temporary"; (2) the "scope of the work must be minor"; (3) there

are "no anticipated adverse physical impacts" nor any "interference with the protected

activities, features, or attributes of the property"; (4) the land must be "fully restored" upon

completion; and (5) there must be documented agreement from the officials who control

the resource. *Id.* The FTA considered these factors and concluded (with Montgomery

County's concurrence) that the Purple Line Project only involves a temporary occupancy

of Elm Street Park. AR1_001642, AR1_00177. This conclusion is supported by the

record, and is neither arbitrary nor capricious.

Plaintiffs also argue that the FTA did not properly assess the impacts of the Purple

Line Project on the "[Georgetown Branch Interim] Trail and its forested buffer between

Bethesda and Lyttonsville." Pls.' Mem. in Supp, of Summ. J. at 43 [Dkt. # 47-1]. The

Georgetown Branch Interim Trail is a "temporary recreational trail that currently exists

within the Georgetown Branch right of way." AR1_001664. The right-of-way is a former

branch of the Baltimore & Ohio Railroad that was transferred to Montgomery County.

Defs.' Mem. in Supp. of Cross-Mot. for Summ. J at 40 [Dkt. # 55]. In 1995, the Montgomery County Council adopted a resolution stating that the "section between Bethesda and Silver Spring remains designated as a transportation corridor in which an interim trail is permitted . . . ." AR1_001664. The regulations implementing Section 4(f) clearly state that "when a property is formally reserved for a future transportation facility temporarily functions for park . . . purposes in the interim," then the interim activity does not subject the property to Section 4(f). 23 C.F.R. § 774.11(h). Here, because Montgomery County clearly reserved the right of way for a future transportation project, the FTA properly concluded that it was not subject to Section 4(f).

Lastly, plaintiffs argue that the "need to seek a special use permit from park authorities" undermines FTA's decision that the use of parks is *de minimis*. Pls.' Mem. in Supp, of Summ. J. at 43 [Dkt. # 47-1]. Although plaintiffs do not clearly articulate their argument, defendants surmise that they are referring to the crossing at the Baltimore-Washington Parkway, which will in fact require the National Park Service to issue a special use permit. Defs.' Mem. in Supp. of Cross-Mot. for Summ. J at 40 [Dkt. # 55] (citing AR1_001709–12). To the extent that this is plaintiffs' argument, it fails. Construction of the Purple Line Project will temporarily use less than 4 acres of parkway land, and less than 3 acres of parkway road, and will permanently use 0.61 acres of Parkway property. *Id.* The regulations implementing § 4(f) state that a park property is exempt from the "no feasible alternative" standard whenever the FTA determines that the use of a park will be *de minimis*—i.e., that the "use will not adversely affect the features, attributes, or activities qualifying the property." 23 CFR § 774.3(b); *id.* § 774.17(5). Here, MTA committed to

implement mitigation measures and to exchange land with the National Park Service, and concluded (with the Park Service's agreement), that the Parkway property would not be adversely affected and was therefore *de minimis*. That determination was neither arbitrary nor capricious, and defendants are entitled to summary judgment on plaintiffs' § 4(f) claims.

## IV.    Endangered Species Act

The Endangered Species Act ("ESA") establishes a process for identifying and protecting plant and animal species that are "threatened" or "endangered." 16 U.S.C. §§ 1533–1544. As relevant here, the Secretary of the Interior is responsible for "listing"—i.e., formally identifying—threatened and endangered species, and administers the statute through the U.S. Fish and Wildlife Service ("FWS"). *Id.* § 1533(a)(1); 50 C.F.R. § 402.01(b).

Pursuant to § 7 of the ESA, federal agencies are required to consult with FWS to make sure that any proposed agency action is "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [the species' critical] habitat . . . ." 16 U.S.C. §1536(a)(2). If FWS advises the agency that the proposed action's area includes neither a listed species nor their critical habitat, then there is no need for ESA consultation between FWS and the agency. 50 C.F.R. § 402.12(d)(1); *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 474–75 (D.C. Cir. 2009). However, the agency must consult with FWS—either formally or informally—if it determines that its proposed action "may affect listed species or critical habitat." 50 CFR § 402.14(c). If informal consultation leads the agency to

determine that the action is "not likely to adversely affect the listed species or critical habitat," and FWS concurs with that conclusion in writing, then the consultation process concludes. *Id.* § 402.13(a). If, however, the agency determines that the action is likely to adversely affected a listed species or its critical habitat, then the agency must engage in formal consultation, which requires the agency to prepare a "biological assessment" of the action and requires FWS to issue a "biological opinion" as to whether the action is likely to "jeopardize the continued existence of any listed species or destroy or adversely modify" critical habitat. *Id.* § 402.14(h). In addition, agencies may need to reopen the consultation process when "new information reveals effects of the action that may affect listed species or critical habitat." *Id.* § 402.16(b).

Whereas § 7 of the ESA governs the consultation process for federal agencies undertaking major actions, § 4 of the ESA governs the process for identifying and listing threatened and endangered species. Under § 4, members of the public can petition FWS and request that a species be listed as threatened or endangered. 16 U.S.C. §1533(b)(3)(A). The petition is subject to a review process, and FWS must ultimately decide whether listing the species is "warranted," "not warranted," or "warranted but precluded"—i.e., placing the species on a candidate list but deferring a final listing determination until later. *Id.* § 1533(b)(3)(B)(i–iii); *Nat'l Ass'n of Home Builders v. U.S. Fish and Wildlife Serv.*, 786 F.3d 1050, 1051 (D.C. Cir. 2015). When a species is listed as "warranted but precluded," FWS must "implement a system to monitor effectively the status" of the species and, if necessary, exercise its emergency listing authority "to prevent a significant risk to [the species'] well-being." 16 U.S.C. § 1533(b)(3)(C)(iii).

The Hay's Spring amphipod is a small crustacean that occurs in springs and seeps adjacent to Rock Creek in Washington, D.C. FWS_482. It has been listed as an endangered species since 1982. *Id.* The Kenk's amphipod is another small crustacean that is known to occur in five spring sites in Maryland and the District of Columbia. FWS_483. The Kenk's amphipod is a "warranted but precluded" candidate species for listing. *Id.*

In October 2011, FWS responded to a request from MTA and advised the agency that "no federal proposed or listed endangered or threatened species are known to exist within the [Purple Line Project] impact area," and that no biological assessment or further ESA § 7 consultation was required. FWS_5. In late 2013, after receiving public comments about the Hay's Spring and Kenk's amphipods, FTA and MTA undertook further informal consultation with FWS about the species. FWS_3–6, 66–70. In January 2014, FWS confirmed that neither species is known to be present in the Purple Line Project Area, and that the Purple Line is expected to have no effect on either species. FWS_94–95. Plaintiffs raise several arguments alleging that FTA and FWS violated the ESA (and by extension, the APA) with respect to their treatment of the amphipods, but plaintiffs' misunderstand the agencies' obligations under the statute, and defendants are entitled to summary judgment on their claims.

First plaintiffs argue that FWS violated the ESA by issuing a "no effect" determination for both amphipod species and thereby "failing" to conduct formal consultation for the Hay's Spring amphipod and "a conference" for the Kenk's amphipod. Am. Compl. ¶ 130 [Dkt. # 20]. Plaintiffs also argue that FTA should have completed a biological assessment of the Purple Line's cumulative impacts on the amphipods.

Pls.' Mem. in Supp. of Mot. for Summ. J. at 44–45 [Dkt. # 47-1]. But this puts the cart before the horse. As discussed above, formal consultation and a biological assessment are *only* required once the agency determines that the propose action is likely to adversely affect a listed species or critical habitat. *See* 50 C.F.R. § 402.12(d)(1), § 402.14(b)(1), § 402.14(h). If the agency determines during the course of informal consultation that the project is *not* likely to have an adverse effect, then "no further action is necessary." *Id.* § 402.14(b)(1). That is exactly what happened here. MTA, FTA, and FWS engaged in informal consultation, and concluded that the Purple Line Project would have no effect on either species, because neither species is known to occur in the project area, and their distance and separation from the project area render any adverse effects unlikely. FWS_94–95. Plaintiffs cannot show that this "no effect" determination was arbitrary and capricious, and thus their claim fails.

Second, plaintiffs argue that the agencies should have reinstated consultation after new information called into question the assumptions underlying FWS's earlier "no effect" determination. Specifically, plaintiffs argue that the elimination of "Green Track" under the Purple Line's rails will result in increased stormwater runoff that may harm the amphipods, and argue that their own Stormwater Report and the MTA's Concept Stormwater Management Report also presented relevant new information about the project's stormwater effects that could alter the FWS's prior determination about the amphipods. Pls. Mem. in Supp. of Mot. for Summ. J at 45 [Dkt. # 47-1]. This argument is unavailing. The record shows that the agencies considered the removal of Green Track and the plaintiff's stormwater-related submissions and concluded that they did not present

20

information that changed their earlier conclusion about the Project and the amphipods. AR5_5–6; AR5_12–14; AR5_20–21. Plaintiffs do not offer evidence showing that this determination was arbitrary or capricious, and thus their claim fails.

Lastly, plaintiffs argue that FWS violated the ESA by failing to monitor effectively the status of the Kenk's amphipod. Pls.' Mem. in Supp. of Mot. for Summ. J. at 45 [Dkt. # 47-1]. As mentioned above, the Kenk's amphipod is a "warranted but precluded" candidate species, which obligates FWS to monitor the species' status and, if necessary, make use of its emergency listing power to "prevent a significant risk to [the species'] well-being." 16 U.S.C. § 1533(b)(3)(C)(iii). Contrary to plaintiffs' protestations, however, the record shows that FWS has in fact been monitoring the Kenk's amphipod. FWS has considered more than 52 surveys for the Kenk's amphipod, conducted at 45 sites in Washington and Maryland. FWS_1441, 1452. FWS coordinates with state and local governments, as well as other federal agencies, and solicits information from academics and non-governmental organizations to ensure that it has the "best scientific and commercial data" available regarding the Kenk's amphipod, and the agency's annual published Candidate Notice of Review ("CNOR") affirmatively asks the public to "submit any new information" regarding the species. FWS_965–66, 971; *see also* FWS_1011. The record shows that FWS is in fact monitoring the Kenk's amphipod, and thus its conclusion that emergency listing is not warranted right now, FWS_965-66, is a reasoned decision that is neither arbitrary nor capricious.

As a result, defendants are entitled to summary judgment on Count II of the Amended Complaint.

## V.    Migratory Bird Treaty Act

The Migratory Bird Treaty Act ("MBTA") renders it unlawful to "pursue, hunt, take, capture, [or] kill" any migratory bird "unless and except as permitted by regulations" promulgated by the Department of the Interior. 16 U.S.C. § 703(a). Plaintiffs argue that the Purple Line Project will likely lead to many deaths of migratory birds protected by the MBTA. Am Compl. ¶ 135 [Dkt. # 20]. As a result, plaintiffs allege that the "FTA's authorization for and funding of the Project without obtaining, or ensuring that the project proponent obtains, a permit to 'take' migratory birds" violates the MBTA, and by extension, the APA. *Id.*

Plaintiffs may sue federal agencies like FTA to enforce the MBTA, but they must do so through the APA. *Am. Bird Conservancy v. FCC*, 516 F.3d 1027, 1031 (D.C. Cir. 2008) ("The court has held that the MBTA applies to federal agencies."); *Defenders of Wildlife v. Jackson*, 791 F. Supp. 2d 96, 119 (D.D.C. 2011) ("Individual plaintiffs may enforce the Migratory Bird Act against government agencies, but must do so through the review provision of the APA).

When courts in our Circuit have permitted claims seeking review of agency action that allegedly violates the MBTA, they have done so where the federal program *directly causes* the taking of migratory birds. *See Humane Soc'y v. Glickman*, 217 F.3d 882 (D.C. Cir. 2000) (reviewing Agriculture Department program of capturing and killing Canadian geese); *Ctr. for Biological Diversity v. Pirie*, 191 F. Supp. 2d 161, 165 (D.D.C. 2002) (reviewing military exercises that killed migratory birds), *vacated as moot sub nom. Ctr. for Biological Diversity v. England*, 2003 WL 179848 (D.C. Cir. Jan. 23, 2003). Here,

FTA's role in the Purple Line Project is much more limited—the agency is simply tasked with deciding whether the project qualifies for a funding grant that will cover part of Maryland's construction costs—and there is no allegation that any action by FTA will directly result in the taking of migratory birds. The Court is unaware of any decision in our Circuit holding that the MBTA's take prohibition extends to a federal agency that authorizes third-party activity that may allegedly cause "take." *See, e.g.*, *Pub. Employees for Envtl. Responsibility v. Beaudreau*, 25 F. Supp. 3d 67, 117–18 (D.D.C. 2014) (holding that agency "did not violate the "MBTA" merely by approving a project that, if ultimately constructed, might result in the taking of migratory birds); *see also Friends of the Boundary Mtns. v. Army Corps. of Eng'rs*, 24 F. Supp. 3d 105, 114 (D.Me. 2014) ("The relationship between the [agency's] regulatory permitting authority and any potential harm to migratory birds appears to be too attenuated to support a direct action against the [agency] to enforce the MBTA's prohibition on 'takes.'"). As a result, federal defendants are entitled to summary judgment on Count III of the Amended Complaint.

## CONCLUSION

For all the foregoing reasons, and the reasons set forth in the Court's earlier opinions,[3] plaintiffs' motion for summary judgment is DENIED IN PART and GRANTED in PART, and federal defendants' and defendant-intervenors' cross-motions for summary judgment are GRANTED IN PART and DENIED IN PART.

RICHARD J. LEON
United States District Judge

---

[3] Aug. 3, 2016 Mem. Op. and Order [Dkts. ## 96, 97]; Nov. 22, 2016 Mem. Op. and Order [Dkts. ## 109, 110]; May 22, 2017 Mem. Op. and Order [Dkts. ## 138, 139].