UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRIENDS OF THE CAPITAL CRESCENT TRAIL *et al.*, <br>     Plaintiffs, <br><br> v. <br><br> FEDERAL TRANSIT ADMINISTRATION *et al.*, <br><br>     Federal Defendants. <br><br> v. <br><br> STATE OF MARYLAND, <br><br>     Defendant-Intervenor. | Civil Case No. 14-01471 (RJL) <br><br> **FILED** <br> JUN 2 6 2017 <br> Clerk, U.S. District & Bankruptcy <br> Courts for the District of Columbia |

## MEMORANDUM OPINION
(June 26, 2017) [Dkt. # 145]

Currently before the Court is defendant-intervenor the State of Maryland's Motion for Stay Pending Appeal and Reinstatement of Record of Decision [Dkt. # 145]. In its motion, Maryland asks me to stay my May 30, 2017 final judgment and my August 3, 2016 Order vacating the Record of Decision ("ROD") approving the Purple Line Project, which would permit Maryland to obtain federal funding and begin construction during the pendency of its appeal to our Circuit Court. Upon consideration of the pleadings, the record evidence, and the relevant law, I find that Maryland has shown neither a likelihood of success on the merits nor the sort of irreparable harm that warrants equitable relief, and has

therefore not met the stringent requirements for a stay pending appeal. As such, Maryland's Motion must be DENIED.

## BACKGROUND

Today's decision marks my fifth substantive opinion on this matter in the past eleven months, so a brief summary of the relevant factual and procedural history will suffice. In March 2014, the Federal Transit Administration ("FTA") issued a ROD approving the Purple Line Project, a 16.2-mile light rail project in Montgomery and Prince George's Counties, Maryland. AR1_000001–03. In August 2014, Friends of the Capital Crescent Trail ("FCCT"), John MacKnight Fitzgerald, and Christine Real de Azua (collectively, "plaintiffs") filed suit in this Court, challenging the ROD and related approvals by the U.S. Fish and Wildlife Service ("FWS") under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–706, and five substantive statutes: (1) the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*; (2) the Federal Transit Act, 49 U.S.C. § 5309; (3) Section 4(f) of the Department of Transportation Act, 23 U.S.C. § 138; (4) the Endangered Species Act, 16 U.S.C. §§ 1531–1544; and (5) the Migratory Bird Treaty Act, 16 U.S.C. § 703. *See generally* Am. Compl. [Dkt. # 20]; First Suppl. Compl. [Dkt # 33]; Second Suppl. Compl. [Dkt # 42].[1]

In August 2016, upon consideration of the parties' cross-motions for summary judgment, I granted partial summary judgment to plaintiffs, finding that the FTA violated the APA when it relied on the formal ownership distinction between the Purple Line and

---

[1] Plaintiffs filed suit against FTA, FWS, the Department of Transportation, and the Department of the Interior (collectively, "federal defendants"). Compl. [Dkt. # 1]. The State of Maryland joined as a defendant-intervenor after the filing of the complaint. Minute Order (July 15, 2015).

WMATA Metrorail and therefore refused to consider the effect that Metrorail's recent safety and ridership issues could have on the Purple Line Project. Aug. 3, 2016 Mem. Op. and Order [Dkts. ## 96, 97]. As a result, I vacated the ROD and remanded to the FTA to prepare a supplemental environmental impact statement ("SEIS") addressing these issues as expeditiously as possible. *Id.* In response, federal defendants and Maryland filed motions to alter or amend the judgment, asking met to reinstate the ROD and permit the FTA to reassess whether an SEIS was warranted. Mots. to Alter Judgment [Dkts. ## 98, 99]. In November 2016, I granted in part and denied in part their motions; although I amended my judgment to give the FTA an opportunity to critically evaluate the likely effects of WMATA's ridership and safety issues and determine what level of additional NEPA analysis was required for the Purple Line, I determined that reinstatement of the ROD was unwarranted under the law of this Circuit. Nov. 22, 2016 Mem. Op. and Order [Dkts. ## 109, 110].

On remand, the FTA relied on a previously prepared Maryland Transit Authority ("MTA") technical assessment and concluded that Metrorail's ridership and safety issues did not constitute the type of information that requires an SEIS, and both FTA and Maryland filed renewed motions for summary judgment. Fed. Defs.' Renewed Cross-Mot. for Summ. J. [Dkt. # 115]; Maryland's Renewed Cross-Mot. for Summ. J. [Dkt. # 116]. On May 22, I issued an opinion holding that the FTA had yet again failed to the take the requisite "hard look" that WMATA Metrorail ridership and safety issues could have on the project, and I again ordered Maryland to prepare an SEIS as expeditiously as possible. May 22, 2017 Mem. Op. and Order [Dkts. ## 138, 139]. Soon thereafter, on May 30, I granted

3

summary judgment to defendants on all of plaintiffs' remaining claims and entered final judgment. Final Judgment [Dkt. # 142]. Less than a week later, Maryland filed the instant motion, asking me to stay my final judgment and my order vacating the ROD during its appeal. [Dkt. # 145].

## STANDARD OF REVIEW

A court's decision to stay its final judgment pending appeal is an extraordinary remedy that constitutes an "intrusion into the ordinary process of. . . judicial review." *Nken v. Holder*, 556 U.S. 418, 428 (2009); *see also Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985). As a result, the decision to grant a stay is entrusted to the Court's discretion, *Nken*, 556 U.S. at 443–44, and the party seeking a stay bears the burden of "justify[ing] the exercise of such an extraordinary remedy." *Cuomo*, 772 F.2d at 978.

When considering whether to stay an order or judgment pending appeal, courts consider the following four factors: (1) whether the applicant has made a "strong showing that [it] is likely to succeed on the merits" of its appeal; (2) whether the applicant will be irreparably harmed without the requested stay; (3) whether the stay "will substantially injure other parties interested in the proceeding"; and (4) "where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 425–26 (2009); *see also Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985); *Washington Metro. Area Transit Comm'n. v. Holiday Tours*, 559 F.2d 841, 842–43 (D.C. Cir. 1977). When considering these factors, the first two—likelihood of success on the merits and irreparable harm—are the most critical. *Nken*, 556 U.S. at 434.

4

## ANALYSIS

### I. Maryland Has Not Established a Likelihood of Success on the Merits.

When determining whether to grant a stay pending appeal, the Court first considers whether the movant has shown that it is "likely to succeed on the merits" of its appeal. *Nken*, 556 U.S. at 425–26.[2]

On remand, the FTA considered whether WMATA's ridership and safety issues required the preparation of an SEIS, and concluded that they did not. In reaching that conclusion, FTA relied on a technical assessment that Maryland Transit Authority had previously prepared in consultation with FTA experts. *See* AR6_00552-55 (MTA Technical Assessment); AR6_000916–23 (FTA Memorandum). The technical assessment discussed five divergent WMATA ridership scenarios, ranging from a rapid return to ridership growth to an "extreme" situation where no riders at all transfer from WMATA to the Purple Line. AR6_000533–67. Although the assessment stated that population and employment growth make it reasonable to believe ridership will return to a growth trend,

---

[2] The parties disagree about the specific contours of this inquiry. Maryland argues that it must simply establish that a "serious legal question is presented by the agency action, not that success on the merits is a mathematical probability," while plaintiffs argue that Maryland must show that there is actually a likelihood of success on the merits. Maryland's Mem. in Supp. of Mot. at 4 [Dkt. # 145-1]; Pls.' Opp'n at 7 n. 5 [Dkt. # 147]. Maryland is correct that our Circuit has held that a Court need not "find that ultimate success by the movant is a mathematical probability, and . . . may grant a stay even though its own approach may be contrary to the movant's view of the merits," in a case in "which the other three factors strongly favor interim relief." *Washington Metro. Area Transit Comm'n. v. Holiday Tours*, 559 F.2d 841, 843 (D.C. Cir. 1977). Plaintiffs point out, however, that this sliding scale approach, in which the strength of one factor for equitable relief can compensate for a relatively weak showing in another, has been called into question by our Circuit. *See Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1969 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (stating that "the old sliding-scale approach to preliminary injunctions . . . is no longer controlling, or even viable" in light of the Supreme Court's decision in *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008)). This dispute does not need to be resolved today, because I find that Maryland fails to make a strong showing of likelihood of success under either standard.

5

AR6_000552, and asserted that the fifth "extreme" scenario was "highly unlikely", AR6_000922, the assessment did not critically assess which scenario was actually most likely to occur. Instead, FTA concluded that under any of the five scenarios, the Purple Line would have the same environmental impact and would have sufficient ridership numbers to meet its identified purpose and need, and thus concluded there was no need for an SEIS. In deciding not to prepare an SEIS, the FTA concluded that the Purple Line would meet its purpose and need no matter what happens to Metrorail, even though one of the stated purposes was to "provide better connections to Metrorail services." AR1_000003.

During the remand process, plaintiffs submitted a series of letters and materials to the FTA for its consideration while conducting its supplemental analysis. Within those materials, plaintiffs included declarations from, former railroad executive Dr. Martin Saggese, economist Dr. Frank Lysy, and transportation planner William G. Allen. AR6_000298–307; AR6_000308–23; AR6_000324–43. The declarations raised serious questions about the impact that WMATA's ridership trends could have on the Purple Line and issues that were closely related to FTA's decision not to prepare an SEIS. As an example, Mr. Lysy's declaration included information that called into question MTA's conclusion that service improvements and a population growth render it reasonable to assume that Metrorail will return to ridership growth. AR6_000308–10.

FTA included plaintiffs' submissions in the administrative record and the FTA's final memorandum claimed that it had "considered and reviewed" plaintiffs' submissions, even though the record of the agency's decision includes *no* discussion or analysis of the

6

declarations. AR6_000916. In my May 22 opinion granting partial summary judgment to plaintiffs, I found that this failure to respond to or assess those declarations was analogous to the facts presented in our Circuit's recent decision in *Public Employees for Environmental Responsibility v. Hopper*, 827 F.3d 1077 (D.C. Cir. 2016). In that case, plaintiffs challenged FWS's decision to issue an incidental take statement under the Endangered Species Act. Agreeing with plaintiffs, the district court vacated the take statement and remanded to the agency to conduct an independent assessment of the proposed mitigation measures. *Id.* at 1089. On remand, plaintiffs submitted data to the FWS in support of a particular mitigation measure, but the FWS ignored those submissions. On appeal, our Circuit Court concluded that the agency's failure to consider the submissions it received on remand was arbitrary and capricious. *Id.* at 1090. By similarly failing to grapple with plaintiffs' declarations here, I found that the FTA failed to take a *hard look* at information in the administrative record that could inform the agency about the effect that Metrorail's ridership and safety issues could have on the Purple Line Project, and ordered the agency to prepare an SEIS. May 22, 2017 Mem. Op. at 10–11 [Dkt. # 138].

Maryland argues that my decision was in error for two alternative (and contradictory) reasons—because the agency actually considered the declarations, or because the agency never "reopened" the record (and were thus not required to consider the declarations). Maryland's Mem. in Supp. of Mot. for Stay at 13–14. Neither argument is persuasive. Put simply, in the absence of any real analysis of the plaintiffs' expert declarations, FTA's bare assertion that it "considered and reviewed" plaintiffs'

7

submissions here is wholly insufficient. Furthermore, the fact that FTA affirmatively included the plaintiffs' declarations in the administrative record it presented to the Court nullifies any claim that it did not "reopen the record" and thus was not obligated to consider the information that plaintiffs submitted. As part of the administrative record, the Government was obligated, at a minimum, to give them reasoned consideration, which it did not.

Furthermore, Maryland argues that I abused my discretion when I declined in my May 22 Memorandum Opinion to explicitly readdress—for a third time—their request to reinstate the ROD. This argument, at best, is not persuasive. In this Circuit, the standard violation for a NEPA violation is vacatur. *Pub. Employees for Envtl. Resp. v. U.S. Fish & Wildlife Serv.*, 189 F. Supp. 3d 1, 2 (D.D.C. 2016); Mem. Op., *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. 16-cv-1534, at 66 (D.D.C. June 14, 2017) [Dkt. # 239]. However, courts have discretion to depart from the presumptive remedy and remand to the agency without vacating. When deciding whether to remand without vacatur, courts consider "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993).

In both my August 3rd and November 22nd opinions, I explicitly applied the *Allied-Signal* factors and explained why it was inappropriate to remand without vacatur, despite the disruption that would result from vacatur and a temporary delay in the construction of the Purple Line, when the agency still needed to conduct critical analysis required by

8

NEPA. *See* Aug. 3, 2016 Mem. Op. at 8–9 [Dkt. # 96]; Nov. 22, 2016 Mem. Op. at 8–11 [Dkt. # 109]. In my May 22 opinion, I determined that an SEIS was still required, and thus that the agency had not completed all of the necessary analysis that NEPA requires. Because I had already explained why vacatur was warranted under these circumstances in two separate opinions, I did not repeat myself for a third time. Maryland cites *no* legal authority explaining why it was an abuse of discretion to forego repeating myself in my May 22 Opinion. It argues that there was a change of circumstances since my earlier decisions that required a written reassessment of my vacatur decision—namely, that the delay caused by vacatur resulted in high financial costs to the state and an increased risk to the project's viability. Mem. in Supp. of Mot. for Stay Dkt. at 11 [Dkt. # 145-1] (citing Second Decl. of Charles Lattuca [Dkt. # 116-2]). Although those concerns are significant, they are not new, and were before me when I previously addressed vacatur. *See, e.g.*, Mem. in Supp. of Maryland's Motion to Alter or Amend the Judgment at 11–16 [Dkt. # 98-1] (arguing that vacatur would lead to increased financial risks and heightened risk to the project (citing First Decl. of Charles Lattuca [Dkt. # 98-3])).

## II. Maryland Has Not Demonstrated the Kind of Possible Irreparable Harm that Warrants a Stay.

The second factor the Court must considering in determining whether to grant a stay of the final judgment is whether the applicant will be irreparably harmed by the stay. Upon review of Maryland's motion and its attached evidence, I find that the State has not established that it is likely to suffer the type of harm that warrants an extraordinary exercise of the court's equitable powers.

9

In its motion, Maryland argues that the lack of a valid ROD has prevented the State from executing a Full Funding Grant Agreement with the FTA and receiving anticipated federal funds, costing it approximately $13 million in its own funds for every month of delay. Mem. in Supp. of Mot. for Stay at 12 [Dkt. # 145-1] (citing Decl. of Pete Rahn ¶¶ 66–71 [Dkt. # 145-2]). Although this amount is significant, it is axiomatic that economic losses alone do not warrant emergency equitable relief. *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). The inquiry does not end here, though, because Maryland argues that the delay—and the resulting costs expended by the state without federal funding—increase the risk that the State will have to cancel the project altogether. Mem. in Supp. of Mot. for Stay at 12 [Dkt. # 145-1].

On April 7, 2016, the State entered into a contract with the Purple Line Transit Partners LLC ("PLTP"), a private sector entity tasked with financing, building, and operating the Purple Line for a 30-year term. Decl. of Pete Rahn, ¶¶ 29, 36, 38 [Dkt. # 145-2]. Since June 2016, PLTP has been performing preliminary non-construction work at the State's instruction. *Id.* ¶¶ 44–45. Under the contract, PLTP is entitled to additional compensation, and can eventually terminate the contract, if there is an extended delay in Purple Line construction. *Id.* ¶¶ 67–68, 72, 78. Because of these contract terms and the state's increased expenditures without federal funding, Maryland argues that the project faces a heightened risk of cancellation. Mem. in Supp. of Mot. for Stay at 12 [Dkt. # 145-1]; Rahn Decl. ¶¶ 64–65, 72–73.

However, Maryland entered into its contract with PLTP in April 2016, a little less than two years *after* this suit was filed and almost two months *after* plaintiffs filed their

10

motion for summary judgment. As a result, Maryland was explicitly on notice that plaintiffs were asking me to vacate the ROD, and could have structured its public-private arrangements to better protect its financial interests in the event of that possibility. Furthermore, the State chose to expend funds on pre-construction activities during this period and continued to do so after I vacated the ROD in August 2016. A stay pending appeal is not intended to inoculate a party against the risks of litigation, nor is it the Court's role to grant emergency relief to protect a party from the consequences of its own fully-informed decisions. *Cf. Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 977 (D.C. Cir. 1985) (holding that company's decision to hire employees and purchase materials without assurance that the project would go forward, and the resulting economic harm to the company if the activity was stayed, were "self-imposed costs [that] are not properly the subject of inquiry on a motion for stay"); *Lee v. Christian Coal. of Am., Inc.*, 160 F. Supp. 2d 14, 33 (D.D.C. 2001). As a result, Maryland has not shown the sort of irreparable harm necessary to merit the granting of a stay pending appeal.

### III. The Balance of the Harms and the Public Interest

Lastly, the Court must consider the balance of the harms and whether the granting of a stay is in the public interest. For both factors, Maryland makes essentially the same argument—that the public stands to gain helpful transportation benefits, economic development, and increased jobs in the region as a result of the project, and that a stay pending appeal will permit Maryland to obtain federal funding and proceed with construction of the Purple Line project. But these are arguments about the merits of the project itself, and thus miss the mark. The question for granting a stay is not whether the

underlying project is, in the final analysis, in the public interest. Instead, the issue is whether a <u>stay pending appeal</u> is in the public interest and whether the State should obtain federal funding that is essentially non-refundable to go forward with irreversible project construction now, while critical NEPA analysis remains incomplete. They have not made that showing here !

## CONCLUSION

For all the foregoing reasons, Maryland's Motion for a Stay Pending Appeal and Reinstatement of Record of Decision is DENIED. An Order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge